IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

            Plaintiff,

vs.                                                                                    No. CR 22-1010 JB

JAMES ANTHONY SANDOVAL,

            Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Objections to Presentence Investigation Report, filed March 7, 2023 (Doc. 99)("Objections"). The Court held a sentencing hearing on March 16, 2023. <u>See</u> Clerk's Minutes at 1, filed March 16, 2023 (Doc. 115). The primary issues are: (i) whether the $182,735.10 total loss calculation in the Presentence Investigation Report, filed February 21, 2023 (Doc. 97)("PSR"), is correct; (ii) whether, on the basis of the total loss calculation, Sandoval's base offense level of 6 is subject to a 10-level increase under U.S.S.G. § 2B1.1(b)(1)(F); and (iii) whether the $182,735.10 restitution calculation in the PSR is correct.[1] The Court concludes: (i) the PSR's $182,735.10 total loss calculation is correct, because (a) Sandoval's non-charged receipt of benefits to which he was not entitled is relevant

---

[1] In addition to the arguments that this Memorandum Opinion and Order addresses, Sandoval raises a factual Objection, specifically, that PSR ¶ 71, at 15, which discusses Sandoval's physical condition, provides insufficient detail regarding the seriousness of Sandoval's health problems. <u>See</u> Objections at 7-8. Sandoval "requests that this medical history -- and the uncontested gravity of his current health conditions -- be incorporated into the PSR." Objections at 8. In response, the United States requests an addition to PSR ¶ 71, at 15, regarding Sandoval's continued self-employment in spite of his health problems. <u>See</u> Response at 10. The Court will work with the parties and the USPO at an upcoming hearing to resolve factual objections to PSR ¶ 71, at 15.

conduct under U.S.S.G. § 1B1.3(a)(2), and (b) Sandoval's non-charged receipt of benefits to which he was not entitled was part of an ongoing scheme and constitutes a criminal offense; (ii) because the PSR's $182,735.10 total loss calculation is correct, Sandoval's base offense level of 6 is subject to a 10-level increase under U.S.S.G. § 2B1.1(b)(1)(F), making his total offense level 16; and (iii) the PSR's restitution calculation should be $55,261.20, and not $182,735.10, because the United States does not meet its burden in establishing the SSA's entitlement to restitution for losses other than those resulting from Sandoval's charged receipt of benefits to which he was not entitled between June, 2017, through February, 2020. Accordingly, the Court sustains in part and overrules in part the Objections. With an offense level of 16 and a criminal history category of I, Sandoval's imprisonment range is 21-27 months, and restitution to the SSA in the amount of $55,261.20 is appropriate.

## PROCEDURAL BACKGROUND

On June 15, 2022, a grand jury indicted Sandoval on: (i) forty-nine counts of Theft of Government Property under 18 U.S.C. § 641; (ii) one count of Making False Statements under 18 U.S.C. § 1001(a)(2); and (iii) one count of False Statement in a Social Security Form under 42 U.S.C. § 408(a)(3). See Indictment at 1-4, filed June 15, 2022 (Doc. 2). On November 23, 2022, the United States filed a nearly identical Superseding Indictment charging Sandoval under the same 51 counts as the original Indictment, but changing a single date referenced in Count 51. See Superseding Indictment at 1-4, filed November 23, 2022 (Doc. 28). Regarding Counts 1 through 49, the Superseding Indictment alleges that Sandoval "willfully and knowingly stole, purloined and converted to his own use and gain . . . Social Security Disability Insurance Benefits payments to which he was not entitled, . . . in the total approximate amount of $83,136.20," through is receipt of forty-nine separate payments. Indictment at 1. Regarding Count 50, the Indictment alleges that

Sandoval

> knowingly and willfully made false, fictitious and fraudulent statements and representations, knowing such statements and representations to be false, fictitious and fraudulent, namely the defendant falsely stated that he was not able to work and had not received any income other than his Social Security Disability Benefits, when in truth and fact the defendant knew that he had been working at and receiving income from Traditions Past and Present, a jewelry business.

Indictment at 4.  Regarding Count 51, the Indictment alleges that Sandoval

> knowingly and willfully made materially false statements and representations in a Work Activity Report - Employee form used by the Social Security Administration to determine continued rights to Disability Insurance Benefits payments, namely the defendant falsely stated that he was not able to work and had not received any income other than his Social Security Disability Insurance Benefits, when in truth and fact the defendant knew that he had been working at and receiving income from Traditions Past and Present, a jewelry business.

Indictment at 4.

Sandoval's trial took place from December 13, 2022, to December 16, 2022.  See Clerk's Minutes at 1, filed December 13, 2022 (Doc. 95).  At the start of trial, the United States moved to dismiss Counts 34-49 of the Superseding Indictment without prejudice.  See Motion to Dismiss Counts 34-49 of the Superseding Indictment, filed December 13, 2022 (Doc. 68)("Motion to Dismiss Counts").  The Court granted the Motion to Dismiss Counts.[2]  See Amended Order to Dismiss Counts 34-49 of the Superseding Indictment, filed December 21, 2022 (Doc. 87).

The jury convicted Sandoval of all thirty-five counts on which the United States proceeded, including (i) thirty-three counts of Theft of Government Property under 18 U.S.C. § 641, corresponding to payments Sandoval received from June, 2017, through February, 2020; (ii) one count of Making False Statements under 18 U.S.C. § 1001(a)(2); and (iii) one count of False

---

[2]As reflected on the Verdict Form, filed December 16, 2022 (Doc. 84)("Verdict"), after the dismissal of counts 34-49, the Superseding Indictment's Counts 50 and 51 are listed as Count 34 and 35.  See Verdict at 7.

Statement in a Social Security Form under 42 U.S.C. § 408(a)(3).  See Verdict at 1-7.

On February 21, 2023, the United States Probation Office ("USPO") filed the PSR.  See PSR at 1-21.  The PSR states the crimes of which Sandoval is convicted and outlines the facts of Sandoval's offense.  See PSR ¶¶ 1-35, at 4-9.  Regarding the benefits payments Sandoval received illegally, the PSR states:

> According to investigative reports, a Certified Extract of Sandoval's overpayment, which comprises the total overpayment to all subjects who SSA issued payments based on Sandoval's eligibility, shows that payments to Sandoval's two children were made to the children's legal custodian, Roseanne Gonzales.  According to the SSA record, Sandoval received a total of $125,357.10 in disability benefits, Child 1 received a total of $42,744.00 in SSA payments and Child 2 received a total of $14,634.00 in SSA payments.  Thus, the total amount Sandoval fraudulently received in SSA benefits is $182,735.10.

PSR ¶ 34, at 9.  Summarizing the facts of Sandoval's case, the PSR states: "In summary, the defendant fraudulently received Social Security benefits by falsely claiming no income or employment.  The defendant completed and signed multiple Social Security forms claiming such, under penalty of perjury.  The total loss to the Social Security Administration is $182,735.10."  PSR ¶ 35, at 9.  The PSR notes that Sandoval did not provide his own version of the offense to the USPO.  See PSR ¶ 36, at 9.  The PSR states that the Mandatory Victim Restitution Act of 1996 applies to Sandoval's offense and that, because the SSA's total loss resulting from Sandoval's crime is $182,735.10, Sandoval owes that amount in restitution to the SSA, see PSR ¶¶ 37-38, at 9-10.

The PSR next calculates Sandoval's offense level.  See PSR ¶¶ 40-51, at 10.  The PSR notes that Sandoval has not accepted responsibility for his crime.  See PSR ¶ 39, at 10.  The PSR applies a base offense level of 6 pursuant to U.S.S.G. § 2B1.1(a)(2), the relevant Guideline provision for a violation of 18 U.S.C. § 641.  See PSR ¶ 42, at 10.  A 10-level increase is applied to the base offense level of 6 pursuant to U.S.S.G. 2B1.1(b)(1)(F), because the SSA's total loss exceeds

$150,000.00, see PSR ¶ 43, at 10, thereby making Sandoval's total offense level 16. See PSR ¶ 50, at 10.

Next, the PSR outlines Sandoval's criminal history. See PSR ¶¶ 52-63, at 11-13. While Sandoval has a criminal history, see PSR ¶¶ 52-56, at 11-12, Sandoval's interactions with the criminal justice system are not of the kind that would increase his criminal history score, see PSR ¶¶ 57, at 12. Accordingly, Sandoval's criminal history score is 0, which establishes a criminal history category of I. See PSR ¶¶ 57-58, at 12-13.

The PSR next discusses Sandoval's offender characteristics. See PSR ¶¶ 64-81, at 14-17. In addition to discussing Sandoval's personal and family information, see PSR ¶¶ 64-68, at 14, and marital information, see PSR ¶¶ 69-70, at 14-15, the PSR discusses Sandoval's physical condition, stating the following:

> The defendant stands 5'5", weighs 128 pounds, has brown eyes, and brown hair. The defendant has significant medical issues including chronic obstructive pulmonary disease (COPD), heart disease, hypertension, and osteoporosis, and takes approximately 20 different medications. The defendant reports he is in need of a bilateral lung transplant. He also uses oxygen daily. The defendant has dealt with these issues for about 15 years. Prior to this case, the defendant was in the process of getting a lung transplant. The defendant stated since being charged with the current federal offenses, he lost his Social Security benefits, including his Medicare coverage. He reported he has no health insurance; therefore, he has been unable to see any of the specialized doctors in Denver, Colorado, that were treating him, and has been unable to proceed with the process of getting a lung transplant. The defendant was receiving treatment at the National Jewish Health hospital in Denver. The defendant clarified he has a primary care physician, Dr. Rebecca Bourbon, who he sees. Defense counsel has indicated the defendant's medical records are extensive and consist of thousands of pages. Medical records have been requested but have not yet been received. Should records and additional information be received prior to sentencing, the information will be provided to the Court and the parties via an addendum.

PSR ¶ 71, at 15. The PSR proceeds through Sandoval's mental and emotional health, substance abuse history, and educational, vocational, and special skills. See PSR ¶¶ 72-75, at 15-16. As to

Sandoval's employment record, the PSR states: "The defendant advised he still owns Traditions Past and Present; however, defense counsel requested that no questions be asked regarding that company as it is related to the instant offense.  The defendant reported no other employment history in the past ten years."  PSR ¶ 76, at 16.  The PSR proceeds through a discussion of Sandoval's financial background.  See PSR ¶¶ 78-81, at 16-17.  At the conclusion of the financial background section, the PSR states:

> [T]he defendant previously reported a positive monthly cash flow, available assets and has the ability to pay a fine in this matter; however, a fine is not recommended, as the defendant will be required to pay restitution in the amount of $182,735.10. It should be noted, the defendant has retained counsel in this matter.

PSR ¶ 81, at 17.

The PSR proceeds to the details regarding Sandoval's sentence.  See PSR ¶¶ 82-99, at 17-19.  Applying a total offense level of 16 and criminal history category of I, Sandoval's Guideline imprisonment range is 21 to 27 months.  See PSR ¶ 83, at 17.  As to the Guideline provisions for supervised release, the PSR states:

> Counts 1-33: Since each count is a Class C Felony, the guideline range for a term of supervised release is 1 year to 3 years per count.  USSG §5D1.2(a)(2).  Count 50: Since the offense is a Class D Felony, the guideline range for a term of supervised release is 1 year to 3 years.  USSG §5D1.2(a)(2).  Count 51: Since the offense is a Class D Felony, the guideline range for a term of supervised release is 1 year to 3 years.  USSG §5D1.2(a)(2).

PSR ¶ 87, at 18.  The PSR specifies that the multiple terms of supervised release are to run concurrently pursuant to 18 U.S.C. § 3624(e).  See PSR ¶ 86, at 18.  As to probation, the PSR states that, "[s]ince the applicable guideline range is in Zone D of the Sentencing Table, the defendant is ineligible for probation," pursuant to U.S.S.G. § 5B1.1, cmt. n.2.  PSR ¶ 90, at 18.  Turning to fines, the PSR states that "[t]he fine range for this offense is from $10,000 to $95,000," pursuant to U.S.S.G. § 5E1.2(c)(3).  PSR ¶ 94, at 18.  The PSR notes additionally that the costs of

prosecution shall be imposed on Sandoval pursuant to U.S.S.G. § 5E1.5.  See PSR ¶ 95, at 19.  The

PSR states that, pursuant to 18 U.S.C. § 3663A and U.S.S.G. § 5E1.1, Sandoval owes $182,735.10

to the SSA in restitution.  See PSR ¶¶ 96-97, at 19.

The PSR does not identify any factors warranting a departure from the Guideline range.

See PSR ¶ 100, at 19.  After assessing the factors that may warrant a sentence outside of the

advisory guideline system, however, the PSR states that, "based on the above factors, and in

consideration of 18 U.S.C. § 3553(a)(1)-(7), a downward variance outside the advisory guideline

range, to a sentence of probation, may be warranted in this case."  PSR ¶ 102, at 20.

After trial, on March 7, 2023, Sandoval filed the Objections.  The Objections contend that

the PSR provides (i) the wrong offense level for Defendant James Anthony Sandoval's crime,

because it provides inappropriate figures for total loss; (ii) the wrong amount in restitution under

the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"); and (iii) insufficient

information about Sandoval's health condition's gravity.  See Objections at 1-8.  First, Sandoval

takes issue with PSR ¶ 34, at 9, specifically, its calculation of the SSA's total loss figure.  See

Objections at 1.  Sandoval objects to the "total overpayment" figure, i.e., the total loss to the SSA,

which results from adding (i) all Social Security Disability Insurance payments Sandoval received

from March, 2015, to June, 2021 ($114,662.40); (ii) Medicare benefits Sandoval received through

2022 ($10,694.70); and (iii) "payments alleged to have been improperly received by Mr. Sandoval's

ex-wife, Roseann Gonzalez, on behalf of his children."  Objections at 1.  Sandoval contends that

his "conduct resulted in overpayment of $50,377.40 in disability payments, plus $4,883.80 in

Medicare benefits, at most."  Objections at 2.  Sandoval argues:

> To more than triple that amount -- thereby increasing the offense level from 12 to
> 16, . . . based on some other conduct of which Mr. Sandoval was not convicted, "the
> Government must prove by a preponderance of the evidence that the defendant (1)

engaged in conduct (2) related to the offense of conviction pursuant to U.S.S.G. § 1B1.3 and (3) constituting a criminal offense under either a federal or state statute."

Objections at 2 (quoting United States v. Griffith, 584 F.3d 1004, 1013 (10th Cir. 2009), and citing U.S.S.G. §§ 1B1.3(a)(2), 1B1.3 cmt. n.5(B)). Sandoval contends that "[i]t is thus not sufficient to show that Mr. Sandoval (much less any other individual) received a payment; the Government must prove that it was *criminal* for that payment to have been received." Objections at 2 (emphasis in original).

Sandoval contends that the United States did not prove at trial a total loss of $185,735.10. See Objections at 1-5. His contentions are that: (i) the United States did not prove that Sandoval's receipt of Medicare payments constituted a criminal offense; (ii) the United States "did not prove criminal conduct prior to June 2017 and, far from proving relevant losses though May 2021, . . . dismissed 15 counts with prejudice on the first day of trial because it could not prove any theft had occurred after February 2020"; and (iii) the United States did not prove "that Roseann Gonzales received benefits for her children in violation of a criminal statute." Objections at 2-3. Further, Sandoval contends that the United States has not addressed whether "'credits against loss' or other reductions could be available based on the conduct of Ms. Gonzales or her children." Objections at 3 (citing U.S.S.G. § 2B1.1 cmt. n.3(E)). Accordingly, Sandoval contends that the proper calculation of total loss is $50,377.40, inclusive only of the Social Security Disability Insurance payments that Sandoval received from June, 2017, to February, 2020. See Objections at 3.

Next, Sandoval objects to the offense level computation in ¶ 43 of the PSR. See Objections at 3. He expresses agreement with the PSR's base offense level calculation of 6, but objects to the level increases the PSR applies. See Objections at 3. Sandoval contends that, "[p]er 20 C.F.R. §

404.1592(d)(1), Mr. Sandoval was entitled to a 'trial work period' of nine months -- which could occur non-consecutively at any point across five years, depending on his actual work levels -- by law, entirely irrespective of any misstatements he made about his work activity."  Objections at 4.

Sandoval states:

> After those nine months, he was entitled to be paid benefits every month until the first month in which he performed "substantial gainful activity"; then he was entitled to payment for that month *and* "the two succeeding months, whether or not [he did] substantial gainful activity during those succeeding months."  20 C.F.R. § 404.316(d).  Following this period of *at least* a year during which Mr. Sandoval was entitled to full and complete benefits, he was entitled to a period of three years -- the minimum set by law -- during which he must continue to receive full benefits in any month during which he did not have "substantial gainful activity" (as measured by his total income).  *See* 20 C.F.R. § 404.1592a(b)(2)(ii), § 404.1592a(c).  Even if Mr. Sandoval's disability benefits terminated after this extended three-year period based on his work activity, he is entitled to a resumption of payments as soon as he stops working because of his health conditions.  *See* 20 C.F.R. § 404.1592a(a) . . . .  All these entitlements further reduce the total loss amount under USSG § 2B1.1 cmt. n.3(F)(ii), but none are properly reflected in the PSR.

Objections at 4-5 (emphasis and alteration in original).  Further, Sandoval contends that the PSR includes in its total loss calculation the "nearly $60,000 allegedly paid to Roseann Gonzales without explanation," and that the United States

> has not offered evidence to support including that number here, nor has it made any showing of any kind related to Ms. Gonzales's alleged receipt to which she was not entitled -- including whether the children were unintended recipients, or whether there is a basis for reducing the loss for Guidelines purposes.

Objections at 5.  Sandoval summarizes his objections to the total loss calculation:

> In sum, Mr. Sandoval objects to the total overpayment asserted in Paragraphs 34 and 43 of the PSR as not supported by evidence and not in keeping with the legal requirements for calculating loss.  The proper loss amount here is $50,377.40 or less, for an increase of 6 levels rather than the 10 proposed in the PSR . . . .  The total offense level should therefore be 12 and not 16.

Objections at 5.

Next, Sandoval objects to the PSR's restitution figure. <u>See</u> Objections at 5-7. Sandoval emphasizes that restitution is calculated differently from total loss, because, while the total loss figure can encompass losses from a defendant's "relevant conduct," restitution is only available for losses resulting from the convicted offense. Objections at 5. Sandoval argues that the SSA is not entitled to restitution of funds paid out beyond a five-year statute of limitations, because Sandoval's crimes, which include his receipt of individual, monthly checks, are not considered continuing offenses for purposes of the Guidelines. <u>See</u> Objections at 6. Sandoval maintains that "[t]hese discrete convictions foreclose an order of restitution deriving the unchargeable time-barred conduct." Objections at 6. Similar to his arguments on the total loss calculation, Sandoval contends that the PSR's restitution calculation of $182,735.10 "includes *years* of uncharged conduct for which restitution is barred by the statute of limitations," and that, "even with respect to the more recent conduct, the PSR fails to provide any evidence supporting such an immense expansion of restitution from the actual conviction, and . . . the Government has failed to provide any financial records or other evidence sufficient to support it." Objections at 7. Similarly, Sandoval states that the United States did not present evidence "to support the conclusion that all the payments allegedly made to Roseann Gonzales must now be repaid by Mr. Sandoval, or that Mr. Sandoval was never at any time between 2015 and 2021 entitled to any of the manifold protections that people with similar 'disabling impairments' routinely receive under federal law." Objections at 7.

Finally, Sandoval argues that the PSR does not take into account properly his medical records outlining his health problems. <u>See</u> Objections at 7-8. Sandoval emphasizes the severity of his health issues. <u>See</u> Objections at 7-8. Accordingly, he "requests that this medical history -- the uncontested gravity of his current health conditions -- be imposed into the PSR." Objections

at 8.

The United States opposes Sandoval's Objections.    See United States Response to Defendant's Objections to Presentence Investigation Report, filed March 14, 2023 (Doc. 103)("Response").  First, the United States responds to Sandoval's arguments regarding the total loss calculation, maintaining that the figure properly encompasses the full range of benefits Sandoval received from March, 2015, to June, 2021, including his Medicare benefits, as well as the benefits paid to Sandoval's children, because they constitute "relevant conduct of the Defendant's fraudulent conduct."  Response at 1.  The United States emphasizes that it does not need to prove relevant conduct beyond a reasonable doubt.  See Response at 2.  The United States discusses the Guidelines' treatment of relevant conduct as well as United States Court of Appeals for the Tenth Circuit case law interpreting the Guidelines.  See Response at 2-3.  Following its analysis of the Guidelines and case law, the United States contends that the SSA payments to Sandoval's children are relevant conduct, because Sandoval's "offenses involved the same victim, the SSA; it involved the same purpose, to defraud the government; and a similar *modus operandi*, making false statement to the SSA so that he can continue receiving SSA disability benefits."  Response at 4.  The United States emphasizes that "the Defendant's false statements to the SSA caused the SSA to issue SSA disability benefits to the Defendant, including Medicare benefits and SSA payments to his children.  Thus, the Defendant's conduct is sufficiently connected or related to each other."  Response at 4.  The United States summarizes trial testimony that it contends proves that Sandoval's 36-month extended period of eligibility ended in November, 2017, and that, during that period, he engaged in substantial gainful activity.  See Response at 4.  The United States contends that, "[a]fter the nine-month trial work period and a two-month grace period, the Defendant was not entitled to receive benefits beginning in March 2015."  Response at 4.  The

United States emphasizes that the SSA payments to Sandoval's children and the Medicare payments to Sandoval occurred as a result of Sandoval's false statements to the SSA and constitute relevant conduct for purposes of the total loss calculation.  See Response at 4-5.

Next, the United States addresses Sandoval's arguments regarding the calculation of the total offense level.  See Response at 6-8.  Specifically, the United States contends that a 10-level increase is warranted, because the SSA's total loss amount exceeds $150,000.00 on the basis of both charged and non-charged relevant conduct.  See Response at 6.  The United States maintains that the total loss amount properly includes the SSA and Medicare payments which Sandoval received after March, 2015, when his eligibility ceased, as well the payments made for his children's benefit during that period.  See Response at 7.  The United States then summarizes the evidence supporting the $182,735.10 total loss amount, including the testimony of SSA personnel. See Response at 7-8.

Next, the United States addresses Sandoval's restitution arguments.  See Response at 8-10. The United States summarizes restitution case law and contends that the SSA is entitled to restitution in the amount of its total loss, a figure which calculates losses from both charged and uncharged conduct.  See Response at 8-9.  The United States emphasizes that the SSA is entitled to restitution for offenses outside the offense of conviction if "'the criminal conduct involves a scheme, conspiracy, or pattern of criminal activity' as an element."  Response at 9 (quoting United States v. Gordon, 480 F.3d 1205, 1210 (10th Cir. 2007)).  Finally, the United States maintains that, "because the SSA was directly and proximate[ly] harmed as a result of the counts of conviction, restitution should be imposed to cover not only the counts of conviction, but the loss caused by the Defendant as a result of the counts of conviction."  Response at 10.

Finally, the United States addresses Sandoval's arguments regarding his medical condition.

See Response at 10.  The United States notes that it does not contest that Sandoval has received a serious medical diagnosis and that doctors have recommended that he receive a lung transplant. See Response at 10.  The United States notes, however, that Sandoval "voluntarily postponed the lung transplant procedure" and that "the United States has not received any medical records indicating otherwise."  Response at 10.  The United States asks that the PSR include the fact that Sandoval postponed voluntarily his lung transplant.  See Response at 10.

The USPO filed the Addendum to the Presentence Report, filed March 15, 2023 (Doc. 105)("PSR Addendum"), which outlines Sandoval's objections and the United States' responses to those objections.  PSR Addendum at 1-4.  In response to Sandoval's first Objection, regarding the calculation of the total loss amount, the PSR Addendum states that the relevant section of the PSR, ¶ 34, at 9, will remain as written.  See PSR Addendum at 2.  As to Sandoval's second Objection, regarding the calculation of the total offense level on the basis of the total loss amount, the PSR Addendum also states that the relevant portion of the PSR, ¶ 43, at 10, will remain as written.  See PSR Addendum at 3-5.  As to Sandoval's third Objection, regarding the restitution calculation, the PSR Addendum states only: "Based on the information provided by the U.S. Attorney's Office, as well as documentation contained in the discovery file, the Social Security Administration claims the total loss incurred is the $182,735.10; therefore, that is the amount that was included in the presentence report."  PSR Addendum at 3.  The only substantive additions the PSR Addendum provides are in response to Sandoval's fourth Objection, regarding the extent of his health issues.  See PSR Addendum at 4.  The PSR Addendum states:

> While some medical records are contained in the discovery file, defense counsel informed the U.S. Probation Office during the presentence interview that defendant's medical records are extensive and consist of thousands of pages.  Based on that information, it does not appear that the full breadth of the defendant's medical records are contained in discovery, and have not been received by the U.S.

Probation Office yet.

PSR Addendum at 4.  The PSR Addendum supplements PSR ¶ 71, at 15, with additional information regarding Sandoval's health problems, including that: (i) Sandoval was hospitalized for COPD in January, 2008; (ii) Sandoval has diminished pulmonary function; (iii) Sandoval has ongoing emphysema and severe COPD; (iv) Sandoval's "active problems" listed in 2019 health records are "celiac disease, COPD, lung pulmonary nodule, dependence on supplemental oxygen, dermatitis, esophageal reflux, osteoporosis, pulmonary hypertension, shortness of breath, and [being] underweight"; and (v) according to 2019 records, Sandoval "likely will require a lung transplant sometime over the next 1-5 years given the level of COPD that he has at this time." PSR Addendum at 4.  The PSR Addendum states that the "Defense counsel's summary of the defendant's medical conditions is added to the presentence report by way of this addendum." PSR at 4.

The United States filed the United States' Sentencing Memorandum, filed March 15, 2023 (Doc. 107)("U.S. Sentencing Memo.").  The United States first summarizes the facts of Sandoval's case, including those revealed through trial testimony.  See U.S. Sentencing Memo. at 4-12. Second, the United States addresses Sandoval's history and characteristics, including his operating jewelry businesses while receiving benefits, his health issues, and his history of domestic violence, driving while intoxicated, and alcohol and drug abuse.  See U.S. Sentencing Memo. at 12-13. Third, the United States requests: (i) a prison sentence within the Guideline range; (ii) three years of supervised release; (iii) restitution; (iv) a fine; and (v) a special penalty assessment.  U.S. Sentencing Memo. at 13-16.

Sandoval filed the Defendant's Sentencing Memorandum, filed March 16, 2023 (Doc. 108)("Sandoval Sentencing Memo.").  Sandoval "asks the Court to reduce his offense level

from what is stated in the PSR, vary downward further, and sentence him to probation in light of the legal arguments he has advanced here and the rapidly degenerating condition of his health." Sandoval Sentencing Memo. at 1.   First, Sandoval expands on his arguments regarding the calculation of the total loss amount originally stated in the Objections.  See Sandoval Sentencing Memo. at 2-11.  Second, Sandoval expands on his arguments regarding the restitution calculation. See Sandoval Sentencing Memo. at 11.  Third, Sandoval seeks a downward variance in light of his health condition, noting that the USPO, before reviewing Sandoval's medical records, noted in the PSR that, "'in consideration of 18 U.S.C. § 3553(a)(1)-(7), a downward variance outside the advisory guideline range, to a sentence of probation, may be warranted in this case.'"  Sandoval Sentencing Memo. at 12 (citing PSR ¶ 102, at 20).  Sandoval notes that, "[i]f the Court is persuaded that Mr. Sandoval's offense level here is 12, it could vary downward only a single offense level and have Mr. Sandoval within the range of probation-eligible sentences."  Sandoval Sentencing Memo. at 12.  Sandoval contends that "his history, characteristics, and -- most strikingly -- his medical needs present more compelling reasons to justify a downward variance than in the typical case."  Sandoval Sentencing Memo. at 12.  Sandoval then details his health problems and his decision to postpone his recommended lung transplant.  See Sandoval Sentencing Memo. at 13-18.

On March 16, 2023, the Court held a sentencing hearing.  See Sentencing Minute Sheet, filed March 16, 2023 (Doc. 115)("Sentencing Minutes").  The United States called A-Jay Sanchez, a program specialist with the SSA cooperative disability investigation unit, and FBI Special Agent Raymond Mauk, as witnesses.  See Sentencing Minutes at 2.  The United States and the USPO confirmed that they had no opposition to including Sandoval's health information in the PSR.  See Sentencing Minutes at 2.  The Court took the sentencing under advisement, stating that it needed

more time to consider Sandoval's objections to the PSR.  <u>See</u> Sentencing Minutes at 2.

## <u>LAW REGARDING THE SENTENCING GUIDELINES</u>

In <u>United States v. Booker</u>, 543 U.S. 220 (2005), the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act, Pub. L No. 98-473, 98 Stat. 1837, 1987, thus making the Guidelines sentencing ranges effectively advisory.  543 U.S. at 245.  In excising the two sections, the Supreme Court left the remainder of the Sentencing Reform Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing.  Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."  <u>United States v. Booker</u>, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary," to comply with the four statutorily-defined purposes that 18 U.S.C. § 3553(a)(2) enumerates:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2).

[A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551(a).  To achieve these purposes, § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the offense's nature, and the nature of the defendant's character; (iii) the available sentences; (iv) the policy favoring uniformity in sentences for defendants who commit similar crimes; (v) the need to provide restitution to victims; and (vi) any pertinent United States Sentencing Commission policy statements in effect on the date of sentencing.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines sentences are no longer mandatory, both the Supreme Court and the Tenth Circuit have clarified that, while the Guidelines are one of several factors which § 3553(a) enumerates, they are entitled to careful consideration.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many"), overruled on other grounds by Gall v. United States, 552 U.S. 35 (2007).  The Guidelines are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] 'represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses.'"  United States v. Cage, 451 F.3d at 593 (quoting United States v. Terrell, 445 F.3d 1261, 1265 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. at 349). A reasonable sentence is one that "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  See United States v. Booker, 543 U.S. at 261-62.

Finally, the Tenth Circuit has "joined a number of other circuits in holding that a sentence

within the applicable Guidelines range is presumptively reasonable." United States v. Terrell, 445 F.3d at 1264. This presumption is an appellate presumption, however, and not one that the trial court can or should apply. See Kimbrough v. United States, 552 U.S. 85, 90-91 (2007); Gall v. United States, 552 U.S. at 46-47; Rita v. United States, 551 U.S. at 350-51 (repeating that the presumption of reasonableness "is an *appellate* court presumption")(emphasis in original). Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory Guidelines sentence. See Kimbrough v. United States, 552 U.S. at 90-91; Gall v. United States, 552 U.S. at 46-47; Rita v. United States, 551 U.S. at 351.

## LAW REGARDING OBJECTIONS TO A PRESENTENCE REPORT

Before the Court imposes a sentence, the USPO "must conduct a presentence investigation and submit a report to the court . . . ." Fed. R. Crim. P. 32(c)(1). A presentence report must apply the advisory sentencing Guideline, meaning that it must:

(A)    identify all applicable guidelines and policy statements of the Sentencing Commission;

(B)    calculate the defendant's offense level and criminal history category;

(C)    state the resulting sentencing range and kinds of sentences available;

(D)    identify any factor relevant to:

(i)    the appropriate kind of sentence, or

(ii)    the appropriate sentence within the applicable sentencing range; and

(E)    identify any basis for departing from the applicable sentencing range.

Fed. R. Crim. P. 32(d)(1). A presentence report also must provide additional information, including:

(A)    the defendant's history and characteristics, including:

(i)    any prior criminal record;

(ii)    the defendant's financial condition; and

(iii)    any circumstances affecting the defendant's behavior that may be helpful in imposing sentence or in correctional treatment;

(B)    information that assesses any financial, social, psychological, and medical impact on any victim;

(C)    when appropriate, the nature and extent of nonprison programs and resources available to the defendant;

(D)    when the law provides for restitution, information sufficient for a restitution order;

(E)    if the court orders a study under 18 U.S.C. § 3552 (b), any resulting report and recommendation;

(F)    a statement of whether the government seeks forfeiture under Rule 32.2 and any other law; and

(G)    any other information that the court requires, including information relevant to the factors under 18 U.S.C. § 3553(a).

Fed. R. Crim. P. 32(d)(2).

After the USPO files a presentence report, the parties have an opportunity to object to the report. See Fed. R. Crim. P. 32(f). Parties must make their objections in writing within fourteen days of receiving the presentence report. See Fed. R. Crim. P. 32(f)(1). Parties may object to many aspects of the presentence report, "including objections to material information, sentencing guideline ranges, and policy statements contained in or omitted from the report." Fed. R. Crim. P. 32(f)(1). For example, a party can object to a presentence report's statement of facts. See, e.g., United States v. Garcia, No. CR 20-1370 KWR, 2022 WL 2341670 (D.N.M. June 29, 2022)(Riggs, J.)(sustaining in part and overruling in part a defendant's objections that a presentence report misstates material facts regarding the posted speed limit and the circumstances surrounding the

victim's injuries).  If a party raises a factual objection, it must present "information to cast doubt on" the presentence report's recitation of the facts.  United States v. Yates, 22 F.3d 981, 989 (10th Cir. 1994).  A party also can object that the USPO miscalculated a defendant's criminal history category.  See, e.g., United States v. Chavez, No. CR 18-0836 JB, 2018 WL 6621283 (D.N.M. December 18, 2018)(Browning, J.)(addressing a defendant's objections that the Court should reduce his criminal history category by several points).  Similarly, a party can object that a presentence report impermissibly applies a base offense level enhancement, see, e.g., United States v. Casias-Grove, No. 22-0109 JB, 2022 WL 17830249 (D.N.M. December 21, 2022)(Browning, J.)(sustaining a defendant's objection that the presentence report impermissibly applies a 4-level enhancement to his base offense level); that a presentence report should have applied an additional base offense level enhancement, see, e.g., United States v. Talk, No. CR 19-1994 JB, 2021 WL 1978624 (D.N.M. May 18, 2021)(Browning, J.)(sustaining the United States' objection that the presentence report should have applied a 4-level enhancement to the defendant's base offense level); or that a presentence report should have applied a base offense level decrease, see, e.g., United States v. Pena, Nos. CR 19-3609 JB, CR 19-3611 JB, 2022 WL 16924000 (D.N.M. November 13, 2022)(Browning, J.)(sustaining the parties' objections that the presentence report should have applied a 2-level reduction to the defendant's base offense level).

Ideally, the parties and the USPO can work through objections without the Court's assistance.  Rule 32(f)(3) establishes that, "[a]fter receiving objections, the probation officer may meet with the parties to discuss the objections.  The probation officer may then investigate further and revise the presentence report as appropriate."  Fed. R. Civ. P. 32(f)(3).  In keeping with rule 32(f)(3), long ago in the District of New Mexico, the Court, the United States Attorney's Office, and the Federal Public Defender's Office agreed that, if there are objections, counsel first will talk

to the USPO and see if they can work to address the objections independently. If the parties and the USPO cannot work out an objection, then the parties may file an objection with the Court. If the parties and the USPO cannot resolve an objection, rule 32(g) establishes that, "[a]t least 7 days before sentencing, the probation officer must submit to the court and to the parties the presentence report and an addendum containing any unresolved objections, the grounds for those objections, and the probation officer's comments on them." Fed. R. Crim. P. 32(g).

If the parties and the USPO cannot resolve an objection on their own, the Court "must . . . rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B). When resolving factual objections, the Court must determine whether the United States has met its burden of proving disputed facts by a preponderance of the evidence. See United States v. Munoz-Tello, 531 F.3d 1174 (10th Cir. 2008). Similarly, in considering objections to enhancements to a defendant's criminal history category or base offense level, the Court must determine whether the United States has met its burden of showing that a particular enhancement applies by a preponderance of the evidence.[3] See United States v. Cervantes-Chavez, 59 F. Supp. 3d 1295, 1315 (D.N.M. 2014)(Browning, J.). The Court may base its conclusion "on evidence presented at trial, undisputed statements in the PSR, and evidence presented at the sentence[ing] hearing." United States v. Garcia, 2022 WL 2341670, at *2 (quoting United States v. White, 663 F.3d 1207, 1216 (11th Cir. 2011)).

---

[3]There is some nuance regarding the applicable burden of proof required for sentencing enhancements, which the Court discusses in greater detail in the next section.

## LAW REGARDING THE BURDEN OF PROOF REQUIRED FOR ENHANCEMENTS
## UNDER THE GUIDELINES

In Apprendi v. New Jersey, 530 U.S. 466 (2000), the Supreme Court reaffirmed the principle that it is permissible for sentencing judges "to exercise discretion -- taking into consideration various factors relating both to offense and offender -- in imposing judgment *within the range* prescribed by statute."  530 U.S. at 481 (emphasis in original).  The Supreme Court cautioned, however, that the Constitution of the United States of America limits this discretion and that the Sixth Amendment to the Constitution requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  Apprendi v. New Jersey, 530 U.S. at 490.  In Blakely v. Washington, 542 U.S. 296 (2004), the Supreme Court elaborated on its holding in Apprendi v. New Jersey, stating that the "'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*."  Blakely v. Washington, 542 U.S. at 303 (emphasis in original)(citing Ring v. Arizona, 536 U.S. 584, 602 (2002); Harris v. United States, 536 U.S. 545, 563 (2002)(plurality opinion), overruled by Alleyne v. United States, 570 U.S. 99 (2012)).  In United States v. Booker, however, the Supreme Court held that, because the sentencing guideline ranges are no longer mandatory, "*Apprendi* does not apply to the present advisory-Guidelines regime."  United States v. Ray, 704 F.3d 1307, 1314 (10th Cir. 2013)(citing United States v. Booker, 543 U.S. at 259).  See United States v. Booker, 543 U.S. at 259 ("[W]ithout this provision [of the Guidelines statute] -- namely, the provision that makes 'the relevant sentencing rules . . . mandatory and impose[s] binding requirements on all sentencing judges' -- the statute falls outside the scope of *Apprendi*'s requirement."  (quoting United States v.

Booker, 543 U.S. at 221)(second alteration added by United States v. Booker)).  More recently, the Supreme Court held that the requirements in Apprendi v. New Jersey apply to facts that increase a defendant's mandatory minimum sentence.  See Alleyne v. United States, 570 U.S. at 103.

In United States v. Magallanez, 408 F.3d 672 (10th Cir. 2005), the Tenth Circuit held that Blakely v. Washington and United States v. Booker did not change the district court's enhancement findings analysis.  See United States v. Magallanez, 408 F.3d at 684-85.  United States v. Magallanez involved plain-error review of a drug sentence in which a jury found the defendant guilty of conspiracy to possess with intent to distribute and conspiracy to distribute methamphetamine.  See United States v. Magallanez, 408 F.3d 676.  As part of its verdict, the jury, through a special interrogatory, attributed to the defendant 50 to 500 grams of methamphetamine; at sentencing, however, the judge -- based on government witnesses' testimony of the various amounts that they had sold to the defendant -- attributed 1,200 grams of methamphetamine to the defendant and used that amount to calculate his sentence under the Guidelines.  See United States v. Magallanez, 408 F.3d at 682.  The district court's findings increased the defendant's Guidelines sentencing range from 63 to 78 months, based on the jury's 50 grams amount, to 121 to 151 months, based on the judge's 1,200 grams amount.  See United States v. Magallanez, 408 F.3d at 682-83.  On appeal, the Tenth Circuit stated that, both before and after Congress' passage of the "Sentencing Reform Act, sentencing courts maintained the power to consider the broad context of a defendant's conduct, even when a court's view of the conduct conflicted with the jury's verdict."  United States v. Magallanez, 408 F.3d at 684.  Although United States v. Booker made the Guidelines ranges "effectively advisory," United States v. Booker, 543 U.S. at 245, the Tenth Circuit reaffirmed that "district courts are still required

to consider Guideline ranges, which are determined through application of the preponderance standard, just as they were before." United States v. Magallanez, 408 F.3d at 685.

The Tenth Circuit, while "recognizing 'strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof,'" has "long held that sentencing facts in the 'ordinary case' need only be proven by a preponderance." United States v. Olsen, 519 F.3d 1096, 1105(10th Cir. 2008)(quoting United States v. Washington, 11 F.3d 1510, 1516 (10th Cir. 1993)).[4] "[T]he application of an enhancement . . . does not implicate

---

[4]Although the Tenth Circuit stated in United States v. Washington that "the issue of a higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth Circuit has since characterized its holding as leaving "open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704 F.3d at 1314 (quoting United States v. Olsen, 519 F.3d at 1105). See United States v. Olsen, 519 F.3d at 1105 (affirming the use of the preponderance-of-the-evidence standard for sentencing facts that increase a sentence in the "'ordinary case'" (quoting United States v. Washington, 11 F.3d at 1516)). The Tenth Circuit has not yet found that an "extraordinary or dramatic" instance warrants a higher standard of proof for certain facts that enhance a defendant's sentence. United States v. Olsen, 519 F.3d at 1105 (explaining that it need not determine whether a higher standard of proof is required to sentence a defendant for committing perjury in relation to a grand jury investigation, because the enhancement did not require the district court to determine that the defendant committed murder, but only that he obstructed a homicide investigation). See United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance-of-the-evidence standard for facts that enhance a defendant's offense level 4 levels); United States v. Valdez, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a dramatic increase in a sentence because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted charges entitled the defendant to a clear-and-convincing evidence standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this argument); United States v. Washington, 11 F.3d at 1516 (concluding that a district court need not find by any more than a preponderance of the evidence the amount of cocaine a defendant distributed, even though its findings increased the defendant's sentence from twenty years to consecutive forty-year terms). Subsequent to United States v. Washington, the Tenth Circuit reiterated the position that preponderance of the evidence is the proper standard, stating: "The Supreme Court has not adopted a heightened standard of proof at sentencing for contested facts, thus we hold that the correct standard of proof in this case was a preponderance of the evidence. This issue has been foreclosed in this Circuit." United States v. Robertson, 946 F.3d 1168, 1171 (10th Cir. 2020)(citing United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)).

the Supreme Court's holding in *Apprendi v. New Jersey*." United States v. Reyes-Vencomo, No. CR 11-2563 JB, 2012 WL 2574810, at *7 (D.N.M. June 26, 2012)(Browning, J.).  The Tenth Circuit applies Apprendi v. New Jersey's requirement that a fact be submitted to a jury only where the fact would increase a defendant's sentence "above the statutory maximum permitted by the statute of conviction." United States v. Price, 400 F.3d 844, 847 (10th Cir. 2005).  Accord United States v. Ray, 704 F.3d at 1314.  A defendant may assert an error under Apprendi v. New Jersey only where the fact at issue increases his or her sentence beyond the statutory maximum.  See United States v. O'Flanagan, 339 F.3d 1229, 1232 n.2 (10th Cir. 2003)(holding that a defendant could not assert an error under Apprendi v. New Jersey, because "his sentence does not exceed the statutory maximum"); United States v. Hendrickson, 592 F. App'x 699, 705 (10th Cir. 2014)(unpublished)(holding that, after Alleyne v. United States, "[i]t is well-established that sentencing factors need not be charged in an indictment and need only be proved to the sentencing judge by a preponderance of the evidence").[5]  The Court has noted:

> [A]lthough the decision of the Supreme Court of the United States in Alleyne v. United States . . . expands the rule from Apprendi v. New Jersey, . . . (holding that facts that increase the maximum sentence a defendant faces must be proven to a jury beyond a reasonable doubt), to cover facts that

---

[5]United States v. Hendrickson, 592 F. App'x 699 (10th Cir. 2014) is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . And we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(unpublished).  The Court concludes that United States v. Hendrickson has persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

increase the mandatory minimum sentence, as well as the maximum sentence, it does not prohibit district judges from continuing to find advisory sentencing factors by a preponderance of the evidence.  See [United States v. Sangiovanni, No. CR 10-3239 JB,] 2014 WL 4347131, at *22-26 [(D.N.M. August 29, 2014)(Browning, J.)].

United States v. Cervantes-Chavez, 59 F. Supp. 3d at 1315.  The Supreme Court has clarified that "[b]oth the 'floor' and 'ceiling' of a sentencing range 'define the legally prescribed penalty.' . . . And under our Constitution, when 'a finding of fact alters the legally prescribed punishment so as to aggravate it,' that finding must be made by a jury of the defendant's peers beyond a reasonable doubt." United States v. Haymond, 139 S. Ct. 2369, 2378 (2019)(quoting Alleyne v. United States, 570 U.S. at 112-14).  Further, the Tenth Circuit has determined that a district court could use its own finding on drug quantity to enhance a defendant's Guidelines range consistent with Alleyne v. United States, "so long as the court does not use its own drug quantity finding to alter the defendant's *statutory* sentencing range."  United States v. Cassius, 777 F.3d 1093, 1094 (10th Cir. 2015)(emphasis in original).

## LAW REGARDING RESTITUTION

Courts do not have inherent power to order restitution, but may do so only when a statute so authorizes.  See United States v. Harwood, 854 F. Supp. 2d 1035, 1051 (D.N.M. 2012)(Browning, J.)(citing United States v. Gordon, 480 F.3d at 1210).  The Mandatory Victim Restitution Act, 18 U.S.C. § 3663A ("MVRA"), is a general act establishing a court's authority to order restitution.  See 3 C. Wright, A. Leipold, P. Henning, & S. Welling, Federal Practice & Procedure: Criminal § 546, at 241 (4th ed 2011)("3 C. Wright").  In the Tenth Circuit, restitution is not criminal punishment, but is based "in the field of compensation and remediation." United States v. Serawop, 505 F.3d 1112, 1123 (10th Cir. 2007)(acknowledging that other Courts of Appeals treat criminal restitution as a criminal penalty).

In 1996, Congress enacted the MVRA, which made restitution mandatory in certain cases, "particularly crimes of violence and theft crimes with identifiable victims who 'suffered a physical injury or pecuniary loss.'"   United States v. Serawop, 505 F.3d at 1117 (quoting 18 U.S.C. § 3663A(c)(1).  The MVRA applies:

> **(c)(1)** . . . in all sentencing proceedings for convictions of, or plea agreements relating to charges for, any offense --
>
>> **(A)**   that is --
>>
>>> **(i)**   a crime of violence, as defined in section 16;
>>>
>>> **(ii)**   an offense against property under this title, or under section 416(a) of the Controlled Substances Act (21 U.S.C. 856(a)), including any offense committed by fraud or deceit;
>>>
>>> **(iii)**   an offense described in section 1365 (relating to tampering with consumer products); or
>>>
>>> **(iv)**   an offense under section 670 (relating to theft of medical products); and
>>
>> **(B)**   in which an identifiable victim or victims has suffered a physical injury or pecuniary loss.
>
> **(2)**   In the case of a plea agreement that does not result in a conviction for an offense described in paragraph (1), this section shall apply only if the plea specifically states that an offense listed under such paragraph gave rise to the plea agreement.

18 U.S.C. § 3663A(c)(1).

The MVRA envisions that, if the district court determines that difficulty in calculating restitution would complicate and prolong the sentencing process, the court may decline to order restitution; the MVRA provides:

> **(3)** This section shall not apply in the case of an offense described in paragraph (1)(A)(ii) if the court finds, from facts on the record, that --
>
>> **(A)** the number of identifiable victims is so large as to make restitution impracticable; or

> **(B)** determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.

18 U.S.C. § 3663A(c)(3).  The term "victim" means

> a person directly and proximately harmed as a result of the commission of an offense as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern. In the case of a victim who is under 18 years of age, incompetent, incapacitated, or deceased, the legal guardian of the victim or representative of the victim's estate, another family member, or any other person appointed as suitable by the court, may assume the victim's rights under this section, but in no event shall the defendant be named as such representative or guardian.

18 U.S.C. § 3663A(a)(2).

Section 3664 governs how courts are to issue and enforce restitution awards for the MVRA. See 18 U.S.C. § 3663A(d); 18 U.S.C. § 3556.  Any dispute "as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence" and the "burden of demonstrating the amount of loss sustained by a victim as a result of the offense shall be on the attorney for the Government."  18 U.S.C. § 3664(e).  See United States v. Serawop, 505 F.3d at 1117 (stating that the United States bears the burden of proving amount of loss under the MVRA). The burden of "demonstrating the financial resources of the defendant and the financial needs of the defendant's dependents" is on the defendant.  18 U.S.C. § 3664(e).  "The burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires."  18 U.S.C. § 3664(e).

Section 3664(a) requires that a court order the USPO to include in its presentence report "information sufficient for the court to exercise its discretion in fashioning a restitution order." 18 U.S.C. § 3664(a).  If the USPO cannot "reasonably ascertain" "the number or identity of

victims" or it is "clearly impracticable" to meet the requirements for other reasons, the USPO must "inform the court." 18 U.S.C. § 3664(a). The United States should provide the USPO a listing of the restitution claims sixty days before sentencing, but § 3664(d)(5) allows a court to "set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing," "if the victim's losses are not ascertainable by the date that is 10 days prior to sentencing." 18 U.S.C. § 3664(d)(5). "If the victim subsequently discovers further losses, the victim shall have 60 days after discovery of those losses in which to petition the court for an amended restitution order." 18 U.S.C. § 3664(d)(5). A court may grant such an order "only upon a showing of good cause for the failure to include such losses in the initial claim for restitutionary relief." 18 U.S.C. § 3664(d)(5).

## ANALYSIS

In evaluating the Objections, the Court first determines that the PSR's $182,735.10 total loss calculation is correct, because the full range of Sandoval's non-charged receipt of benefits to which he was not entitled is relevant conduct, is part of an ongoing scheme, and constitutes a criminal offense. Second, the Court concludes that, because the $182,735.10 total loss calculation is correct, a total offense level of 16 applies, because Sandoval is subject to a 10-level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(F) from a base offense level of 6. Third, the Court concludes that the PSR's $182,735.10 restitution calculation is incorrect, because the United States only meets in burden in proving that the SSA is entitled to restitution in connection with Sandoval's charged receipt of benefits between June, 2017 and February, 2020, which amounts to $55,261.20. Accordingly, the Objections are sustained in part and overruled in part.

I.    **THE PSR'S $182,735.10 TOTAL LOSS CALCULATION IS CORRECT, BECAUSE IT INCLUDES LOSSES FROM CHARGED CONDUCT AND NON-CHARGED RELEVANT CONDUCT THAT IS PART OF AN ONGOING SCHEME AND THAT CONSTITUTES A CRIMINAL OFFENSE.**

As the first step in analyzing the Objections, the Court examines the validity of the PSR's total loss calculation and concludes that the $182,735.10 total loss figure is correct. Regarding the calculation of loss under the Sentencing Guidelines, the Tenth Circuit states:

> Under the Sentencing Guidelines, "loss" means "the greater of actual loss or intended loss," with "actual loss" defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1, cmt. n. 3(A). For cases involving government benefits, "loss" is further defined as "*not less than* the value of the benefits obtained by unintended recipients or diverted to unintended uses . . . . For example, if the defendant was the intended recipient food stamps having a value of $100 but fraudulently received food stamps having a value of $150, loss is $50." *Id.* cmt. n.3(F)(ii) (emphasis added). Where evidence of loss is not available, the district court "need only make a reasonable estimate of the loss." *Id.* cmt. n3(C); *see* [*United States v.*] *Sutton*, 520 F.3d [1259] . . . [,] 262-63 [(10th Cir. 2011)].

United States v. Griffith, 584 F.3d 1004, 1011 (10th Cir. 2009)(footnote omitted). "In calculating loss under the Guidelines, the district court does not limit itself to conduct underlying the offense of conviction, but rather may consider all of the defendant's 'relevant conduct.'" United States v. Griffith, 584 F.3d 1004 at 1011-12 (citing U.S.S.G. §§ 1B1.3, 1B1.2(b)). The Guidelines' definition of "relevant conduct" includes: (i) "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense"; (ii) in instances where § 3D1.2(d) requires grouping of multiple counts, "all acts and omissions described above . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction"; and (iii) "all harm that resulted from the acts and omissions specified . . . above, and all harm that was the object of such acts and omissions." U.S.S.G. §§ 1B1.3(a)(1)(A); 1B1.3(a)(2); 1B1.3(a)(3).

When a loss amount is disputed, the United States bears the burden of establishing its estimation of loss by a preponderance of the evidence.  See United States v. Garcia, 939 F. Supp. 2d 1155, 1199 (D.N.M. 2013)(Browning, J.)(citing Robert W. Haines, Jr., et al, Federal Sentencing Guidelines Handbook § 14, at 353 (2012-13 ed.)).  The Tenth Circuit has, accordingly, held that a district court cannot include losses in its calculation under § 2B1.1 until the "Government first . . . prove[s] by a preponderance of the evidence that the conduct giving rise to those losses (1) was a part of Defendant's ongoing scheme . . . and (2) constituted a criminal offense under a federal or state statute." United States v. Kieffer, 681 F.3d 1143, 1168 (10th Cir. 2012).  Next, the United States must "prove the amount of loss (or a reasonable estimate thereof) associated with that conduct by a preponderance of the evidence."  United States v. Kieffer, 681 F.3d at 1168 (citing United States v. Peterson, 312 F.3d 1300, 1302 (10th Cir. 2002)).  "Because the damage from fraud can be difficult to calculate, the district court needs only to 'make a reasonable estimate of loss rather than a precise determination.'" United States v. Ferdman, No. CR 12-0411 JB, 2013 WL 6504300, at *6 (D.N.M. October 24, 2013)(Browning. J.)(quoting United States v. Gregoire, 638 F.3d 962, 970 (8th Cir. 2011)).

The standard of admissibility for evidence at sentencing is different than at trial. "A preponderance-of-the-evidence standard applies at sentencing."  United States v. Monroy–Reynoso, No. CR 12-1609 JB, 2012 WL 6632594, at *5 (D.N.M. Dec.13, 2012)(Browning, J.)(citing United States v. Manatau, 647 F.3d 1048, 1054 n.2 (10th Cir. 2011)(noting that the preponderance-of-the-evidence standard applies during sentencing); United States v. Gomez–Arrellano, 5 F.3d 464, 466 (10th Cir. 1993)("Sentencing determinations of relevant conduct and offense characteristics must be supported by a preponderance of the evidence.")).  Additionally, evidence which is not admissible at trial may be admissible at sentencing. See United States v.

Monroe-Reynoso, 2012 WL 6632594, at *5 (citing United States v. Beaulieu, 893 F.2d 1177, 1179

(10th Cir. 199).  The Sentencing Guidelines authorize a court to consider hearsay in the sentencing

process.  See United States v. Beaulieu, 893 F.2d at 1179 (holding that reliable hearsay may be

used in sentencing under the guidelines); United States v. Cunningham, No. CR 06-2493 JB, 2008

WL 6049940, at *13 (D.N.M. October 28, 2008)(Browning, J.)("[T]he Court may rely on hearsay

at sentencing so long as it has 'sufficient indicia of reliability to support its probable accuracy.'"

(alteration in original)(quoting U.S.S.G. § 6A1.3(a), and citing United States v. Beaulieu, 893 F.2d

at 1179).  Section 6A1.3 states: "In resolving any dispute concerning a factor important to the

sentencing determination, the court may consider relevant information without regard to its

admissibility under the rules of evidence applicable at trial, provided that the information has

sufficient indicia of reliability to support its probable accuracy."  U.S.S.G. § 6A1.3.  Likewise, the

protections of the Confrontation Clause of the Sixth Amendment to the Constitution of the United

States of America do not apply in the sentencing context.  See United States v. Bustamante, 454

F.3d 1200, 1202-03 (10th Cir.2006)(recognizing that Crawford v. Washington, 541 U.S. 36

(2004), does not apply to sentencing proceedings).

     The United States proved at trial that Sandoval stole $55,261.20 in Social Security

Disability Insurance benefits between June, 2017 and February, 2020.  See Verdict at 1-7.

Sandoval's unlawful receipt of $55,261.20 in Social Security Disability Insurance benefits,

corresponding to Counts 1 through 33, is "conduct underlying the offense of conviction."  United

States v. Griffith, 584 F.3d 1004 at 1011.  With the $55,261.20 at the total loss calculation's core,

the Court's analysis proceeds to whether there are also losses resulting from Sandoval's "'relevant

conduct'" that should be incorporated into the total loss calculation.  See United States v. Griffith,

584 F.3d at 1011-12 (quoting U.S.S.G. § 1B1.3; citing U.S.S.G. § 1B1.2(b)).

A.    **THE FULL RANGE OF NON-CHARGED RECEIPT OF BENEFITS TO WHICH SANDOVAL WAS NOT ENTITLED IS RELEVANT CONDUCT FOR THE TOTAL LOSS CALCULATION'S PURPOSES.**

The Court concludes that full range of non-charged receipt of benefits to which Sandoval was not entitled is relevant conduct for purposes of the total loss calculation. Sandoval argues that the United States does not meet its burden to prove that the SSA suffered a total loss of $182,735.10 as a result of his offenses. See Objections at 1-3. In arriving at the $182,735.10 loss figure, the PSR states:

> According to investigative reports, a Certified Extract of Sandoval's overpayment, which comprises the total overpayment related to all subjects who SSA issued payments based on Sandoval's eligibility, shows that payments to Sandoval's two children were made to the children's legal custodian, Roseanne Gonzales. According to the SSA record, Sandoval received a total of $125,357.10 in disability benefits, Child 1 received a total of $42,744.00 in SSA payments and child 2 received a total of $14,634.00 in SSA payments. Thus, the total amount Sandoval fraudulently received in SSA benefits is $182,735.10.

PSR ¶ 34, at 9. Sandoval emphasizes that the United States tried him only in connection with his theft of government benefits in the period from June, 2017 to February, 2020, and that the evidence at trial showed "at most" overpayment in the amount of $50,337.40 in disability payments and $4,883.80 in Medicare benefits. Objections at 1-2. Sandoval contends that the United States: (i) "made no showing that Mr. Sandoval's receipt of Medicare 'constitut[ed] a criminal offense' such that those amounts can be added to the total loss"; (ii) "did not prove criminal conduct prior to June 2017 and, far from proving relevant losses through May 2021, . . . the Government dismissed 15 counts with prejudice on the first day of trial because it could not prove any theft had occurred after February 2020"; and (iii) "never offered -- nor does the PSR contain -- any proof whatsoever that Roseann Gonzales received benefits for her children in violation of a criminal statute." Objections at 2-3.

The United States pursued this case through separate counts for each month of benefits that Sandoval received illegally. <u>See</u> Indictment, filed June 15, 2022 (Doc. 2) at 1-4. Sandoval notes correctly that the United States chose to try this case on the basis of benefits which Sandoval received illegally from June, 2017 through February, 2020. <u>See</u> Objection at 1-2. The United States proceeded successfully through trial on Counts 1-33, and 50-51,[6] but not on Counts 34-49, which correspond to March, 2020 through June, 2021, and which the Court dismissed without prejudice. <u>Compare</u> Indictment at 1-4, <u>with</u> Verdict at 1-7.

The Court concludes that the non-charged offenses which cause the United States' loss figure to rise from the $55,261.20 associated with Counts 1-33 to the $182,735.10, as the PSR states, were "part of the same course of conduct or common scheme or plan as the offense of conviction," U.S.S.G. § 1B1.3(a)(2), in a case involving groups of closely related counts, <u>see</u> U.S.S.G. § 3D1.2(d), here, for Theft of Government Property, Making False Statements, and False Statements in a Social Security Form, <u>see</u> PSR at 1.[7] Even if the United States did not seek to convict Sandoval on the full range of alleged offending conduct, the Court looks to his "relevant conduct" under the Guidelines in calculating total loss to the SSA. <u>United States v. Griffith</u>, 584 F.3d 1004 at 1011-12 (citing U.S.S.G. §§ 1B1.3, 1B1.2(b)). Under the Guidelines, "'[f]or two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factors, such as common victims, common accomplices,

---

[6]As reflected on the Verdict, after the dismissal of counts 34-49, the Superseding Indictment's Counts 50 and 51 are listed as Count 34 and 35. <u>See</u> Verdict at 7.

[7]As the PSR notes correctly, "Counts 1-33, 50, and 51 are grouped for guideline calculation purposes because the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing and continuous in nature and the offense guideline is written to cover such behavior." PSR ¶ 41, at 10 (citing U.S.S.G. § 3D1.2(d)). <u>See</u> U.S.S.G. § 3D1.2 cmt. n. 6.

common purposes, or similar modus operandi.'" United States v. Smith, 705 F.3d 1268, 1274 (10th Cir. 2013)(quoting U.S.S.G. § 1B1.3, cmt. n. 5(B)(i)).  Here, Sandoval's monthly receipt of government benefits, whether through Social Security or Medicare payments, and whether for his own benefit or that of his family members, had a common victim in the SSA, a common purpose in securing benefits to which Sandoval was not entitled, and similar modus operandi in Sandoval's making false statements to the SSA.  Even if the uncharged offenses were not part of a common scheme or plan, they still would be part of the same course of conduct under the Guidelines, for being "sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." U.S.S.G. § 1B1.3, cmt. n. 5(B)(ii). See United States v. Smith, 705 F.3d at 1274-75.  The Guidelines look to "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses" to determine whether they are part of the same course of conduct as another offense. U.S.S.G. § 1B1.3, cmt. n. 5(B)(ii).  Here, the offenses involve the receipt of government benefits to which Sandoval was not entitled, including by the use of false statements to the SSA, and were repeated monthly for a period of years, which indicates "['‌]an identifiable "*behavior pattern*" . . . of specified criminal activity.'"  United States v. Garcia, 946 F.3d 1191, 1203-04 (10th Cir. 2020)(quoting United States v. Roederer, 11 F.3d 973, 979 (10th Cir. 1993)(quoting United States v. Perdomo, 957 F.2d 111, 115 (10th Cir. 1993)(emphasis and ellipsis in United States v. Garcia, but not United States v. Roederer, or United States v. Perdomo))).  Accordingly, the Court concludes that the non-charged offenses constitute relevant conduct for purposes of calculating the SSA's total loss.

B.    **SANDOVAL'S NON-CHARGED RECEIPT OF BENEFITS TO WHICH HE WAS NOT ENTITLED WAS PART OF AN ONGOING SCHEME AND CONSTITUTES A CRIMINAL OFFENSE.**

Having concluded that the non-charged offenses constitute relevant conduct for purposes of the total loss calculation, the Court concludes that the United States proves "by a preponderance of the evidence that the conduct giving rise to those losses (1) was a part of Defendant's ongoing scheme . . . and (2) constituted a criminal offense under a federal or state statute." United States v. Kieffer, 681 F.3d at 1168. As the PSR reflects, Sandoval made false statements to the SSA that he was unable to work because of a medical condition and received benefits from the SSA to which he was not entitled from March, 2015, until May, 2021. See PSR ¶¶ 5-35, at 4-9 (describing the offense conduct). The PSR paragraph at issue in the Objections, ¶ 34, at 9, states that, in addition to Sandoval's receiving $125,357.10 in Social Security Disability Insurance benefits,[8] Roseanne Gonzales, Sandoval's children's legal custodian, received payments corresponding to $42,744.00 for one child and $14,634.00 for another based on Sandoval's eligibility. See PSR ¶ 34, at 9. Combined, these benefits payments to Sandoval, including those for the benefit of his children, amount to $182,735.10, the sum that the United States contends corresponds to the SSA's total loss. See PSR ¶ 34, at 9. Whether the payments were made directly to Sandoval or to his children, they were the result of Sandoval's ongoing scheme, i.e., his years-long effort to receive, on a monthly basis, benefits from the SSA to which he was not entitled. The Court concludes that the facts in the PSR, see PSR ¶¶ 5-35, at 4-9, establish, by a preponderance of the evidence, that the SSA has suffered a total loss of $182,735.10 due to Sandoval's conduct (i) that "was a part of

---

[8]Elsewhere, the PSR states that "investigative reports show Sandoval received DIB benefits from March 2015 until May 2021 for a total amount of $125,357.10," the figure that ¶ 34 recites in reference to the disability benefits Sandoval received. PSR ¶ 30, at 8.

Defendant's ongoing scheme," i.e., to receive government benefits to which he was not entitled, and (ii) that "constituted a criminal offense under federal or state statute," United States v. Kieffer, 681 F.3d at 1168, as reflected in 18 U.S.C. § 641, the Theft of Government Property statute under which Sandoval was convicted, see 18 U.S.C. § 641.  Accordingly, the Court concludes that the United States meets its burden in establishing that Sandoval's actions caused the SSA to incur a total loss of $182,735.10 and overrules Sandoval's Objection.

## II.    BECAUSE THE PSR'S $182,735.10 TOTAL LOSS CALCULATION IS CORRECT, SANDOVAL'S BASE OFFENSE LEVEL OF 6 IS SUBJECT TO A 10-LEVEL INCREASE UNDER U.S.S.G. § 2B1.1(b)(1)(F), MAKING HIS TOTAL OFFENSE LEVEL 16.

Having determined that the $182,735.10 total loss calculation is correct, after consulting the PSR and the Guidelines, the Court also concludes that a total offense level of 16 applies.  See U.S.S.G. § 2B1.1(b)(1)(F).  When the United States asserts that a defendant's base offense level is subject to an increase under the Guidelines, the United States must prove that the enhancement applies by a preponderance of the evidence.  See United States v. Cervantes-Chavez, 59 F. Supp. 3d at 1315.  If the parties and the USPO cannot resolve an objection on their own, the Court "must . . . rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing."  Fed. R. Crim. P. 32(i)(3)(B).  For crimes involving larceny, embezzlement, and other forms of theft; offenses involving stolen property; property damage or destruction; fraud and deceit; forgery; and offenses involving altered or counterfeit instruments other than counterfeit bearer obligations of the United States, the Guidelines prescribe a base offense level of 6.  See U.S.S.G. § 2B1.1(a)(2). The Guidelines increase levels corresponding to the size of the loss at issue: no increase for $6,500 or less; 2 for more than $6,500; 4 for more than $15,000; 6 for more than $40,000; 8 for more than

$95,000; 10 for more than $150,000; and greater increases for greater loss amounts.[9]  See U.S.S.G. § 2B1.1(b)(1).

Having concluded that the $182,735.10 total loss figure is appropriate, the Court concludes that the PSR's total offense level of 16 is correct.  The PSR applies a 10-level increase from the base offense level of 6, which results in a total offense level of 16.  See PSR ¶¶ 42-50, at 10.  Because the Court concludes that the appropriate measure of loss is $182,735.10, a 10-level increase is warranted under the Guidelines, resulting in a total offense level of 16, as the PSR states.  See U.S.S.G. § 2B1.1(b)(1)(F).  The imprisonment range for a defendant with an offense level of 16 and criminal history category of I is subject to a Guideline imprisonment range of 21-27 months.  Because $182,735.10 is the appropriate loss figure on which to calculate the Sandoval's total offense level, the Court overrules Sandoval's objection to the PSR.

## III.    THE PSR'S $182,735.10 RESTITUTION CALCULATION IS INCORRECT, BECAUSE THE UNITED STATES ONLY MEETS ITS BURDEN IN PROVING THE SSA'S ENTITLEMENT TO RESTITUTION FOR $55,261.20 IN PAYMENTS SANDOVAL RECEIVED BETWEEN JUNE, 2017, AND FEBRUARY, 2020.

While the PSR's total loss calculation is accurate, the Court concludes that the United States does not meet its burden in proving the SSA's entitlement to restitution equivalent to the $182,735.10 total loss amount.  "Courts have no inherent power to order restitution; they may only do so as authorized by statute."  United States v. Gordon, 480 F.3d at 1210.  The MVRA enumerates several categories of offenses, and authorizes restitution in "sentencing proceedings for convictions of, or plea agreements, relating to charges for" offenses in those categories, where "an identifiable victim or victims has suffered a physical injury or pecuniary loss."  18 U.S.C. §

_____

[9]The Guidelines provide for sixteen level increases in total, the highest being 30 for more than $550,000,000.  See U.S.S.G. § 2B1.1(b)(1).  Because the PSR recommends a 10-level increase, the Court does not recite the higher-level increases here.

3663A(c)(1)(B).  The Tenth Circuit states that "the principal aim of [] restitution is to ensure that crime victims, to the extent possible, are made whole for their losses." United States v. Ferdman, 779 F.3d 1129, 1132 (10th Cir. 2015)(citing United States v. James, 564 F.3d 1237, 1246 (10th Cir. 2009)).  See Paroline v. United States, 572 U.S. 434, 456 (2014)("The primary goal of restitution is remedial or compensatory.").  Accordingly, an order of restitution aims to "restor[e] victims to the position they occupied before the crime" and not "unjustly enrich crime victims or provide them a windfall."  United States v. Ferdman, 779 F.3d at 1132 (citing Hughey v. United States, 495 U.S. 411, 416 (1990)).

An order of restitution imposed under the MVRA cannot "'provide incidental, consequential, or pain and suffering awards,'" but only awards for losses "'actually caused by the defendant's offense.'"  United States v. Shengyang Zhou, 717 F.3d 1139, 1154 (10th Cir. 2013)(quoting United States v. Serawop, 505 F.3d at 1123, 1124, and citing United States v. Patty, 992 F.2d 1045, 1049 (10th Cir. 1993); United States v. Quarrell, 310 F.3d 664, 680 (10th Cir. 2002)).  See United States v. Gordon, 480 F.3d at 1211 ("[R]estitution may only be ordered for losses caused by the offense of conviction."); United States v. Quarrell, 310 F.3d 664, 680 (10th Cir. 2002)("A restitution order must be based on *actual* loss.")(emphasis in original).  Accordingly, in considering "whether a defendant is required to pay restitution under the MVRA the district court must determine [] whether the crime of conviction or plea . . . was the proximate cause of the damage."  United States v. West, 646 F.3d 745, 751 (10th Cir. 2011).  The Tenth Circuit has stated that the causation inquiry centers on "'whether there was an intervening cause and, if so, whether this intervening cause was directly related to the offense conduct.'"  United States v. Speakman, 594 F.3d 1165, 1172 (10th Cir. 2010)(quoting United States v. Wilfong, 551 F.3d 1182, 1187 (10th Cir. 2008)).  Regarding restitution's applicability for conduct other than the

offense of conviction, the Tenth Circuit states:

> The MVRA . . . did not change the general rule that restitution may only be ordered for losses caused by the offense of conviction.  In only two cases does the MVRA authorize restitution to be paid to someone other than the victim (or his estate) of the offense of conviction.  The first is where the criminal conduct involves a "scheme, conspiracy, or pattern of criminal activity."  18 U.S.C. § 3663A(a)(2); *see also id.* (extending restitution in such cases to "any person harmed by the defendant's criminal conduct"); *United States v. Fogg*, 409 F.3d 1022, 1028 (8th Cir. 2005) ("Unless the charged offense has a scheme, conspiracy, or pattern of criminal activity as an element, . . . the restitution order may only cover losses from the specific offense for which the defendant was indicted and convicted.").

United States v. Gordon, 480 F.3d at 1211 (concluding that credit card fraud "does not contain as an element a scheme, conspiracy, or pattern of criminal activity").

The Court concludes that, under the MVRA, the SSA is entitled only to restitution in connection with the counts on which Sandoval was convicted and not from losses stemming from Sandoval's relevant conduct for the total loss calculation's purposes.  Sandoval is correct to note, citing United States v. Griffith, that a defendant "'may be ordered to pay restitution *only* for conduct underlying the offense of conviction.'"  Objections at 5 (quoting 584 F.3d at 1022 (emphasis in Objections, but not in United States v. Griffith)).  Indeed, the Tenth Circuit has "repeatedly held that a restitution order which exceeds the amount of loss actually caused by the offense of conviction is an illegal sentence."  United States v. Zander, 794 F.3d 1220, 1233 (10th Cir. 2015)(citing United States v. Griffith, 584 F.3d at 1019; United States v. Smith, 156 F.3d 1046, 1057 (10th Cir. 1998); United States v. Wainwright, 938 F.2d 1096, 1098 (10th Cir. 1991)).  This limitation on restitution can lead to discrepancies between a total loss figure and restitution amount.  The United States Court of Appeals for the Eleventh Circuit states in United States v. Patterson, 595 F.3d 1324 (11th Cir. 2010), that, "[w]hile the [MVRA] requires a judge to order restitution to compensate the full amount of each victim's losses . . . , it does not require restitution to match the

loss figure used for sentencing.  Indeed, the amounts of loss and restitution can and do differ."  595 F.3d at 1327 (citing United States v. Jones, 289 F.3d 1260, 1265 (11th Cir. 2002); United States v. Woodward, 459 F.3d 1078, 1087-88 (11th Cir. 2006)).

In Hughey v. United States, the Supreme Court observes that, "[i]f a prosecutor chooses to charge fewer than the maximum possible number of crimes, the potential recovery of victims of crime is undoubtedly limited, but so too is the potential sentence that may be imposed on a defendant."  495 U.S. at 421.  The Tenth Circuit, commenting on Hughey v. United States, notes that "prosecutorial decisions to frame indictments with a 'view to success at trial rather than to a victim's interest in full compensation' are made with a full understanding of the potential consequences."  United States v. Mendenhall, 945 F.3d 1264, 1269 (10th Cir. 2019)(citing Hughey v. United States, 495 U.S. at 421).  That principle applies not just to limiting the scope of an indictment before its filing, but also to a prosecutor's decision to later dismiss counts in the indictment, as the United States did in this case.  See Motion to Dismiss Counts at 1.  At the start of trial, the United States moved to dismiss without prejudice Counts 34-49 of the Superseding Indictment, which corresponded to the Social Security Disability Insurance benefits Sandoval received from March, 2020, to June, 2021.  See Motion to Dismiss Counts at 1.  The United States chose to prosecute this case by bringing (i) a series of separate counts for each Social Security Disability Insurance payment Sandoval received; (ii) a single count corresponding to false statements Sandoval made during his interview at the SSA office on February 19, 2020; and (iii) a single count corresponding to false statements Sandoval made in an SSA Work Activity Report -- Employee form on March 15, 2021.  The United States made strategic decisions on how it would prosecute this case, and, at sentencing, it must accept those decisions' consequences.  See United States v. Mendenhall, 945 F.3d at 1269 (citing Hughey v. United States, 495 U.S. at 421).  While

the Court considers the full range of benefits payments that Sandoval received to which he was not entitled for the total loss amount calculation, its restitution calculation is based on "conduct underlying the offense[s] of conviction." United States v. Griffith, 584 F.3d at 1002. Accordingly, in calculating restitution, the Court looks exclusively to losses resulting from the counts of conviction in this case.

First, the Court considers the SSA's losses corresponding to the counts for Theft of Government Property pursuant to 18 U.S.C. § 641 and concludes that they are properly included in the restitution figure. These losses include the Social Security Disability Insurance payments that Sandoval received from June, 2017, to February, 2020, i.e, those corresponding to Counts 1 through 33 in the Superseding Indictment, which are includable in the restitution calculation, because they correspond directly to charged conduct. See United States v. Griffith, 584 F.3d at 1002. By contrast, the Social Security Disability Insurance payments preceding June, 2017, which the Court includes in its total loss calculation, are not includable in the restitution figure, as they do not correspond to charged conduct and occurred outside the five-year statute of limitations, given that the Indictment was filed in June, 2022. See 18 U.S.C. 3282 (providing a general five-year statute of limitations for non-capital offenses). Because the United States did not win, or even seek, a conviction in connection with the full range of Medicare payments made to Sandoval or the Social Security payments to Sandoval's children, the Court declines to consider them in its restitution calculation. See United States v. Griffith, 584 F.3d at 1002. Further weighing against the inclusion of uncharged, time-barred conduct is the fact that none of the claims in the Superseding Indictment are continuing offenses, given that none of them "contain as an element a scheme, conspiracy, or

pattern of criminal activity."[10]  United States v. Gordon, 480 F.3d at 1211.  See 18 U.S.C. § 641 (listing elements for Theft of Government Property); 18 U.S.C. § 1001(a)(2) (listing elements of Making False Statements); 42 U.S.C. § 408(a)(3) (listing elements of False Statement in a Social Security Form).  Given these considerations, the total amount in restitution related to Counts 1 through 33, corresponding to Sandoval's receipt of Social Security Disability Insurance checks from June, 2017, through February, 2020, is $55,261.20, a figure that the Court calculates by adding the value of the payments which Sandoval received between June, 2017, and February, 2020.  See Certification of Extract From Records (dated June 4, 2021) at 4-5, filed March 14, 2023 (Doc. 103-3); Superseding Indictment at 1-3.

The Court now turns to the losses related to the counts brought under 18 U.S.C. § 1001(a)(2), Making False Statements, and 42 U.S.C. § 408(a)(3), False Statement in a Social Security Form, and concludes that the United States does not meet its burden in establishing the SSA's entitlement to restitution in connection with those claims.  These counts correspond to: (i) Sandoval's false statements made in his SSA interview on February 19, 2020; and (ii) Sandoval's false statements made on the Work Activity Report -- Employee form on March, 15, 2021.  See Superseding Indictment at 4.  They do not refer to particular payments, but the Court may consider losses the SSA suffered as a result of those crimes.  See United States v. Gordon, 480 F.3d at 1211.  The parties' briefing on restitution for the false statement claims is not exhaustive, although Sandoval is correct to state that "[r]estitution must 'be based on *actual* loss, which the

---

[10]It is irrelevant, for example, that a defendant can steal government property as part of a scheme or pattern of criminal activity, as Sandoval's conviction on thirty-three counts of Theft of Government Property in thirty-three consecutive months indicate he did; the key inquiry is whether the crime's elements include a "scheme, conspiracy, or pattern of criminal activity."  United States v. Gordon, 480 F.3d at 1211.

government bears the burden of proving."  Objections at 7 (quoting <u>United States v. Griffith</u>, 584 F.3d at 1019 (emphasis in original)).  With this principle in mind, the Court recites the brief argument that the United States puts forward in service of the contention that it is entitled to restitution in connection with Sandoval's false statements:

> Here, based on the Defendant's false statements to the SSA, the SSA continued issuing SSA disability benefits to the Defendant.  A jury found the Defendant guilty of 33 counts of theft of government property (from June 2017 to February 2020) . . . .  The Court dismissed counts 34 to 49 of the superseding indictment on the government's motion . . . .  However, because the SSA was directly and proximate [sic] harmed as a result of the counts of conviction, restitution should be imposed to cover not only the counts of conviction, but the loss caused by the Defendant as a result of the counts of conviction.

Response at 9-10.

The Court understands the United States' argument to be, in relation to the false statement claims, that the SSA is entitled to restitution for all benefits payments, including Social Security Disability Insurance and Medicare, which Sandoval and his children received after Sandoval's false statements on February 19, 2020, and March 15, 2021.  As Sandoval correctly notes, however, "'[a] restitution order must be specific in a dollar amount that is supported by evidence in the record.  A restitution order entered without proof of loss is clearly erroneous.'"  Objections at 7 (quoting <u>United States v. Williams</u>, 292 F.3d 681, 688 (10th Cir. 2002)).  Given the United States' focus in the briefing on getting restitution for the full value of the SSA's total loss, there is little attention paid to providing specific figures for losses stemming from the false statement counts.  <u>See</u> Response at 9-10.  The PSA is focused on the same $182,735.10 figure as the United States' briefing.  <u>See</u> PSR ¶ 34, at 9.  On the present record, the Court is hesitant to award restitution for losses stemming from the false statement claims.  The SSA regulatory scheme takes study, including as to cessation of benefits, and the United States has not established causation for

restitution in connection with the false statement claims, specifically. See United States v. West, 646 F.3d at 751 ("[W]hether a defendant is required to pay restitution under the MVRA the district court must determine [] whether the crime of conviction or plea . . . was the proximate cause of the damage."). Tenth Circuit case law urges caution in providing restitution awards. See United States v. Zander, 794 F.3d at 1233 ("We have repeatedly held that a restitution order which exceeds the amount of loss actually caused by the offense of conviction is an illegal sentence."). Accordingly, the Court concludes that the United States does not meet its burden in proving the SSA's entitlement to restitution for the false statement claims. The appropriate restitution figure is, therefore, $55,261.20, corresponding to the Social Security Disability Insurance payments Sandoval received between June, 2017, and February, 2020.

IT IS ORDERED that: (i) the Defendant's Objections to Presentence Investigation Report, filed March 7, 2023 (Doc. 99), are sustained in part and overruled in part; (ii) Defendant James Anthony Sandoval's base offense level of 6 is subject to a 10-level increase under U.S.S.G. § 2B1.1(b)(1)(F), making his total offense level 16; (iii) with a total offense level of 16 and a criminal history category of I, Sandoval's United States Sentencing Guideline imprisonment range is 21-27 months; and (iii) restitution in the amount of $55,261.20 is appropriate.



_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Alexander M.M. Uballez
  United States Attorney
Kristopher N. Houghton
Raquel Ruiz-Velez
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Paul J. Kennedy
Elizabeth Harrison
Kennedy Hernandez & Harrison, P.C.
Albuquerque, New Mexico

*Attorneys for the Defendant*