# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

   Plaintiff,

vs.               No. CR 22-1010 JB

JAMES ANTHONY SANDOVAL,

   Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendant's Motion for Judgment of Acquittal, filed December 16, 2022 (Doc. 77)("Acquittal Motion").  Defendant James Anthony Sandoval filed the Acquittal Motion at the close of the Plaintiff United States of America's case-in-chief at trial, and the parties argued the Acquittal Moton at that time.  <u>See</u> Transcript of Motion for Judgment of Acquittal in Trial Proceedings (dated December 16, 2022), filed March 24, 2023 (Doc. 113)("Acquittal Motion Tr.").  The primary issue is whether the Court should, pursuant to rule 29 of the Federal Rules of Criminal Procedure, enter a judgment of acquittal on all charged counts because of insufficient evidence to support the crimes charged in the operative Indictment.  <u>See</u> Superseding Indictment, filed November 23, 2022 (Doc. 28)("Superseding Indictment").  The Court concludes that: (i) sufficient evidence regarding Sandoval's income and countable income from the charging period supports Sandoval's thirty-three counts of Theft of Government Property under 18 U.S.C. § 641; (ii) sufficient evidence supports Sandoval's count of Making False Statements under 18 U.S.C. § 1001(a)(2), because a jury could conclude that he earned income from Traditions Past and Present -- a jewelry business that Sandoval is alleged to own -- and thus his statements to the contrary are materially false; and (iii) for similar reasons,  sufficient evidence in the United States' case-in-chief supports Sandoval's count of False Statement in a Social

Security Form under 42 U.S.C. § 408(a)(3).  The Court concludes that sufficient evidence supports a jury finding of guilt on all charges.  Accordingly, the Court denies the Acquittal Motion.

## PROCEDURAL BACKGROUND

The Court provides the relevant procedural background required for analysis of the Acquittal Motion.  First, the Court discusses the charged crimes in this case as the operative Indictment outlines them.  Next, the Court discusses the Acquittal Motion.  Third, the Court describes the arguments made at the close of the United States' case at trial.  See Acquittal Motion Tr.  Last, the Court discusses the United States' Response -- which was filed after the conclusion of the trial -- and Sandoval's Reply.

### 1.     The Indictments.

On June 15, 2022, the Grand Jury indicted Sandoval on: (i) forty-nine counts of Theft of Government Property under 18 U.S.C. § 641; (ii) one count of Making False Statements under 18 U.S.C. § 1001(a)(2); and (iii) one count of False Statement in a Social Security Form under 42 U.S.C. § 408(a)(3).  See Indictment at 1-4, filed June 15, 2022 (Doc. 2).  On November 23, 2022, the Grand Jury filed a nearly identical Superseding Indictment charging Sandoval under the same 51 counts as the original Indictment, but changing a date in Count 51.  See Superseding Indictment. Regarding Counts 1 through 49, the Superseding Indictment alleges that Sandoval "willfully and knowingly stole, purloined and converted to his own use and gain . . . Social Security Disability Insurance Benefits payments to which he was not entitled, . . . in the total approximate amount of $83,136.20," via forty-nine separate payments.  Superseding Indictment at 1.  Regarding Count 50, the Indictment alleges that Sandoval

> knowingly and willfully made false, fictitious and fraudulent statements and representations, knowing such statements and representations to be false fictitious and fraudulent, namely the defendant falsely stated that he was not able to work and had not received any income other than his Social Security Disability Benefits, when in truth and fact the defendant knew that he had been working at and receiving

income from Traditions Past and Present, a jewelry business.

Superseding Indictment at 4.   Regarding Count 51, the Superseding Indictment alleges that Sandoval

> knowingly and willfully made materially false statements and representations in a Work Activity Report – Employee form used by the Social Security Administration to determine continued rights to Disability Insurance Benefits payments, namely the defendant falsely stated that he was not able to work and had not received any income other than his Social Security Disability Insurance Benefits, when in truth and fact the defendant knew that he had been working at and receiving income from Traditions Past and Present, a jewelry business.

Superseding Indictment at 4.

Sandoval's trial took place from December 13, 2022, to December 16, 2022.  See Clerk's Minutes at 1, filed December 13, 2022 (Doc. 95).  At the start of trial, the United States moved to dismiss Counts 34-49 of the Superseding Indictment without prejudice.  See Motion to Dismiss Counts 34-49 of the Superseding Indictment, filed December 13, 2022 (Doc. 68).  The Court granted the Motion to Dismiss Counts 34-49 of the Superseding Indictment.  See Amended Order to Dismiss Counts 34-49 of the Superseding Indictment, filed December 21, 2022 (Doc. 87).  At the close of evidence, the jury convicted Sandoval of all thirty-five counts on which the United States proceeded, including (i) thirty-three counts of Theft of Government Property under 18 U.S.C. § 641, corresponding to payments Sandoval received from June, 2017, through February, 2020; (ii) one count of Making False Statements under 18 U.S.C. § 1001(a)(2); and (iii) one count of False Statement in a Social Security Form under 42 U.S.C. § 408(a)(3).  See Verdict Form at 1-7, filed December 16, 2022 (Doc. 84).

**2.      The Acquittal Motion.**

At the close of the United States' case-in-chief, Sandoval filed the Acquittal Motion.  See Acquittal Motion at 1-8.  In the Acquittal Motion, Sandoval moves under rule 29 of the Federal

Rules of Criminal Procedure.  <u>See</u> Acquittal Motion at 1.  Sandoval contends that he should be acquitted on each of the counts that the United States brought against him.  <u>See</u> Acquittal Motion at 1-8.  The Acquittal Motion is organized around the three categories of charges: (i) Sandoval's thirty-three counts of Theft of Government Property, contrary to 18 U.S.C. § 641; (ii) his one count of Making False Statements, contrary to  18 U.S.C. § 1001(a)(2); and (iii) his one count of False Statement in a Social Security Form, contrary to 42 U.S.C. § 408(a)(3).

First, Sandoval argues that he should be acquitted on the thirty-three counts of Theft of Government Property under 18 U.S.C. § 641.  <u>See</u> Acquittal Motion at 1-7.  Broadly, Sandoval argues that the United States does not prove that he stole government benefits under 18 U.S.C. § 641, because, he argues, the United States' evidence does not demonstrate that he was not entitled to continue to receive benefits in the relevant period pursuant to 20 C.F.R. § 404.  <u>See</u> Acquittal Motion at 1.  In support of this argument, Sandoval begins with the premise that, under 20 C.F.R. § 404.316(d), he has a "disabling impairment" as 20 C.F.R. § 404.1511 defines that term.  Acquittal Motion at 1.  To support this premise, he asserts that "the uncontroverted medical evidence has been that he has emphysema, which is one of the conditions specifically listed in Appendix 1." Acquittal Motion at 1.  Next, Sandoval contends that he was entitled to a "trial work period" under 20 C.F.R. § 404.1592(d)(1), which he characterizes as "a period of nine months -- which do not have to be consecutive, and can occur at any point in a five-year period -- in which Mr. Sandoval met a certain income threshold but would still be entitled to receive full benefits."  Acquittal Motion at 2.  Sandoval also emphasizes that, "[a]fter the trial work period, the regulations further require that Mr. Sandoval be 'paid benefits for the first month after the trial work period in which [he does] substantial gainful activity *and* the succeeding two months, whether or not [he does] substantial gainful activity during those succeeding months.'"  Acquittal Motion at 2 (quoting 20 C.F.R. §

404.316(d) (alterations and emphasis in Acquittal Motion, but not in 20 C.F.R. § 404.316(d))). Sandoval asserts that he is entitled to "full benefits irrespective of how much he works or makes" for the three months after the trial work period. Acquittal Motion at 2. He then contends that, moving beyond the trial work period and the three-month grace period, 20 C.F.R. § 404.1592a(b)(2)(ii) entitles him to a "reentitlement period," i.e., an Extended Period of Eligibility, of no less than three years, "during which he would get paid full benefits for any month he did not have 'substantial gainful activity,'" i.e., "work for profit." Acquittal Motion at 2. Further, Sandoval asserts that 20 C.F.R. § 404.1592a(a) permits him an additional "layer[] of protection that a person with a genuine 'disabling impairment' is entitled to." Acquittal Motion at 2-3 (quoting 20 C.F.R. § 404.316(d)). Sandoval highlights that "[n]one of these regulations have exceptions for fraud, false statements, or fault in providing bad information to the SSA." Acquittal Motion at 3.

After discussing the regulations, Sandoval alleges that the trial record is insufficient to support his conviction for the thirty-three counts of Theft of Government Property under 18 U.S.C. § 641. See Acquittal Motion at 3-7. Sandoval notes that, because IRS records show that he received $0.00 in income from 2009 to the present, the United States relied on Wells Fargo records and charts summarizing those records. See Acquittal Motion at 3. Sandoval emphasizes that, because the United States submitted no financial evidence for the period before May 7, 2016, it did not prove that Sandoval received income in 2015, in 2014, in 2013, or any earlier year. See Acquittal Motion at 3. Accordingly, Sandoval contends, the United States "cannot have proved that James [Sandoval] met a trial-work-period threshold in any month before May 2016." Acquittal Motion at 3. As a consequence, Sandoval maintains, "[t]hose nine months, which again do not have to be consecutive, and during which Mr. Sandoval is entitled to full disability benefits, must start in May 2016 or later." Acquittal Motion at 3.

Sandoval makes a series of arguments regarding the start of the trial work period.  See Acquittal Motion at 3-5.  Sandoval states that the earliest financial statement in the record dates from May 7, 2016, and is the only record which the United States submitted for the time period between May, 2016, and June, 2017.  See Acquittal Motion at 3.  Sandoval emphasizes: "The operative amount in 2016, per § 404.1592, was $810 per month.  That is therefore the threshold that Mr. Sandoval had to hit to trigger a trial work period."  Acquittal Motion at 3-4.  Sandoval states that, based on the statements from May, 2016, through September, 2016,

> [t]he most prosecution-generous reading of the evidence is that Mr. Sandoval's trial work period *might have* begun in October 2016 (Bates 1255 and 1260), although no witness testified to the origin of the deposits and transfers or why they should be construed as income within the meaning of the SSA statutes and regulations.

Acquittal Motion at 4.  Similarly, Sandoval contends that, for the statements for November and December, 2016, and January through May, 2017, "there are deposits and transfers, but no evidence that those qualify as 'income.'"  Acquittal Motion at 4.  Sandoval asserts that, "by the most generous measure to the prosecution, the three-year reentitlement period began in mid-2017; it therefore must have continued past the last count still charged in the indictment (which relates to February 2020)."  Acquittal Motion at 5.  Sandoval argues that the business account records from after June 1, 2017, cannot "make the trial work period end before nine months have passed, of course, because counting to nine will be the same regardless (and the trial work period is not impacted at all by how much money you make over the threshold.)"  Regarding the records at issue, Sandoval states:

> [W]e can note two things: (1) the original records from the 5042 account (Ex. 40) only cover June 1, 2017 to October 31, 2018; and (2) the records show -- most clearly on Mr. Paylor's Excel exhibit, **Ex. 50** -- that in 2017, the business had net earnings of **-$2,459.71**.  In 2018, it was a better year, and it had net earnings of **$3,806.47** for the entire year.  No mathematical manipulation can make these numbers hit the substantial gainful activity threshold for 2017, which was $1,170 per month, or 2018, which was $1,180 per month.  The same is true of the 5742 personal account (Ex. 38); going month by month through the pages from Bates 1304 to 1408 -- which is July 2017 through March 2019 -- and there is only one month that could even

- 6 -

*arguably* hit the substantial gainful activity threshold.  That is February 2018 (Bates 1338 and 1343), which had one transfer and two mobile deposits adding up to $2,000 total.  There was absolutely no evidence presented about what those deposits were, because again no one performed a manual review of those records.  All we have are two lines on the records that say "mobile deposit" -- and that is not enough to prove income where the Government has the burden of proving beyond a reasonable doubt that Mr. Sandoval was not entitled to benefits in each and every month charged in the indictment.

Acquittal Motion at 6 (all emphasis and citations in original).  Sandoval summarizes his acquittal

arguments for the Theft of Government Property under 18 U.S.C. § 641 counts:

[T]he Government did not prove that the reentitlement period -- or the Extended Period of Eligibility, as the witnesses called it -- ended at any point during or prior to the period at issue in the indictment.  And then they further did not prove that there was substantial gainful activity in any of those months.  If there is no substantial gainful activity in any month of the reentitlement period -- which is based by law on *income*, as defined by law, not on accumulated deposits or transfers coming in to a business account without regard to what's going out -- then Mr. Sandoval would be entitled to full disability benefits for any such month.  That is not what the records show up through April 2019, and there are no records at all from that point through to February 2020.  And that compels the conclusion that the Government has not presented sufficient evidence to convict Mr. Sandoval of the Theft of Government Property alleged in Counts 1-33 of the indictment.  We therefore ask the Court to enter a judgment of acquittal on all those counts.

Acquittal Motion at 7 (emphasis in original).

Next, Sandoval turns to his arguments in support of acquittal on Count 34, Making False

Statements under 18 U.S.C. § 1001(a)(2).  *See* Acquittal Motion at 7.  Sandoval's contentions

regarding Count 34 are that: (i) Sandoval did not tell Ryan Palmiter, a special agent with the Social

Security Administration, Office of Inspector General, in his interview that he could not work, but

only that he did not work; and (ii) Sandoval's bank statements and IRS records reflect that he made

zero income.  *See* Acquittal Motion at 7.  Given evidence that Sandoval made no income, he

maintains that the United States does not meet its burden to prove that he lied knowingly and

willfully about not making any income.  *See* Acquittal Motion at 7.

Finally, Sandoval addresses Count 35, False Statement in a Social Security Form under

42 U.S.C. § 408(a)(3).  <u>See</u> Acquittal Motion at 7-8.  Sandoval contends that the trial record does

not indicate that the statements he made on the form at issue are false.  <u>See</u> Acquittal Motion at 7-

8.  Sandoval makes an additional argument regarding materiality:

> This form was completed over a year after any alleged theft by Mr. Sandoval, during
> a period where he had been under investigation for going on three years.  Under the
> circumstances, the Government did not show that -- in addition to the statements
> being knowingly and willfully false -- they were capable of influencing the SSA in
> the manner required for them to be material.

Acquittal Motion at 8.

### 3.    <u>Arguments before the Court</u>.

The parties argued the Acquittal Motion on December 16, 2022, the same day it was filed.

<u>See</u> Acquittal Motion Tr.  In the argument before the Court, Sandoval begins by stating that an

essential element of his charges under 18 U.S.C. § 641 is that the United States must prove that

the property in question did not belong to Sandoval -- "that is to say that Mr. Sandoval was not

entitled to those benefits."  Acquittal Motion Tr. at 2:22-23 (Harrison).  The focus of Sandoval's

argument, then, is whether he legally was entitled to benefits during the period in which the United

States brings counts under 18 U.S.C. § 641; because if Sandoval was legally entitled to the benefits

under the relevant law -- his theory goes -- then he could not have stolen them.  In this vein, to

make the argument that he was entitled to benefits during the charging period, Sandoval relies on

an interpretation of the regulatory scheme that governs his entitlement to benefits, namely, 20

C.F.R. 404.  <u>See</u> Acquittal Motion Tr. at 2:24-3:3 (Harrison).

Although the argument is somewhat technical in a regulatory sense, its basic sequence is

relatively straightforward.  Sandoval begins with the premise that -- under the relevant regulations

-- he has a "disabling impairment."  Acquittal Motion Tr. at 3:7-8 (Harrison).  After establishing

this premise, Sandoval states that "the question, then, is if he started to work, was he entitled to a

trial work period?"  Acquittal Motion Tr. at 3:18-19 (Harrison).  Sandoval answers this question

in the affirmative and asserts that a trial work period "means a period of nine months during which he's entitled to absolutely full disability benefits."  Acquittal Motion Tr. at 3:22-24 (Harrison). He further adds that those nine months "don't have to be consecutive . . . .  They could take place at any point over a five-year period." Acquittal Motion Tr. at 4:3-4 (Harrison).  In addition, Sandoval asserts that, following the conclusion of the trial work period, he is entitled to an additional "grace period" of three months in which "the regulations require that Mr. Sandoval get the benefits for the first month after the trial work period in which he engages in substantial gainful activity,"  Acquittal Motion Tr. at 4:13-23 (Harrison), and also the "two succeeding months, whether or not he has substantial gainful activity during those months," Acquittal Motion Tr. at 4:23-25 (Harrison).  Moreover, Sandoval also contends that, in addition to the trial work period and the three-month grace period, the relevant regulations entitle him to a "reentitlement period" for a minimum of three years in which "he would also get paid full benefits unless he made substantial gainful activity in each month."  Acquittal Motion Tr. at 5:4-13 (Harrison).

On the basis of this interpretation of the regulatory scheme, Sandoval argues that -- as a matter of law -- he was entitled to disability benefits during each of the months in which the Superseding Indictment charges him with theft of government property.  See Acquittal Motion Tr. at 7:2-18:18 (Harrison).  To demonstrate why he was entitled to benefits, Sandoval begins with an argument regarding the beginning of his trial work period.  He argues that the triggering event of a trial work period is "either a certain income threshold or a number of hours worked."  Acquittal Motion Tr. at 4:5-7 (Harrison).  Sandoval focuses his argument on income threshold as a possible trigger for his trial work period, because, he asserts, that "[w]e didn't hear any testimony about hours worked."  Acquittal Motion Tr. at 4:8-9 (Harrison).

As it relates to income, Sandoval contends that, "to the extent that any of this hinges on

what was reported to the IRS, what the IRS concluded about his income, that is zero." Acquittal Motion Tr. at 7:6-9 (Harrison). Sandoval posits, therefore, that the only source of a possible income analysis -- for the purposes of determining when his trial work period begins -- is found in the "Wells Fargo bank records." Acquittal Motion Tr. at 7:15 (Harrison). Sandoval notes that, in looking at these bank records, "there is no financial evidence in the records that predates May 7, 2016." Acquittal Motion Tr. at 7:21-22 (Harrison). Sandoval argues that, because of the absence of bank records before that date, "[t]here is no basis for a fact finder to conclude reasonably that there was trial work period, there was substantial gainful activity, there has been no showing of income in any period prior to . . . May 7 . . . of 2016." Acquittal Motion Tr. at 7:23-8:2 (Harrison). Again, Sandoval argues, that the absence of bank records preceding that date "just knocks out 2015, 2014, and any prior months in 2016 as well," as the possible date on which a trial work period could have begun. Acquittal Motion Tr. at 8:2-4 (Harrison). In short, because of the absence of bank records before May, 2016, the trial work period must have begun either at that time or later.

Sandoval argues, however, that the bank records from May, 2016, to September, 2016, likewise do not form a basis on which a jury could find that Sandoval met the income threshold to trigger a trial work period. See Acquittal Motion Tr. at 9:12-10:8 (Harrison). Sandoval argues that the relevant monthly income threshold in 2016 was $810.00, see Acquittal Motion Tr. at 9:6-8 (Harrison), and that Sandoval's income during those months -- as the bank statements reflect -- does not "meet the threshold of $810 per month," Acquittal Motion Tr. at 9:12-10:6 (Harrison). He argues that on a "very generous reading of the prosecution's evidence," Acquittal Motion Tr. at 10:12-13 (Harrison), the first month in which Sandoval may have reached the earning threshold and thus begun the trial work period would have been October, 2016, see Acquittal Motion Tr. at

10:9-16 (Harrison).[1]  Following from the idea that Sandoval's trial work period may have begun in October, 2016, Sandoval then asserts that he would have been entitled to full benefits at least from October, 2016, until nine months later, in June, 2017.  See Acquittal Motion Tr. at 10:13-16 (Harrison).  On this basis, he states that "June 2017, really by any calculation, cannot be a month in which he was entitled to zero benefits, and therefore, cannot be a basis of a theft of government property count."  Acquittal Motion Tr. at 11:6-9 (Harrison).  June, 2017, as noted above, is the first month of the charging period in the Superseding Indictment.  See Superseding Indictment at 1.

Beyond June, 2017, Sandoval argues that, because of the post-trial work period three-month "grace period," Acquittal Motion Tr. at 11:14-15 (Harrison), he also cannot be said to have stolen government property during any of the three-month period between July, 2017, and September, 2017,  see Acquittal Motion Tr. at 11:13-18 (Harrison), because he would have been "entitled to full benefits during those months," Acquittal Motion Tr. at 11:20-21 (Harrison).  Accordingly, Sandoval argues that dismissal of the first four counts of the Superseding Indictment -- covering June, 2017, through September, 2017 -- is appropriate "purely by application of the regulations to the records that the Government entered in their case-in-chief."  Acquittal Motion Tr. at 11:23-25 (Harrison).  After September 2017, Sandoval argues, the reentitlement period, which Sandoval contends is a minimum of 3 years, "must necessarily have continued through the entire course of the indictment."  Acquittal Motion Tr. at 12:7-8 (Harrison).  Again, with respect

---

[1]Sandoval qualifies this "very generous reading of the prosecution's evidence" argument by stating that, as to the bank account deposits for this month, "[t]here is no one who testified why that should be construed as income."  Acquittal Motion Tr. at 10:19-20 (Harrison).  Sandoval does not concede that these deposits should be construed as income for the purposes of determining when the trial work period begins, but states that, even assuming that they are income, the evidence is still insufficient.  See Acquittal Motion Tr. at 10:9-11:3 (Harrison).

to this rentitlement period, Sandoval's position is that, during that time, "he would also get paid full benefits unless he made substantial gainful activity in each month."  Acquittal Motion Tr. at 5:4-13 (Harrison).

Sandoval posits that he did not meet the relevant income threshold that would have constituted substantial gainful activity for any month during the remainder for the relevant charging period, i.e., from October, 2017, through February, 2020.  To make this argument, Sandoval states that, "pursuant to the regulations, a Title 2 disability recipient, who is self-employed, has a legal standard that's applied to determining what his income is [and] [s]elf-employed income is not whatever came into his account that month, irrespective of what went out."  Acquittal Motion Tr. at 12:21-13:1 (Harrison).  Rather, Sandoval asserts that self-employed persons' "covered earnings are called self-employment income, which is based on your net earnings from the self-employment during a taxable year."  Acquittal Motion Tr. at 13:8-10 (Harrison).  He further contended that "[n]et earnings means gross income, as figured under Subtitle A of the Internal Revenue Code, minus deductions attributed to your trade or business that are allowed by that subtitle, so what's allowed by the tax code."  Acquittal Motion Tr. at 13:11-16 (Harrison).

On the basis of this definition of income, Sandoval argues that there is no evidence in the record which can support a finding that he reached the substantial gainful activity threshold for any of the months during which, under his theory of the trial work period and grace period, he would have been in his reentitlement period.  See Acquittal Motion Tr. at 14:8-16:2 (Harrison).  In other words, Sandoval focuses on the bank records evidence for the months from October, 2017, though February, 2020, and argues that the bank records from Sandoval's personal and business accounts cannot form the basis of a jury finding that he reached the substantial gainful activity

threshold during that time.  As to the business account, Sandoval argues that "there is no evidence in the record that the debits and transfers that go out of that 5042 account were not . . . anything other than deductions attributable to trade or business, which are permitted by the tax code, which is 26 U[.]S[.]C[. §] 1402(a)."  Acquittal Motion Tr. at 13:25-14:4 (Harrison).  Sandoval further contends that the bank records for the business account "only go from June 2017 through October of 2018," Acquittal Motion Tr. at 14:16-17 (Harrison), and that the net earnings demonstrated by that business account show negative net earnings in the aggregate for that entire period, and cannot during any month meet the substantial gainful activity threshold, which Sandoval asserts was $1,170 per month in 2017 and $1,180 per month in 2018, see Acquittal Motion Tr. at 14:16-17 (Harrison).

As for the personal account, Sandoval contends that there is only one month during the charging period "that could even come close to the standard for substantial gainful activity [. . .] [a]nd this was February of 2018."  Acquittal Motion Tr. at 15:16-19 (Harrison).  In that month, the bank records show -- in addition to his check from the Social Security Administration -- $2000.00 in deposits to Sandoval's personal account.  See Acquittal Motion Tr. at 15:19-21 (Harrison).  Sandoval maintains, however, that "[t]here is absolutely no evidence of what those mobile deposits were" and that, therefore, "[t]here is no way to confirm that was income."  Acquittal Motion Tr. at 15:21-24 (Harrison).  Sandoval sums up his argument as follows:

> So the short version -- if this can be called short -- is that the Government did not prove that either the trial work period ended, or that the reentitlement period ended at any point prior to any of the months that are at issue in the indictment, nor did they prove that any of the single months at issue in the indictment actually met the substantial gainful activity threshold, and therefore, stripped him of his entitlement to benefits, such that he could be guilty of theft of government property under [18 U.S.C. §] 641.

Acquittal Motion Tr. at 16:3-13 (Harrison).

- 13 -

Following his arguments on the theft of government property charges, Sandoval also restates his arguments related to the final two counts in the Superseding Indictment.  First, he argues that -- on the charge of making false statements -- the evidence adduced at trial does not show that Sandoval falsely claimed that "he couldn't work" or that "he makes no income." Acquittal Motion Tr. at 16:24-25 (Harrison).  Instead, Sandoval argues that the evidence shows that he said he "doesn't work," and there is a "substantial difference" between the representation that he "doesn't work" versus the United States' allegation that he said he "couldn't work." Acquittal Motion Tr. at 17:5-7 (Harrison).  And, moreover, Sandoval asserts that his representation that he "makes no income" is consistent with his argument -- described above -- that he makes no "income" in the manner that the relevant regulations which govern his disability benefits contemplates.  Acquittal Motion Tr. at 17:1-3 (Harrison).

As for his argument related to the final charge in his case -- the single count for making a false statement in a social security form -- Sandoval repeats his arguments concerning his charge of making false statements, namely, Sandoval states that the representation on the social security form that he "didn't work" is substantially different than the notion that he "could not work," and also that his representation that he earned no income is not false given the relevant regulatory meaning on the term "income."  Acquittal Motion Tr. at 17:2-25 (Harrison).  In addition, Sandoval restates his argument from the Acquittal Motion regarding the materiality of the form in question. See Acquittal Motion Tr. at 18:1-14 (Harrison).

The United States offered argument in response.  See Acquittal Motion Tr. at 18:25-31:17 (Court, Harrison, Houghton).  Regarding Sandoval's assertions on the charges of theft of United States property, the United States contended that Sandoval's argument "takes a highly technical view of what the United States can rely on for proof."  Acquittal Motion Tr. at 20:8-10 (Houghton).

In essence, the United States critiques the notion, which Sandoval argues explicitly, that the only evidence on which the jury can rely to determine Sandoval's income is the bank records submitted as evidence.  See Acquittal Motion Tr. at 20:8-10 (Houghton).  In contrast, the United States argues that a jury properly may rely on other circumstantial evidence for proof of income, as well as its witnesses' interpretation of Sandoval's eligibility to receive benefits.  See Acquittal Motion Tr. at 20:22-21:15 (Houghton).  The United States notes that, if bank records are the only possible basis of proof for Sandoval's charge, such an approach "would prohibit the Government from ever charging any case that didn't involve bank records," Acquittal Motion Tr. at 22:19-20 (Houghton), as would occur in a hypothetical case "in which somebody has zero banking records, [and] just work[s] for cash," Acquittal Motion Tr. at 22:8-9 (Houghton).

After stating its view that the jury properly can rely on more than just the bank records, the United States argues that there is enough evidence in this case -- on the basis of witness testimony and the bank records -- to sustain a conviction of government property under 18 U.S.C. § 641.  The United States highlighted the testimony of Gidget Hall, "who talked about the defendant's practice," Acquittal Motion Tr. at 22:23 (Houghton), which included significant cash income from "trade shows" that was not recorded formally as income because Sandoval "didn't want those kept track of," Acquittal Motion Tr. at 22:24-23:7 (Houghton).  The United States also points to the following circumstantial evidence of a more general nature:

> Then you have all the circumstantial evidence about the store's opening; the fact that he owns a house, which was an admission he made in the ruse interview; the fact that he owns multiple cars; the fact that he travels in, at least 2018 he admitted, 52 times a year; and also in the ruse interview says that, 'I've worked very hard to get where I'm at,' and he gestures towards the car and gestures towards the business.

Acquittal Motion Tr. at 23:14-22 (Houghton).  The United States further asserts that the evidence related to Sandoval's status as a business owner with two storefronts, with "the type of inventory

that he had, which we heard about, getting paid, like, by customers like Ms. Dow, thousands of dollars for just one piece of jewelry," all contributes to "the reasonable inference . . . that he is making more than what is a pretty small amount per month, [$]1,170." Acquittal Motion Tr. at 24:2-7 (Houghton).   The United States also contends that the jury reasonably could rely on the testimony of La'Kendra Coleman, a Lead Disability Processing Specialist with the Social Security Administration, to the effect that December, 2017, was the "37th month" -- i.e., the first month after the reentitlement period, and that "when there is a show of over [substantial gainful activity] income for that month, you're ineligible thereafter." Acquittal Motion Tr. at 21:6-10 (Houghton). See id. at 24:8-14 (Houghton).   The United States also posited that the jury could rely on the testimony of Jennifer Yung, a Module Manager for the Social Security Administration, who also testified "about the extended period of eligibility and the disability cessation period." Acquittal Motion Tr. at 25:217-23 (Houghton). The United States contends that "all of that evidence, circumstantial evidence, is what the jury could rely on in determining that [Sandoval] was not eligible for these benefits." Acquittal Motion Tr. at 24:25-25:3 (Houghton).   The United States concluded this portion of its argument by reflecting that Sandoval's arguments "really go to the weight of the evidence," but not "to the sufficiency of the evidence." Acquittal Motion Tr. at 25:4-9 (Houghton).

As for Sandoval's arguments concerning the charge of Making False Statements contrary to 18 U.S.C. § 1001(a)(2), the United States posited that there is sufficient evidence that the statements made during the interview regarding income and ability to work are false, because the jury could look at all the statements made during the interview and make a "reasonable inference" that Sandoval was making false statements.   Acquittal Motion Tr. at 26:13 (Houghton).   See id. at 26:5-28:12 (Houghton).   According to the United States, Sandoval asserted "multiple times that

he did not work" during the interview, and the United States also expressed its skepticism on the idea that, "because the words, 'I can't work' didn't come out of his mouth, . . . [some]how the jury can't make a reasonable inference there."  Acquittal Motion Tr. at 26:11-14 (Houghton).  Finally, regarding Sandoval's challenge to the final count -- for False Statement in a Social Security Form -- the United States restates its arguments that the statement was false, and it argues that the statement is "material," because it had a "natural tendency to influence" the determination of the Social Security Administration.  Acquittal Motion Tr. at 30:15-18 (Court, Houghton).

On rebuttal, the Court asked Sandoval whether he would agree that, "on Counts 1 through 33, if there is a factual dispute -- and I know you're not conceding there is -- but if there is a factual dispute about whether there was substantial income earned during those periods, then that's an issue some fact finder, the jury, had to determine?"  Acquittal Motion Tr. at 31:23-32:3 (Court).  Sandoval responded that he agreed "[t]o an extent," Acquittal Motion Tr. at 32:4 (Harrison), but still reiterated his view that the bank records are the only evidence that the United States produced on which a determination of income, and also a determination of when Sandoval's trial work period began, could be made, see Acquittal Motion Tr. at 32:11-33:4 (Court, Harrison).  When the Court queried whether La'Kendra Coleman's testimony -- which supported the United States' theory about the timing of the trial work period and of the reentitlement period -- is sufficient to support a jury finding of guilt, Sandoval called into question whether such evidence could support a jury finding:

> I think it's very interesting that the Government is relying on the testimony of La'Kendra Coleman in particular, but also apparently Jennifer Yung.  These are SSA employees who testified that they relied on hearsay from Agent Palmiter.  She testified that she never looked at the bank records.  She never reviewed them.
>
> . . . .
>
> Because the SSA determinations are not subject to the same standards as a

criminal prosecution to allow an SSA witness to come in here and bypass the standards of both proof beyond a reasonable doubt, by sitting up there and saying: I hereby announce that an element of this crime has been proven because I said so, even though I didn't review the records myself, is going to thwart the process that this man is entitled to in this court in a criminal trial. It's not the same standard.

. . . .

They could have come in here with records that would have shown something that supported what Ms. Coleman said. There was no evidence that what she relied on was correct. What she said she relied on was hearsay that never materialized. And it is the case that that witness came in here and said: I hereby say that an element of this crime is met, his trial work period has passed and therefore, he's in a period where he might be entitled to benefits, that without my say-so, he wouldn't be. He'd be entitled to benefits for that period.

Acquittal Motion Tr. at 32:22-34:17 (Harrison).

Sandoval concluded his rebuttal by calling into question the basis for Coleman's and Yung's testimony. See Acquittal Motion Tr. at 35:15-36:25 (Harrison). In essence, Sandoval asserts that Coleman testified that she made her administrative determinations about the timing of Sandoval's trial work period and reentitlement period on the basis of information that is not part of the record, and "only at trial revised her determination to base it exclusively on the hearsay report of the bank records that what she understood those bank records to have represented from Agent Palmiter." Acquittal Motion Tr. at 35:23-35:2 (Harrison). This, Sandoval argues, is "particularly inapposite in this criminal setting." Acquittal Motion Tr. at 35:6-7 (Harrison). Next, Sandoval argues that, for Yung's testimony, "all she did was recite the numbers of the benefits he got from the Social Security Administration. It had nothing to do with his income." Acquittal Motion Tr. at 36:9-12 (Harrison). Sandoval concluded that,

to put all the eggs in the basket of these administrative witnesses coming in here from the SSA, and just telling us whether someone has committed a crime, based on an administrative review we can't probe because there are no records upon which it is based, is just not sufficient for a criminal prosecution.

Acquittal Motion Tr. at 35:9-12 (Harrison).

At the conclusion of the arguments, the Court stated that it would "continue to think about your motion," Acquittal Motion Tr. at 38:17-18 (Court), and also stated that it thought Sandoval's strongest argument was, "Did the period begin when Ms. Yung and when Ms. Coleman said it did[?]," Acquittal Motion Tr. at 35:9-12 (Court).  The Court noted that it was inclined to think that the "administrative decision," as to when the trial work period began and ended,

> is an administrative decision.  It may or may not be correct, but it is just an administrative decision that somebody within the SSA has to make.  How they made it, whether it was incorrect or false or something like that, is not the standard here.  It's maybe floating around as to how shaky or good it was.  But it's just a determination.  It's just when the period starts for the SSA.
>
> And then, I think, if that is true, it seems to me, then there is sufficient evidence in the record that following that he had substantial income.

Acquittal Motion Tr. at 37:6-18 (Court).

### 4. <u>The Acquittal Response and the Acquittal Reply</u>.

The United States waited over three months to respond to the Acquittal Motion, ultimately filing what it styles United States' Supplemental Briefing in Support of Its Response to Defendant's Motion for Judgment of Acquittal, filed March 23, 2023 (Doc. 110)("Acquittal Response").[2]  In the Acquittal Response, the United States directs the Court to the standard in <u>United States v. White</u>, 673 F.2d 299, 301 (10th Cir. 1982), that, on a motion for acquittal, the court "must view evidence 'both direct and circumstantial, in the light most favorable to the government.'"  Acquittal Response at 1 (quoting <u>United States v. White</u>, 673 F.2d at 301).  The United States argues that each of Sandoval's convictions should stand.  <u>See</u> Acquittal Response at 2-8.

First, the United States contends that there is sufficient evidence at trial to convict Sandoval

---

[2]Although the United States characterizes its Acquittal Response as "supplemental briefing," before March 23, 2023, it never filed a response to which the Acquittal Response could serve as supplemental briefing.  Acquittal Response at 1.

of Counts 1 through 33, for Theft of Government Property under 18 U.S.C. § 641.  See Acquittal

Response at 2-7.  The United States argues that the Court must deny Sandoval's Acquittal Motion

on the basis that the United States proved that, "even when the Defendant had a serious health

condition, he was engaged in substantial gainful activity prior, during, and after the charged period."

Acquittal Response at 2.  The Acquittal Response summarizes relevant regulations, including 20

C.F.R. §§ 404.1505, 404.1510, 404.1574a(a), 404.1574(b)(2), and 404.1575(a)(1)-(2).  See

Acquittal Response at 2-3.  The United States then asserts that the trial record indicates that

Sandoval engaged in substantial gainful activity between March, 2015, and June, 2021, pointing to

business incorporation records, online posts, and witness testimony.  See Acquittal Response at 3-

5.  Next, the United States contests Sandoval's representation that the United States did not establish

when Sandoval was entitled to a trial work period, and maintains that "[t]rial testimony showed that

the SSA correctly calculated the TWP, [i.e., trial work period] and the Extended Period of Eligibility

(EPE).  And thus, the Defendant was not entitled to SSA disability benefits since March 2015,

which is when the EPE began."  Acquittal Response at 5 (brackets added).   The United States then

summarizes SSA Disability Program Specialist La'Kendra Coleman's testimony, including

regarding her determination that Sandoval's benefits should have ended in December, 2017, her

preparation of a due process notice to alert Sandoval of the SSA's proposed decision, her issuance

of a final decision in May 18, 2021, and her conclusion that Sandoval gave her no reason to alter

her decision.  See Acquittal Response at 5-6.

        Next, the United States addresses Sandoval's arguments for acquittal on Count 34, Making

False Statements in Violation of 18 U.S.C. § 1001(a)(2).  See Acquittal Response at 7-8.  Again,

the United States maintains that the evidence that it submitted at trial is sufficient to support

Sandoval's conviction.  See Acquittal Response at 7.  The United States emphasizes that, in his

interview with SSA programs specialists, Sandoval "made statements," knowing that they were false, "that he did not work, he was on oxygen all the time, and he did not receive money from his business."   Acquittal Response at 7.   The United States also points to videos of undercover operations that it submitted at trial which show that Sandoval "posed as the owner, manager, and jewelry designer of" Traditions Past and Present.   Acquittal Response at 7.   Further, the United States maintains:

> [I]n the February 19, 2020 recorded statement, the Defendant lied to Mr. Jaramillo and Special Agent Palmiter. Further, the Defendant made these statements willfully, deliberately, voluntarily, and intentionally, which is clearly demonstrated through the evidence presented at trial showing the Defendant's presentation and conduct during his interactions with undercover agents, as well as his interaction with SSA employees. The Defendant's statements were made in a matter pertaining to the SS, which is a federal agency within the jurisdiction of the executive branch of the United States.   Finally, the statements were material to the SSA because the Defendant's statements had a natural tendency to influence a decision of the SSA. In other words, the Defendant lied so that he could continue receiving SSA disability benefits.

Acquittal Response at 7-8.

Finally, the United States turns to Sandoval's arguments regarding acquittal for Count 35, False Statement in a Social Security Form under 42 U.S.C. § 408(a)(3).   See Acquittal Response at 8.   The United States maintains that Sandoval made a false statement or representation to the SSA when he indicated that he was not receiving any income from 2016 to the time that he signed the SSA form.   See Acquittal Response at 8.   In support of the contention that Sandoval's statement is false, the United States points to evidence in the trial record that Sandoval had been working at and earning income from his business since 2009.   See Acquittal Response at 8.   Further, the United States maintains that Sandoval's "statement or representation was for use in determining the right to a federal benefit because his statements could have affected his SSA disability benefits.   And the statement or representation was of a material fact."   Acquittal Response at 8.

Sandoval replied to the Acquittal Response on April 6, 2023. See Reply in Support of Motion for Judgment of Acquittal, filed April 6, 2023 (Doc. 116)("Acquittal Reply"). First, Sandoval argues that the United States "has failed to prove (or even address) 'income.'" Acquittal Reply at 1. Sandoval contends that the provision on which the United States' argument regarding Sandoval's income rests "does not apply to the cessation of benefits, but rather to initial applications and benefit reinstatement." Acquittal Reply at 1. Specifically, Sandoval argues that "[t]he central issue at trial was . . . whether Mr. Sandoval's entitlement to disability benefits ceased, and if so, when," which makes 20 C.F.R. § 404.1575(e) the relevant provision. Acquittal Reply at 2. Sandoval contends that, instead of looking to the proper standard under 20 C.F.R. § 404.1575(e), the United States "attempts to answer the cessation-of-benefits question by using" a different provision, 20 C.F.R. § 404.1575(a)(1)(iii). Acquittal Reply at 2. Regarding 20 C.F.R. § 404.1575(e), Sandoval states:

> Paragraph (e), the correct standard here, establishes "[s]pecial rules for evaluating the work you do after you have received social security disability benefits for at least 24 months"; these "special rules" apply to the question of "whether you have engaged in substantial gainful activity or demonstrated the ability to engage in substantial gainful activity for the purpose of determining whether your disability has ceased because of your work activity." 20 C.F.R. § 404.1575(a)(1)(ii). Per the "special rules," that determination requires application of the "countable income test." Id.

Acquittal Reply at 2 (brackets in Acquittal Reply). Regarding the countable income test, Sandoval states:

> First, [the United States] had to determine "gross income," and "deduct your normal business expenses," thereby determining "net income." 20 C.F.R. § 404.1575(c)(1). Then it had to "deduct the reasonable value of any significant amount of unpaid help furnished by your spouse, children, or others." Id. Then it had to "deduct impairment-related work expenses," to the extent that those were not accounted for under "normal business expenses." Id. (citing 20 C.F.R. § 404.1576). Then it had to "deduct unincurred business expenses paid for you by another individual or agency," which occur when "another person incurs responsibility for the payment of certain business expenses, e.g., rent, utilities, or purchases and repair of

- 22 -

> equipment, or provides you with equipment, stock, or other material for the operation of your business." *Id.* "That part of your income remaining after we have made all applicable deductions represents the actual value of work performed. The resulting amount is the amount we use to determine if you have done substantial gainful activity." *Id.*

Acquittal Reply at 2-3 (brackets added). Sandoval then states that, "[o]nce 'countable income' has been included in accordance with the rules above, the SSA 'will compare your countable income to the earnings guidelines in § 404.1574(b)(2) to determine if you have engaged in substantial gainful activity.'" Acquittal Reply at 3 (quoting 20 C.F.R. § 404.1575I(3)). He then lists the threshold "monthly earnings" amounts for 2014 through 2020, noting that "[t]hese are specific numbers, not general ranges a jury could guess at; but the Government never proposed a calculation of Mr. Sandoval's countable income or compared that income with these numbers, as required by the regulations." Acquittal Reply at 3. Sandoval maintains that, because "comparing countable income to earnings guidelines in § 404.1574(b)(2)(ii)(B) does not take into account, <u>e.g.</u>, whether a disabled person has made social media posts or talked with customers on the phone[,] . . . . almost the entirety of the Government's response [is] beside the point," as "[t]he necessary analysis here . . . is about *payment*." Acquittal Reply at 3-4 (emphasis in original).

Sandoval emphasizes that the United States' case-in-chief does not mention the relevant standards that the regulations provide. <u>See</u> Acquittal Reply at 4. He contends that the United States asks "that the Court consider services that Mr. Sandoval performed as 'circumstantial evidence' of income when countable income *specifically excludes consideration of such services*." Acquittal Reply at 4 (citing 20 C.F.R. § 404.1575(e)(1), but source of quoted material not cited)(emphasis in Reply). Sandoval concludes his argument about which standards apply as follows:

> In this case, the witness testimony showed that substantial gainful activity is based on income alone -- but the Government not only failed to define "income" itself during the presentation of evidence, it also objected (successfully) to the Defendant's request for a jury instruction defining that word as it is used in the

federal regulations.  And although Mr. Sandoval's Rule 29 motion cites extensively and in detail to the amounts in the bank records -- the only evidence of income that the Government entered, as noted in the motion -- the Government does not engage whatsoever in the required analysis of what Mr. Sandoval's income was.

Acquittal Reply at 4.

Next, Sandoval elaborates his argument that "[a]n administrative determination is not the same as a finding of guilt beyond a reasonable doubt, and the former cannot simply substitute for the latter."  Acquittal Reply at 5 (citing United States v. Anderson, 483 F. App'x 433, 439-40 (10th Cir. 2012)), Sandoval maintains that "the SSA's determination alone does not even meet a *preponderance of the evidence* burden.  And much like in *Anderson*, where the SSA employees could not articulate any consistent applicable standard that justified taking away a defendant's benefits, here they admitted that the basis of their benefits determination had disappeared." Acquittal Reply at 5 (emphasis in original).  Sandoval contends that Coleman testified on cross-examination that she did not review Sandoval's bank records and, as to information which Coleman reviewed, emphasizes:

There is no reason that Ms. Coleman's determination based on since-amended IRS information should be afforded any deference in a criminal case -- no more than her assertions based on reading someone else's report purporting to summarize records, which records themselves are not in evidence, should be a basis for a felony conviction.

Acquittal Reply at 6.  Sandoval maintains that the United States

has at every point used a demonstrably wrong standard for the disability determination critical to this case.  Offering evidence suggesting that Mr. Sandoval does not really need oxygen (while objecting to medical records that prove he does) and failing to offer evidence about its burden of *countable income* (while objecting to the defense's attempts to define income for the jury) very probably causes confusion about what disability benefits Mr. Sandoval was entitled to -- but that confusion is not sufficient to support a conviction beyond a reasonable doubt.

Acquittal Reply at 6 (emphasis in original).

Finally, Sandoval contends that the evidence is insufficient to convict him of making false

statements.  See Acquittal Reply at 7.  Sandoval argues that "there is a distinct difference between what the Government charged in the indictment and argued at trial, i.e., that Mr. Sandoval *could not* work, and his statements to agents that he *did not* work."  Acquittal Reply at 7 (emphasis in original).  Further, Sandoval contends that the United States did not produce sufficient evidence that he made income.  See Acquittal Reply at 7.  Specifically, Sandoval maintains that "[h]is bank statements, analysis of which conspicuously omitted from the Government's response, reflect few income payments" and that none of the bank statements "were analyzed by Government witnesses, who in fact specifically disclaimed 'manual review' of the unknown deposits reflected in those records."  Acquittal Reply at 7 (source of quoted material not cited).  Finally, Sandoval contends that "[t]he general proposition that '[t]he SSA relies on [its] beneficiaries to be truthful' is also not sufficient to establish the criminal element of materiality," and that, "[a]t the point of the March 15, 2021 statement in particular, the SSA was attempting to build a criminal case against Mr. Sandoval, not to weigh whether he was eligible for the continuation of benefits."  Acquittal Reply at 8 (first, second, and third alterations in original).

## LAW REGARDING MOTIONS FOR JUDGMENT OF ACQUITTAL

Rule 29 of the Federal Rules of Criminal Procedure provides:

**(a)    Before Submission to the Jury.** After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction. If the court denies a motion for a judgment of acquittal at the close of the government's evidence, the defendant may offer evidence without having reserved the right to do so.

**(b)    Reserving Decision.** The court may reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict. If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.

**(c)      After Jury Verdict or Discharge.**

**(1)      Time for a Motion**. A defendant may move for a judgment of acquittal, or renew such a motion, within 7 days after a guilty verdict or after the court discharges the jury, whichever is later.

**(2)      Ruling on the Motion**. If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal. If the jury has failed to return a verdict, the court may enter a judgment of acquittal.

**(3)      No Prior Motion Required**. A defendant is not required to move for a judgment of acquittal before the court submits the case to the jury as a prerequisite for making such a motion after jury discharge.

**(d)      Conditional Ruling on a Motion for a New Trial.**

**(1)      Motion for a New Trial.** If the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed. The court must specify the reasons for that determination.

**(2)      Finality**. The court's order conditionally granting a motion for a new trial does not affect the finality of the judgment of acquittal.

**(3)      Appeal.**

**(A)      Grant of a Motion for a New Trial.** If the court conditionally grants a motion for a new trial and an appellate court later reverses the judgment of acquittal, the trial court must proceed with the new trial unless the appellate court orders otherwise.

**(B)      Denial of a Motion for a New Trial.** If the court conditionally denies a motion for a new trial, an appellee may assert that the denial was erroneous. If the appellate court later reverses the judgment of acquittal, the trial court must proceed as the appellate court directs.

- 26 -

Fed. R. Crim. P. 29 (bold in original).  In Jackson v. Virginia, 443 U.S. 307 (1979), the Supreme Court of the United States noted that the long-settled practice of allowing federal courts to enter judgments of acquittal when evidence is insufficient to sustain a conviction "only . . . highlight[s] the traditional understanding in our system that the application of the beyond-a-reasonable-doubt standard to the evidence is not irretrievably committed to jury discretion." 443 U.S. at 317 n.10. A judgment of acquittal thus enables a federal district court to protect a defendant's due process rights by removing from jury consideration a charge with respect to which no rational trier of fact could find guilt beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. at 317-19.

In deciding a motion for judgment of acquittal, the court must ask "only whether taking the evidence -- both direct and circumstantial, together with the reasonable inferences to be drawn therefrom -- in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt."  United States v. McKissick, 204 F.3d 1282, 1289 (10th Cir. 2000).  The court relies on the jury, "as the fact finder, to resolve conflicting testimony, weigh the evidence, and draw inferences from the facts presented."  United States v. McKissick, 204 F.3d at 1289.  See United States v. Brooks, 438 F.3d 1231, 1236 (10th Cir. 2006)("Furthermore, it is not our duty to weigh conflicting evidence nor to consider the credibility of witnesses.").  The court must refrain from "examining the evidence in 'bits and pieces,'" and must instead "evaluate the sufficiency of the evidence by 'consider[ing] the collective inferences to be drawn from the evidence as a whole.'"  United States v. Brooks, 438 F.3d at 1236 (quoting United States v. Wilson, 107 F.3d 774, 778 (10th Cir. 1997))(alteration in United States v. Wilson and in United States v. Brooks).

The court's role is to determine whether the evidence, if believed, would establish each element of the crime. See United States v. Delgado-Uribe, 363 F.3d 1077, 1081 (10th Cir.

2004)(citing United States v. Vallo, 238 F.3d 1242, 1247 (10th Cir. 2001)).  "[T]he evidence

necessary to support a verdict 'need not conclusively exclude every other reasonable hypothesis

and need not negate all possibilities except guilt.'"  United States v. Wood, 207 F.3d 1222, 1228

(10th Cir. 2000)(quoting United States v. Wilson, 182 F.3d at 742).  The court should enter a

judgment of acquittal only if no reasonable juror could have found the defendant guilty. See

United States v. Carter, 130 F.3d 1432, 1439 (10th Cir. 1997)("We will not overturn a jury's

finding unless no reasonable juror could have reached the disputed verdict." (citing United States

v. Chavez-Palacios, 30 F.3d 1290, 1294 (10th Cir. 1994); United States v. Hoenscheidt, 7 F.3d

1528, 1530 (10th Cir. 1993)).  The court should not conclude that there is enough evidence to

support a conviction, however, if a conviction can only be "obtained by piling inference upon

inference.  'An inference is reasonable only if the conclusion flows from logical and probabilistic

reasoning.'"  United States v. Valadez-Gallegos, 162 F.3d 1256, 1262 (10th Cir. 1998)(quoting

United States v. Taylor, 113 F.3d 1136, 1144 (10th Cir. 1997); and citing United States v. Jones,

44 F.3d 860, 865 (10th Cir. 1995)).  The Tenth Circuit stated in United States v. Summers, 414

F.3d 1287 (10th Cir. 2005):

> The rule prohibiting the stacking of inference upon inference merely indicates that at some point along a rational continuum, inferences may become so attenuated from underlying evidence as to cast doubt on the trier of fact's ultimate conclusion.  In other words, "the chance of error or speculation increases in proportion to the width of the gap between underlying fact and ultimate conclusion where the gap is bridged by a succession of inferences, each based upon the preceding one."  United States v. Shahane, 517 F.2d 1173, 1178 (8th Cir. 1975).

United States v. Summers, 414 F.3d at 1294-95.  See United States v. Baca, 333 F.R.D. 211, 219

(D.N.M. 2019)(Browning, J.)("The Tenth Circuit's standard for motions for judgments of

acquittal is deferential, requiring that the court consider, in the light most favorable to the United

States, the direct and circumstantial evidence as well as any reasonable inferences a jury could

draw from that evidence.").

## LAW REGARDING SOCIAL SECURITY DISABILITY INSURANCE BENEFITS

Social Security Disability Insurance benefits ("SSDI") "provide[] benefits to people who

have developed a disability or who are blind and who are 'insured' by workers' contributions to

the Social Security trust fund."   Social Security Administration, Red Book: A Guide to Work

Incentives and Employment Supports for People Who Have a Disability Under the Social Security

Disability Insurance (SSDI) and Supplemental Security Income (SSI) Programs 7 (August 2023),

https://www.ssa.gov/pubs/EN-64-030.pdf ("Red Book")(source of quoted material not cited).

SSDI benefits are for individuals with a disability so severe that they are

> not only unable to do his previous work but cannot, considering his age, education,
> and work experience, engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such work exists in the
> immediate area in which he lives, or whether a specific job vacancy exists for him,
> or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).  Unlike Supplemental Security Income -- which draws from general tax

revenues -- funds for SSDI come from the disability trust fund.  See Red Book at 8; see also 42

U.S.C. § 401(b).  SSDI benefits' statutory origin is Subchapter II of the Social Security Act, 42

U.S.C. § 423, the intent of which is "is to ameliorate some of the rigors of life," including disability

that prevents a person from work.  Dvorak v. Celebrezze, 345 F.2d 894, 897 (10th Cir. 1965).  The

regulatory framework that governs SSDI benefits is in Part 404 of Title 20 of the Code of Federal

Regulations.  See 20 C.F.R. §§ 404.1 to 404.2127.

### 1.    Initial Eligibility and Definition of Disability.

The minimum initial qualifications for SSDI benefits are that: (i) the claimant meets the

statutory "disability" criteria -- discussed below -- and (ii) the claimant must be "insured" based

on contributions made to pursuant to the Federal Insurance Contributions Act, 26 U.S.C. §§ 3101

to 3134.  Red Book at 8.  See also 20 C.F.R. § 416.130 (titled "How we determine disability insured

status").   Under the Social Security Act, the term "disability" means:

> **(A)**     inability to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can be expected to
> result in death or which has lasted or can be expected to last for a continuous period
> of not less than 12 months; or
>
> **(B)**     in the case of an individual who has attained the age of 55 and is blind
> (within the meaning of "blindness" as defined in section 416(i)(1) of this title),
> inability by reason of such blindness to engage in substantial gainful activity
> requiring skills or abilities comparable to those of any gainful activity in which he
> has previously engaged with some regularity and over a substantial period of time.

42 U.S.C. § 423(d)(1)(A)-(B).  "Substantial gainful activity," in turn, is a term that the regulations

define as "work that . . . [i]nvolves doing significant and productive physical or mental duties; and

. . . [i]s done (or intended) for pay or profit."  20 C.F.R. § 404.1510.  See 20 C.F.R. § 404.1572(a)

(noting that substantial gainful activity is work activity that is both substantial and gainful, and

that "[s]ubstantial work activity is work activity that involves doing significant physical or mental

activities[; y]our work may be substantial even if it is done on a part-time basis or if you do less,

get paid less, or have less responsibility than when you worked before," and "[g]ainful work

activity is work activity that you do for pay or profit.  Work activity is gainful if it is the kind of

work usually done for pay or profit, whether or not a profit is realized").  Further, "[e]ven a

claimant who frequently suffers from pain, or a terminal illness, generally is ineligible to receive

benefits if substantial gainful activity is found."  3 Soc. Sec. Law & Prac. § 40:1 (September 2023

update)(footnoted omitted).

     To determine whether an individual suffers from a disability as 42 U.S.C. § 423(d)(1)

defines that term, the relevant regulations provide a "five-step sequential evaluation process."  20

C.F.R. § 404.1520(a)(1).  On the basis of "all evidence in [a claimant's] case record,"[3] 20 C.F.R.

§ 404.1520(a)(3), the Social Security makes a determination of disability using the following five

steps:

> (i)      At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. (See paragraph (b) of this section.)

> (ii)     At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. (See paragraph (c) of this section.)

> (iii)    At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. (See paragraph (d) of this section.)

> (iv)     At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. See paragraphs (f) and (h) of this section and § 404.1560(b).

> (v)      At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled. See paragraphs (g) and (h) of this section and § 404.1560(c).

20 C.F.R. § 404.1520(a)(4)(i)-(v).  See Cleveland v. Pol'y Mgmt. Sys. Corp., 526 U.S. 795, 804

(1999)("[I]n order to process the large number of SSDI claims, the SSA administers SSDI with

the help of a five-step procedure that embodies a set of presumptions about disabilities, job

availability, and their interrelation.").

---

[3]Another regulation -- 20 C.F.R. § 404.1520b -- provides guidance on how the Social Security Administration considers evidence.

2.   **Continuing Review of Eligibility.**

"There is a statutory requirement that, if you are entitled to disability benefits, your continued entitlement to such benefits must be reviewed periodically." 20 C.F.R. § 404.1594(a). The Social Security Administration also will review a claimant's case if they "receive information that [a claimant] may have medically improved." Red Book at 9. See 20 C.F.R. § 404.1590 ("When and how often we will conduct a continuing disability review."). To "assure that disability reviews are carried out in a uniform manner, that decisions of continuing disability can be made in the most expeditious and administratively efficient way, and that any decisions to stop disability benefits are made objectively, neutrally and are fully documented," the Social Security Administration follows a regulation-imposed sequential process "in reviewing the question of whether [a claimant's] disability continues." 20 C.F.R. § 404.1594(f). That process is as follows:

(1)   Are you engaging in substantial gainful activity? If you are (and any applicable trial work period has been completed), we will find disability to have ended (see paragraph (d)(5) of this section).

(2)   If you are not, do you have an impairment or combination of impairments which meets or equals the severity of an impairment listed in appendix 1 of this subpart? If you do, your disability will be found to continue.

(3)   If you do not, has there been medical improvement as defined in paragraph (b)(1) of this section? If there has been medical improvement as shown by a decrease in medical severity, see step (4). If there has been no decrease in medical severity, there has been no medical improvement. (See step (5).)

(4)   If there has been medical improvement, we must determine whether it is related to your ability to do work in accordance with paragraphs (b)(1) through (4) of this section; i.e., whether or not there has been an increase in the residual functional capacity based on the impairment(s) that was present at the time of the most recent favorable medical determination. If medical improvement is not related to your ability to do work, see step (5). If medical improvement is related to your ability to do work, see step (6).

(5)   If we found at step (3) that there has been no medical improvement or if we found at step (4) that the medical improvement is not related to your ability to work, we consider whether any of the exceptions in paragraphs (d) and (e) of this section apply. If none of them apply, your disability will be found to continue. If

one of the first group of exceptions to medical improvement applies, see step (6). If an exception from the second group of exceptions to medical improvement applies, your disability will be found to have ended. The second group of exceptions to medical improvement may be considered at any point in this process.

(6)     If medical improvement is shown to be related to your ability to do work or if one of the first group of exceptions to medical improvement applies, we will determine whether all your current impairments in combination are severe (see § 404.1521). This determination will consider all your current impairments and the impact of the combination of those impairments on your ability to function. If the residual functional capacity assessment in step (4) above shows significant limitation of your ability to do basic work activities, see step (7). When the evidence shows that all your current impairments in combination do not significantly limit your physical or mental abilities to do basic work activities, these impairments will not be considered severe in nature. If so, you will no longer be considered to be disabled.

(7)     If your impairment(s) is severe, we will assess your current ability to do substantial gainful activity in accordance with § 404.1560. That is, we will assess your residual functional capacity based on all your current impairments and consider whether you can still do work you have done in the past. If you can do such work, disability will be found to have ended.

(8)     If you are not able to do work you have done in the past, we will consider whether you can do other work given the residual functional capacity assessment made under paragraph (f)(7) of this section and your age, education, and past work experience (see paragraph (f)(9) of this section for an exception to this rule). If you can, we will find that your disability has ended. If you cannot, we will find that your disability continues.

(9)     We may proceed to the final step, described in paragraph (f)(8) of this section, if the evidence in your file about your past relevant work is not sufficient for us to make a finding under paragraph (f)(7) of this section about whether you can perform your past relevant work. If we find that you can adjust to other work based solely on your age, education, and residual functional capacity, we will find that you are no longer disabled, and we will not make a finding about whether you can do your past relevant work under paragraph (f)(7) of this section. If we find that you may be unable to adjust to other work or if § 404.1562 may apply, we will assess your claim under paragraph (f)(7) of this section and make a finding about whether you can perform your past relevant work.

20 C.F.R. § 404.1594(f)(1)-(9).  As with the initial "five-step sequential evaluation process" in 20

C.F.R. § 404.1520(a)(4), the threshold focus here is on whether a claimant has engaged in

substantial gainful activity, and this focus makes sense, given that an inability to engage in

substantial gainful activity is foundational to the statutory meaning of disability.  See 42 U.S.C. § 423(d)(1)(A) (defining disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment").

    **3.**    **Trial Work Period.**

Despite the focus on a claimant's inability to engage in substantial gainful activity when determining whether SSDI benefits are appropriate, the statutory scheme allows for recipients of SSDI to "test [their] ability to work," 20 C.F.R. § 404.1592(a), and still receive benefits for a specific period, see 42 U.S.C. § 422(c).  This period of time is called a "trial work period," 20 C.F.R. § 404.1592(a), or a "period of trial work," and "[w]ork done during a trial work period . . . may not be considered in determining whether a claimant's disability has ceased during that period," Newton v. Chater, 92 F.3d 688, 692 (8th Cir. 1996).  See Walker v. Sec'y of Health & Hum. Servs., 943 F.2d 1257, 1259 (10th Cir. 1991)("A trial work period is designed to enable an individual to test his or her ability to return to work without losing disability insurance benefits.").  During a trial work period, an individual will continue to receive the full amount of her or his SSDI benefits.  See Red Book at 20; 42 U.S.C. § 422(c)(2) ("For purposes of sections 416(i) and 423 of this title, any services rendered by an individual during a period of trial work shall be deemed not to have been rendered by such individual in determining whether his disability has ceased in a month during such period.").

A trial work period is limited to "as many as 9 months, but these months do not have to be consecutive."  20 C.F.R. § 404.1592(a).  The regulations state that, during this time, "you may perform *services*," 20 C.F.R. § 404.1592(a) (emphasis in original), and "services" is defined as follows:

        When used in this section, *services* means any activity (whether legal or illegal), even though it is not substantial gainful activity, which is done in employment or self-employment for pay or profit, or is the kind normally done for

pay or profit. We generally do not consider work done without remuneration to be *services* if it is done merely as therapy or training or if it is work usually done in a daily routine around the house or in self-care. We will not consider work you have done as a volunteer in the federal programs described in section 404.1574(d) in determining whether you have performed services in the trial work period.

20 C.F.R. § 404.1592(b) (emphasis in original).  Beginning on January 1, 2002, for self-employed individuals receiving SSDI benefits, the Social Security Administration will consider a claimant's activities as a self-employed person to be "services" if

you work more than 80 hours a month in the business, or your net earnings in a month are more than an amount determined for each calendar year to be the larger of:

(A)    Such amount for the previous year, or

(B)    An amount adjusted for national wage growth, calculated by multiplying $530 by the ratio of the national average wage index for the year 2 calendar years before the year for which the amount is being calculated to the national average wage index for 1999. We will then round the resulting amount to the next higher multiple of $10 where such amount is a multiple of $5 but not of $10 and to the nearest multiple of $10 in any other case.

20 C.F.R. § 404.1592(b)(2)(ii)(A)-(B).

A trial work period begins "with the month in which you become entitled to disability insurance benefits," but "[i]t cannot begin before the month in which you file your application for benefits."  20 C.F.R. § 404.1592(e).  The trial work period ends in "whichever of the following calendar months is the earliest":

(1)    The 9th month (whether or not the months have been consecutive) in which you have performed services if that 9th month is prior to January 1992;

(2)    The 9th month (whether or not the months have been consecutive and whether or not the previous 8 months of services were prior to January 1992) in which you have performed services within a period of 60 consecutive months if that 9th month is after December 1991; or

(3)    The month in which new evidence, other than evidence relating to any work you did during the trial work period, shows that you are not disabled,

> even though you have not worked a full 9 months. We may find that your disability
> has ended at any time during the trial work period if the medical or other evidence
> shows that you are no longer disabled. See § 404.1594 for information on how we
> decide whether your disability continues or ends.

20 C.F.R. § 404.1592(e)(1)-(3).  A SSDI benefits recipient is entitled to only one trial work period

during their period of entitlement to cash benefits.  See 20 C.F.R. § 404.1592(c).

### 4.   **Reentitlement Period.**

"The reentitlement period is an additional period after 9 months of trial work during which

you may continue to test your ability to work if you have a *disabling impairment,* as defined in

§ 404.1511."  20 C.F.R. § 404.1592a (emphasis in original).  "During the 36-month re-entitlement

period, you get benefits for all months your earnings or work activities are below the substantial

gainful activity . . . level."  Red Book at 21.  If a claimant works during the reentitlement period

and their work is found to constitute substantial gainful activity, SSDI benefits will cease.  See 20

C.F.R. § 404.1592a.  Even if this cessation occurs, however, if the claimant then stops engaging

in substantial gainful activity thereafter, benefits payments will resume even without a new

application for benefits.  See 20 C.F.R. § 404.1592a.  Moreover, built into the reentitlement period

is a "grace period," Red Book at 21, in which:

> If we determine under paragraph (a)(1) of this section that your disability ceased
> during the reentitlement period because you perform substantial gainful activity,
> you will be paid benefits for the first month after the trial work period in which you
> do substantial gainful activity (*i.e.*, the month your disability ceased) and the two
> succeeding months, whether or not you do substantial gainful activity in those
> succeeding months.

20 C.F.R. § 404.1592a(a)(2)(i).  In deciding whether a claimant has engaged in substantial gainful

activity during the reentitlement period, the regulations state that the Social Security

Administration will apply "all of the relevant provisions of §§ 404.1571-404.1576 including, but

not limited to, the provisions for averaging earnings, unsuccessful work attempts, and deducting

impairment-related work expenses, as well as the special rules for evaluating the work you do after

you have received disability benefits for at least 24 months."  20 C.F.R. § 404.1592a(a)(1).

**5.**   **How the SSA Determines Whether a Claimant is Engaging in Substantial Gainful activity.**

The relevant provisions of §§ 404.1571-404.1576 and 20 C.F.R. § 404.1592a(a)(1) provide

the general and specific information on how substantial gainful activity is assessed.  As noted

above, the basic rule is that, "[i]f you are able to engage in substantial gainful activity, [the Social

Security Administration] will find that you are not disabled."  20 C.F.R. § 404.1571.  Moreover,

the regulations state that "[w]e will consider all of the medical and vocational evidence in your file

to decide whether or not you have the ability to engage in substantial gainful activity."  20 C.F.R.

§ 404.1571.

The regulations provide general guidance about what constitutes this work activity:

> (a)   *The nature of your work.*  If your duties require use of your experience, skills, supervision and responsibilities, or contribute substantially to the operation of a business, this tends to show that you have the ability to work at the substantial gainful activity level.

> (b)   *How well you perform.* We consider how well you do your work when we determine whether or not you are doing substantial gainful activity. If you do your work satisfactorily, this may show that you are working at the substantial gainful activity level. If you are unable, because of your impairments, to do ordinary or simple tasks satisfactorily without more supervision or assistance than is usually given other people doing similar work, this may show that you are not working at the substantial gainful activity level. If you are doing work that involves minimal duties that make little or no demands on you and that are of little or no use to your employer, or to the operation of a business if you are self-employed, this does not show that you are working at the substantial gainful activity level.

> (c)   *If your work is done under special conditions.* The work you are doing may be done under special conditions that take into account your impairment, such as work done in a sheltered workshop or as a patient in a hospital. If your work is done under special conditions, we may find that it does not show that you have the ability to do substantial gainful activity. Also, if you are forced to stop or reduce your work because of the removal of special conditions that were related to your impairment and essential to your work, we may find that your work does not show that you are able to do substantial gainful activity. However, work done under special conditions may show that you have the necessary skills and ability to work at the substantial gainful activity level. Examples of the special conditions that may

relate to your impairment include, but are not limited to, situations in which --

> (1)  You required and received special assistance from other employees in performing your work;

> (2)  You were allowed to work irregular hours or take frequent rest periods;

> (3)  You were provided with special equipment or were assigned work especially suited to your impairment;

> (4)  You were able to work only because of specially arranged circumstances, for example, other persons helped you prepare for or get to and from your work;

> (5)  You were permitted to work at a lower standard of productivity or efficiency than other employees; or

> (6)  You were given the opportunity to work despite your impairment because of family relationship, past association with your employer, or your employer's concern for your welfare.

> (d)  *If you are self-employed.* Supervisory, managerial, advisory or other significant personal services that you perform as a self-employed individual may show that you are able to do substantial gainful activity.

> (e)  *Time spent in work.* While the time you spend in work is important, we will not decide whether or not you are doing substantial gainful activity only on that basis. We will still evaluate the work to decide whether it is substantial and gainful regardless of whether you spend more time or less time at the job than workers who are not impaired and who are doing similar work as a regular means of their livelihood.

20 C.F.R. § 404.1573(a)-(e)(emphasis in original).  In addition, as this provision demonstrates, in discussing substantial gainful activity, the regulations often distinguish between work that is done as an "employee[,]" 20 C.F.R. § 404.1573(c)(5),  and work that is done as a "self-employed" worker,  20 C.F.R. § 404.1573(d).  Later provisions also distinguish different substantial gainful activity evaluation methods "on whether the work activity occurs before or after you have received such benefits for at least 24 months and on the purpose of the evaluation."  20 C.F.R. § 404.1575(a)(1).

a.   **Evaluation Guides for Employees**.

20 C.F.R. § 404.1574 provides the applicable "[e]valuation guides if you are an employee."

For these individuals, the Social Security Administration's "primary consideration will be the

earnings you derive from the work activity."  20 C.F.R. § 404.1574(a)(1).  The dollar amount of

these earnings -- with applicable deductions[4] -- "is the amount we use to determine if you have

done substantial gainful activity."  20 C.F.R. § 404.1574(b)(1).  If the averaged[5] amount is less

than the earnings threshold used to determine substantial gainful activity, then a claimant

generally[6] has not engaged in substantial gainful activity.  See 20 C.F.R. § 404.1574(b)(3)(i).

---

[4]In the case of employees, these deductions include any subsidized earnings, see 20 C.F.R. § 404.1574(a)(2), and the reasonable costs of any impairment-related work expenses as discussed in 20 C.F.R. § 404.1576,  see 20 C.F.R. § 404.1574(b)(1).

[5]The provisions in 20 C.F.R. § 404.1574a instruct on "[w]hen and how we will average your earnings."  20 C.F.R. § 404.1574a.

[6]The regulations provide for some exceptions:

(ii)   *When we will consider other information in addition to your earnings.*  We will generally consider other information in addition to your earnings if there is evidence indicating that you may be engaging in substantial gainful activity or that you are in a position to control when earnings are paid to you or the amount of wages paid to you (for example, if you are working for a small corporation owned by a relative). (See paragraph (b)(3)(iii) of this section for when we do not apply this rule.) Examples of other information we may consider include, whether --

(A)   Your work is comparable to that of unimpaired people in your community who are doing the same or similar occupations as their means of livelihood, taking into account the time, energy, skill, and responsibility involved in the work; and

(B)   Your work, although significantly less than that done by unimpaired people, is clearly worth the amounts shown in paragraph (b)(2) of this section, according to pay scales in your community.

20 C.F.R. § 404.1574(b)(3)(ii) (emphasis in regulation).

Conversely, if the amount is greater than the threshold, the claimant has engaged in substantial gainful activity.  See 20 C.F.R. § 404.1574(b)(2).  For all dates after January 1, 2001, the regulations provide threshold earnings amount is the larger of:

> (A)     The amount for the previous year, or
>
> (B)     An amount adjusted for national wage growth, calculated by multiplying $700 by the ratio of the national average wage index for the year 2 calendar years before the year for which the amount is being calculated to the national average wage index for the year 1998. We will then round the resulting amount to the next higher multiple of $10 where such amount is a multiple of $5 but not of $10 and to the nearest multiple of $10 in any other case.

20 C.F.R. § 404.1574(b)(2)(ii).  To avoid the cumbersome arithmetic that 20 C.F.R. § 404.1574(b)(2)(ii)(B) mandates, interested persons can refer to the substantial gainful activity thresholds on the Social Security Administration's Website.  See Social Security Administration, Substantial     Gainful     Activity     (last     visited     December     22,     2023), https://www.ssa.gov/oact/cola/sga.html.

### b.     Evaluation Guides for Self-Employed Individuals.

For self-employed individuals, the relevant regulations for evaluating substantial gainful activity are in 20 C.F.R. § 404.1575.  The provision states:

> If you are entitled to social security disability benefits and you work as a self-employed person, the way we will evaluate your work activity will depend on whether the work activity occurs before or after you have received such benefits for at least 24 months[7] and on the purpose of the evaluation.

---

[7]The 24-month requirement is further explained:

> For purposes of paragraphs (a)(1) and (e) of this section, we consider you to have received social security disability benefits for at least 24 months beginning with the first day of the first month following the 24th month for which you actually received social security disability benefits that you were due or constructively received such benefits. The 24 months do not have to be consecutive. We will consider you to have constructively received a benefit for a month for purposes of the 24-month requirement if you were otherwise due a social security disability benefit for that month and your monthly benefit was withheld to recover an

20 C.F.R. § 404.1575(a)(1).  For claimants who have not received SSDI benefits for twenty-four

months, the regulations instruct that substantial gainful activity is evaluated by applying three tests:

> We will consider your activities and their value to your business to decide whether you have engaged in substantial gainful activity if you are self-employed. We will not consider your income alone because the amount of income you actually receive may depend on a number of different factors, such as capital investment and profit-sharing agreements. We will generally consider work that you were forced to stop or reduce to below substantial gainful activity after 6 months or less because of your impairment as an unsuccessful work attempt. See paragraph (d) of this section. We will evaluate your work activity based on the value of your services to the business regardless of whether you receive an immediate income for your services. We determine whether you have engaged in substantial gainful activity by applying three tests. If you have not engaged in substantial gainful activity under test one, then we will consider tests two and three. The tests are as follows:

> (i)      *Test one:* You have engaged in substantial gainful activity if you render services that are significant to the operation of the business and receive a substantial income from the business. Paragraphs (b) and (c) of this section explain what we mean by significant services and substantial income for purposes of this test.

> (ii)     *Test Two:* You have engaged in substantial gainful activity if your work activity, in terms of factors such as hours, skills, energy output, efficiency, duties, and responsibilities, is comparable to that of unimpaired individuals in your community who are in the same or similar businesses as their means of livelihood.

> (iii)    *Test Three:* You have engaged in substantial gainful activity if your work activity, although not comparable to that of unimpaired individuals, is clearly worth the amount shown in § 404.1574(b)(2) when considered in terms of its value to the business, or when compared to the salary that an owner would pay to an employee to do the work you are doing.

---

overpayment. Any months for which you were entitled to benefits but for which you did not actually or constructively receive a benefit payment will not be counted for the 24-month requirement. If you also receive supplemental security income payments based on disability or blindness under title XVI of the Social Security Act, months for which you received only supplemental security income payments will not be counted for the 24-month requirement.

20 C.F.R. § 404.1575(e)(2).

20 C.F.R. § 404.1575(a)(2)(i)-(iii).[8]  For self-employed claimants who have received SSDI for

more than twenty-four months, there are "[s]pecial rules":

> We will apply the provisions of this paragraph to evaluate the work you are
> doing or have done if, at the time you do the work, you are entitled to social security
> disability benefits and you have received such benefits for at least 24 months. We
> will apply the provisions of this paragraph only when we are evaluating that work
> to consider whether you have engaged in substantial gainful activity or
> demonstrated the ability to engage in substantial gainful activity for the purpose of
> determining whether your disability has ceased because of your work activity (see
> §§ 404.1592a(a)(1) and (3)(ii) and 404.1594(d)(5) and (f)(1)). We will use the
> countable income test described in paragraph (e)(3) of this section to determine
> whether the work you do after you have received such benefits for at least 24
> months is substantial gainful activity or demonstrates the ability to do substantial
> gainful activity. We will not consider the services you perform in that work to
> determine that the work you are doing shows that you are able to engage in
> substantial gainful activity and are, therefore, no longer disabled.  However, we
> may consider the services you perform to determine that you are not doing
> substantial gainful activity. We will generally consider work that you were forced
> to stop or reduce below substantial gainful activity after 6 months or less because
> of your impairment as an unsuccessful work attempt. See paragraph (d) of this
> section.

20 C.F.R. § 404.1575(e)(1).  The "countable income test," in turn, is described as:

> (3)    *Countable income test.*  We will compare your countable income to
> the earnings guidelines in § 404.1574(b)(2) to determine if you have engaged in
> substantial gainful activity.  See paragraph (c)(1) of this section for an explanation
> of countable income.  We will consider that you have engaged in substantial gainful
> activity if your monthly countable income averages more than the amounts
> described in § 404.1574(b)(2) for the month(s) in which you work, unless the
> evidence shows that you did not render significant services in the month(s). See
> paragraph (b) of this section for what we mean by significant services. If your
> average monthly countable income is equal to or less than the amounts in
> § 404.1574(b)(2) for the month(s) in which you work, or if the evidence shows that
> you did not render significant services in the month(s), we will consider that your
> work as a self-employed person shows that you have not engaged in substantial
> gainful activity.

---

[8]20 C.F.R. § 404.1575(b) explains "[s]ignificant services" for the purpose of this provision,
and 20 C.F.R. § 404.1575(c) explains "substantial income."

20 C.F.R. § 404.1575(e)(3).  "Countable income" under the regulations is calculated by taking a self-employed individual's gross income, and then deducting: (i) "normal business expenses," 20 C.F.R. § 404.1575(c)(1); (ii) "the reasonable value of any significant amount of unpaid help furnished by your spouse, children, or others," 20 C.F.R. § 404.1575(c)(1); (iii) "impairment-related work expenses that have not already been deducted," 20 C.F.R. § 404.1575(c)(1); see 20 C.F.R. § 404.1576 (explaining impairment-related work expenses); (iv) "unincurred business expenses paid for you by another individual or agency," 20 C.F.R. § 404.1575(c)(1); and (v) -- if applicable -- "soil bank payments if they were included as farm income," 20 C.F.R. § 404.1575(c)(1).  The number that results after these deductions "is the amount we use to determine if you have done substantial gainful activity."  20 C.F.R. § 404.1575(c)(1).  To make a monthly average amount, the Social Security Administration uses the framework described in 20 C.F.R. § 404.1574(a) ("When and how we will average your earnings.").

20 C.F.R. § 404.1575(e)'s regulatory provision circumscribes the evidence that can be considered when making a benefits cessation determination for a self-employed claimant who has received benefits for more than twenty-four months.  This more restrictive approach has its statutory basis in § 221(m) of the Social Security Act -- a provision codified at 42 U.S.C. § 421(m).  This provision, titled "Work activity as a basis for review," reads:

> (1)    In any case where an individual entitled to disability insurance benefits under section 423 of this title or to monthly insurance benefits under section 402 of this title based on such individual's disability (as defined in section 423(d) of this title) has received such benefits for at least 24 months --

> (A)    no continuing disability review conducted by the Commissioner may be scheduled for the individual solely as a result of the individual's work activity;

> (B)    *no work activity engaged in by the individual may be used as evidence that the individual is no longer disabled*; and

(C)     no cessation of work activity by the individual may give rise to a presumption that the individual is unable to engage in work.

(2)     An individual to which paragraph (1) applies shall continue to be subject to--

(A)     continuing disability reviews on a regularly scheduled basis that is not triggered by work; and

(B)     termination of benefits under this subchapter in the event that the individual has earnings that exceed the level of earnings established by the Commissioner to represent substantial gainful activity.

42 U.S.C. § 421(m)(emphasis added).

## **LAW REGARDING PROOF OF POSSESSION UNDER 18 U.S.C. § 641**

18 U.S.C. § 641 reads:

Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or

Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted --

Shall be fined under this title or imprisoned not more than ten years, or both; but if the value of such property in the aggregate, combining amounts from all the counts for which the defendant is convicted in a single case, does not exceed the sum of $1,000, he shall be fined under this title or imprisoned not more than one year, or both.

The word "value" means face, par, or market value, or cost price, either wholesale or retail, whichever is greater.

18 U.S.C. § 641.  The Tenth Circuit has stated that "the elements which must be proven under the statute include proof that the accused person: (1) intentionally;[] (2) embezzled, stole, purloined, or converted;[] (3) a record, voucher, money, or something of value exceeding $100;[] (4) which

the government owned.[j]"   United States v. Crook, 213 F. App'x 754, 758-59 (10th Cir.

2007)(footnotes omitted)[9](citing Morissette v. United States, 342 U.S. 246, 263 (1952); United

States v. Speir, 564 F.2d 934, 937-39 (10th Cir. 1977); United States v. Leavitt, 599 F.2d 355, 360

(10th Cir. 1979); United States v. Hill, 835 F.2d 759, 763 (10th Cir. 1987); United States v.

McPhilomy, 270 F.3d 1302, 1307 (10th Cir. 2001)).  Indeed, 18 U.S.C. § 641 "requires proof of

federal ownership of the money or property taken."  United States v. Crook, 213 F. App'x at 759.

## ANALYSIS

The Court denies the Acquittal Motion, because the Court concludes that there is sufficient

evidence in the United States' case-in-chief to support each of the crimes charged.  First, the Court

concludes that sufficient evidence supports the thirty-three counts of Theft of Government

Property, contrary to 18 U.S.C. § 641.  To reach this conclusion, the Court considers -- and

disagrees with -- Sandoval's arguments regarding the trial work period and the reentitlement

period, and then determines that the evidence in the record supports a jury finding that Sandoval

was not entitled to the SSDI benefits that he received from June, 2017, to February, 2020, because

---

[9]United States v. Crook is an unpublished opinion, but the Court can rely on a United States Court of Appeals for the Tenth Circuit unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. [. . .] However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citing In re Citation of Unpublished Opinions/Ords. & Judgments, 151 F.R.D. 470 (10th Cir. 1993)).  The Court concludes that United States v. Crook, as well as United States v. McBride, 656 F. App'x 416 (10th Cir. 2016), have persuasive value with respect to material issues in this case, and will assist the Court in its preparation of this Memorandum Opinion and Order.

of his countable income.  Second, the Court concludes that a reasonable jury could find Sandoval guilty beyond a reasonable doubt on his charge of Making False Statements, contrary to 18 U.S.C. § 1001(a)(2), because the jury reasonably could find that Sandoval's statements to Palmiter were materially false.  Third, and finally, the Court concludes that a reasonable jury could find Sandoval guilty beyond a reasonable doubt on his charge of False Statement in a Social Security Form, contrary to 18 U.S.C. § 408(a)(3), because the jury could reasonably find that Sandoval's statements on his Social Security Form were materially false.

I.    **SUFFICIENT EVIDENCE EXISTS IN THE UNITED STATES' CASE-IN-CHIEF TO SUSTAIN CONVICTIONS OF EACH OF SANDOVAL'S COUNTS OF THEFT OF GOVERNMENT PROPERTY UNDER 18 U.S.C. § 641.**

At the outset, the Court agrees with Sandoval's general premise that "[a] fundamental prerequisite to Mr. Sandoval's criminal liability in this case is that he was not entitled to the Social Security Disability Insurance benefits that he received."  Acquittal Motion at 1.  From this premise, to illustrate that sufficient evidence exists to support a jury finding that he was not entitled to those SSDI benefits, the Court takes Sandoval's argument in three steps.  First, the Court determines that sufficient evidence exists on which a jury could make a determination that Sandoval's trial work period concluded before the charging period in the Superseding Indictment.  Second, the Court determines that sufficient evidence exists on which a jury could determine that Sandoval's post-trial work period "grace period" had concluded before the charging period in the Superseding Indictment.  Last, the Court concludes that, for each of the Superseding Indictment's charges, sufficient evidence in the record exists on which the jury could conclude that Sandoval was not entitled to SSDI benefits for each of the months in the Superseding Indictment.

Rule 29 of the Federal Rules of Criminal Procedure requires courts to direct acquittal on charged crimes if "the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29.  In the oft-quoted formulation of the Honorable E. Barrett Prettyman, United States Circuit Judge for

the United States Court of Appeals for the District of Columbia Circuit:

> If the evidence is such that reasonable jurymen must necessarily have such a doubt,
> the judge must require acquittal, because no other result is permissible within the
> fixed bounds of jury consideration.  But if a reasonable mind might fairly have a
> reasonable doubt or might fairly not have one, the case is for the jury, and the
> decision is for the jurors to make.

Curley v. United States, 160 F.2d 229, 232 (D.C. Cir. 1947).  As Wright and Miller note, in making

this determination,

> It is not for the court to assess the credibility of witnesses, weigh the evidence, or
> draw inferences of fact from the evidence.  These are functions of the jury.  The
> court must look to all of the evidence, but must take the view of the evidence and
> the inferences therefrom in the light most favorable to the government.  That the
> testimony is in conflict is not in itself enough to require judgment of acquittal.

2A Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 467 (4th ed. 2023).

Finally, to make this sufficiency determination, the Court considers "only the 'legal' question

'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational

trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"

Musacchio v. United States, 577 U.S. 237, 243 (2016)(Thomas, J.)(quoting Jackson v. Virginia,

443 U.S. 307, 319 (1979))(emphasis both in Musacchio v. United States and in Jackson v.

Virginia).  Accordingly, to undertake its analysis of this "legal" question, the Court compares the

evidence that the United States presented in its case-in-chief with the applicable legal frameworks

that bear on this case.

### A.   SUFFICIENT EVIDENCE EXISTS ON WHICH A JURY COULD CONCLUDE THAT THE TRIAL WORK PERIOD HAD ENDED AT LEAST THREE MONTHS BEFORE THE CHARGING PERIOD.

As noted above, a recipient of SSDI benefits is entitled to a trial work period, which is a

nine-month period -- months that do not have to be consecutive -- in which a benefits recipient

may test his or her capacity to work without fear that benefits will be terminated.  See 42 U.S.C.

§ 422(c); 20 C.F.R. § 404.1592(a).  During a trial work period, a SSDI benefits recipient is entitled to full benefits no matter the amount of income that he or she receives from testing their work capacity through employment.  See 42 U.S.C. § 422(c)(2); Red Book at 20.  As it pertains to this case, then, the United States must provide sufficient evidence that Sandoval's trial work period had concluded before the months listed in the United States' charging period.  The Court concludes that sufficient evidence exists in the United States' case-in-chief to meet rule 29's burden.  Viewed in the light most favorable to the United States, see Wright & Miller, Federal Practice and Procedure § 467, sufficient evidence exists in the United States' case-in-chief on which a jury could conclude that Sandoval's trial work period began in March, 2014, and ended in November, 2014 -- roughly two-and-a-half years before the months charged in the Superseding Indictment. See Superseding Indictment at 1.

First is the testimony of La'Kedra Coleman, a disability program specialist with the Social Security Administration.  See Volume 3 Trial Transcript at 66:10-21 (dated December 15, 2023), filed June 5, 2023 (Doc. 117)("Vol. 3 Tr.")(Coleman).  Coleman described the trial work period as follows:

> So Social Security allows you the chance to test your abilities, to see if you can go into the work force again.  And you have nine months to work at any level, no matter what.  Like, you can get $1,000; you can get a $2,000 check; nine months without being penalized.  And [you] can continue to get your disability check.

Vol. 3 Tr. at 70:24-71:5 (Coleman).  Coleman further testified that "the system will calculate the trial work period months," Vol. 3 Tr. at 73:11-12 (Coleman), on the basis of information that is imputed from various different sources: (i) the "Detailed Earnings Query," which Coleman described as comprised of information "communicated from the IRS's database to Social Security's database," Vol. 3 Tr. at 74:24-75:2 (Coleman); (ii) the report from the Office of the Inspector General of the Social Security Administration, which "la[ys] out figures from a

business," which come from "bank statements, business accounts, and personal accounts," Vol. 3 Tr. at 75:12-17 (Coleman); (iii) "paystubs," Vol. 3 Tr. at 75:22 (Coleman); (iv) tax forms, see Vol. 3 Tr. at 75:23 (Coleman); and (v) if, applicable, a "work number," which is "when your employer communicates your earnings into the system," Vol. 3 Tr. at 75:25-76:2 (Coleman).  With all this information, Coleman testified that the SSA will then "plug it into a system that calculates what you made per month," Vol. 3 Tr. at 76:3-4 (Coleman), and thereby determines when a benefits recipient had their trial work period, see Vol. 3 Tr. at 76:17-25 (Coleman).  Further, Coleman testified that, following this determination -- like other determinations the SSA makes about benefits -- a claimant is "given the chance to follow up and provide any information [so] they can try to reduce those months."  Vol. 3 Tr. at 77:1-3 (Coleman).

As this process was applied to Sandoval's case in particular, Coleman testified that Sandoval's trial work period began in March, 2014, and ended in November, 2014.  See Vol. 3 Tr. at 85:15-86:20 (Coleman, Ruiz-Velez).  Coleman testified that Sandoval's file -- on which these determinations were made -- contains a report from the Office of the Inspector General of the Social Security Administration, which contains "financial records from around 2014 to 2018, or so, from a business and personal accounts."  Vol. 3 Tr. at 84:18-20 (Coleman).[10]  She also testified that she reviewed the "details earning query," Vol. 3 Tr. at 84:23-24 (Coleman), as well as two separate work activity reports, Vol. 3 Tr. at 83:23-84:4 (Coleman).  Coleman also testified that, after her review of those documents and reports, she sent Sandoval "an 820 and an 821," which are "work activity forms, to allow the beneficiary to provide the information, per those forms, that we need regarding earnings, just to discuss them, explain them, and work your way through those

---

[10]Anthony Paylor, an investigative analyst with the Social Security Administration, Office of the Inspector General, confirmed in his testimony that the OIG report that he prepared consists of bank records "from 2014 until 2019."  Vol. 3 Tr. at 27:25-28:1 (Paylor).

forms, to explain how these earnings occurred, why, and so forth."   Vol. 3 Tr. at 85:5-10 (Coleman).   Coleman testified that Sandoval and Coleman had a "conversation" after her notice of "proposed decision," but that "[t]he conversation did not change the outcome of the final decision."   Vol. 3 Tr. at 89:6-7 (Coleman).

On direct examination, Coleman also testified about certain letters that the Social Security Administration sent to Sandoval in February, 2022, which indicate that the IRS had updated Sandoval's tax information to amend his earnings amounts for tax years 2016 and 2017.  See Vol. 3 Tr. at 90:6-93:22 (Coleman, Ruiz-Velez).  The Court admitted these letters into evidence.  See Earnings Information Letter (dated February 22, 2022), admitted into evidence on December 15, 2022, as United States' Trial Exhibit 51 ("Letter Ex. 51"); Earnings Information Letter (dated February 22, 2022), admitted into evidence on December 15, 2022, as United States' Trial Exhibit 52 ("Letter Ex. 52"), Vol. 3 Tr. at 92:2-3 (Court)(admitting Letter Ex. 51 and Letter Ex. 52 into evidence).  Coleman testified that, although these letters indicate that Sandoval's earnings for the years in question were zero, this fact alone would not have altered any of her determination, because Coleman stated, "we have a combination of systems and information available to us.  We did not have tax records available.  We had other evidence.  So it would not change my decision, what I have entered."  Vol. 3 Tr. at 93:9-13 (Coleman).  Coleman testified that, even in the absence of the tax records, she had at her disposal "other records that show income," namely, "the OIG report that laid out bank information."  Vol. 3 Tr. at 93:14-17 (Coleman, Ruiz-Velez).

Another witness, Gidget Hall, helped Sandoval's business as a bookkeeper beginning "around 2013 or 2014."  Volumes 1 and 2, Excerpt -- Testimony of Gidget Hall at 6:3-16 (dated December 13 and 14, 2023)(Hall, Houghton), filed on March 24, 2023 (Doc. 111)("Hall Testimony Tr.").  Hall testified that, during that time, Sandoval would go to "craft shows or rodeos

or western shows" to sell his wares.  Hall Testimony Tr. at 12:10-13:4 (Hall, Houghton).  Hall

testified that she would help process the receipts from these shows, in which she would "tally up

the receipts from his shows that would show income, purchases, and what the dollar amounts were

there, as well as what the expenses were for the trip."  Hall Testimony Tr. at 12:6-9 (Hall).  Hall

testified that Sandoval's earnings from these shows would be "24, 47, 60-some thousand dollars

at one show," depending on the type of show and how long it was, and that in one "really good

show" there was "$67,000 at one show."  Hall Testimony Tr. at 14:16-23 (Hall, Houghton).  Hall

also testified that she was asked to take "$37,000 from a show and put[] it in [Sandoval's] mom's

banking account," and also asked to file Sandoval's "quarterly taxes . . . through the business that

doesn't have [his] mom's name on it."  Hall Testimony Tr. at 29:17-21 (Hall).   Similarly, Hall

also testified that Sandoval had told her that "he didn't need to report gross receipts tax on the

business that he was running," Hall Testimony Tr. at 24:3-4 (Hall), and that Sandoval told Hall

"[n]ot to worry" about processing cash sales, which were handed to Sandoval directly and thus

were not accounted for in the income calculations.  Hall Testimony Tr. at 24:11-25:2 (Hall,

Houghton).  These practices concerned Hall, because "[y]ou can't balance an account if you don't

have everything that's coming in and coming out."  Hall Testimony Tr. at 25:9-11 (Hall).  As she

put it, "how do I say what your expenses are against your purchases or your sales, if we don't have

the sales?"  Hall Testimony Tr. at 25:11-13 (Hall).  Hall also testified that, through her work doing

bookkeeping, she estimated that the "income of the business" was "substantial . . . over 150 to

$200,000, easy, a year."  Hall Testimony Tr. at 34:11-17 (Hall).

The Court concludes that this evidence is sufficient to support the United States' theory

that Sandoval's trial work period began in March, 2014, and ended in November, 2014.  See Vol.

3 Tr. at 85:15-86:20 (Coleman, Ruiz-Velez).  To support the theory that Sandoval's trial work

period happened during this time, there must be evidence on which a jury could reasonably conclude that Sandoval earned an amount greater than $1,070 per month during that period. See 20 C.F.R. § 404.1592; Social Security Administration, Substantial Gainful Activity (last visited December 22, 2023), https://www.ssa.gov/oact/cola/sga.html. The evidence in the record, particularly Coleman's and Hall's testimony, provides sufficient evidentiary support such that a reasonable mind might fairly lack any reasonable doubt as to the timing of the trial work period, and thus the decision should properly be left to the jury. See Curley v. United States, 160 F.2d at 232. Coleman testified that, on the basis of various pieces of evidence and data that she had at her disposal while reviewing Sandoval's file, she made an initial determination that his trial work period had begun and concluded in 2014, and that Sandoval -- after being given an opportunity to explain his earnings or provide further information -- subsequently provided her no reason to alter this initial determination. See Vol. 3 Tr. at 84:18-20 (Coleman); id. at 93:9-17 (Coleman). Moreover, Coleman -- a lay witness -- explained her first-hand perception of the process in arriving at this initial determination, see Vol. 3 Tr. at 85:15-89:24 (Coleman, Ruiz-Velez), and also testified that Sandoval's IRS information was not dispositive of any of her determinations, see Vol. 3 Tr. at 85:15-89:24 (Coleman, Ruiz-Velez). While Coleman's initial determination of the timing of Sandoval's trial work period is not conclusive evidence of the timing of the trial work period, and Sandoval's cross-examination of Coleman might have given the jury reasons to accord this evidence lesser weight, for the purposes of rule 29, the Court concludes that her testimony is: (i) relevant to timing of the trial work period, and (ii) provides a basis on which a jury could reasonably infer that the trial work period began in March, 2014, and ended in November, 2014.

In addition to Coleman's testimony, Hall testified that, during 2013 and 2014, Sandoval would earn "24, 47, 60-some thousand dollars at one show," Hall Testimony Tr. at 14:16-17 (Hall),

and she stated that the "income of the business" was "substantial . . . over 150 to $200,000, easy, a year," Hall Testimony Tr. at 34:11-17 (Hall).  While Hall's statements regarding single-show earnings and the gross income of the business are only circumstantial evidence of Sandoval's monthly income for the purposes of calculating whether he was engaged in "services" under 20 C.F.R. § 404.1592(b)(2)(B), the Court concludes that these statements form the basis of a reasonable inference that Sandoval was engaging in services that would trigger his trial work period during 2014.  When compared to these estimations, after all, the threshold to trigger the trial work period is relatively meagre.  See 20 C.F.R. § 404.1592(b)(2)(ii)(A)-(B).  As the Court has observed previously, "[t]he Tenth Circuit's standard for motions for judgments of acquittal is deferential, requiring that the court consider, in the light most favorable to the United States, the direct and circumstantial evidence as well as any reasonable inferences a jury could draw from that evidence."  United States v. Baca, 333 F.R.D. at 219.  Accordingly, the Court concludes that Coleman and Hall's testimony, and the reasonable inferences arising therefrom, form a sufficient basis on which a jury could conclude that, during 2014, Sandoval was engaged in "services" under 20 C.F.R. § 404.1592(b)(2)(B), and thus exhausted this trial work period during that time.

### B.   SUFFICIENT EVIDENCE EXISTS ON WHICH A JURY COULD CONCLUDE THAT THE REENTITLEMENT "GRACE PERIOD" HAD CONCLUDED BEFORE THE CHARGING PERIOD.

In the previous section, the Court concludes that, viewed in the light most favorable to the United States, Sandoval's trial work period began in March, 2014, and ended in November, 2014.  As discussed above, however, see Law Regarding Social Security Disability Benefits supra at 36-37, following a trial work period, disability benefits recipients are given a "reentitlement period," which is "an additional period after 9 months of trial work during which you may continue to test your ability to work if you have a *disabling impairment,* as defined in § 404.1511."  20 C.F.R.

§ 404.1592a (emphasis in regulation).  During this thirty-six-month reentitlement period, benefits

are paid to a claimant so long as the claimant does not engage in substantial gainful activity --

determined by the application of "the relevant provisions of §§ 404.1571-404.1576," 20 C.F.R.

§ 404.1592a(a)(1) -- but benefits cease for any month in which the claimant engages in substantial

gainful activity, see 20 C.F.R. § 404.1592a(a).  In addition, a benefits recipient is entitled to a

"grace period," Red Book at 21:

> If we determine under paragraph (a)(1) of this section that your disability
> ceased during the reentitlement period because you perform substantial gainful
> activity, you will be paid benefits for the first month after the trial work period in
> which you do substantial gainful activity (i.e., the month your disability ceased)
> and the two succeeding months, whether or not you do substantial gainful activity
> in those succeeding months.

20 C.F.R. § 404.1592a(a)(2)(i).  Owing to the existence of this "grace period," the Court must

assess whether there is sufficient evidence in the United States' case-in-chief that the first post-

trial work period month in which Sandoval engaged in substantial gainful activity was at least two

months before the first month of the charging period.[11]  For reasons that are similar to the analysis

above regarding the trial work period, see Section I(A), supra at 47-53, the Court concludes that,

viewed in the light most favorable to the United States, see Wright & Miller, Federal Practice and

Procedure § 467, sufficient evidence exists in the United States' case-in-chief on which a jury

could conclude that Sandoval engaged in substantial gainful activity in December, 2014, and thus

---

[11]This need is because, if the "grace period" occurred during the charging period, then those months could not form the basis of criminal liability under 18 U.S.C. § 641 because -- regardless of Sandoval's earnings during the "grace period" -- he is entitled to full benefits, see 20 C.F.R. § 404.1592a(a)(2)(i) (noting that, "[i]f we determine under paragraph (a)(1) of this section that your disability ceased during the reentitlement period," then "you will be paid benefits for the first month after the trial work period in which you do substantial gainful activity . . . and the two succeeding months, whether or not you do substantial gainful activity in those succeeding months").

his "grace period" under 20 C.F.R. § 404.1592a(a)(2)(i) ran from December, 2014, until February, 2015. These three months, under this theory, also were the first three months in Sandoval's thirty-six-month reentitlement period. Accordingly, sufficient evidence supports the United States' theory that Sandoval's "grace period" occurred before the charging period, and therefore the "grace period" cannot shield Sandoval from criminal liability during the charging period.

Evidence in Coleman's and Hall's testimony supports this theory. Similar to her testimony about the timing of the trial work period, Coleman testified that, based on the values that she inputted -- the "plug[ing] in," Vol. 3 Tr. at 86:6 (Coleman), of "all the figures in the database," Vol. 3 Tr. at 85:23 (Coleman) -- the "system," Vol. 3 Tr. at 85:24 (Coleman), indicated that Sandoval's reentitlement period "ended November 2017," Vol. 3 Tr. at 86:17 (Coleman). Because the reentitlement period lasts thirty-six months, see 20 C.F.R. § 404.1592a(b), this testimony supports the notion that Sandoval's reentitlement period began the first month after the trial work period concluded: December, 2014. Moreover, Coleman testified that, on the basis of all the sources of information available to her at the time, her initial determination was that "SGA[12] was performed throughout the extended period of eligibility."[13]   Vol. 3 Tr. at 87:6-8 (Coleman). Viewing this statement in the light most favorable to the United States, a jury could reasonably conclude that Sandoval engaged in substantial gainful activity in December, 2014, and therefore would have exhausted his grace period by the end of February, 2015. Additionally, as with the

---

[12]I.e., substantial gainful activity.

[13]The regulations call this period the "reentitlement period," but it is often referred to as the "extended period of eligibility." Red Book at 21; Foxman v. Saul, No. 19-CV-21712, 2021 WL 1171668, at *5 (D.N.J. March 29, 2021)(Wolfson, C.J.)(noting that, "[a]fter the trial work period, the beneficiary enters his or her extended period of eligibility, also known as the re-entitlement period" (citing 20 C.F.R. § 404.1592a(b)(2)(ii))).   The Court uses the term "reentitlement period," because that term is the one in the regulatory scheme. 20 C.F.R. § 404.1592a.

previous section, the Court also concludes that Hall's testimony regarding Sandoval's business income and the amount of gross income that he made during trade shows throughout 2014, see Hall Testimony Tr. at 14:16-17 (Hall); id. at 34:11-17 (Hall), supports a reasonable inference that he had a countable income greater than $1,070.00 during December, 2014, see 20 C.F.R. § 404.1592a(a)(1); 20 C.F.R. § 404.1574(b)(2)(ii).  In sum, the Court concludes that, on the basis of Coleman's and Hall's testimony, there is sufficient evidence on which a jury reasonably could conclude that Sandoval's "grace period" under 20 C.F.R. § 404.1592a(a)(2)(i) began in December, 2014 and concluded in February, 2015.

### C.   SUFFICIENT EVIDENCE EXISTS ON WHICH A JURY COULD CONCLUDE THAT SANDOVAL WAS NOT ENTITLED TO SSDI BENEFITS DURING EACH OF THE MONTHS CHARGED IN THE SUPERSEDING INDICTMENT.

The two previous sections of this opinion conclude that the evidence in the United States' case-in-chief, when viewed in the light most favorable to the United States, support the notion that Sandoval's trial work period and subsequent "grace period" concluded in February, 2015 -- some twenty-seven months before the charging period's first month.  See Superseding Indictment at 1. Without recourse to these regulatory provisions -- both of which allow a disability recipient to earn any amount of income and still maintain their eligibility to SSDI benefits -- the Court now squarely assesses the Motion's central question: whether the evidence in the United States' case-in-chief supports a jury conclusion Sandoval was not entitled to SSDI benefits for each of the charging period's months.

As discussed previously, for Sandoval -- a self-employed man who had been receiving SSDI benefits since 2007 -- 20 C.F.R. § 404.1575, and, specifically, the "special rules" in 20 C.F.R. § 404.1575(e)(1), govern the regulatory standard for assessing his substantial gainful activity.  This regulatory scheme mandates that, in determining whether Sandoval has engaged in substantial

gainful activity, his "countable income" is compared with "the earnings guidelines in § 404.1574(b)(2)."[14]  20 C.F.R. § 404.1575(e)(3).  "Countable income" is calculated by taking a self-employed individual's gross income, and then deducting: (i) "normal business expenses," 20 C.F.R. § 404.1575(c)(1); (ii) "the reasonable value of any significant amount of unpaid help furnished by your spouse, children, or others," 20 C.F.R. § 404.1575(c)(1); (iii) "impairment-related work expenses that have not already been deducted," 20 C.F.R. § 404.1575(c)(1); see 20 C.F.R. § 404.1576 (explaining impairment-related work expenses); (iv) "unincurred business expenses paid for you by another individual or agency," 20 C.F.R. § 404.1575(c)(1); and (v) -- if applicable -- "soil bank payments if they were included as farm income," 20 C.F.R. § 404.1575(c)(1).  For the years in the Superseding Indictment, the relevant substantial gainful activity threshold amounts were: $1,170.00 for 2017; $1,180.00 for 2018; $1,220.00 for 2019; and $1,260.00 for 2020.  See  Substantial Gainful Activity, Soc. Sec. Admin. (last visited December 22, 2023),  https://www.ssa.gov/oact/cola/sga.html;  Vol. 3 Tr. at 72:15-22 (Coleman, Ruiz-Velez)(testifying to these amounts).  Moreover, under 20 C.F.R. § 404.1575(e)(1), to determine

---

[14]Again, 20 C.F.R. § 404.1574(b)(2)(ii) states that, for all dates after January 1, 2001, the threshold earnings amount is the larger of:

> (A)     The amount for the previous year, or

> (B)     An amount adjusted for national wage growth, calculated by multiplying $700 by the ratio of the national average wage index for the year 2 calendar years before the year for which the amount is being calculated to the national average wage index for the year 1998. We will then round the resulting amount to the next higher multiple of $10 where such amount is a multiple of $5 but not of $10 and to the nearest multiple of $10 in any other case.

20 C.F.R. § 404.1574(b)(2)(ii).  And again, although 20 C.F.R. § 404.1574(b)(2)(ii)(B) does not provide dollar amounts, the substantial gainful activity thresholds are available on the Social Security Administration's Website.  See Substantial Gainful Activity, Soc. Sec. Admin.  (last visited December 22, 2023), https://www.ssa.gov/oact/cola/sga.html.

whether Sandoval is engaging in substantial gainful activity, "[w]e will not consider the services you perform in that work to determine that the work you are doing shows that you are able to engage in substantial gainful activity and are, therefore, no longer disabled."   20 C.F.R. § 404.1575(e)(1).  In addition, 20 C.F.R. § 404.1592a(a)(3)(i), states:

> If you worked during the reentitlement period and we decided that your disability ceased during the reentitlement period because of your work under paragraph (a)(1) of this section, we will find that your entitlement to disability benefits terminates in the first month in which you engaged in substantial gainful activity after the end of the reentitlement period.

20 C.F.R. § 404.1592a (a)(3)(i).

The Court concludes that, looking at the evidence in the light most favorable to the United States, there is sufficient evidence in the United States' case-in-chief on which a jury could reasonably conclude that Sandoval's countable income is greater than the relevant substantial gainful activity threshold for the relevant months of the Superseding Indictment.  To begin, as discussed previously, the United States' opening witness -- Hall -- testified about Sandoval's business and bookkeeping practices, which she stated included pocketing significant cash proceeds from trade shows, using separate bank accounts for certain business income, and not reporting that income for tax purposes as pertaining to his business.  See Hall Testimony Tr. at 14:16-23 (Hall, Houghton); id. at 29:17-21 (Hall); id. at 24:3-4 (Hall); id. at 24:11-25:2 (Hall, Houghton); id. at 29:17-21 (Hall).  Hall also testified that, through her work doing bookkeeping, she estimated that the "income of the business" was "substantial . . . over 150 to $200,000, easy, a year."  Hall Testimony Tr. at 34:11-17 (Hall).  While Hall did not work for Sandoval during the charging period, this circumstantial testimonial evidence is relevant to the jury's determination of Sandoval's countable income during the charging period, because, on the basis of Hall's testimony, a jury reasonably could infer that Sandoval's business practices are such that his bank statements

and business records might not reflect accurately his or the business' income, which she testified

was substantial.  Relatedly, Hall's testimony also suggests that, given the nature of Sandoval's

business, some not-insignificant amount of his income was earned in cash sales.  Such

commonsense inferences from Hall's testimony are potentially helpful to the jury's determinations

in this case and are in no way improper.  See United States v. McBride, 656 F. App'x 416, 422

(10th Cir. 2016)("Jurors are permitted to use their common sense to evaluate the evidence.").  As

the Criminal Pattern Jury Instructions for the Tenth Circuit note:

> While you must consider only the evidence in this case, you are permitted
> to draw reasonable inferences from the testimony and exhibits, inferences you feel
> are justified in the light of common experience.  An inference is a conclusion that
> reason and common sense may lead you to draw from facts which have been
> proved.
>
> By permitting such reasonable inferences, you may make deductions and
> reach conclusions that reason and common sense lead you to draw from the facts
> which have been established by the testimony and evidence in this case.

Crim. Pattern Jury Instructions, Crim. Pattern Jury Instruction Comm. of the United States Court

of Appeals for the Tenth Circuit, Evidence -- Direct and Circumstantial -- Inferences § 1.07, at 15.

The United States' next witness, Officer Andrew Herrera, a special agent with the New

Mexico Attorney General's Office, testified regarding a "ruse interview"[15] that he and other

---

[15]Herrera explained that a "ruse interview" is an interview with an individual in which the
officers identify themselves as law enforcement but tell the interviewee that the interview pertains
to some other matter -- a matter in which the individual is not a suspect -- and thereby attempt to
speak with the individual "in their natural state when they're not trying to conceal anything."  Draft
Transcript of Trial, Day 2 at 57:10-22 (held December 14, 2022)(Herrera)(The Court's citations
to the transcript of the hearing refer to the court reporter's original, unedited version. Any final
transcript may contain slightly different page and/or line numbers).  Another law enforcement
witness, Agent Damian Reyes, described ruse interview techniques as:

> say you're going to go talk to an individual who is concealing their work and instead
> of identifying yourself as a Social Security Special Agent because they might
> understand what's going on, you might ruse them and say, hey we're here because
> you may be a victim of identity theft and we need to get some information from

officers conducted with Sandoval on February 5, 2019.  Draft Transcript of Trial, Day 2 at 57:5

(held December 14, 2022)(Herrera)("Dec. 14 Tr.").[16]    The Court admitted the video of that

interview and allowed the United States to publish the video to the jury.  See Video of Ruse

Interview (United States' Trial Exhibit 12)("Ruse Interview"); Dec. 14 Tr. at 60:15-16

(Court)(admitting into evidence the Ruse Interview).  The video of the ruse interview included

Sandoval commenting to law enforcement that he had "worked his ass off to have this [gesturing

to his storefront] and have this [gesturing to his automobile]," Ruse Interview at 13:29-32, and

also stated that he owns "several vehicles," Ruse Interview at 19:12-14.  Moreover, of potential

relevance to his earnings -- given Hall's testimony regarding trade shows' profitability -- Sandoval

also told the officers that he did "52 shows last year." Ruse Interview at 20:32-35.  Another

witness, Special Agent Damian Reyes, of the Office of the Inspector General for the Social

Security Administration, see Dec. 14 Tr. at 173:4-7 (Reyes), testified that he spoke to Sandoval at

a trade show in San Antonio, Texas, on February 11, 2019, where Sandoval told Reyes that

Sandoval sold pieces of jewelry that ranged in price from "[$]500 to $20,000," Dec. 14 Tr. at 185:2

(Reyes).  The jury also saw photographs of some of Sandoval's jewelry inventory at the San

Antonio trade show, with one photograph showing a necklace worth $8,900.00.  See Photo From

Trade Show, admitted into evidence as United States' Trial Exhibit 18; Dec. 14 Tr. at 187:11-13

(Court)(admitting into evidence United States' Trial Exhibit 18).  Another witness, a customer of

Sandoval's jewelry who testified that she had purchased jewelry from Sandoval many times, stated

---

you.

Draft Transcript of Trial, Day 2 at 178:7-1 (Reyes).

[16]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

that she had paid as much as $6,000.00 for Sandoval's work, see Vol. 3 Tr. at 152:5 (Dow), which

she described as "very high end," Vol. 3 Tr. at 148:8 (Dow).  Also admitted into evidence is a

video from an undercover interaction with Sandoval, in which the undercover law enforcement

agent posed as a prospective jewelry customer.  See Video of Ruse Customer Interaction at

Traditions Past and Present (dated September 25, 2019), admitted United States' Trial Exhibit 19b

("Ruse Jewelry Customer Video"); Vol. 3 Tr. at 230:22-23 (Court)(admitting into evidence the

Ruse Jewelry Customer Video).  In the Ruse Jewelry Customer Video, Sandoval tells the agent: "I

have customers all over the United States, I show in California, I show in New York, I show in

Florida," Ruse Jewelry Customer Video at 4:21-29, and "I usually do two trips a month . . . I'm

not building a lot of pieces, I'm just building a lot of really expensive ones," Ruse Jewelry

Customer Video at 4:30-38.

Another witness, Anthony Paylor, an investigations analyst with the Social Security

Administration, Office of the Inspector General, see Vol. 3 Tr. at 10:17-25 (Houghton, Paylor),

testified that his specialty is "financial records analysis," Vol. 3 Tr. at 13:22 (Paylor).   Paylor

testified that part of his job in the investigative process is to convert "paper bank statements, bank

records," to "Excel or a spreadsheet that we can then analyze."  Vol. 3 Tr. at 15:2-4 (Paylor).

Paylor first testified that he performed analysis on a personal bank account associated with

Sandoval -- both checking and savings -- over the period from May 7, 2016, see Vol. 3 Tr. at

25:15-16 (Paylor), to April 5, 2019, see Vol 3 Tr. at 27:13-14 (Paylor); Vol. 3 Tr. at 26:1-15

(Houghton, Paylor).  The United States introduced into evidence the Excel spreadsheet that Paylor

made based on these bank records.  See Excel Summary Account Numbers 5742 and 9053,

admitted as United States' Trial Exhibit 47 ("5742 and 9053 Excel Spreadsheet"); Vol. 3 Tr. at

31:9-10 (Court)(admitting into evidence 5742 and 9053 Excel Spreadsheet).  Paylor testified that

the 5742 and 9053 Excel Spreadsheet shows various categories for money going in and out of Sandoval's personal account to a business account for Traditions Past and Present (which also carries Sandoval's name), see Vol. 3 Tr. at 35:1-16 (Houghton, Paylor), and stated that "from June 2017 through April 2019, there were 56 total deposits . . . And a total, [$]45,269.88," Vol. 3 Tr. at 35:22-24 (Paylor).  Paylor also testified that the bank records showed frequent transfers made back-and-forth from Sandoval's business account to his personal account, and testified that this indicated that the accounts were "very closely linked."  Vol. 3 Tr. at 44:11-12 (Houghton, Paylor).

The Court also admitted into evidence bank records from Sandoval's business account. See Business Account Application (dated September 12, 2018), admitted into evidence as United States' Trial Exhibit 35 on December 15, 2022 ("2018 Business Account Application"); Wells Fargo Bank Records for Account Ending in -7791 (covering months from September, 2018, until April, 2019), admitted into evidence as United States' Trial Exhibit 36 on December 15, 2022 ("7791 Bank Records");  Business Account Application (dated March 7, 2014), admitted into evidence as United States' Trial Exhibit 39 on December 15, 2022 ("2014 Business Account Application"); Wells Fargo Bank Records for Account Ending in -5042 (covering months from June, 2017, until April, 2018), admitted into evidence as United States' Trial Exhibit 40 on December 15, 2022 ("5042 Bank Records, Part 1"); Wells Fargo Bank Records for Account Ending in -5042 (covering months from April, 2018, until October, 2018), admitted into evidence as United States' Trial Exhibit 41 on December 15, 2022 ("5042 Bank Records, Part 2"); Vol. 3 Tr. at 46:13-14 (Court)(admitting into evidence the 2018 Business Account Application and the 7791 Bank Records); id. at 46:21-22 (Court)(admitting into evidence the 2014 Business Account Application, the 5042 Bank Records, Part 1, and the 5042 Bank Records, Part 2).  The Court also admitted into evidence two more spreadsheets that correspond to the business accounts.  See Excel

Summary Account Numbers 5042 and 7791, admitted as United States' Trial Exhibit 49 ("5042 and 7791 Excel Spreadsheet"); Excel Summary Account Numbers 5042, admitted as United States' Trial Exhibit 50 ("5042 Excel Spreadsheet"); Vol. 3 Tr. at 47:10-11 (Court)(admitting into evidence the 5042 and 7791 Excel Spreadsheet, and the 5042 Excel Spreadsheet).   The date range for the first business account examined -- the account ending in 7791, Vol. 3 Tr. at 49:18-19 (Paylor) -- spans from August, 2018, see Vol. 3 Tr. at 49:18-19 (Paylor), through March 29, 2019, see Vol. 3 Tr. at 50:10-11 (Paylor).   The spreadsheet shows, and Paylor testified, that October, 2018, shows a total of $38,357.17 in deposits into this business account for that month alone.  See 5042 and 7791 Excel Spreadsheet; Vol. 3 Tr. at 52:1-8 (Houghton, Paylor).  November, 2018, shows deposits totaling $45,341.72.  See 5042 and 7791 Excel Spreadsheet; Vol. 3 Tr. at 53:2-3 (Paylor).   December, 2018, shows deposits totaling $72,874.33.   See 5042 and 7791 Excel Spreadsheet; Vol. 3 Tr. at 53:15-16 (Paylor).

The Court also admitted into evidence records pertaining to a business checking account with an account number ending in 5042, see Vol. 3 Tr. at 54:5-7 (Paylor), and these records ranged from June 1, 2017, see Vol. 3 Tr. at 54:8 (Paylor), until October 31, 2018, see Vol. 3 Tr. at 55:22 (Paylor).  Paylor testified, and the spreadsheets show, that the total amount of deposits into this account from June, 2017 to December, 2017 is $205,427.43.  See 5042 Excel Spreadsheet; Vol. 3 Tr. at 57:14-19 (Houghton, Paylor).  February, 2018, which is "the biggest month of these records," according to Paylor, Vol. 3 Tr. at 57:25-58:2 (Houghton, Paylor), shows a deposit total of $61,823.90 for the month, see 5042 Excel Spreadsheet.  Paylor testified that, although the deposit amounts varied in these business accounts from month to month throughout the period that he analyzed, they were generally "pretty steady."  Vol. 3 Tr. at 58:11-16 (Houghton, Paylor).  Paylor also stated that, in his last four years doing financial analysis for the Social Security

Administration, "[t]his is definitely one of the larger in terms of the amount of money going in and out of the account. This is one of the largest ones I've ever done." Vol. 3 Tr. at 59:12-15 (Paylor). He also stated that, "in terms of total transactions," Vol. 3 Tr. at 59:12-15 (Houghton), the amount of "just one of these accounts" was $1,900,000.00, Vol. 3 Tr. at 59:25-60:4 (Houghton, Paylor).

In addition, Coleman testified that Sandoval's reentitlement period ended November, 2017, and explained that, if Sandoval earned over the substantial gainful activity amount in December, 2017 -- the first month following a reentitlement period in which Sandoval performed substantial gainful activity -- his SSDI benefits would be terminated: "After the 36 months, SGA is performed at the 37th month, benefits terminate . . . . You're not entitled to any more benefits or payments for disability." Vol. 3 Tr. at 86:24-87:19 (Coleman). This conclusion accords with 20 C.F.R. § 404.1592a(a)(3)(i), which states:

> If you worked during the reentitlement period and we decided that your disability ceased during the reentitlement period because of your work under paragraph (a)(1) of this section, we will find that your entitlement to disability benefits terminates in the first month in which you engaged in substantial gainful activity after the end of the reentitlement period.

20 C.F.R. § 404.1592a (a)(3)(i). Because Coleman testified that, in Sandoval's case, "SGA was performed throughout the extended period of eligibility," his benefits should have been terminated in December, 2017. According to this theory, then, Sandoval was not entitled to any SSDI benefits that he received in 2018, 2019, or 2020, because his benefits were terminated -- by operation of 20 C.F.R. § 404.1592a -- in December, 2017.

Another witness, Jennifer Yung, who at the time of the investigation into Sandoval worked as a module manager with the Social Security Administration, see Vol. 3 Tr. at 130:19-22 (Ruiz-Velez, Yung), testified to the benefits amounts that Sandoval received in SSDI from 2017 until 2020, see Vol. 3 Tr. at 137:16-142:22 (Court, Ruiz-Velez, Yung). The Court also admitted into

evidence a "Payment Worksheet" that shows all SSDI payments made to Sandoval. Payment Worksheet (dated June 2, 2021), admitted as United States' Trial Exhibit 20 on December 15, 2022 ("Payment Worksheet"). See Vol. 3 Tr. at 137:12-13 (Court)(admitting into evidence the Payment Worksheet). Both Yung's testimony and the Payment Worksheet indicate that Sandoval received SSDI benefits in amounts greater than $1,000.00 for all of the months of the charging period. See Vol. 3 Tr. at 137:16-142:22 (Court, Ruiz-Velez, Yung); Payment Worksheet at 1-2.

The Court concludes that all of this evidence, and the reasonable inferences that arise from this evidence, render a judgment of acquittal inappropriate on Sandoval's thirty-three counts of theft of government property under 18 U.S.C. § 641. See Superseding Indictment at 1-3. Taking all of this evidence together, and viewing it in the light most favorable to the United States, see Wright & Miller, Federal Practice and Procedure § 467, the Court concludes that sufficient evidence exists on which a jury reasonably could conclude that Sandoval was not entitled to SSDI benefits for any of the months of the charging period -- from June, 2017, until February, 2020.

One way in which a jury could have reached this conclusion is on the basis of the United States' theory regarding the reentitlement period. As discussed above, the United States provided sufficient evidence on which a jury could conclude that Sandoval's reentitlement period under 20 C.F.R. § 404.1592a spanned thirty-six months from December, 2014, until November, 2017. See Analysis Section I(B), supra at 53-56. As noted earlier, under 20 C.F.R. § 404.1592a(a)(3)(i), if Sandoval "worked during the reentitlement period" and engaged in substantial gainful activity during that time, then his "entitlement to disability benefits terminates in the first month in which [he] engaged in substantial gainful activity after the end of the reentitlement period." 20 C.F.R. § 404.1592a(a)(3)(i). If, therefore, the jury could conclude that Sandoval "worked during the reentitlement period," and also engaged in substantial gainful activity during December, 2017

(Sandoval's first post-reentitlement period month), then it also reasonably could conclude that Sandoval's benefits terminated in December, 2017.  Under this theory, the United States needs to show that Sandoval engaged in substantial gainful activity from June 2017, through December, 2017, because thereafter his benefits would be terminated, and thus he was not entitled to any SSDI benefits received.  See 20 C.F.R. § 404.1592a(a)(3)(i).

The evidence that the United States adduced during its case-in-chief provides a basis on which the jury reasonably could reach this conclusion.  The bank records for 2017, for example, indicate that a total of $55,000.00 was deposited from Sandoval's business accounts into his personal account over the course of the year.[17]  More generally, as Paylor testified, the bank records from Sandoval's personal and business bank accounts show frequent back-and-forth transfers, indicating that Sandoval's personal and business accounts were "very closely linked."  Vol. 3 Tr. at 44:11-12 (Houghton, Paylor).  Moreover, the jurors heard circumstantial evidence suggesting that Sandoval moved income around various bank accounts to avoid taxation, see Hall Testimony Tr. at 29:17-21 (Hall), as well as evidence concerning Sandoval's alleged practice of pocketing cash income at trade shows, Hall Testimony Tr. at 24:11-25:2 (Hall, Houghton).  The jury also heard testimony regarding both the trade shows' profitability as well as the frequency of Sandoval's attendance at the trade shows.  See Hall Testimony Tr. at 14:16-23 (Hall, Houghton);

---

[17]The Court arrives at this sum by reviewing the bank records for Sandoval's personal account, and looking for deposits that are labeled as transfers from Sandoval's business accounts. See Wells Fargo Bank Records for Account Ending in -5742 (covering months from May, 2016, until April, 2019), admitted into evidence as United States' Trial Exhibit 38 on December 15, 2022 ("5742 Bank Records"); Vol. 3 Tr. at 17:9-11 (Court)(admitting into evidence 5742 Bank Records).  Such transfers are typically labeled as, "Online Transfer From James A Sandoval Business Checking xxxxxx5042."  E.g., 5742 Bank Records at Bates No. 1277.  By the Court's tally, there are twenty-eight such transfers during 2017, ranging from $200.00 to $10,000.00, with a sum total of $55,000.00.  See 5742 Bank Records at Bates No. 1277-1333 (The 5742 Bank Records, as an exhibit, contain no contiguous pagination, and thus, for the sake of precision, the Court utilizes the Bates Numbers at the bottom of the exhibit to refer to specific pages).

Ruse Jewelry Customer Video at 04:30-38.  This evidence, in the aggregate, provides a sufficient basis on which a jury reasonably could conclude that Sandoval's countable income during 2017 was greater than $1,170.00 per month -- the substantial gainful activity threshold for 2017.  See Substantial Gainful Activity, Soc. Sec. Admin. (last visited December 22, 2023), https://www.ssa.gov/oact/cola/sga.html.

In arriving at these conclusions related to Sandoval's charges under 18 U.S.C. § 641, the Court disagrees with two of Sandoval's main contentions -- contentions which are generally implicit, but sometimes explicit, in his arguments in the Acquittal Motion, the Acquittal Reply, and before the Court.  See Acquittal Motion at 3-4; Acquittal Reply at 3-4; Acquittal Motion Tr. at 7:2-8:4 (Harrison).   Specifically, the contentions that the Court does not accept are: (i) that financial records (bank records, IRS forms, etc.) are the sole form of evidence on which a jury may conclude that an individual's countable income is above the relevant substantial gainful activity threshold for any given month, see Acquittal Motion at 3-4; Acquittal Reply at 3-4; Acquittal Motion Tr. at 7:2-8:4 (Harrison); and, relatedly, (ii) that the jury may not use circumstantial evidence that is not in the form of financial statements in determining a self-employed individual's "countable income" under 20 C.F.R. § 404.1575(e)(1), see Acquittal Reply at 3-4.  The Court discusses each of these contentions in turn.

As to the first, Sandoval emphasizes repeatedly to the Court that, against the legal backdrop of the trial work period, the reentitlement period, and countable income test, "everything that we need to look at in this record, the only evidence that there is, are the Wells Fargo bank records." Acquittal Motion Tr. at 7:13-15 (Harrison).[18]   In essence, Sandoval asserts that, for a jury to

_____

[18]Sandoval makes this assertion after noting that the IRS concluded that his income for the relevant years was "zero," and thus the Wells Fargo bank records are the only remaining financial records on which a determination of income could be made.  Acquittal Motion Tr. at 7:2-12

determine Sandoval's income for the purposes of assessing the trial work period, the reentitlement period, or countable income test, financial records -- in this case, "the Wells Fargo bank records," Acquittal Motion Tr. at 7:13-15 (Harrison) -- are the only material that the factfinder properly may consider.[19]  The Court rejects this contention because it contradicts basic principles of substantive evidence law.   In short, the Court cannot square Sandoval's contentions -- regarding a highly circumscribed scope of available evidence to prove income in this case -- with general principles regarding the value of circumstantial evidence, specifically that "[c]ircumstantial evidence may be accorded the same weight as direct evidence."  United States v. Henry, 468 F.2d 892, 894 (10th Cir. 1972).  See Crim. Pattern Jury Instructions, Crim. Pattern Jury Instruction Comm. of the United States Court of Appeals for the Tenth Circuit, Evidence -- Direct and Circumstantial -- Inferences § 1.07, at 15 ("As a general rule, the law makes no distinction between direct and circumstantial evidence.").

Following this principle, the Court does not agree with Sandoval's contention that "the Wells Fargo bank records" are "the only evidence that there is" to determine Sandoval's income for purposes of determining the trial work period, the reentitlement period, and the countable

---

(Harrison).

[19]Sandoval also makes this assertion in the Acquittal Motion:

The first conspicuous point is that there is no financial evidence in the record dated prior to May 7, 2016. The Government has not proved that Mr. Sandoval received any income whatsoever in 2015, 2014, 2013, or any prior year. They therefore cannot have proved that James met a trial-work-period threshold in any month before May 2016. Those nine months, which again do not have to be consecutive, and during which Mr. Sandoval is entitled to full disability benefits, must start in May 2016 or later.

Acquittal Motion at 3.  Again, the validity of this argument rests on the premise that the jury may consider only financial records to determine Sandoval's income.

income test.  Acquittal Motion Tr. at 7:13-15 (Harrison).  The jury properly may consider, for example, circumstantial evidence not in the form of financial statements in making its determination of Sandoval's income: witnesses' testimony regarding Sandoval's business practices, his business' profitability, the trade shows' profitability, the dollar value of Sandoval's jewelry, and Sandoval's representations about his business' success and his jewelry's value.  Aside from his reliance on 20 C.F.R. § 404.1575(e)(1) -- discussed below -- Sandoval cites to no authority to support this argument that traditional financial records may be the only basis for his income determination, and the Court has been unable to find any authority of its own that supports Sandoval's contention.  The Court thus concludes that non-financial-data circumstantial evidence -- the likes of which is in the United States' case-in-chief -- properly can support a jury determination of Sandoval's income.

The Court acknowledges that in cases involving criminal wrongdoing of a financial nature, seeking direct proof of exact dollar amounts presents a vexing problem for the prosecution.  In considering this issue in the context of a prosecution for income tax evasion, the Honorable James C. Hill, then-Circuit Judge of United States Court of Appeals for the Fifth Circuit, Unit B, states:

> The essence of appellant's argument is that his financial affairs must be reduced to an absolute certainty before he can be convicted. . . . Apparently the appellant would require the IRS to document every transaction among the investing partnership of which he was a member even though the partnership itself kept no records.  The government is not required to perform the impossible.

United States v. Dwoskin, 644 F.2d 418, 423 (5th Cir. Unit B May 1981)(citing United States v. Hiett, 581 F.2d 1199, 1201 (5th Cir. 1978)).  Also, in the context of tax crimes, and in a related vein, the Supreme Court has noted that income derived for illicit activity is, likewise, exceedingly difficult to ascertain via direct proof, and thus the applicable proof standards must reflect the reality of the available evidence in such cases:

that these gambling transactions were on an enormous scale was overwhelmingly established.  It is not to be expected that the actual financial transactions of such a vast illicit business would appear by direct proof. . . . Of course the government did not have to prove the exact amounts of unreported income by Johnson.  To require more or more meticulous proof than this record discloses that there were unreported profits from an elaborately concealed illegal business, would be tantamount to holding that skilful [sic] concealment is an invincible barrier to proof.

United States v. Johnson, 319 U.S. 503, 517-18 (1943).  The basic principles in these criminal tax cases, the Court concludes, lead to the more general, commonsense conclusion that in criminal prosecutions which involve jury determinations of income -- and especially of income derived in part or in whole from activity for which orthodox financial records may not be available -- the prosecution need not prove exact dollar amounts via direct proof, but properly may rely on other forms of circumstantial evidence to ascertain income.

Sandoval's second contention is similar, namely, that 20 C.F.R. § 404.1575(e)(1) circumscribes the evidence that the jury may consider to arrive at a determination of Sandoval's countable income.   As noted above, 20 C.F.R. § 404.1575(e)(1), states that for self-employed SSDI claimants who have received benefits for more than twenty-four months, "[w]e will not consider the services you perform in that work to determine that the work you are doing shows that you are able to engage in substantial gainful activity and are, therefore, no longer disabled." 20 C.F.R. § 404.1575(e)(1).  Sandoval contends that this regulatory restriction "renders also the entirety of the Government's response [to the Motion] beside the point," Acquittal Reply at 4, apparently because Sandoval considers all evidence -- aside from the bank records -- as evidence of "services."  20 C.F.R. § 404.1575(e)(1).

The Court concludes that Sandoval's interpretation of the term "services" as used in 20 C.F.R. § 404.1575(e)(1), is not correct.  Instead, in the context of that regulatory provision, the Court concludes that the term refers to physical activities that an individual performs for the

purposes of their employment.  On this interpretation, 20 C.F.R. § 404.1575(e)(1)'s mandate --

that "[w]e will not consider the services you perform in that work to determine that the work you

are doing shows that you are able to engage in substantial gainful activity and are, therefore, no

longer disabled" -- refers to the notion that, for individuals who fall within the regulation's scope,

the Social Security Administration may not consider a person's physical work activities in making

a determination that the individual is no longer physically disabled.  This interpretation accords

with 42 U.S.C. § 421(m) -- the statutory authority on which 20 C.F.R. § 404.1575(e)(1) is based -

- which states that:

> (1)      In any case where an individual entitled to disability insurance benefits under section 423 of this title or to monthly insurance benefits under section 402 of this title based on such individual's disability (as defined in section 423(d) of this title) has received such benefits for at least 24 months --
>
> > (A)      no continuing disability review conducted by the Commissioner may be scheduled for the individual solely as a result of the individual's work activity;
> >
> > (B)      no work activity engaged in by the individual may be used as evidence that the individual is no longer disabled; and
> >
> > (C)      no cessation of work activity by the individual may give rise to a presumption that the individual is unable to engage in work.
>
> (2)      An individual to which paragraph (1) applies shall continue to be subject to--
>
> > (A)      continuing disability reviews on a regularly scheduled basis that is not triggered by work; and
> >
> > (B)      termination of benefits under this subchapter in the event that the individual has earnings that exceed the level of earnings established by the Commissioner to represent substantial gainful activity.

42 U.S.C. § 421(m).  The Court's analysis of this statute begins with a recognition -- as the United

States Court of Appeals for the Sixth Circuit has observed -- that this statute is, on a facial level,

ambiguous:

> Section 421(m)(1)(B) states that when an individual has received Social Security disability benefits for at least 24 months, "no work activity engaged in by the individual may be used as evidence that the individual is no longer disabled." But § 421(m)(2)(B) states that such an individual shall be subject to "termination of benefits under this subchapter in the event that the individual has earnings that exceed the level of earnings established by the Commissioner to represent substantial gainful activity." These two provisions create an ambiguity as to whether the Commissioner may consider an individual's work activity that generates earnings. Section 421(m)(1)(B) appears to proscribe taking such activity into account, yet the Commissioner would need to do so in order to determine whether the individual has earnings that amount to "substantial gainful activity."

Valent v. Comm'r of Soc. Sec., 918 F.3d 516, 520 (6th Cir. 2019).  After acknowledging this facial ambiguity, however, the Sixth Circuit concludes that the Social Security Administration had offered a permissible construction of this ambiguous statute, in which 42 U.S.C. § 421(m)(1)(B) is interpreted to

> bar [the Social Security Administration] from considering work activity in determining whether a beneficiary is *medically* disabled.  In other words, according to the Administration's permissible construction of the statute, if an individual claims Social Security disability benefits because of, say, a back injury, and the Administration later determines that the individual was engaging in manual labor that belies his or her back injury, then it cannot use this work activity as evidence that the individual is no longer *medically* disabled.  But if the work activity generates profit or pay, then the Administration can consider the work activity in determining whether the individual has "earnings that exceed the level of earnings established by the Commissioner to represent substantial gainful activity" under § 421(m)(2)(B).

Valent v. Comm'r of Soc. Sec., 918 F.3d at 521-22 (emphasis in Valent v. Comm'r of Soc. Sec.). The Court agrees with this statutory interpretation, which corresponds with the Court's interpretation of 20 C.F.R. § 404.1575(e)(1).  Accordingly, the Court concludes that 20 C.F.R. § 404.1575(e)(1)'s restriction against considering "services" when evaluating substantial gainful activity refers to physical activities that an individual performs for the purposes of his or her employment.  This restriction does not mean -- as Sandoval implicitly suggests -- that the factfinder

cannot consider any evidence aside from financial records to determine Sandoval's countable income.  The Court concludes that the jury, when determining Sandoval's countable income for 20 C.F.R. § 404.1575(e)'s purposes, properly may consider circumstantial evidence of Sandoval's income that relates to his conduct while at work -- i.e., testimony regarding his practice of pocketing cash income at trade shows, testimony regarding Sandoval's frequent attendance at those shows, testimony regarding those trade shows' profitability, Sandoval's comments that he makes only "really expensive" jewelry, Ruse Jewelry Customer Video at 4:30-38, Sandoval's comments that he "worked his ass off" to build his business and have the ability to own "several" vehicles, Ruse Interview at 13:29-32; id. at 19:12-14.  The jury was not called upon to consider this evidence as evidence that Sandoval was no longer disabled, as § 404.1575(e)(1) contemplates, but rather as circumstantial evidence of his income.  Therefore, the evidence may be properly considered when determining Sandoval's countable income.

The Court also disagrees with Sandoval's suggestion that the United States' case-in-chief relies impermissibly on "administrative determinations."  Acquittal Reply at 5.  The crux of Sandoval's argument on this score is that much -- if not all -- of the evidence on which a jury properly could rely to make determinations regarding the trial work period, the reentitlement period, and the countable income test, comes only from Coleman's administrative determinations, and those determinations do not provide a sufficient evidentiary basis for a determination of guilt beyond a reasonable doubt in a criminal proceeding.  See Acquittal Reply at 5-6.  In support of this proposition, Sandoval cites and discusses an unpublished Tenth Circuit Order and Judgment. See United States v. Anderson, 483 F. App'x 433 (10th Cir. 2012).  As the Court discusses below, this case -- in addition to being nonprecedential -- is also distinguishable from Sandoval's case. Moreover, Coleman's "administrative determinations" are not the only evidence on which a jury

could rely in making factual determinations relevant to Sandoval's guilt.

In United States v. Anderson, the Tenth Circuit reviewed a restitution order stemming from a plea agreement in which defendant Steven Anderson pleaded guilty to one count of making a false statement in violation of 18 U.S.C. § 1001.  See 483 F. App'x at 434.  The district court had ordered restitution in the amount of $78,478.40 based on a letter in which the Social Security Administration "had informed Anderson that it overpaid him" in that amount, owing to his receipt of SSDI benefits during a period of time in which he was allegedly not entitled to them.  483 F. App'x at 434.  Ultimately, the Tenth Circuit determined that, on the basis of the evidence adduced at two separate sentencing hearings, the United States had "failed to prove that Anderson's false statement caused any actual loss," and thus reversed and vacated the restitution order.  483 F. App'x at 434.

If effect, despite some marked procedural differences -- and, consequently, a different standard of proof -- the central issue for the district court in United States v. Anderson is substantially similar to the one in Sandoval's case.  Namely, the United States must prove that an SSDI recipient is not entitled to the benefits which he received.  In United States v. Anderson, Anderson, a disabled recipient of SSDI benefits, allegedly engaged in work activity at a used car lot which his girlfriend owned.  See 483 F. App'x at 434.  After an investigation -- during which Anderson had provided a "signed, sworn statement that he did not work" at the car lot, 483 F. App'x at 434 -- the Social Security Administration ultimately determined that Anderson was no longer eligible to receive SSDI benefits, and also determined "that Anderson had ceased to be entitled to benefits in 2002 and calculated the overpayments he had received since that date at $119,094."  483 F. App'x at 435.  Based on this calculation, Anderson's presentence report asserted that he should be held responsible to pay restitution in that amount, and Anderson

objected:

> Although he acknowledged that he had done work and lied about it, he disputed
> that any of his work rose to the level of "substantial gainful activity" under the
> SSA's regulations.  Therefore, he asserted that he never ceased to be entitled to
> benefits.  He argued that the SSA should never have rescinded his eligibility, and
> therefore, he had received no overpayments, the SSA had suffered no loss, and he
> owed no restitution.

483 F. App'x at 435.

At the hearings, the United States put on two witnesses who purported to provide testimony
that would illuminate how the Social Security Administration came to its conclusion that Anderson
had engaged in substantial gainful activity and was, therefore, not entitled to his SSDI benefits.
See 483 F. App'x at 435.  The first witness was "an SSA technical expert who assisted SSDI
applicants, investigated claimants' eligibility, and verified overpayment calculations."  483 F.
App'x at 435.  This witness acknowledged that "there was no evidence Anderson had been paid
for his work," 483 F. App'x at 435, but nevertheless testified that, in assessing Anderson's
substantial gainful activity, the Social Security Administration would have determined Anderson's
"countable income" by applying "three tests," 483 F. App'x at 436.  On cross examination,
however, this witness acknowledged that she was "getting confused," and, after a break, conceded
that she "in fact did not know what test had been applied -- or should have been applied -- in
Anderson's case," and "noted that her involvement with the case had come in near the end, and
that it was 'a very complicated case.'"  483 F. App'x at 436 (quoting district court transcript).  The
second witness, a special agent who had been involved in the investigation of Anderson's case,
testified that he had made his own calculation of how much Anderson had been overpaid, but was
"unable, however, to say what test should have been used" to determine whether Anderson had
engaged in substantial gainful activity.  483 F. App'x at 436.  At another hearing, the United States
altered its proposed restitution amount to $78.478.40, "because Anderson had received a letter

from the SSA stating that he was responsible for overpayments in that amount."  483 F. App'x at

437.  The United States, however, "produced no evidence to support this calculation"; instead, it

stated: "Social Security in sending out that letter made the determination that the defendant was

engaged in substantial gainful activity and I think that finding, it should be given deference by the

Court. They are the ones that are engaged in this type of work."  483 F. App'x at 437 (quoting

district court transcript).  The district court ordered restitution -- explicitly based on actual loss --

in the amount of $78.478.40.  See 483 F. App'x at 437.

The Tenth Circuit reversed, concluding that the district court had relied on "little more than

the fact that Anderson received a letter stating that he owed the SSA $78,478.40," and that "the

existence of an unsubstantiated letter stating an overpayment amount did not satisfy the

government's burden of proving by a preponderance of the evidence that Anderson received SSDI

benefits to which he was not entitled."  483 F. App'x at 439-40.  To reach this conclusion, the

Tenth Circuit determined that the district court had not relied on the witness testimony to prove

that Anderson received SSDI benefits to which he was not entitled.  The Tenth Circuit noted that

the district court had stated on the record that "the testimony was extremely difficult to follow

about how the Social Security Administration calculated that [Anderson] engaged in some

substantial gainful activity," but then suggested that, if "the Social Security Administration didn't

apply their own regulations correctly . . . [,] this is not really the venue to make that decision[.]"

483 F. App'x at 439 (quoting district court transcript).  Based on these comments, in conjunction

with the confused witness testimony about which standard was used to determine whether

Anderson had engaged in substantial gainful activity, see 483 F. App'x at 439 (noting that the

witnesses "could not explain" why they had classified Anderson as a self-employed person, and

they "did not know what standard had been applied to determine he had engaged in substantial

gainful activity," and, that neither "witness explain[s] why, under any standard, Anderson's work rose to the level of substantial gainful activity," given that, "[n]othing in the record suggests that he was ever paid for his time"), the Tenth Circuit concluded that the district court had relied solely on an "unsubstantiated letter stating an overpayment amount" to determine Anderson's restitution amount,  483 F. App'x at 439-40.

Here, the evidence on which the factfinder can rely to make reasonable determinations of Sandoval's guilt beyond a reasonable doubt is more numerous and substantial than the lone "unsubstantiated letter" at issue in United States v. Anderson.  483 F. App'x at 440.  Coleman's testimony regarding her administrative decisions, see Vol. 3 Tr. at 83:7-93:17 (Court, Coleman, Ruiz-Velez), is supported by an in-depth discussion of the various materials and figures that were imputed into "the system," Vol. 3 Tr. at 85:24 (Coleman), to determine the timing of the trial work period and the reentitlement period, see Vol. 3 Tr. at 68:13-70:9 (Coleman, Ruiz-Velez)(describing all the sources of information),[20] and the evidence also features testimony of a more general discussion of these regulatory terms and their meanings, see Vol. 3 Tr. at 70:19-72:3 (Coleman, Ruiz-Velez).  Coleman also testified that, after issuing a "proposed decision," Vol. 3 Tr. at 88:22 (Coleman), she had a discussion with Sandoval regarding this initial determination, but that "conversation did not change the outcome of the final decision," Vol. 3 Tr. at 89:6-7 (Coleman). Also, unlike the muddled witness testimony in United States v. Anderson, Coleman offers a straight-forward account of how substantial gainful activity was assessed in Sandoval's case, namely, "work for payment," Vol. 3 Tr. at 72:10 (Coleman), that had to reach a certain monthly monetary threshold, and the dollar amounts of those thresholds were provided by Coleman's

---

[20]As noted above, Paylor confirmed in his testimony that the OIG report that he prepared -- one of the materials that Coleman considered in making her proposed determinations -- consists of bank records "from 2014 until 2019."   Vol. 3 Tr. at 27:25-28:1 (Paylor).

testimony, see Vol. 3 Tr. at 72:15-22 (Coleman, Ruiz-Velez).   In short, while the sole "unsubstantiated letter," 483 F. App'x at 440, in United States v. Anderson had "no evidence to support [its] calculation," 483 F. App'x at 437, easy-to-follow testimony regarding the methods and materials used to arrive at these conclusions supports the various administrative determinations in this case.

Moreover, in this case, Coleman's testimony about her administrative determinations is only one evidentiary source among many upon which the jury properly can rely in assessing whether Sandoval stole property belonging to the United States beyond a reasonable doubt.  For example, as discussed previously, see Section I(A), supra at 47-53, for determining the timing of Sandoval's trial work period, the jury reasonably might consider Hall's testimony regarding Sandoval's financial practices during 2014, see Hall Testimony Tr. at 29:17-21 (Hall); id. at 24:3-4 (Hall); id. at 24:11-25:2 (Hall, Houghton), and the jury also reasonably could consider the reasonable inferences arising from Hall's testimony about the profitability of Sandoval's business and his substantial gross profits from trade shows, see Hall Testimony Tr. at 14:16-23 (Hall, Houghton); id. at 34:11-17 (Hall).   Following the trial work period, to support a reasonable inference that Sandoval "worked during the reentitlement period" and engaged in substantial gainful activity during that time, 20 C.F.R. § 404.1592a(a)(3)(i), the jury could look to the bank records -- which begin in 2016, see 5742 Bank Records at Bates No. 1232 (personal bank records begin with May, 2016) -- and also to various other pieces of evidence about Sandoval's sale of expensive pieces of jewelry during that time, see, e.g., Vol. 3 Tr. at 148:8 (Dow); id. at 152:5 (Dow).  The jury reasonably also could infer, based on Hall's general testimony about Sandoval's business practices, see Hall Testimony Tr. at 29:17-21 (Hall); id. at 24:3-4 (Hall); id. at 24:11-25:2 (Hall, Houghton), and Sandoval's general statements about his busy work schedule and expensive

jewelry, see Ruse Jewelry Customer Video at 4:21-38, that he "worked during the reentitlement period" and engaged in substantial gainful activity during that time, 20 C.F.R. § 404.1592a(a)(3)(i).  This same confluence of bank records and witness testimony likewise supports a reasonable jury finding that Sandoval engaged in substantial gainful activity during the entirety of 2017, which -- on the United States' theory -- would mean that his SSDI benefits should have terminated following December, 2017.  See Section I(C), supra at 65-67.

In sum, the Court disagrees with Sandoval's suggestions regarding the permissible scope of evidence in this case, and concludes that, under rule 29's "deferential" standard, the direct and circumstantial evidence in the United States' case-in-chief -- viewed in the light most favorable to the United States -- is sufficient to support a jury finding that Sandoval violated 18 U.S.C. § 641 for each of the 33 months the United States charged.   United States v. Baca, 333 F.R.D. at 219. See Cartwright v. United States, 335 F.2d 919, 921 (10th Cir. 1964)(Seth, J.)("In considering the motion for acquittal, the district judge must consider the evidence in the light most favorable to the Government . . . together with the inferences which may be reasonably drawn from the facts."); Wright & Miller, Federal Practice and Procedure § 467.  Evidence in the record provides sufficient support for the United States' theory regarding the timing of the trial work period, work activity and substantial gainful activity during the reentitlement period, and countable income. Consequently, the Court concludes that a judgment of acquittal on Sandoval's 33 counts of Theft of Government Property under 18 U.S.C. § 641 is inappropriate.

## II.    SUFFICIENT EVIDENCE EXISTS IN THE UNITED STATES' CASE-IN-CHIEF TO SUSTAIN A CONVICTION OF MAKING FALSE STATEMENTS UNDER 18 U.S.C. § 1001(a)(2).

A conviction under 18 U.S.C. § 1001(a)(2) requires the United States to prove five elements: "that (1) the defendant made a statement; (2) the statement was false, fictitious, or fraudulent as the defendant knew; (3) the statement was made knowingly and willfully; (4) the

statement was within the jurisdiction of the federal agency; and (5) the statement was material."
United States v. Harrod, 981 F.2d 1171, 1175 (10th Cir. 1992)(quoting United States v. Irwin, 654
F.2d 671, 675 (10th Cir. 1981), abrogated by United States v. Daily, 921 F.2d 994 (10th Cir.
1990)).  Related to the fifth element -- materiality -- the Pattern Criminal Jury Instructions for the
Tenth Circuit state:

> A fact is "material" if it has a natural tendency to influence or is capable of influencing a decision of [name of government entity].
>
> It is not necessary that [government entity] was in fact influenced in any way.

Crim. Pattern Jury Instructions, Crim. Pattern Jury Instruction Comm. of the United States Court
of Appeals for the Tenth Circuit, False Statement 18 U.S.C. § 1001(a)(2) § 2.46.1, at 171.

The Court understands Sandoval's rule 29 argument to focus on 18 U.S.C. § 1001(a)(2)'s
second element: that Sandoval's statement was false.  See Acquittal Motion at 7; Acquittal Reply
at 7.  In the Superseding Indictment, the United States alleges that Sandoval "falsely stated that he
was not able to work and had not received any income other than his Social Security Disability
Insurance Benefits."  Superseding Indictment at 4.  In the Acquittal Motion, Sandoval argues that
neither of these statements is a proper basis for a conviction under 18 U.S.C. § 1001(a)(2), because:
(i) Sandoval states that, in the interview with Palmiter, Sandoval did not state that he could not
work, but rather that he "did not work," Acquittal Motion at 7 (emphasis in Acquittal Motion); and
(ii) Sandoval's statement that he had not received any income is not false, because, he, in fact,
makes no income or makes no reportable income," and therefore, "that cannot be a false
statement," Acquittal Motion Tr. at 17:1-3 (Harrison).  See Acquittal Reply at 7.

First, the Court concludes that sufficient evidence in the record supports a jury finding that
Sandoval had "received . . . income other than his Social Security Disability Insurance Benefits,"

and thus his statement to the contrary -- that he did not receive "a cent" from Traditions Past and Present, February 19 Interview at 12:54-56, admitted into evidence as United States' Trial Exhibit 26 on December 15, 2022 ("February 19 Interview"); see Vol. 3 Tr. at 237:5-6 (Court)(admitting February 19 Interview into evidence) -- is false.  As discussed above, see Section I(C), supra at 56-79, the Court concludes that there is sufficient evidence in the record to support a jury determination that Sandoval earned countable income above the substantial gainful activity threshold from Traditions Past and Present.  An inevitable corollary of this conclusion is that there is likewise sufficient evidence in the record to support a jury finding that Sandoval knowingly made a false statement to a federal government official when he told Palmiter of the Social Security Administration, Office of the Inspector General, several times, that he had "not received a cent from that business."  February 19 Interview at 12:54-56.  See id. at 13:42-44 (same); id. at 16:14-16 (same); id. at 15:43-46 ("Do I make a cent?  Do I get paid any money?  No.").  In short, because sufficient evidence exists to support a jury conclusion regarding income derived from the business, sufficient evidence supports a jury conclusion that Sandoval's contrary statements are false.

Second, the Court also concludes that Sandoval's argument concerning the discrepancy between the allegation in the indictment and the evidence at trial -- i.e., between the Indictment's allegation that Sandoval falsely stated "that he was not able to work," Superseding Indictment at 4, and Sandoval's statements in the February 19 Interview that he did not work at Traditions Past and Present, see February 19 Interview at 3:59-4:01; id. at 4:11-18; id. at 4:26-28; id. at 6:13-18, and that the last time he worked was "in 2002 or 2003," February 19 Interview at 5:59-6:03 -- does not support a judgment of acquittal under rule 29.  As noted, Sandoval argues that there is a "distinct difference between what the Government charged in the indictment and argued at trial, i.e., that Mr. Sandoval *could not* work, and his statements to agents that he *did not* work."  Acquittal

Reply at 7 (emphasis in Acquittal Reply).

At the outset, the Court notes that, in cases involving false statements under 18 U.S.C. § 1002(a)(2), "the context in which the statement was purportedly made must be considered." United States v. Subeh, No. 04-CR-6077, 2006 WL 3407891, at *2 (W.D.N.Y. November 27, 2006)(Siragusa, J.).  See United States v. Fern, 696 F.2d 1269, 1275 (11th Cir. 1983)("We are unwilling to isolate a statement from context and give it a meaning entirely different from that which it has when the entire evidence is considered").  Although Sandoval did not say -- verbatim -- that he was unable to work, the Court concludes that, in the context of his statements in the February 19 Interview, his statements that he did not work at Traditions Past and Present, see February 19 Interview at 03:59-04:01; id. at 04:11-18; id. at 04:26-28; id. at 06:13-18, and that the last time he worked was in "2002 or 2003," February 19 Interview at 05:59-06:03, could be construed reasonably as statements that Sandoval was unable to work.  According to Palmiter's testimony, the February 19 Interview was conducted so that Sandoval could "be honest and tell us about Traditions Past and Present; tell us about his history of functioning," Vol. 3 Tr. at 235:16-18 (Palmiter), and during the February 19 Interview, the agents told Sandoval that the interview's purpose was "to go over [Sandoval's] work information" in the context of his disability benefits. February 19 Interview at 2:25-50.  The Count concludes that, given the interview's purpose and the clear implications that ability to work could have on Sandoval's receipt of SSDI benefits, a jury reasonably could interpret Sandoval's responses to the Agent's questions as statements that he was unable to work.  Moreover, in the context of the evidence more broadly, there is no indication that Sandoval would have refrained from working for any other reason; he does not state that he has another job, or that he was on vacation, or that he was taking off time.  Rather, the evidence in the case as a whole, and Sandoval's own representations, indicate that he was not

working at Traditions Past and Present was because of his disability -- i.e., that he was unable to work. That is, given the evidence in the courtroom, a reasonable jury could have concluded that when Sandoval responded, "no," to questions about whether he worked at Traditions Past and Present, see February 19 Interview at 3:59-4:01, he was stating that he could not work due to his disability, because that was the only reason why he would not be working.[21]

In addition, the Court also concludes that, unlike the circumstances in the Supreme Court's landmark perjury case Bronston v. United States, 409 U.S. 352 (1973),[22] there is no indication that Sandoval's exact, verbatim, statements -- that he did not work, or had not worked since 2002 or 2003 -- are truthful. Indeed, the evidence in the record is sufficient to support the opposite conclusion: Sandoval's statements that he did not work are sufficient to support a jury verdict that Sandoval violated 18 U.S.C. § 1001(a)(2) by making these statements. This conclusion is because the same evidence that is sufficient to support Sandoval's charges under 18 U.S.C. § 641, see Section I, supra at 46-79, also supports a reasonable jury finding that Sandoval's statements during the February 19 Interview that he did not work at Traditions Past and Present, see February 19 Interview at 3:59-4:01; id. at 4:11-18; id. at 4:26-28; id. at 6:13-18, are false. In short, the jury reasonably can conclude that Sandoval worked at Traditions Past and Present, and thus can

---

[21]The Court notes that, in ordinary, everyday speech, people often engage in conversations in which it is clear to everyone what is being said, despite the use of imprecise language, figures of speech, idioms, metaphor, malapropisms, etc. Here, the Court concludes that a reasonable jury, in the context of the conversation, could have concluded that Sandoval's statements were intended to convey to the agents that he was unable to work.

[22]In Bronston v. United States, the Supreme Court held that an individual cannot be convicted of perjury when the allegedly false statement is "literally true but not responsive to the question asked and arguably misleading by negative implication." 409 U.S. at 353. Other courts have applied this holding -- and its so-called "literal truth" defense, United States v. Strohm, 671 F.3d 1173, 1183 (10th Cir. 2011) -- to prosecutions under 18 U.S.C. § 1001, see United States v. Mandanici, 729 F.2d 914, 921 (2d Cir. 1984).

conclude reasonably that his statements to the contrary are false.  Accordingly, the Court concludes

that the evidence in the record is sufficient to support: (i) a jury determination that Sandoval stated

that he was unable to work, and, alternatively, (ii) a jury determination that Sandoval's repeated

statements that he did not work were also false and capable of supporting a conviction under

18 U.S.C. § 1001(a)(2).[23]

---

[23]The Court recognizes that this second, alternative, conclusion, however, does not respond comprehensively to Sandoval's objection that the false statement alleged in the indictment is distinct from the false statements heard in the February 19 Interview -- i.e., the notion that there is a distinction between the Indictment's allegation that Sandoval falsely stated "that he was not able to work," Superseding Indictment at 4, and Sandoval's statements in the February 19 Interview that he did not work at Traditions Past and Present, see February 19 Interview at 3:59-4:01; id. at 4:11-18; id. at 4:26-28; id. at 6:13-18, and that the last time he worked was "in 2002 or 2003," February 19 Interview at 5:59-6:03.  On this point, the Court is aware that Constitutional issues can arise from too great a discrepancy between the wrongdoing charged in the indictment and wrongdoing that the evidence shows.  Indeed, the issue has a long history in our jurisprudence; it has provoked thoughtful discussions by, among others, our nation's two Justice Marshalls.  In 1813, Chief Justice John Marshall wrote:

> The rule that a man shall not be charged with one crime and convicted of another, may sometimes cover real guilt, but its observance is essential to the preservation of innocence.  It is only a modification of this rule, that the accusation on which the prosecution is founded, should state the crime which is to be proved, and state such a crime as will justify the judgment to be pronounced.

The Hoppet, 11 U.S. 389, 394, 7 Cranch 389 (1813).  Chief Justice Marshall provides two reasons for this rule: (i) that it provides the defendant notice of the charge and thus allows him to prepare a defense; and (ii) that "the Court may see with judicial eyes that the fact, alleged to have been committed, is an offence against the laws, and may also discern the punishment annexed by law to the specific offence."  The Hoppet, 11 U.S. at 394.
Over a century-and-a-half later, the other Justice Marshall -- Justice Thurgood Marshall -- wrote:

> To uphold a conviction on a charge that was neither alleged in an indictment nor presented to a jury at trial offends the most basic notions of due process.  Few constitutional principles are more firmly established than a defendant's right to be heard on the specific charges of which he is accused.

Dunn v. United States, 442 U.S. 100, 106 (1979)(citing Eaton v. City of Tulsa, 415 U.S. 697, 698-99 (1974); Garner v. Louisiana, 368 U.S. 157, 163-64 (1961); Cole v. Arkansas, 333 U.S. 196, 201 (1948); De Jonge v. Oregon, 299 U.S. 353, 362 (1937)).  This principle's Constitutional source

generally is understood to be the Fifth Amendment's "right to be tried only for charges upon indictment by a grand jury," United States v. Brown, 400 F.3d 1242, 1253 (10th Cir. 2005), although other Constitutional sources also have been offered, see, e.g., United States v. Farr, 536 F.3d 1174, 1179 (10th Cir. 2008)(Gorsuch, J.)(suggesting the principle is also derived from the "Sixth Amendment's assurance of a defendant's right 'to be informed of the nature and cause of the accusation' against him or her" (quoting U.S. Const. amend. VI)).

This basic principle being established firmly, a secondary -- more context-dependent -- question arises: when is a difference between the crime alleged in the indictment and the proof at trial so great as to implicate squarely these grave Constitutional concerns?  In answering this question over time, courts have established an analytical spectrum:

> The courts categorize situations where the proof differs from the indictment as either a variance or a constructive amendment.  The term variance applies when the difference between the indictment and proof is relatively slight, and the term constructive amendment applies when the difference is more significant.  The distinction between variances and constructive amendments is a matter of degree, and the distinction is rather shadowy.

Wright & Miller, Federal Practice and Procedure § 516 (footnotes omitted).  The Tenth Circuit has stated that "a constructive amendment is more dangerous because it actually modifies an essential element of the offense charged," and that, "[i]n order to rise to this level, the change in the indictment must be more than the addition or deletion of nonessential factual averments . . . . [T]he amendment must effectively alter the substance of the indictment."  Hunter v. New Mexico, 916 F.2d 595, 599 (10th Cir. 1990).  A variance, on the other hand, occurs "when 'the charging terms are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment.'"  Hunter v. New Mexico, 916 F.2d at 598 (quoting United States v. Hathaway, 798 F.2d 902, 910 (6th Cir. 1986)).  "Where a simple variance exists, 'convictions generally have been sustained as long as the proof upon which they are based corresponds to an offense that was clearly set out in the indictment.'"  Hunter v. New Mexico, 916 F.2d at 599 (10th Cir. 1990)(quoting United States v. Miller, 471 U.S. 130, 136 (1985)).  Moreover, "a variance is fatal only when the defendant is prejudiced in his defense because he cannot anticipate from the indictment what evidence will be presented against him or is exposed to the risk of double jeopardy."  Hunter v. New Mexico, 916 F.2d at 599.  See Ortiz v. United States, No. 21-PO-0021, 2022 WL 16961445, at *22 (D.N.M. November 15, 2022)(Browning, J.)(discussing variances and constructive amendments); United States v. Perea, No. 09-CR-1034, 2010 WL 2292937, at *8 (D.N.M. May 21, 2010)(Browning, J.)(same).

At the appellate level, the distinction between a variance and a constructive amendment is considerable: "If the matter is considered merely a variance, it is reversible error only if it affected the defendant's substantial rights," whereas, a "constructive amendment requires relief without proof of prejudice when the objection is timely raised." Wright & Miller, Federal Practice and Procedure § 516.  As the Tenth Circuit puts it, a variance "triggers harmless error analysis," while a constructive amendment "is reversible per se." Hunter v. New Mexico, 916 F.2d at 598-99 (10th Cir. 1990)(citing Browning v. Foltz, 837 F.2d 276, 280 (6th Cir. 1988); United States v. Apodaca, 843 F.2d 421, 428 (10th Cir. 1988)).  The Court, of course, cannot apply an appellate standard of review, but the difference in approach is nonetheless instructive, because it speaks to the respective

III.    **SUFFICIENT EVIDENCE EXISTS IN THE UNITED STATES' CASE-IN-CHIEF TO SUSTAIN A CONVICTION OF FALSE STATEMENT IN A SOCIAL SECURITY FORM UNDER 42 U.S.C. § 408(a)(3).**

42 U.S.C. § 408(a)(3) states:

Whoever --

. . .

(3)    at any time makes or causes to be made any false statement or representation of a material fact for use in determining rights to payment under this subchapter

. . .

shall be guilty of a felony and upon conviction thereof shall be fined under Title 18 or imprisoned for not more than five years, or both, except that in the case of a person who receives a fee or other income for services performed in connection with any determination with respect to benefits under this subchapter (including a claimant representative, translator, or current or former employee of the Social Security Administration), or who is a physician or other health care provider who submits, or causes the submission of, medical or other evidence in connection with any such determination, such person shall be guilty of a felony and upon conviction thereof shall be fined under Title 18, or imprisoned for not more than ten years, or both.

42 U.S.C. § 408.  The "subchapter" referenced here is Subchapter II of the Social Security Act,

which governs federal old-age, survivors, and disability insurance benefits.  See 42 U.S.C. §§ 401

to 434.  As noted above, see Law Regarding Social Security Disability Benefits, supra at 29, 42

---

Constitutional severity of each species of indictment-versus-proof mismatch.

In Sandoval's case, as noted above, the Court concludes that the evidence in the record is sufficient to support a conviction under 18 U.S.C. § 1001(a)(2) on the basis that Sandoval's responses to the agents' questions reasonably could be interpreted as statements that he was unable to work.  Even under, however, the Court's alternative theory, i.e., that Sandoval's repeated statements that he did not work were also false and capable of supporting a conviction under 18 U.S.C. § 1001(a)(2), to the extent there is any difference between the indictment and the evidence at trial, that difference is a variance and not a constructive amendment.  The Superseding Indictment properly alleges violations under 18 U.S.C. § 1001(a)(2), and Sandoval was able to review the February 19 Interview during discovery and knew of its contents.  Similarly, it is implausible that Sandoval was "prejudicially surprised at trial" by the allegations of criminal wrongdoing under the statute.  United States v. Miller, 471 U.S. at 134.  For these reasons, the Court concludes that the discrepancy between the allegation in the indictment and the evidence at trial does not support a judgment of acquittal under rule 29.

U.S.C. § 423 governs SSDI benefits.

The United States alleges that Sandoval violated this statute when, "in a matter within the jurisdiction of the Social Security Administration, [Sandoval] knowingly and willfully made materially false statements and representations" in a SSA Work Activity Report when he "falsely stated that he was not able to work and had not received any income other than his Social Security Disability Insurance benefits."   Superseding Indictment at 4.   Sandoval makes two discrete arguments under rule 29 against his charge under this statute.   First, in a similar fashion to his argument against his 18 U.S.C. § 1001(a)(2) charge, Sandoval contends that his statements regarding are true, because the United States "has not . . . proven" that he made any income. Acquittal Motion Tr. at 17:25 (Harrison).   Sandoval's other contention as it relates to the 42 U.S.C. § 408(a)(3) charge is that his statements are not "material" -- i.e., "the Government did not show that -- in addition to the statements being knowingly and willfully false -- they were capable of influencing the SSA in the manner required for them to be material."  Motion at 8.

The Court concludes that the first of these arguments fails for the same reason as it does for Sandoval's 18 U.S.C. § 1001(a)(2) argument.   Namely, because sufficient evidence exists to support a jury conclusion regarding Sandoval's countable income, sufficient evidence supports a jury conclusion that Sandoval's statement was false in the March 15, 2021, Work Activity Report -- wherein Sandoval checked "No" in response to a question that asks, "[h]ave you had any employment income or wages since the DATE[24] shown above in the identification section?" Social Security Administration Important Information Letter and Work Activity Report at Bates No. 216[25] (dated March 15, 2021), admitted on December 14, 2022 (as United States' Trial Exhibit

---

[24]The date listed in this section is "09/2016."  March 15 Form at Bates No. 216.

[25]The March 15 Form, as an exhibit, contains two different portions that contain their own

28)("March 15 Form"); Dec. 14 Tr. at 107:4-5 (Court)(admitting into evidence March 15 Form).

As for Sandoval's arguments on materiality, the Court notes that, although 42 U.S.C. § 408 does not define what is a "material fact" for the statute's purposes, and the Tenth Circuit has not spoken on the question, other Courts of Appeals conclude that -- akin to 18 U.S.C. § 1001(a)(2) -- a statement is material under 42 U.S.C. § 408 if "it has 'a natural tendency to influence or was capable of influencing the government agency or official.'" United States v. Phythian, 529 F.3d 807, 813 (8th Cir. 2008)(quoting United States v. Baker, 200 F.3d 558, 561 (8th Cir. 2000)). See Fed. Crim. Jury Instructions of the Seventh Circuit, Comm. on Fed. Crim. Jury Instructions of the United States Court of Appeals for the Seventh Circuit, 42 U.S.C. § 408(a)(3) Making or Causing to Be Made a False Statement or Representation of Material Fact for Use in Determining a Federal Benefit -- Elements, Comm. Comment (explaining that "[a] fact is material for purposes of § 408(a)(3) if it has 'a natural tendency to influence or was capable of influencing the government agency or official.'" (quoting United States v. Phythian, 529 F.3d at 813)). The Court concludes that "a material fact" for the purposes of 42 U.S.C. § 408 is the same standard that the Tenth Circuit has used for other false statement offenses, namely: "a false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed." United States v. Irvin, 682 F.3d 1254, 1267 (10th Cir. 2012)(quoting Neder v. United States, 527 U.S. 1, 16 (1999)).

Under this standard, the Court concludes that there is sufficient evidence in the United States' case-in-chief that Sandoval's representation on the March 15 Form -- that he earned no income or wages between September, 2016, and March 15, 2021 -- is not only false, but materially

---

pagination. For the sake of precision, the Court utilizes the Bates Numbers at the bottom of the exhibit to refer to specific pages.

false.  Sandoval contends that the Social Security Administration was "already investigating him, they already knew what their determination was going to be," and therefore Sandoval's representation "was not the kind of information that was likely to have or did have an impact on the decision of the agency."  Acquittal Motion Tr. at 29:12-19 (Harrison).  Tenth Circuit precedent -- which instructs that materiality concerns "natural tendencies and capabilities," and deals with, "an *objective* quality, unconcerned with the subjective effect that a defendant's representations actually had upon the . . . decision" -- forecloses this argument.  United States v. Irvin, 682 F.3d at 1267 (emphasis in United States v. Irvin).  Put another way, materiality "does not turn on whether the misrepresentation actually influenced the [decision maker] or whether the decision maker actually relied on the misrepresentation."  United States v. Williams, 865 F.3d 1302, 1310 (10th Cir. 2017).  The Court concludes that, given the central importance of income in determining whether Sandoval engaged in substantial gainful activity, there is sufficient evidence in the United States' case-in-chief on which a jury reasonably could conclude that Sandoval's statements regarding his income in the March 15 Form have a natural tendency to influence the Social Security Administration's decision concerning Sandoval's SSDI benefits.

In sum, the Court concludes that the United States' case-in-chief -- when viewed in the light most favorable to the government, see Cartwright v. United States, 335 F.2d at 921 -- provides a sufficient evidentiary foundation on which a jury could find Sandoval guilty on all charged counts.  First, sufficient direct and circumstantial evidence regarding Sandoval's income and countable income from the charging period supports Sandoval's thirty-three counts of Theft of Government Property under 18 U.S.C. § 641.  See Section I, supra at 46-79.  Second, the Court concludes that sufficient evidence supports Sandoval's count of Making False Statements under 18 U.S.C. § 1001(a)(2), because a jury could conclude that he earned income from Traditions Past

and Present, and thus his statements to the contrary are materially false.  <u>See</u> Section II, <u>supra</u> at 79-85.  Last, for much the same reason, the Court concludes that sufficient evidence in the United States' case-in-chief supports Sandoval's count of False Statement in a Social Security Form under 42 U.S.C. § 408(a)(3).  <u>See</u> Section III, <u>supra</u> at 85-89.  Because the Court concludes that sufficient evidence exists on which a jury could find Sandoval guilty on all counts charged, the Court denies the Motion.

**IT IS ORDERED** that the Defendant's Motion for Judgment of Acquittal, filed December 16, 2022 (Doc. 77), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Alexander M.M. Uballez
   United States Attorney
Kristopher N. Houghton
Raquel Ruiz-Velez
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Paul J. Kennedy
Elizabeth Harrison
Kennedy Hernandez & Harrison, P.C.
Albuquerque, New Mexico

   *Attorneys for the Defendant*