**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                   No. CR 22-1010 JB

JAMES ANTHONY SANDOVAL,

      Defendant.

<u>**MEMORANDUM OPINION AND ORDER**</u>

**THIS MATTER** comes before the Court on the Defendant's Motion to Dismiss for *Brady* Violations, filed December 14, 2022 (Doc. 74)("Motion").  The Court heard argument on the Motion during the trial in this matter on December 14, 2022, and December 15, 2022.  <u>See</u> Clerk's Minutes for Jury Trial Held December 13, 2022 to December 16, 2022 at 6, 8 (dated December 13, 2022), filed December 13, 2022 (Doc. 95)("Clerk's Minutes").[1]  The primary issues are: (i) whether Plaintiff United States of America, in this case involving alleged theft of Social Security Disability benefits, violated Defendant James Anthony Sandoval's Due Process rights under the Fifth Amendment to the Constitution of the United States when it unlawfully failed to disclose exculpatory evidence to Sandoval by withholding Social Security Administration ("SSA") letters that indicate Sandoval's self-employment income is $0.00; (ii) whether the United States violated Sandoval's Constitutional Due Process rights when it belatedly disclosed potential impeachment information regarding one of its witnesses -- Gidget Hall, Sandoval's former employee -- until after that witness' trial testimony had begun; and (iii) whether the United States must disclose Sandoval's entire SSA file based on its Constitutional or rule-based disclosure

---

[1]Although Clerk's Minutes are dated on the first day of trial, these minutes contain information from throughout the entire trial.  <u>See</u> Clerk's Minutes at 1-16.

obligations.   The Court concludes that: (i) the United States has not violated Sandoval's Due Process rights by withholding the SSA letters, because, although those letters are favorable to Sandoval and the United States suppressed them, Sandoval has not shown that the United States' failure to disclose has prejudiced him; (ii)  the United States has not violated Sandoval's Due Process rights by belatedly disclosing the impeachment evidence for one of the United States' witnesses, G. Hall, because Sandoval has used the evidence to impeach G. Hall during the trial and has not otherwise shown that the delay was materially prejudicial; and (iii) the United States must review all materials in Sandoval's SSA file, and disclose any material therein that is material to Sandoval's guilt or punishment.   Accordingly, the Court denies the Motion, but orders the United States to comply with its disclosure obligations with respect to Sandoval's SSA file.

## FACTUAL BACKGROUND

The Court provides the following facts solely for the purpose of this Memorandum Opinion and Order, and to provide background and context to the Court's discussion of the Motion.   The Court derives these facts from the Indictment in this matter, see Superseding Indictment, filed November 23, 2022 (Doc. 28)("Indictment"), the parties' Joint Statement of the Case, filed December 8, 2022 (Doc. 51)("Case Statement"), the Motion, and the United States' Response to Defendant's Motion to Dismiss, filed December 15, 2022 (Doc. 75)("Response").   Sandoval is presumed innocent, and the Court acknowledges that most of the facts are the United States' version of the story.

The United States alleges violations of three federal statutes: Theft of Government Property, contrary to 18 U.S.C. § 641; Making False Statements, contrary to 18 U.S.C. § 1001(a)(2); and False Statement in a Social Security Form, contrary to 42 U.S.C. § 408(a)(3). See Indictment at 1.   The United States alleges that Sandoval stole United States property by

- 2 -

receiving -- over a period spanning from June, 2017, until February, 2020[2] -- Social Security Insurance Benefits to which he was not entitled under law. See Case Statement at 1. According to the United States, the reason that Sandoval is not entitled to these benefits is that, despite Sandoval's representations that he was not working or earning money because of a disability, he was working and earning income that was sufficient to put him over the relevant earning threshold to receive Social Security Disability Insurance ("SSDI") Benefits. See Indictment at 1; Motion at 1; Case Statement at 1-2. The United States also contends that, during the investigation into these allegations, Sandoval lied to federal agents about whether he was able to work and whether he had received any income. See Case Statement at 1-2.

Pertinent to the Motion, Sandoval states that, in February, 2022, he received two letters from an entity called "Social Security Administration - DEBS," which say: "'Based on information provided to us from the Internal Revenue Service, we are reducing the amount of your self-employment income on your Social Security earnings record from $118,500.00 to $0.00 for tax year 2016.'" Motion at 1 (source of quoted material not cited). Sandoval states that a second letter "reaches the same result for the year 2017." Motion at 1. Although Sandoval does not discuss what "Social Security Administration - DEBS" is, the United States asserts that DEBS is an acronym that refers to the SSA's "Division of Earnings and Business Services." Response at 2. The United States explains that, "[a]s currently understood by the United States," the letters

> are the result of a process by which certain information from the Internal Revenue Service ("IRS") is electronically updated in an electronic database used by DEBS. The information is automated, meaning that as IRS data migrates to the DEBS

---

[2]Originally, the United States' charging period for the 18 U.S.C. § 641 charges began in June, 2017, and ended in June, 2021. On the eve of trial, however, the United States moved to dismiss sixteen of its original counts, shortening the charging period to June, 2017, until February, 2020. See Motion to Dismiss Counts 34-49 of the Superseding Indictment, filed December 13, 2022 (Doc. 68). The Court granted that motion on December 19, 2022. See Order to Dismiss Counts 34-49 of the Superseding Indictment, filed December 19, 2022 (Doc. 85).

database automatically, without human input. The DEBS database changes automatically to reflect the amount of taxable income an IRS database contains based on IRS returns and/or amendments. If there is a change, the DEBS database automatically generates a letter to the claimant. Letters that are sent are then housed in the DEBS system.

Response at 2. Substantively, Sandoval contends that these letters "directly contradict" the United States' main argument in this case, namely, that Sandoval's income meant that he was not entitled to Social Security Insurance Benefits. Motion at 1. Sandoval also states that these letters contradict "virtually all the discovery about Mr. Sandoval's income ever provided to the defense," Motion at 1, and that all the United States' previous disclosures about income stop in 2021, before the SSA "reversed themselves based on the IRS information," Motion at 2. Sandoval represents that he asked the United States for other material that must be disclosed pursuant to Brady v. Maryland, 373 U.S. 83 (1963)("Brady"),[3] in light of these letters, and the United States responded that "it 'do[es] not believe these letters are Brady material,' and that '[t]he SSA, in general, is not part of the prosecution team.'" Motion at 2 (source of quoted material not given, brackets in original).

Sandoval also states that the United States did not disclose information related to its "most 'essential'" witness -- G. Hall, who worked as a bookkeeper at Sandoval's business -- until the evening of the first night of trial, after G. Hall's testimony had begun. Motion at 3 (source of quoted material not cited). Specifically, Sandoval states that "[a]t no time did the Government ever disclose to the defense any information about G. Hall's daughter, Sarah Hall, the embezzlement charges that S. Hall faced arising from her employment at Mr. Sandoval's business,

_____

[3]Brady v. Maryland, discussed in greater detail below, infra, is the case in which the Supreme Court of the United States held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87.

or any other court proceedings involving Gidget or Sarah Hall." Motion at 3. Sandoval contends

that, on the evening of December 13, 2022, "after the cross-examination of Gidget Hall had already

begun, the Government transmitted the defense a copy of her testimony at Sarah Hall's preliminary

hearing, which has been in its possession since at least August 17, 2016." Motion at 4. Sandoval

also states that, on the witness stand at trial on December 13, 2022, "Gidget Hall testified that she

had spoken with the Government's counsel, and they knew her daughter's name, knew about the

embezzlement case, and knew about this obviously fertile ground for impeachment." Motion at 4.

## PROCEDURAL BACKGROUND

The Motion requests the Court to dismiss all of Sandoval's charges owing to "the

government's *Brady* violations." Motion at 1. The Motion argues that there are

> two categories of violations at issue: (1) the Government's failure to provide clearly
> exculpatory evidence from the Social Security Administration file on the grounds
> that the SSA "is not part of the prosecution team"; and (2) the Government's failure
> to timely disclose exculpatory and impeachment evidence relating to its "most
> important witness," Gidget Hall, who began testifying on December 13, 2022.

Motion at 1 (source of quoted material not cited). As to the first category, Sandoval asserts that,

pursuant to case law from the United States Court of Appeals for the Tenth Circuit, for Brady

purposes, "'the "prosecution" includes not only the individual prosecutor handling the case, but

also the prosecutor's entire office, as well as law enforcement personnel and other arms of the state

involved in investigative aspects of a particular criminal venture.'" Motion at 2 (quoting

McCormick v. Parker, 821 F.3d 1240, 1247 (10th Cir. 2016)). Accordingly, Sandoval argues, the

United States' assertion that the SSA is not part of the prosecution team does not shield the United

States from fulfilling its disclosure obligations under Brady. Sandoval then quotes the Supreme

Court of the United States for the proposition that, "'[w]hen the prosecutor receives a specific and

relevant request, the failure to make any response is seldom, if ever, excusable.'" Motion at 3

(quoting United States v. Agurs, 427 U.S. 97, 106 (1976)). Sandoval contends that, here, the

United States "has pointed out that such materials exist, but the prosecution has still not met its burden," and, because witnesses have already begun to testify in the trial, Sandoval is being forced "to react without the *Brady* material from that agency."  Motion at 3.

As for the second category of alleged disclosure violations, Sandoval states that the transcript of G. Hall's testimony from a State preliminary hearing in her daughter's criminal case covers much of the same substantive ground as G. Hall's testimony from trial in this case, and yet the testimony from these two cases "bear[] strikingly little resemblance."  Motion at 4.  Sandoval states that "'[i]t would eviscerate the purpose of the *Brady* rule and encourage gamesmanship were we to allow the government to postpone disclosures to the last minute, during trial.'"  Motion at 5 (quoting United States v. Burke, 571 F.3d 1048, 1054 (10th Cir. 2009)("Burke")).  Sandoval also quotes a Tenth Circuit case which states that belated disclosure "'tends to throw existing strategies and trial preparation into disarray.'"  Motion at 5 (quoting Burke, 571 F.3d at 1054).  Sandoval requests that, because of these violations, the Court dismiss all of the Indictment's remaining counts, see Motion at 5, or, in the alternative, grant "the following remedies":

> (1)    immediate production of the complete SSA file, including the determination that Mr. Sandoval had zero income and any internal communications about that decision or its basis;
>
> (2)    exclusion of any evidence or argument that Mr. Sandoval made income from self-employment;
>
> (3)    exclusion of any evidence or "expert" testimony opining that Mr. Sandoval was not entitled to SSDI benefits due to self-employment income;
>
> (4)     striking Gidget Hall's testimony, and an instruction to the jury to ignore her testimony in its entirety; and
>
> (5)     an instruction to the jury regarding the prosecution's failures to disclose exculpatory material.

Motion at 6.

In the Response, the United States contends that Sandoval's Motion is "without merit and the Court should decline to grant any of the remedies sought."  Response at 1.  As it relates to the SSA file, the United States asserts that, until Sandoval sent the United States the two letters from the SSA showing the Internal Revenue Service's reduction to Sandoval 2016 and 2017 income, the United States was "unaware of these documents," because they do not originate from the SSA's Office of the Inspector General ("OIG"), which is "the investigative agency in this prosecution." Response at 2.  Instead, those letters, according to the United States, "are the result of a process by which certain information from the Internal Revenue Service ('IRS') is electronically updated in an electronic database used by" DEBS, and, then, if there is a change to an individual's taxable income, "the DEBS database automatically generates a letter to the claimant."  Response at 2.  The United States represents that it "conferred with its case agent, OIG SSA Special Agent Ryan Palmiter and learned that he can access the archived letters if he specifically queries the SSA system."  Response at 2.  The United States asserts that "Agent Palmiter's regular practice during an investigation is to enter an alert in the SSA system-wide to indicate that OIG has an open matter on a claimant," and that he entered an alert in this case, but that DEBS did not respond to his alert, allegedly because the process that produced the letter "was an automated one between the IRS and the DEBS database."  Response at 3.  The United States contends that Palmiter "reports that a DEBS income determination does not dictate an OIG investigation."  Response at 3.

In relation to the letters specifically, the United States argues that the letters are not <u>Brady</u> material for three reasons.  First, it argues that the letters were not "suppressed" by the prosecution, as Sandoval provided them to the United States.  Response at 4.  The United States explains that "'evidence is not suppressed if the defendant either knew, or should have known of the essential facts permitting him to take advantage of any exculpatory evidence.'"  Response at 4 (quoting

Ellsworth v. Warden, 333 F.3d 1, 6 (1st Cir. 2003)).  Second, the United States argues that the letters are not Brady material, because the information in the letters is not material, given that "[t]he documentation in question here is nothing more than a determination by DEBS that Defendant had no taxable income for 2016 or 2017, based on the information contained in his IRS return," and that this information does not "compel the SSA OIG to reach any particular conclusions regarding Defendant's income."  Response at 5-6.  Third and last, the United States argues that the letters are not Brady material, because DEBS is not a member of the prosecution team, and, "[a]lthough the United States has a duty to disclose exculpatory information, it does not have to [sic] duty to search for records for entities that are not part of the prosecution team."  Response at 6 (citing United States v. Boutte, No. CR 17-3338, 2019 WL 885935, at *1-2 (D.N.M. February 22, 2019)(Carson, J., sitting by designation)).

On this final point, the United States notes that

knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor, for the imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to adopt "a monolithic view of government" that would "condemn the prosecution of criminal cases to a state of paralysis."

Response at 6 (quoting United States v. Boutte, 2019 WL 885935, at *2).  The United States contends that there are three main "factors" which courts consider "in determining whether an agency is a member of the prosecution team."  Response at 6-7.  These factors are: (i) "[w]hether the prosecutor and agency in question conducted a joint investigation," Response at 7 (citing United States v. Pelullo, 399 F.3d 197, 218 (3d Cir. 2005), as amended (March 8, 2005)); (ii) "[w]hether the prosecutor had knowledge of or obtained information or evidence from the agency in question," Response at 7 (citing United States v. Casas, 356 F.3d 104, 115 (1st Cir. 2004), and United States v. Morris, 80 F.3d 1151, 1169 (7th Cir. 1996)); and (iii) "[w]hether the

prosecution can direct the actions of the agency in question,"  Response at 7 (citing United States v. Pelullo, 399 F.3d at 218, and United States v. Velte, 331 F.3d 673, 680 (9th Cir. 2003)).  Under these parameters, the United States argues, DEBS is not a part of the prosecution team, as "the DEBS did not conduct a joint investigation with SSA OIG," "the DEBS query to the IRS was not requested by or on behalf of the investigative team," and "[t]he United States has no control over the DEBS and cannot direct its actions."  Response at 8-9.  The United States also asserts that it "could not find any case law discussing whether the DEBS, a program within the SSA, is a member of the prosecution team," but the closest available case, according to the United States, indicates that DEBS is not part of a joint investigative team with the prosecutors or the SSA's investigating agency.  Response at 8 (citing and discussing United States v. Middendorf, No. CR 18-0036, 2018 WL 3956494, at *3-5 (S.D.N.Y. August 17, 2018)(Oetken, J.)).

Next, the United States characterizes Sandoval's request for the "complete SSA file" as "purely speculative."  Response at 9.  The United States asserts that "[t]he mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard."  Response at 9 (quoting United States v. Fleming, 19 F.3d 1325, 1331 (10th Cir. 1994), and United States v. Acosta-Gallardo, 656 F.3d 1109, 1117 (10th Cir. 2011)).  The United States also asserts that the letters "point to additional crimes by Defendant," Response at 9, and further states that the "Defendant appears to believe that simply labeling something as '*Brady* material' should open the entire SSA file to him in discovery," but that "such a ruling would create a dangerous precedent."  Response at 9-10.  Moreover, the United States contends that "the SSA is an enormous federal agency," with "central offices in Baltimore, ten regional offices, six processing centers, 1,230 field offices, and dozens of sub-agencies and programs that serve 64 million people," and accordingly "[t]he United States cannot glean what the 'complete SSA file' refers to."  Response at 10.  The

United States contends that it "can, however, produce information from the investigation conducted by SSA OIG, and matters within the possession of the prosecution team, and it has." Response at 10 (emphasis in Response).

Responding to Sandoval's contentions about impeachment material regarding G. Hall, the United States asserts that "the information related to witness Hall's daughter was not suppressed because it was known -- in fact, the criminal prosecution was initiated by -- Defendant." Response at 10. The United States asserts that Sandoval "was present at the hearing during which both Ms. Hall and her daughter testified," and therefore had first-hand knowledge of G. Hall's prior testimony. Response at 10 (citing United States v. Shelley, 760 F. App'x 657, 662 (11th Cir. 2019)). Moreover, Sandoval asserts that, "even if Defendant did not have direct first-hand knowledge of these events, the information was publicly available." Response at 11 (citing United States v. Brown, 398 F. App'x 352, 355 (10th Cir. 2010)). The United States concludes the Response by stating that it "strenuously objects" to all of Sandoval's proposed remedies for his allegations of disclosure violations: "[A]ll of Defendant's requested remedies are inappropriate as there has been no violation." Response at 11-12.

On the second day of trial, out of the jury's presence and before the United States had filed its Response, the Court discussed the Motion. See Draft Transcript of Trial, Day 2 at 62:10-64:12 (held December 14, 2022)(Court, Harrison, Houghton)("Dec. 14 Tr.").[4] The United States represented that it had "just received" the Motion and would "get something filed as soon as possible." Dec. 14 Tr. at 62:11-15 (Houghton). The Court stated that it would not require the disclosure of the entire SSA file "if the Government has made [its] representation that they've

_____

[4]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

gone through it for <u>Brady</u> material." Dec. 14 Tr. at 63:7-11 (Court).  The United States contended,

as it later said in the Response, that the "Social Security [A]dminstration as a whole is a much

bigger entity than the investigative unit that is on the prosecution team" and that therefore the

"extent" of the disclosure obligations were correspondingly curtailed.  Dec. 14 Tr. at 63:12-23

(Houghton).  The Court stated that the United States is "responsible for searching out all the <u>Brady</u>

material" and further elaborated that "[y]ou're the federal government . . . you're bringing a

criminal case, you can get that material.  You can pick up the phone and get material[,] it's in your

possession[,] custody or control." Dec. 14 Tr. at 64:9-12 (Court).  The following morning, before

the jury entered the Courtroom, the Court told the United States: "I'm not saying they're entitled

to the complete SSA file.  But you have to do a <u>Brady</u> review of the entire SSA file.  And make a

representation that there is not other <u>Brady</u> material that hasn't been produced." Draft Transcript

of Trial, Day 3 at 2:8-12 (held December 15, 2022)(Court)("Dec. 15 Tr.").  The Court reasserted:

"I think those materials [are] in your custo[dy, ] possession or control." Dec. 15 Tr. at 2:20-22

(Court).

### LAW REGARDING THE UNITED STATES' DUTY TO DISCLOSE IN CRIMINAL CASES

In <u>Brady</u>, the Supreme Court explained that "the suppression by the prosecution of

evidence favorable to an accused upon request violates due process where the evidence is material

either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373

U.S. at 87.  In <u>Giglio v. United States</u>, 405 U.S. 150 (1972), the Supreme Court extended the

prosecution's disclosure obligation to evidence that is useful to the defense in impeaching

government witnesses, even if the evidence is not inherently exculpatory.  <u>See</u> 405 U.S. at 153;

<u>Douglas v. Workman</u>, 560 F.3d 1156, 1172-73 (10th Cir. 2009)("[N]o distinction is recognized

between evidence that exculpates a defendant and 'evidence that the defense might have used to

impeach the [State's] witnesses by showing bias and interest.'" (quoting United States v. Bagley, 473 U.S. 667, 676 (1985))(brackets in Douglas v. Workman, but not in United States v. Bagley)). Finally, the Supreme Court has refined Brady and clarified that it is not necessary that a defendant request exculpatory evidence: "[R]egardless of request, favorable evidence is material, and constitutional error results from its suppression by the government 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  Kyles v. Whitley, 514 U.S. at 433 (quoting United States v. Bagley, 473 U.S. at 682).  See Fontenot v. Crow, 4 F.4th 982, 1061-62 (10th Cir. 2021)("[T]he duty to disclose favorable evidence in the hands of the state arises regardless of whether a request for such evidence has been made by the defense."); Douglas v. Workman, 560 F.3d at 1172 ("The government's obligation to disclose exculpatory evidence does not turn on an accused's request."); United States v. Summers, 414 F.3d 1287, 1304 (10th Cir. 2005)("[T]he prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request.").  On the other hand, "[i]t is well settled that there is 'no affirmative duty upon the government to take action to discover information which it does not possess.'"  United States v. Badonie, No. CR 03-2062, 2005 WL 2312480, at *2 (D.N.M. August 29, 2005)(Browning, J.)(quoting United States v. Tierney, 947 F.2d 854, 864 (8th Cir. 1991)).  Relatedly, "[a] prosecutor does not have a duty . . . to obtain evidence from third parties."  United States v. Badonie, 2005 WL 2312480, at *2.  See United States v. DeLeon, 428 F. Supp. 3d 716, 765 (D.N.M. 2019)(Browning, J.).

More broadly, during a criminal prosecution, the Federal Rules of Criminal Procedure and the Constitution of the United States of America require the United States to disclose certain evidence to a criminal defendant.  Rule 16 of the Federal Rules of Criminal Procedure is one source that imposes a disclosure duty on the United States.  The Due Process Clause of the United States

Constitution is another source imposing a duty to disclose on the United States.

## LAW REGARDING RULE 16

Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure provides:

> **(E)     Documents and Objects.** Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:
>
> > **(i)**     the item is material to preparing the defense;
> >
> > **(ii)**     the government intends to use the item in its case-in-chief at trial; or
> >
> > **(iii)**     the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(E) (bold in original).  Although rule 16's language is permissive, it does not authorize "a blanket request to see the prosecution's file," and a defendant may not use the rule to engage in a metaphorical "fishing expedition."  United States v. Maranzino, 860 F.2d 981, 985-86 (10th Cir. 1988)(citing Jencks v. United States, 353 U.S. 657, 667 (1957)).  Rule 16 also does not obligate the United States to "'take action to discover information which it does not possess.'"  United States v. Badonie, 2005 WL 2312480, at *2 (quoting United States v. Tierney, 947 F.2d 854, 864 (8th Cir. 1991)).  Nor is the United States required to secure information from third parties.  See United States v. Baca, CR 16-1613, 2020 WL 1289508, at *10 (D.N.M. March 18, 2020)(Browning, J.)("The test for Cordova's rule 16 request is not whether the U.S. Marshals Service is part of the prosecution team, but whether the documents are in the United States' possession, custody, or control."); United States v. Gatto, 763 F.2d 1040, 1048 (9th Cir. 1985)(holding that rule 16 does not contain a due diligence element requiring a prosecutor to search for evidence not within the United States' possession, custody, or control).

Evidence is "material" under rule 16 if "'there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, . . . or assisting impeachment or rebuttal.'" United States v. Graham, 83 F.3d 1466, 1474 (D.C. Cir. 1996)(quoting United States v. Lloyd, 992 F.2d 348, 351 (D.C. Cir. 1993)).  "Although the materiality standard is 'not a heavy burden,' . . . the Government need disclose rule 16 material only if it 'enable[s] the defendant significantly to alter the quantum of proof in his favor.'" United States v. Graham, 83 F.3d at 1474 (United States v. Lloyd, 992 F.2d at 351, and United States v. Caicedo-Llanos, 960 F.2d 158, 164 (D.C. Cir. 1992)).  See United States v. Harmon, 871 F. Supp. 2d 1125, 1170 (D.N.M. 2012)(Browning, J.)(analyzing materiality in rule 16's context), aff'd, 742 F.3d 451 (10th Cir. 2014).

Rule 16(d)(1) provides guidelines for courts to regulate discovery by issuing or modifying protective orders:

> At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief.  The court may permit a party to show good cause by a written statement that the court will inspect ex parte.  If relief is granted, the court must preserve the entire text of the party's statement under seal.

Fed. R. Crim. P. 16(d)(1).  In In re Terrorist Bombings of United States Embassies in East Africa, 552 F.3d 93 (2d Cir. 2008), the United States Court of Appeals for the Second Circuit held that rule 16(d) gives district courts the discretion to determine the circumstances "under which the defense may obtain access to discoverable information." In re Terrorist Bombings of United States Embassies in East Africa, 552 F.3d at 122.  In United States v. Delia, 944 F.2d 1010 (2d Cir. 1991), the Second Circuit noted that rule 16(d)(1) is "permissive," and gives district courts the ability to "limit or otherwise regulate discovery pursuant to Rule [16(d)(1)]." United States v. Delia, 944 F.2d at 1018.

Under rule 16(d)(2), "a district court has broad discretion in choosing a sanction upon determining that a party has violated a discovery obligation." United States v. Jumaev, 20 F.4th 518, 547 (10th Cir. 2021).

> **(2)     Failure to Comply.**  If a party fails to comply with this rule, the court may:
>
> > **(A)** order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions;
> >
> > **(B)** grant a continuance;
> >
> > **(C)** prohibit that party from introducing the undisclosed evidence; or
> >
> > **(D)** enter any other order that is just under the circumstances.

Fed. R. Crim. P. 16(d)(2) (bold in original).  "'In selecting a proper sanction, a court should typically consider: (1) the reasons the government delayed producing requested materials, including whether the government acted in bad faith; (2) the extent of prejudice to defendant as a result of the delay; and (3) the feasibility of curing the prejudice with a continuance.'"  United States v. Charley, 189 F.3d 1251, 1262 (10th Cir. 1999)(quoting United States v. Gonzales, 164 F.3d 1285, 1292 (10th Cir. 1999)).  In United States v. Martinez, 455 F.3d 1127 (10th Cir. 2006), the Tenth Circuit held that "a court should impose the least severe sanction."  455 F.3d at 1131 (quoting United States v. Wicker, 848 F.2d 1059, 1061 (10th Cir. 1988)).  The Tenth Circuit notes: "Rule 16 and our cases specifically mention continuance or exclusion of the evidence as preferred remedies."  455 F.3d at 1131.

## LAW REGARDING THE GOVERNMENT'S DUTY TO DISCLOSE UNDER THE DUE <u>PROCESS CLAUSE OF THE CONSTITUTION</u>

The Due Process Clause of the Constitution requires that the government disclose to the defendant any evidence that "is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>Brady</u>, 373 U.S. at 87.  As noted above, the Supreme Court has extended the prosecution's disclosure obligation to include evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory. See <u>Giglio</u>, 405 U.S. 150; <u>Douglas v. Workman</u>, 560 F.3d at 1172-73 ("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [State's] witnesses by showing bias and interest.'" (quoting <u>United States v. Bagley</u>, 473 U.S. at 676 (1985)(brackets in <u>Douglas v. Workman</u>, <u>United States v. Bagley</u> says "Government's")); <u>United States v. Abello-Silva</u>, 948 F.2d 1168, 1179 (10th Cir. 1991)("Impeachment evidence merits the same constitutional treatment as exculpatory evidence.").  Finally, the Supreme Court has refined <u>Brady</u> and clarified that it is not necessary that a defendant request exculpatory evidence: "Regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government." <u>Kyles v. Whitley</u>, 514 U.S. 419, 433 (1995)(quoting <u>United States v. Bagley</u>, 473 U.S. at 682). See <u>Douglas v. Workman</u>, 560 F.3d at 1172 ("The government's obligation to disclose exculpatory evidence does not turn on an accused's request."); <u>United States v. Summers</u>, 414 F.3d 1287, 1304 (10th Cir. 2005)("[T]he prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request.").

### 1.    <u>Material Exculpatory Evidence Under</u> Brady.

"The Constitution, as interpreted in <u>Brady</u>, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant." <u>Smith v. Sec'y of</u>

N.M. Dep't of Corr., 50 F.3d 801, 823 (10th Cir. 1995).  Instead, Brady requires disclosure only

of evidence that is both favorable to the accused, and "material either to guilt or to punishment."

Brady, 373 U.S. at 87.  "Evidence is material only if there is a reasonable probability that, had the

evidence been disclosed to the defense, the result of the proceeding would have been different."

United States v. Bagley, 473 U.S. at 682.  See United States v. Allen, 603 F.3d 1202, 1215 (10th

Cir. 2010).  A "reasonable probability," in turn, is a "'probability sufficient to undermine

confidence in the outcome.'"  United States v. Bagley, 473 U.S. at 682 (quoting Strickland v.

Washington, 466 U.S. 668, 694 (1984)).  The Tenth Circuit has noted that "[t]he mere possibility

that evidence is exculpatory does not satisfy the constitutional materiality standard."  United States

v. Fleming, 19 F.3d 1325, 1331 (10th Cir. 1994).  The Tenth Circuit also has stated that evidence

is material if it "might meaningfully alter a defendant's choices before and during trial . . .

[including] whether the defendant should testify."  Case v. Hatch, 731 F.3d 1015, 1041 (10th Cir.

2013)(quoting United States v. Burke, 571 F.3d 1048, 1054 (10th Cir. 2009))(brackets in Case v.

Hatch, but not in United States v. Burke).

"To be material under Brady, undisclosed information or evidence acquired through that

information must be admissible."  Banks v. Reynolds, 54 F.3d 1508, 1521 n.34 (10th Cir.

1995)(quoting United States v. Kennedy, 890 F.2d at 1059).  The Supreme Court in Cone v. Bell,

556 U.S. 449 (2009), notes:

> Although the Due Process Clause of the Fourteenth Amendment, as
> interpreted by Brady, only mandates the disclosure of material evidence, the
> obligation to disclose evidence favorable to the defense may arise more broadly
> under a prosecutor's ethical or statutory obligations.  See Kyles, 514 U.S. at 437
> ("[T]he rule in Bagley (and, hence, in Brady) requires less of the prosecution than
> the ABA Standards for Criminal Justice Prosecution Function and Defense
> Function 3-3.11(a) (3d ed. 1993)").  See also ABA Model Rules of Professional
> Conduct 3.8(d) (2008)("The prosecutor in a criminal case shall" "make timely
> disclosure to the defense of all evidence or information known to the prosecutor
> that tends to negate the guilt of the accused or mitigates the offense, and, in

connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal").

Cone v. Bell, 556 U.S. at 470 n.15.

The government bears the burden of producing exculpatory materials; the defendant has no obligation first to note that such materials exist.  See Kyles v. Whitley, 514 U.S. at 437 (stating that the prosecution has an affirmative duty to disclose evidence, because "the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached" (source of quoted material not cited, but presumably United States v. Bagley, 473 U.S. at 682)); United States v. Deutsch, 475 F.2d 55, 57 (5th Cir. 1973)(granting a mistrial for failure to produce personnel files of government witnesses), overruled on other grounds by United States v. Henry, 749 F.2d 203 (5th Cir. 1984); United States v. Padilla, 2011 WL 1103876, at *6.  This obligation means that the government must "volunteer exculpatory evidence never requested, or requested only in a general way." Kyles v. Whitley, 514 U.S. at 433. Additionally, "[u]nder Brady, the good or bad faith of government agents is irrelevant."  United States v. Quintana, 673 F.2d 296, 299 (10th Cir. 1982).  "This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence." Kyles v. Whitley, 514 U.S. at 439.

**2.    Timing of the Disclosure Under Brady.**

"The obligation of the prosecution to disclose evidence under Brady can vary depending on the phase of the criminal proceedings and the evidence at issue." United States v. Harmon, 871 F. Supp. 2d 1125, 1149 (D.N.M. 2012)(Browning, J.), aff'd, 742 F.3d 451 (10th Cir. 2014).  As a general matter, "[s]ome limitation on disclosure delay is necessary to protect the principles

articulated in <u>Brady v. Maryland</u>."  <u>United States v. Burke</u>, 571 F.3d at 1054.  The Tenth Circuit

has recognized, however, that "[i]t would eviscerate the purpose of the <u>Brady</u> rule and encourage

gamesmanship were we to allow the government to postpone disclosures to the last minute, during

trial."  <u>United States v. Burke</u>, 571 F.3d at 1054.  "[T]he belated disclosure of impeachment or

exculpatory information favorable to the accused violates due process when an 'earlier disclosure

would have created a reasonable doubt of guilt.'"  <u>United States v. Burke</u>, 571 F.3d at 1054

(quoting <u>United States v. Young</u>, 45 F.3d 1405, 1408 (10th Cir. 1995)).  The Tenth Circuit has

stated:

> Where the district court concludes that the government was dilatory in its
> compliance with <u>Brady</u>, to the prejudice of the defendant, the district court has
> discretion to determine an appropriate remedy, whether it be exclusion of the
> witness, limitations on the scope of permitted testimony, instructions to the jury, or
> even mistrial.

<u>United States v. Burke</u>, 571 F.3d at 1054.  Notably, "not every delay in disclosure of <u>Brady</u> material

is necessarily prejudicial to the defense."  <u>United States v. Burke</u>, 571 F.3d at 1056.  "To justify

imposition of a remedy, the defense must articulate to the district court the reasons why the delay

should be regarded as materially prejudicial."  <u>United States v. Burke</u>, 571 F.3d at 1056.  <u>See</u>

<u>United States v. DeLeon</u>, 428 F. Supp. 3d 841, 1152 (D.N.M. 2019)(Browning, J.), <u>aff'd sub nom.</u>

<u>United States v. Herrera</u>, 51 F.4th 1226 (10th Cir. 2022).

Once a prosecutor's obligations under <u>Brady</u> have been triggered, however, they

"continue[] throughout the judicial process."  <u>Douglas v. Workman</u>, 560 F.3d at 1173.  For

instance, the prosecutor's obligation to disclose <u>Brady</u> material can arise during trial.  <u>See United</u>

<u>States v. Headman</u>, 594 F.3d at 1183 (10th Cir. 2010)("Although <u>Brady</u> claims typically arise from

nondisclosure of facts that occurred before trial, they can be based on nondisclosure of favorable

evidence (such as impeachment evidence) that is unavailable to the government until trial is

underway."). The disclosure obligation continues even while a case is on direct appeal.  See United States v. Headman, 594 F.3d at 1183; Smith v. Roberts, 115 F.3d 818, 819, 820 (10th Cir. 1997)(applying Brady to a claim that the prosecutor failed to disclose evidence received after trial but while the case was on direct appeal).

The Supreme Court has held that Brady does not require "preguilty plea disclosure of impeachment information." United States v. Ruiz, 536 U.S. 622, 629 (2002)("We must decide whether the Constitution requires that preguilty plea disclosure of impeachment information.  We conclude that it does not.").  In United States v. Ruiz, the Supreme Court recognized that "impeachment information is special in relation to the *fairness of a trial*, not in respect to whether a plea is *voluntary*."  536 U.S. at 629 (emphasis in original).  The Supreme Court acknowledged that, "[o]f course, the more information the defendant has, the more aware he is of the likely consequences of a plea, waiver, or decision, and the wiser that decision will likely be," but concluded that "the Constitution does not require the prosecutor to share all useful information with the defendant." United States v. Ruiz, 536 U.S. at 632.  Moreover, the Supreme Court added:

> [T]his Court has found that the Constitution, in respect to a defendant's awareness of relevant circumstances, does not require complete knowledge of the relevant circumstances, but permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor.

United States v. Ruiz, 536 U.S. at 630.  The Supreme Court explained that "a constitutional obligation to provide impeachment information during plea bargaining, prior to entry of a guilty plea, could seriously interfere with the Government's interest in securing those guilty pleas that are factually justified, desired by defendants, and help to secure the efficient administration of justice." United States v. Ruiz, 536 U.S. at 630.  The Tenth Circuit has reiterated these principles:

> Johnson asserts that his plea was not knowing and voluntary because he did not know that he was giving up a claim that the government failed to disclose

impeachment evidence.   The Supreme Court, however, foreclosed this exact argument in United States v. Ruiz, by holding that the government has no constitutional obligation to disclose impeachment information before a defendant enters into a plea agreement.   Ruiz emphasized that "impeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary."   Rather, "a waiver [is] knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply in general in the circumstances -- even though the defendant may not know the specific detailed consequences of invoking it."

United States v. Johnson, 369 F. App'x 905, 906 (10th Cir. 2010)(unpublished)(quoting United States v. Ruiz, 546 U.S. at 630).[5]

The Tenth Circuit has held, however, that United States v. Ruiz does not apply to exculpatory evidence, but rather applies only to impeachment evidence:

Ruiz is distinguishable in at least two significant respects.   First, the evidence withheld by the prosecution in this case is alleged to be exculpatory, and not just impeachment, evidence.   Second, Ohiri's plea agreement was executed the day jury selection was to begin, and not before indictment in conjunction with a "fast-track" plea.   Thus, the government should have disclosed all known exculpatory information at least by that point in the proceedings. By holding in Ruiz that the government committed no due process violation by requiring a defendant to waive her right to impeachment evidence before indictment in order

_____

[5]United States v. Johnson is an unpublished opinion, but the Court can rely on a Tenth Circuit unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").   The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. [. . .] However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citing In re Citation of Unpublished Opinions/Ords. & Judgments, 151 F.R.D. 470 (10th Cir. 1993)).   The Court concludes that United States v. Johnson, United States v. Johnson, 117 F.3d 1429, 1997 WL 381926 (10th Cir. 1997)(unpublished table decision), United States v. Ohiri, 133 F. App'x 555 (10th Cir. 2005), and United States v. Dahl, 597 F. App'x 489 (10th Cir. 2015), have persuasive value with respect to material issues in this case, and will assist the Court in its preparation of this Memorandum Opinion and Order.

> to accept a fast-track plea, the Supreme Court did not imply that the government may avoid the consequence of a Brady violation if the defendant accepts an eleventh-hour plea agreement while ignorant of withheld exculpatory evidence in the government's possession.

United States v. Ohiri, 133 F. App'x 555, 562 (10th Cir. 2005)(unpublished).  The Tenth Circuit qualifies its holding in United States v. Ohiri, however, stating that the case presents "unusual circumstances."  133 F. App'x at 562.

The United States Courts of Appeals "have split on the issue whether Brady's restrictions apply to suppression hearings."  United States v. Harmon, 871 F. Supp. 2d at 1151.  In an unpublished opinion, the Tenth Circuit, without discussing whether Brady applies to a suppression hearing, rejected a defendant's argument that the prosecution violated Brady by failing to disclose impeachment evidence before a suppression hearing on the basis that the evidence was not impeachment evidence and not material.  See United States v. Johnson, 117 F.3d 1429, 1997 WL 381926, at *3 (10th Cir. 1997)(unpublished table decision).  Specifically, the Tenth Circuit found that

> disclosure of the evidence existing at the time of the hearing, even if impeaching, would not establish a reasonable probability that the outcome of the suppression hearing would have been different.  First, we question whether the evidence in question would have been admitted at the suppression hearing.  Even if it had been admitted, however, in light of [the defendant's] lack of truthfulness, our confidence in the result of the hearing has not been undermined.  Therefore, we hold that the evidence was not material, and that its nondisclosure by the prosecution does not constitute a Brady violation.

United States v. Johnson, 1997 WL 381926, at *3 (citation omitted).

The United States Court of Appeals for the District of Columbia Circuit has recognized that "it is hardly clear that the Brady line of Supreme Court cases applies to suppression hearings," because "[s]uppression hearings do not determine a defendant's guilt or punishment, yet Brady rests on the idea that due process is violated when the withheld evidence is 'material either to guilt

or to punishment.'"  United States v. Bowie, 198 F.3d 905, 912 (D.C. Cir. 1999)(quoting Brady, 373 U.S. at 87).  Without deciding the issue and in an unpublished opinion, the United States Court of Appeals for the Sixth Circuit quoted with approval this language from United States v. Bowie. See United States v. Bullock, 130 F. App'x 706, 723 (6th Cir. 2005)(unpublished)("Whether the suppression hearing might have come out the other way, however, is of questionable relevance to the Brady issues at stake here.").  The United States Court of Appeals for the Seventh Circuit has held that, under its own precedent, as well as under law from other Courts of Appeals, it was not "obvious" for clear-error purposes that "Brady disclosures are required prior to suppression hearings."  United States v. Stott, 245 F.3d 890, 902 (7th Cir. 2001).  The Second Circuit also has noted that Brady's applicability to suppression hearings is not "obvious" for plain error purposes. United States v. Nelson, 193 F. App'x 47, 50 (2d Cir. 2006).

Before the Supreme Court decided United States v. Ruiz, the Fifth Circuit and the United States Court of Appeals for the Ninth Circuit held that Brady applies to suppression hearings.  See United States v. Barton, 995 F.2d 931, 935 (9th Cir. 1993)("[W]e hold that the due process principles announced in Brady and its progeny must be applied to a suppression hearing involving a challenge to the truthfulness of allegations in an affidavit for a search warrant."); Smith v. Black, 904 F.2d 950, 965-66 (5th Cir. 1990)("Timing is critical to proper Brady disclosure, and objections may be made under Brady to the state's failure to disclose material evidence prior to a suppression hearing."), vacated on other grounds, 503 U.S. 930 (1992).  Most recently, the Tenth Circuit has suggested that Brady does not apply to suppression hearings, because "Brady rests on the idea that due process is violated when the withheld evidence is material to either guilt or punishment," but "[s]uppression hearings do not determine a defendant's guilt or punishment."  United States v. Dahl, 597 F. App'x 489, 491 n.2 (10th Cir. 2015)(unpublished)(quoting United States v. Lee Vang

Lor, 706 F.3d 1252, 1256 n.2 (10th Cir. 2013)(Whether *Brady's* disclosure requirements even apply at the motion to suppress stage is an open question")).  Although the United States Courts of Appeals have split on whether Brady applies to suppression hearings, "it is not likely that a prosecutor must disclose impeachment evidence before a suppression hearing in light of the Supreme Court's conclusion in United States v. Ruiz that a prosecutor does not have to disclose impeachment evidence before the entry of a guilty plea." United States v. Harmon, 871 F. Supp. 2d at 1151.  The Tenth Circuit affirmed the Court's United States v. Harmon, in which the Court concludes that the United States need not disclose impeachment information before a suppression hearing:

> Given that the Court has located no Tenth Circuit case deciding this issue, the Court believes that the Tenth Circuit would extend the holding of United States v. Ruiz to suppression hearings.  The Supreme Court's rationale distinguishing the guilty-plea process from a trial applies equally to a comparison of the suppression-hearing process and a trial.  The Court believes that both the Tenth Circuit and the Supreme Court would recognize that impeachment evidence need not be disclosed before a suppression hearing.   In United States v. Ruiz, the Supreme Court recognized that "impeachment information is special in relation to the *fairness of a trial*, not in respect to whether a plea is *voluntary*." United States v. Ruiz, 536 U.S. at 632 . . . (emphasis in original).  It acknowledged that, "[o]f course, the more information the defendant has, the more aware he is of the likely consequences of a plea, waiver, or decision, and the wiser that decision will likely be," but concluded that "the Constitution does not require the prosecutor to share all useful information with the defendant." United States v. Ruiz, 536 U.S. at 632 . . . .  Likewise, "the more information the defendant has, the more" likely he will be able to successfully suppress a particular piece of evidence, but "the Constitution does not require the prosecutor to share all useful information with the defendant."   United States v. Ruiz, 536 U.S. at 632 . . . .

United States v. Harmon, 871 F. Supp. 2d at 1169 (emphasis in original).  Accordingly, Brady does not require the United States to disclose impeachment evidence before suppression hearings. See United States v. Harmon, 871 F. Supp. 2d at 1165-67.

**3.    Evidence Must Be in the United States' Possession.**

"It is well settled that there is no 'affirmative duty upon the government to take action to

discover information which it does not possess.'" United States v. Tierney, 947 F.2d 854, 864 (8th Cir. 1991)(quoting United States v. Beaver, 524 F.2d 963, 966 (5th Cir. 1975)).  Accord United States v. Kraemer, 810 F.2d 173, 178 (8th Cir. 1987)(explaining that the prosecution is not required "to search out exculpatory evidence for the defendant"); United States v. Badonie, 2005 WL 2312480, at *2.  On the other hand, "a prosecutor's office cannot get around Brady by keeping itself in ignorance, or by compartmentalizing information about different aspects of a case." Carey v. Duckworth, 738 F.2d 875, 878 (7th Cir. 1984).   Under Brady, "[a] prosecutor must disclose information of which it has knowledge and access."  United States v. Padilla, 2011 WL 1103876, at *7 (citing United States v. Bryan, 868 F.2d 1032, 1037 (9th Cir. 1989)).  "A prosecutor may have a duty to search files maintained by other 'governmental agencies closely aligned with the prosecution' when there is 'some reasonable prospect or notice of finding exculpatory evidence.'" United States v. Padilla, 2011 WL 1103876, at *7 (quoting United States v. Brooks, 966 F.2d 1500, 1503 (D.C. Cir. 1992)).  A prosecutor does not have a duty, however, to obtain evidence from third parties.  See United States v. Combs, 267 F.3d 1167, 1173 (10th Cir. 2001)(observing that Brady v. Maryland does not oblige the government to obtain evidence from third parties).

## ANALYSIS

The Court denies the Motion, as Sandoval has not established any Constitutional violation pursuant to Brady.  The Court reaches this conclusion, because, although the discovery materials identified in the Motion are favorable to Sandoval and -- in the case of the SSA letters -- the United States suppressed them, Sandoval has not met his burden to establish by a preponderance of the evidence that the United States' nondisclosure of the withheld evidence prejudiced him.  The Court concludes, however, that the United States must review all materials in Sandoval's SSA file to determine whether that material must be disclosed to Sandoval pursuant to its rule 16 and Constitutional disclosure obligations.  The Court discusses each conclusion in turn.

I.   **THE COURT CONCLUDES THAT NO <u>BRADY</u> VIOLATION OCCURRED IN RELATION TO THE WITHHELD EVIDENCE, BECAUSE, ALTHOUGH THE SSA LETTERS AND G. HALL'S PRIOR TESTIMONY TRANSCRIPT ARE FAVORABLE TO SANDOVAL, AND THE UNITED STATES SUPPRESSED THE SSA LETTERS, THE UNITED STATES' NONDISCLOSURE OF BOTH <u>CATEGORIES OF EVIDENCE HAS NOT PREJUDICED SANDOVAL.</u>**

First, the Court analyzes Sandoval's alleged <u>Brady</u> violations.  In the Motion, Sandoval identifies two categories of evidence which he alleges that the United States withheld in violation of <u>Brady</u>: (i) the self-employment income reduction letters from the SSA, <u>see</u> Factual Background, <u>supra</u>, at 3-4; and (ii) a transcript of G. Hall's prior testimony at the preliminary hearing for S. Hall's State criminal prosecution, <u>see</u> Factual Background, <u>supra</u>, at 3-4.  As the Supreme Court explains, "[t]here are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." <u>Strickler v. Greene</u>, 527 U.S. at 281-82.  <u>See</u> <u>Fontenot v. Crow</u>, 4 F.4th at 1061-82.  "The defense needs to establish these elements by a preponderance of the evidence."  <u>United States v. Durham</u>, 902 F.3d 1180, 1221 (10th Cir. 2018).  <u>See</u> <u>Smith v. Sec'y of New Mexico Dep't of Corr.</u>, 50 F.3d at 824 n.33 ("It is clear the defendant bears the burden of establishing a *Brady* violation.").

A.   **THE UNITED STATES' SUPPRESSION OF THE SSA - DEBS LETTERS DOES NOT VIOLATE <u>BRADY</u>.**

As for the self-employment income reduction letters from the SSA, the Court concludes that although this evidence is favorable to Sandoval and was suppressed by the United States, Sandoval has not shown that he was prejudiced by the United States' failure to disclose.  <u>See</u> <u>Fontenot v. Crow</u>, 4 F.4th at 1061-82.  First, on the first element of a <u>Brady</u> violation, the Court concludes that the letters are favorable to Sandoval.  The letters, which Sandoval received from the "Social Security Administration - DEBS," state: "Based on information provided to us from

the Internal Revenue Service, we are reducing the amount of your self-employment income on

your Social Security earnings record from $118,500.00 [or $127,200.00, in the case of the 2017

letter] to $0.00 for tax year 2016[/2017]."   Earnings Information Letter (dated February 22,

2022)(admitted into evidence on December 15, 2022, as United States' Trial Exhibit 51)("Income

Reduction Letter for 2016"); Earnings Information Letter (dated February 22, 2022)(admitted into

evidence on December 15, 2022, as United States' Trial Exhibit 52 )("Income Reduction Letter

for 2016"), Transcript of Trial Proceedings, Volume 3 at 91:2-3, December 15, 2022, filed March

10, 2023 (Doc. 101)("Vol. 3 Tr.")(Court)(admitting Income Reduction Letter for 2016 and Income

Reduction Letter for 2017 into evidence).  While the Court appreciates the United States' argument

that "a DEBS income determination does not dictate an OIG investigation," Response at 3,

regardless whether these letters are outcome-determinative of the OIG's investigation, these letters

support Sandoval's defense theory that he earned no income during the time that he received SSDI

benefits, see Fontenot v. Crow, 4 F.4th at 1066 (stating that, for Brady purposes, "[e]vidence

favorable to the defense encompasses exculpatory evidence, which 'tend[s] to establish a criminal

defendant's innocence'" (quoting Exculpatory Evidence, Black's Law Dictionary (11th ed.

2019))).

The Court also concludes that the United States "suppressed" the SSA self-employment

income reduction letters.  Strickler v. Greene, 527 U.S. at 282.  The Tenth Circuit instructs that

"[e]vidence is 'suppressed by the State, either willfully or inadvertently, when it is 'known to the

[State] but not disclosed to trial counsel.'"  Fontenot v. Crow, 4 F.4th at 1062 (quoting Strickler v.

Greene, 527 U.S. at 282)(second brackets in Fontenot v. Crow).  Here, the United States argues

that it has not "suppressed" -- for Brady purposes -- the self-employment income reduction letters

for two reasons: (i) Sandoval knew about the letters, and "'evidence is not suppressed if the

defendant either knew, or should have known of the essential facts permitting him to take advantage of any exculpatory evidence,'" Response at 4 (quoting Ellsworth v. Warden, 333 F.3d 1, 6 (1st Cir. 2003)); and (ii) because DEBS is not a member of the prosecution team, given that "[a]lthough the United States has a duty to disclose exculpatory information, it does not have to [sic] duty to search for records for entities that are not part of the prosecution team," Response at 6 (citing United States v. Boutte, 2019 WL 885935, at *1-2).  As explained below, both of these arguments lack a sound basis in the relevant facts and applicable law.

First, although some United States Courts of Appeals hold that "[e]vidence is not 'suppressed' if the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence," Fontenot v. Crow, 4 F.4th at 1065 (quoting United States v. LeRoy, 687 F.2d 610, 618 (2d Cir. 1982)), that rule "is not the law in this circuit," Fontenot v. Crow, 4 F.4th at 1065.  In the Tenth Circuit, "the prosecution's obligation to turn over the evidence in the first instance stands independent of the defendant's knowledge":

> Simply stated, "[i]f the prosecution possesses evidence that, in the context of a particular case is obviously exculpatory, then it has an obligation to disclose it to defense counsel whether a general request is made or whether no request is made." *Smith v. Secretary of N.M. Dep't of Corrections,* 50 F.3d [at] 826 . . . ; *see Bagley,* 473 U.S. at 682, . . . (Blackmun, J.); *id.* at 685, . . . (White, J.).  In this case, the fact that defense counsel "knew or should have known" about the Dean/Hicks information, therefore, is irrelevant to whether the prosecution had an obligation to disclose the information. The only relevant inquiry is whether the information was "exculpatory."

Banks v. Reynolds, 54 F.3d 1508, 1517 (10th Cir. 1995).  A defendant's knowledge of evidence in the possession of the prosecution is important for the question of prejudice, but it is of no consequence for the question whether the government "suppressed" evidence.  See Fontenot v. Crow, 4 F.4th at 1066 ("While it has no bearing on whether the evidence was 'suppressed by the state,' a defendant's knowledge instead implicates the element of prejudice, or materiality."

(source of quoted material not cited)).

Second, the Court considers the question whether DEBS is a member of "the prosecution team" for Brady purposes.  Response at 6.  To understand this argument, some discussion of the term "prosecution team" is warranted.[6]  Although the term is not found in Supreme Court case law, the term's underlying concept seeks to refer to an aspect of Constitutional disclosure jurisprudence that arises from Brady and its progeny.  As the Court understands it, that concept is best explained as follows: In Brady, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  This formulation, of course, begs the question what "the prosecution" means in this context.  Brady, 373 U.S. at 87.  The Supreme Court later clarified that, owing to the government's Brady obligations, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."  Kyles v. Whitley, 514 U.S. at 437.  This obligation remains even if the individual prosecutor has no "actual knowledge of the existence of the evidence at issue," Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 824, because "[k]nowledge by police or investigators is . . . imputed to the prosecution under Brady," United States v. Buchanan, 891 F.2d 1436, 1442 (10th Cir. 1989).  See Youngblood v. W. Virginia, 547 U.S. 867, 869-70 (2006)(per curiam)("Brady suppression occurs when the government fails to turn over even evidence that is 'known only to police investigators and not to the prosecutor.'" (quoting Kyles v. Whitley, 514 U.S. at 438)).  Accordingly, under Brady, "'a prosecutor's office cannot get around Brady by

_____

[6]As the Court discusses infra, the Court has significant reservations about the use of this term.  See infra, at 30-39.

keeping itself in ignorance, or by compartmentalizing information about different aspects of a case.'" United States v. Harmon, 871 F. Supp. 2d 1125, 1153 (D.N.M. 2012)(Browning, J.)(quoting Carey v. Duckworth, 738 F.2d 875, 878 (7th Cir. 1984)), aff'd, 742 F.3d 451 (10th Cir. 2014).

While the Court would, on a clean slate, not use the term "prosecution team," the Court understands that other courts use the term to refer to those parts of the government to which Brady-related knowledge may be imputed.[7]  Stated differently, it is a concept that seeks to limit the scope of an individual prosecutor's duty to obtain evidence favorable to the defendant.  This formulation is, at any rate, how the Tenth Circuit has used the term.  Although the "prosecution team" is mentioned off-handedly, or in parentheticals, beginning with Tenth Circuit cases in the 1980s, see Bowen v. Maynard, 799 F.2d 593, 606 (10th Cir. 1986)(quoting the district judge referring to the "prosecution team" in a Brady context); United States v. Buchanan, 891 F.2d 1436, 1442 (10th Cir. 1989)(parenthetically citing Schneider v. Estelle, 552 F.2d 593, 595 (5th Cir. 1977), for the proposition that, because "state law enforcement officer is part of prosecution team, his knowledge is imputed to the prosecutor under Brady"), the Tenth Circuit only has one published case that discusses the concept in any sort of depth.[8]

---

[7]In this sense, the term is more of a conclusion than a helpful analytical tool.

[8]In the past, the Tenth Circuit has used other terms, including "agents of the prosecution." Fero v. Kerby, 39 F.3d 1462, 1472 n.12 (10th Cir. 1994).  According to the Court's research, the case often cited as the origin of the term "prosecution team" came from the United States Court of Appeals for the Fifth Circuit.  See Mark D. Villaverde, Structuring the Prosecutor's Duty to Search the Intelligence Community for Brady Material, 88 Cornell L. Rev. 1471, 1494 (2003)("The prosecution team standard finds its roots in the Fifth Circuit's decision in United States v. Antone[, 603 F.2d 566 (5th Cir. 1979)("Antone")]").  In Antone, the Fifth Circuit answered the question whether certain information -- about which State-level agents involved in the investigation and early prosecution of a federal defendant know -- should be imputed under Brady to the federal prosecutor during the federal prosecution.  See 603 F.2d at 568-70.  Although the United States in Antone argued that "the knowledge of the state investigators should not be imputed to the federal prosecutor," because "the two represent entirely separate sovereigns," 603 F.2d at 569-70, the Fifth

- 30 -

Circuit declined to apply any per se or bight-line rule to this dual sovereign issue, instead stating that it "prefer[s] a case-by-case analysis of the extent of interaction and cooperation between the two governments," 603 F.2d at 570. In <u>Antone</u>, the Fifth Circuit concludes that "extensive cooperation between the investigative agencies convinces us that the knowledge of the state team . . . must be imputed to the federal team." 603 F.2d at 570. Accordingly, at its inception, the term "prosecution team" was not used in a particularly narrow manner. Following the Fifth Circuit split, moreover, cases from the United States Court of Appeals from the Eleventh Circuit interpreted <u>Antone</u> to instruct that "*Brady* . . . applies only to information possessed by the prosecutor or anyone over whom he has authority." <u>United States v. Meros</u>, 866 F.2d 1304, 1309 (11th Cir. 1989)(per curiam).

The Fifth Circuit appears to have come up with this term -- or, at any rate, popularized it -- and it uses the term in an expansive, and not restrictive, manner. <u>See</u> <u>Antone</u>, 603 F.2d at 570; <u>United States v. Meros</u>, 866 F.2d at 1309. In contemporary criminal practice, however, at least from the Court's perspective, the United States has latched onto the term as a means of attempting to limit the <u>Brady</u> doctrine's scope. <u>See, e.g.</u>, <u>United States v. Pelullo</u>, 399 F.3d 197, 216-19 (3d Cir. 2005), <u>as amended</u> (March 8, 2005)(concluding that the "Pension and Welfare Benefits Administration" -- an entity within the United States Department of Labor -- "was not a member of the prosecution team," despite the fact that the Department of Labor "prepared the . . . case for trial"). Again, given that the Supreme Court did not use the term "prosecution team" in <u>Brady</u>, and never otherwise has used the term in a <u>Brady</u> context, the Court suggests that the inferior courts should be cautious about using the term that the Fifth Circuit invented or concocted, especially when that term often is used in a manner that seeks to limit the government's Constitutional disclosure obligations.

The Court suggests that the judiciary should discard the term and focus on the evidence -- exculpatory information -- rather than on some ambiguous "team." The lead prosecutor on a given case should sit in his or her office, in his or her chair, and think about all the possible locations in which all information about the case and witnesses might be located. If such information exists, regardless of where it is, the prosecutor must go and get it. This duty does not mean the prosecutor has to produce it, but it is difficult for the prosecutor to do his or her <u>Brady</u> review without looking at the evidence in question. The Court recognizes that it cannot and should not incorporate civil discovery law into criminal procedural law, but if a civil lawyer in a civil case knows that there is information in a third party's possession which is subject to a request for production, the judicial system would expect that civil attorney to ask for the information. Similarly, if an Assistant United States Attorney knows that there is relevant, exculpatory information in another person or entity's possession, the law should encourage him or her to go get it. The basic standard for rule 16's disclosure obligations is whether the information in question is "within the government's possession, custody, or control." Fed. R. Crim. P. 16(a)(1)(B)(i), (D), (E), (F)(1). While the Court does not want to conflate rule 16 with <u>Brady</u>, the rule 16's standard offers a workable conceptual framework on which a <u>Brady</u> inquiry can begin. As for "possession," there is no doubt that if an Assistant United States Attorney, sitting in her or her chair, has exculpatory material in his or her possession, that material must be disclosed under <u>Brady</u>. Likewise, any exculpatory material in an Assistant United States Attorney's "custody" must also be produced under <u>Brady</u>. Finally, "control," if the Assistant United States Attorney has the ability to pick up the telephone, call an individual or entity, and say "hey, I need such-and-such information," and that individual or entity complies with this request, then the information is within the United States' control, and -- the

In <u>McCormick v. Parker</u>, 821 F.3d 1240 (10th Cir. 2016)("<u>McCormick</u>"), a habeas case, the petitioner sought relief from his Oklahoma child sexual abuse conviction on the grounds that the State prosecution violated <u>Brady</u> when it "suppressed evidence regarding the credentials of a witness who testified falsely that she was a certified sexual assault nurse examiner (SANE nurse) at the time of trial." 821 F.3d at 1242. The appeal's key question, as the Tenth Circuit frames it, is whether, "under the circumstances of this case, the SANE nurse was a member of the prosecution

---

Court posits -- this information would also be imputed to the prosecutor under <u>Brady</u>. Put another way, when certain material or information is within the United States' "control" for rule 16 purposes, there is no sound reason that a prosecutor should not have an obligation to review that information to ensure that the government is complying with its Constitutional obligations under <u>Brady</u>. Clearly, as discussed above, the mere fact that the United States and, in particular, the United States Attorney's Office, does not actually have that evidence immediately on hand does not excuse the government from reviewing the material for <u>Brady</u> purposes. <u>See</u> <u>United States v. Harmon</u>, 871 F. Supp. 2d at 1153. On the other hand, if an agency will not cooperate with the Assistant United States Attorney's request, then there may not be much that the Assistant United States Attorney can do.

Again, while the Court understands that criminal discovery is not like civil discovery and should not be the same, the Court thinks that the Assistant United States Attorney should sit in his or her chair in his or her office, and think like a civil litigator at the beginning of the case. The Assistant United States Attorney should think long and hard about where information about the case might be located, and -- in particular -- where <u>Brady</u> material might be located. In short, the system requires civil litigators to think about all the places evidence might be located; Assistant United States Attorneys should do the same thing, even if the Assistant United States Attorney makes a conscious decision not to go get and look at that information.

The United States Attorney's Office often gets federal cases from federal agencies. While these agencies are not the United States Attorneys' clients, they usually want something done, such as prosecute a case. The Assistant United States Attorney should exhaust the knowledge of his or her contact at these agencies for information and where it might be located. The contact likely will be eager to please, and the Assistant United States Attorney should impress on this contact the need to be thorough in retrieving information and possible evidence.

If this picture is accurate, and it should be, it is difficult for the United States to argue that this agency working with the Assistant United States Attorney is not part of the "prosecution team" -- under any feasible definition of that slippery term. If the federal courts are going to use that term, the agency working with the Assistant United States Attorney should be considered part of that team. In this case, then, the SSA is part of the "prosecution team," and the Assistant United States Attorneys should have worked closely with their contact at the SSA to make sure that it exhausted the SSA of all possible <u>Brady</u> material.

team" such that the prosecution's failure to disclose exculpatory impeachment evidence about the nurse violated the petitioner's rights under Brady.  McCormick, 821 F.3d at 1242.  The Tenth Circuit held that the SANE nurse was, under the facts of the case, a "member of the prosecution for *Brady* purposes." McCormick, 821 F.3d at 1246-48.  The exculpatory information at issue in McCormick was that the SANE nurse in the case -- Carolyn Ridling -- was not certified as a SANE nurse during the trial, despite her representations to the contrary.  See 821 F.3d at 1243-44. Although the petitioner in McCormick did not "point to any evidence that indicates the prosecutor actually knew about Ridling's lapsed credentials," 821 F.3d at 1246, the Court imputed the nurse's knowledge of this fact to the prosecutor, because the nurse had "examined [the victim] 'at the behest of' law enforcement as part of a criminal investigation into [the victim]'s allegation that McCormick sexually abused her," and the nurse also had "explicitly testified that she kept a record of the exam to prepare herself to testify later," 821 F.3d at 1247 (quoting appellee's brief at 20). On these grounds, the Tenth Circuit concluded "that Ridling was part of the prosecution team for *Brady* purposes," and accordingly, "we must impute her knowledge of her own lack of certification to the prosecutor."  McCormick, 821 F.3d at 1247 (citing Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 824; People v. Uribe, 162 Cal. App. 4th 1457, 1481, 76 Cal. Rptr. 3d 829, 846 (2008)). The Tenth Circuit emphasized that "the essence" of its holding was "that Ridling was part of the prosecution team because she acted at the request of law enforcement in the pre-arrest investigation of a crime."  McCormick, 821 F.3d at 1247-48 (10th Cir. 2016)(citing People v. Uribe, 76 Cal. Rptr. 3d at 845-46).

After McCormick, the Tenth Circuit again mentioned the term "prosecution team" in the Brady context, but ultimately decided the case on other grounds.  United States v. Holloway, 939 F.3d 1088, 1105 n.11 (10th Cir. 2019)(stating that "Holloway contends that the receiver was a

member of the prosecution team, and thus the prosecution had a duty to ask the receiver to provide

it with all exculpatory and material documents," but eventually deciding the case on other grounds,

leaving open the question "whether a court-appointed receiver can be a member of the prosecution

team for Brady purposes").  Aside from McCormick, then, there is little guidance in the Tenth

Circuit on how district courts are to assess the scope of the "prosecution team" for Brady purposes.

See United States v. Rosenschein, No. CR 16-4571, 2019 WL 2298810, at *5 (D.N.M. May 30,

2019)(Herrera, J.)("Unfortunately, there are few cases in which the Tenth Circuit has analyzed

whether a person or entity is part of the prosecution team."), clarified on denial of reconsideration,

No. CR 16-4571, 2020 WL 2750247 (D.N.M. May 27, 2020).

There are, however, Tenth Circuit cases that deal with similar issues.  For example, in

United States v. Beers, 189 F.3d 1297 (10th Cir. 1999)("Beers"), the Tenth Circuit considered

whether a federal prosecutor violated Brady by "failing to disclose evidence that would have

impeached one of the government's witnesses" when the purported impeachment evidence in

question was in the possession of the Albuquerque Police Department and pertained to a separate

State-level prosecution.  Beers, 189 F.3d at 1303.  The defendant in Beers was alleged to be a

pimp, and the witness at the center of the Brady dispute -- Twila Lujan -- was a sex worker who

testified for the United States in the defendant's trial.  See Beers, 189 F.3d at 1303.

> The alleged impeachment evidence forming the basis of defendant's
> complaint consists of seven items, including a video, pertaining to an unrelated
> attack on Lujan by one of her customers.  Lujan stated at trial that her customer
> physically and sexually attacked her after picking her up.  According to defendant,
> the impeachment evidence shows that the acts were consensual.

189 F.3d at 1303.  This attack on Lujan by the customer was the subject of a State-level

prosecution: "The Albuquerque Police Department investigated and the State of New Mexico

prosecuted the customer for these acts."  189 F.3d at 1303.  As for the alleged impeachment

evidence related to this incident, the Tenth Circuit notes that "[t]he Albuquerque Police Department possessed the evidence in question, and there is no indication that the investigation was a joint effort between the state and federal government or that the federal prosecutor possessed the complete investigation materials."  189 F.3d at 1303.  In concluding that no <u>Brady</u> violation occurred, the Tenth Circuit notes that, while "[i]nformation possessed by other branches of the federal government, including investigating officers, is typically imputed to the prosecutors of the case," <u>Beers</u> 189 F.3d at 1304 (10th Cir. 1999)(citing <u>Smith v. Sec'y of New Mexico Dep't of Corr.</u>, 50 F.3d at 825), here, the Tench Circuit "decline[s] to extend this principle for federal prosecutors to exculpatory materials in the possession of the state government," <u>Beers</u>, 189 F.3d at 1304.  The Tenth Circuit reasons:

> It is unrealistic to expect federal prosecutors to know all information possessed by state officials affecting a federal case, especially when the information results from an unrelated state investigation.  We thus hold that the state's knowledge and possession of potential impeachment evidence cannot be imputed to a federal prosecutor for purposes of establishing a *Brady* violation.

<u>Beers</u>, 189 F.3d at 1304.

More straightforwardly, in an earlier case, <u>Smith v. Secretary of New Mexico Department of Corrections</u>, 50 F.3d 801, the Tenth Circuit concludes that "knowledge of law enforcement personnel is imputed to the prosecutor."   <u>Smith v. Sec'y of New Mexico Dep't of Corr.</u>, 50 F.3d at 830.  This conclusion rests on the Tenth Circuit's rule that

> the "prosecution" for *Brady* purposes encompasses not only the individual prosecutor handling the case, but also extends to the prosecutor's entire office, *see id.,* as well as law enforcement personnel and other arms of the state[] involved in investigative aspects of a particular criminal venture.  Logically, then, it follows that because ""'"investigative officers are part of the prosecution, the taint on the trial is no less if they, rather than the prosecutors, were guilty of nondisclosure."'" *Buchanan,* 891 F.2d at 1442 (quoting *United States v. Endicott,* 869 F.2d 452, 455 (9th Cir.1989) (quoting *United States v. Butler,* 567 F.2d 885, 891 (9th Cir.1978))).

<u>Smith v. Sec'y of New Mexico Dep't of Corr.</u>, 50 F.3d at 824 (quoting convention in <u>Smith v.</u>

Sec'y of New Mexico Dep't of Corr.).

These cases indicate some basic Brady imputation principles in the Tenth Circuit.  First, these cases indicate that the prosecution has a duty to learn about and obtain exculpatory material from entities that are involved with "investigative aspects of a particular criminal venture."  Smith v. Sec'y of New Mexico Dep't of Corr., 50 F.3d at 824.  Accordingly, while a police officer's knowledge can be imputed to a prosecutor if that police officer is investigating the "particular criminal venture" at issue, Smith v. Sec'y of New Mexico Dep't of Corr., 50 F.3d at 824, that imputation does not extend to investigative conduct related to separate criminal ventures, Beers, 189 F.3d at 1304.  A second principle that McCormick suggests is that imputation is not limited to solely law enforcement individuals or entities -- or even government-employed individuals or government entities -- so long as those individuals or entities work on investigative aspects of a particular criminal venture.  See McCormick, 821 F.3d at 1247-48.

One issue that these cases leave open, however, is whether a prosecutor's duty to search for Brady material extends to entities that are not involved actively in the investigation of a particular criminal venture, but nonetheless produce or possess information that is exculpatory to the defendant in a particular criminal venture.  Such is the case here: DEBS is not alleged to be an investigatory agency in the traditional sense, but there can be little doubt that it possesses some material -- like the SSA letters -- that are exculpatory to Sandoval in this case.  The question, then, is whether an entity can be involved in "investigative aspects of a particular criminal venture" without being an investigative entity.  Smith v. Sec'y of New Mexico Dep't of Corr., 50 F.3d at 824.  The Count concludes that, under this case's facts, knowledge of exculpatory information within DEBS' control is imputed to the prosecution, because DEBS is involved in the "investigative aspects of a particular criminal venture."  Smith v. Sec'y of New Mexico Dep't of

Corr., 50 F.3d at 824.  The SSA letters come from an entity titled "Social Security Administration - DEBS," and they inform Sandoval of a reduction to his "self-employment income" on his "Social Security earnings record."  Income Reduction Letter for 2016 at 1.  A claimant's self-employment income level, for SSA purposes, is important to whether that claimant is entitled to receive -- or continue to receive -- SSDI benefits.  See 20 C.F.R. § 404.1574.  As explained above, this question is at the very heart of Sandoval's case.  See Factual Background, supra, at 2.  Accordingly, because "Social Security Administration - DEBS" helps determine or assess the SSA's computation of a claimant's "self-employment income" on their "Social Security earnings record," Income Reduction Letter for 2016 at 1, the Court determines that, under the facts of this case, that entity is "involved in investigative aspects of a particular criminal venture," and therefore, it is necessary to say, it is part of the prosecution team, Smith v. Sec'y of New Mexico Dep't of Corr., 50 F.3d at 824.

As noted, although the term "prosecution team" has become de rigueur and entered firmly into the prosecutor's favored lexicon, the Court is cautious about using the term to refer to entities like DEBS, as discussed in footnote 8, supra, at 30-32.  Again, as an initial matter, the Supreme Court has never used the term "prosecution team" in the Brady context, and, in the Court's view, the term "prosecution team" places undue rhetorical emphasis on the idea that Brady material encompasses material only that is known or possessed by individuals or entities that are, themselves, actively investigative.  The Court believes, instead, that some entities, like DEBS in this case, are "involved in investigative aspects of a particular criminal venture" without taking on a specifically investigative role.  The SSA as a whole is a participant in the investigation into Sandoval, and DEBS is an entity that is involved in making a determination -- computation of a claimant's "self-employment income" on their "Social Security earnings record," Income

Reduction Letter for 2016 at 1 -- that is intimately related to the "particular criminal venture" in this case, i.e., Theft of Government Property, contrary to 18 U.S.C. § 641.  In this sense, the Court is more in favor of a standard more akin to that of the Ninth Circuit, which -- in the Court's view -- approaches this issue with greater nuance:

> As a matter of law, the prosecution is "deemed to have knowledge of and access to anything in the possession, custody or control of any federal agency participating in the same investigation of the defendant."  *United States v. Bryan*, 868 F.2d 1032, 1036 (9th Cir. 1989).  The government's attempts to absolve itself of wrongdoing for other agencies' failures therefore fall flat. To the extent that any government agencies or actors, through their own flagrant misconduct, failed to make known exculpatory information, the flagrant nature of such conduct will be imputed to the prosecution -- just as the agencies' or actors' *Brady* violations are imputed to the prosecution.

United States v. Bundy, 968 F.3d 1019, 1037 (9th Cir. 2020).  Or, closer to home, as the Honorable Richard P. Matsch, then-Chief Judge of the United States District Court for the District of Colorado, wrote during the trial of Timothy McVeigh and Terry Nichols, while the government's obligations under Brady become complicated in cases that involve multiple agencies, this complication does not relieve the government of its Constitutional disclosure duties:

> Application of the *Brady* doctrine to this case is especially difficult because the scope of inquiry is so broad and the information gathering capability of all government agencies is so great.  The lawyers appearing on behalf of the United States, speaking for the entire government, must inform themselves about everything that is known in all of the archives and all of the data banks of all of the agencies collecting information which could assist in the construction of alternative scenarios to that which they intend to prove at trial.  That is their burden under *Brady.*

United States v. McVeigh, 954 F. Supp. 1441, 1450 (D. Colo. 1997)(Matsch, C.J.).  The Court agrees with Chief Judge Matsch's formulation and has doubts that the term "prosecution team" adequately captures this broad understanding of the government's disclosure obligations under Brady.  As noted above, the Supreme Court in Brady uses the term "the prosecution."  373 U.S. at 87.  The prosecution, in the American legal system, is sometimes called "the United States," "the

State," or "the government." See Criminal Pattern Jury Instruction Committee of the United States Court of Appeals for the Tenth Circuit, Criminal Pattern Jury Instruction 1.01, at 2 (PRELIMINARY INSTRUCTIONS BEFORE TRIAL)(2021 ed., updated 2023)("This criminal case has been brought by the United States government.  I will sometimes refer to the government as the prosecution.").  Relatedly, Black's Law Dictionary explains that the word "State" means: "The people of a state, collectively considered as the party wronged by a criminal deed; esp., the prosecution as the representative of the people."  State, Black's Law Dictionary (11th ed. 2019). By inserting the word "team" after the word "prosecution," however, the government is attempting to narrow rhetorically the word "prosecution" to refer only to the attorneys involved, or to actively investigative agents closely aligned therewith.  The Court concludes that this narrowing is misleading at best, and at worst it is inconsistent with Brady and its progeny.  The Court accordingly discourages this term's use and would prefer to frame the question as whether the knowledge of a particular individual or entity is imputed to the prosecutor pursuant to Brady principles, with a focus on the exculpatory information instead of some ambiguous "team."  Here, the Court concludes that the knowledge of the information in the SSA - DEBS letter is imputed to the United States under Brady and its related Tenth Circuit case law.  Accordingly, because that information was not disclosed to Sandoval, the Court concludes that the United States "suppressed" it.  Fontenot v. Crow, 4 F.4th at 1062.

Nevertheless, although the SSA letters are favorable to Sandoval and the United States suppressed them, Sandoval has not demonstrated by a preponderance of the evidence that the United States' failure to disclose these letters has prejudiced him.  See Fontenot v. Crow, 4 F.4th at 1061-82; United States v. Durham, 902 F.3d at 1221.  "Prejudice satisfying the third element exists 'when the suppressed evidence is material for Brady purposes.'"  Douglas v. Workman, 560

F.3d at 1173 (quoting Banks v. Dretke, 540 U.S. 668, 691 (2004)). Favorable evidence is material, in this context, when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. at 682. This showing of materiality "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant)," but rather, the "touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important." Kyles v. Whitley, 514 U.S. at 434 (source of quoted material not cited, but presumably United States v. Bagley, 473 U.S. at 682).

Here, the Court concludes that Sandoval has not demonstrated, by a preponderance of the evidence, that there is a reasonable probability that, had the SSA letters been disclosed, the proceeding's result would be different. See United States v. Bagley, 473 U.S. at 682. The Tenth Circuit states that, "[o]bviously, if the defense already has a particular piece of evidence, the prosecution's disclosure of that evidence would, in many cases, be cumulative and the withheld evidence would not be material." Banks v. Reynolds, 54 F.3d at 1517 (quoting Mustread v. Gilmore, 966 F.2d 1148, 1152 (7th Cir. 1992); Hughes v. Hopper, 629 F.2d 1036, 1040 (5th Cir. 1980)). It was Sandoval who "sent counsel for the United States two documents from the Division of Earnings and Business Services ('DEBS') for the Social Security Administration ('SSA')" on the eve of trial, which indicates that those letters were already in his possession. Moreover, the letters are addressed to Sandoval. He was later able to introduce the letters into evidence, see Vol. 3 Tr. at 92:2-3 (Court)(admitting Income Reduction Letter for 2016 and Income Reduction Letter for 2016 into evidence), and he also referred to them in his opening statement, see Draft Transcript of Trial, Day 1 at 197:21-198:3 (held December 13, 2022)(Harrison)("Dec. 13 Tr."). The Court

concludes that the United States' disclosure of the letters would have been cumulative and therefore the evidence is not material for Brady purposes, as there is no reasonable probability that, had the United States disclosed the SSA letters, the proceeding's result of would have been different.  See United States v. Bagley, 473 U.S. at 682.

**B.   THE UNITED STATES' LATE DISCLOSURE OF G. HALL'S PRIOR TESTIMONY TRANSCRIPT DOES NOT VIOLATE BRADY, BECAUSE THE TRANSCRIPT WAS NOT SUPPRESSED BY THE UNITED STATES.**

The Court also concludes that the United States' belated disclosure of G. Hall's prior testimony transcript does not constitute a Constitutional violation under Brady.  As to the first element of a Brady violation, the Court concludes that the evidence in question is favorable to Sandoval.  The transcript is impeachment evidence that could be used to undermine G. Hall's credibility, but impeachment evidence "merits the same constitutional treatment as exculpatory evidence," Bowen v. Maynard, 799 F.2d 593, 610 (10th Cir. 1986), because "if disclosed and used effectively," impeachment evidence "may make the difference between conviction and acquittal," United States v. Bagley, 473 U.S. at 676.  Here, the Court concludes that G. Hall's prior testimony transcript is favorable to Sandoval because, the Jury's determination of G. Hall's testimony could "make the difference between conviction and acquittal," United States v. Bagley, 473 U.S. at 676, as it has the potential to cast doubt on the credibility of a key witness for the United States.  Cf. Napue v. People of State of Ill., 360 U.S. 264, 269 (1959)("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.").  More specifically, the transcript of the prior testimony contradicts G. Hall's trial testimony regarding whether Sandoval tried to force G. Hall to file his quarterly business taxes.  Compare Dec. 13 Tr. at 229:9-230:22 (Hall, Houghton), with Dec. 14 Tr. at 11:12-

14:12 (Court, Kennedy, Hall, Houghton).

The Court concludes, however, that the United States has not "suppressed" this evidence, and the delayed disclosures have not prejudiced Sandoval. As a factual matter, Sandoval acknowledges that the United States eventually disclosed the G. Hall impeachment evidence, although he contends that the disclosure was unconstitutionally tardy. See Motion at 4-5. For support, Sandoval relies on the Tenth Circuit case of United States v. Burke, 571 F.3d 1048 (10th Cir. 2009)(McConnell, J.), and especially on its proposition that "[i]t would eviscerate the purpose of the _Brady_ rule and encourage gamesmanship were we to allow the government to postpone disclosures to the last minute, during trial." 571 F.3d at 1054. While the statement is an accurate quoting of United States v. Burke, that case also makes clear that not all late disclosures result in a Brady violation. As the Court has described previously:

> "[T]he belated disclosure of impeachment or exculpatory information favorable to the accused violates due process when an 'earlier disclosure would have created a reasonable doubt of guilt.'" United States v. Burke, 571 F.3d at 1054 (quoting United States v. Young, 45 F.3d 1405, 1408 (10th Cir. 1995)). Notably, "not every delay in disclosure of _Brady_ material is necessarily prejudicial to the defense." United States v. Burke, 571 F.3d at 1056. "To justify imposition of a remedy, the defense must articulate to the district court the reasons why the delay should be regarded as materially prejudicial." United States v. Burke, 571 F.3d at 1056.

United States v. DeLeon, 428 F. Supp. 3d 841, 1152 (D.N.M. 2019)(Browning, J.), aff'd sub nom. United States v. Herrera, 51 F.4th 1226 (10th Cir. 2022). Here, the Court concludes that an earlier disclosure of G. Hall's prior testimony transcript would not have created a reasonable doubt of guilt. In this case, after receiving the testimony transcript, Sandoval put the transcript to use to cross examine vigorously G. Hall based on inconsistencies between the transcript and her testimony in Sandoval's trial. See Dec. 14 Tr. at 11:12-14:12 (Court, Kennedy, Hall, Houghton); id. at 13:3-4 (Kennedy)("That's what you testified yesterday[,] is that not the case?"). Moreover,

the Motion states only that the transcript is necessary for impeachment -- which he was able to

perform -- and Sandoval does not offer any other "reasons why the delay should be regarded as

materially prejudicial." United States v. Burke, 571 F.3d 1048, 1056 (10th Cir. 2009). The Court

concludes that, under this case's facts, the United States' late disclosure of G. Hall's prior

testimony transcript does not rise to a Constitutional violation under Brady.[9]

In sum, the Court finds that neither the United States' nondisclosure of the SSA letters, nor

the late disclosure of G. Hall's prior testimony transcript violate the United States' Constitutional

disclosure obligations. Although the Court has considered these pieces of evidence separately, the

Court is mindful that, "[i]n evaluating the materiality of withheld evidence, we do not consider

each piece of withheld evidence in isolation. Rather we review the cumulative impact of the

withheld evidence, its utility to the defense as well as its potentially damaging impact on the

---

[9]In addition to his Brady argument related to G. Hall's prior testimony transcript, Sandoval also asserts in a footnote to his Motion that "failing to disclose a statement of this kind by a defendant also violates Rule 16(a)(1)(B)(i)." Motion at 4 n.1. Rule 16(a)(1)(B)(i) of the Federal Rules of Criminal Procedure states:

> Upon a defendant's request, the government must disclose to the defendant, and make available for inspection, copying, or photographing, all of the following:
>
> **(i)**   any relevant written or recorded statement by the defendant if:
>
> •   the statement is within the government's possession, custody, or control; and
>
> •   the attorney for the government knows -- or through due diligence could know -- that the statement exists.

Fed. R. Crim. P. 16(a)(1)(B). Sandoval is deemed to have requested "the discovery to which [he] is entitled pursuant to Rules 16(a)(1)(A), (B), (C), (D), (E), and (F) of the Federal Rules of Criminal Procedure." Order, filed July 12, 2022 (Doc. 11). Sandoval does not explain, however, why rule 16(a)(1)(B)(i) covers G. Hall's previous testimony, as that testimony is not "by the defendant." Fed. R. Crim. P. 16(a)(1)(B).

prosecution's case." Simpson v. Carpenter, 912 F.3d 542, 572 (10th Cir. 2018).  See Kyles v. Whitley, 514 U.S. at 437.  Viewed in a cumulative manner, the Court concludes that Sandoval's alleged disclosure violations do not violate Sandoval's Due Process rights.

## II.   THE UNITED STATES MUST REVIEW SANDOVAL'S SSA FILE AND PRODUCE ALL BRADY MATERIAL TO SANDOVAL.

Sandoval's request for the "immediate production of the complete SSA file," Motion at 6, is based on the notion that, given the existence of the SSA letters, there must be more exculpatory material in the complete SSA file, "including whatever communications [the SSA] received from the IRS in order to reach its decision," Motion at 2.  The Court concludes that the United States must review, as part of its Constitutional and rule-based disclosure obligations, all materials in Sandoval's SSA file that are known "the prosecutor's entire office, . . . as well as law enforcement personnel and other arms of the state[] involved in investigative aspects of a particular criminal venture," Smith v. Sec'y of New Mexico Dep't of Corr., 50 F.3d at 824, and produce all such material to Sandoval.  As the Court told the United States on the record: "I'm not saying they're entitled to the complete SSA file.  But you have to do a Brady review of the entire SSA file.  And make a representation that there is not other Brady material that hasn't been produced."  Dec. 15 Tr. at 2:8-12 (held December 15, 2022)(Court).  See United States v. McVeigh, 954 F. Supp. at 1450 ("The lawyers appearing on behalf of the United States, speaking for the entire government, must inform themselves about everything that is known in all of the archives and all of the data banks of all of the agencies collecting information which could assist in the construction of alternative scenarios to that which they intend to prove at trial.  That is their burden under *Brady*.").

**IT IS ORDERED** that: (i) the Defendant's Motion to Dismiss for *Brady* Violations, filed December 14, 2022 (Doc. 74)("Motion"), is denied; (ii) the United States must review all materials in Defendant James Anthony Sandoval's Social Security Administration file and disclose all Brady

materials to Sandoval.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Alexander M.M. Uballez
  United States Attorney
Kristopher N. Houghton
Raquel Ruiz-Velez
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Paul J. Kennedy
Elizabeth Harrison
Kennedy Hernandez & Harrison, P.C.
Albuquerque, New Mexico

      *Attorneys for the Defendant*