# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                              No. CR 22-1010 JB

JAMES ANTHONY SANDOVAL,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the United States' Sentencing Memorandum, filed March 15, 2023 (Doc. 107)("U.S. Sentencing Memo."); and (ii) the Defendant's Sentencing Memorandum, filed March 16, 2023, (Doc. 108)("Sandoval's Sentencing Memo."). The Court held a sentencing hearing on February 13, 2024. <u>See</u> Clerk's Minutes for Sentencing Proceeding, filed February 13, 2024 (Doc. 123). The primary issues are: (i) whether the Court should reconsider its conclusion -- made in the Court's Memorandum Opinion and Order, filed August 29, 2023 (Doc. 118)("Objections MOO") -- that Defendant James Anthony Sandoval's monthly receipt of government benefits, whether through Social Security or Medicare payments, and whether for his benefit or for that of his family members, is considered relevant conduct for the purposes of §§ 1B1.3 and 2B1.1(b) of the United States Sentencing Guideline Manual (U.S. Sent'g Comm'n 2023)("U.S.S.G." or "Guidelines"); (ii) whether the Court should sentence Sandoval to a term of probation, as Sandoval requests; (iii) whether the Court should sentence Sandoval to a sentence of incarceration within the Guidelines range -- 15 to 21 months -- as the Plaintiff United States of American requests; and (iv) whether the Court should impose a fine under U.S.S.G. § 5E1.2, as the United States requests. Having weighed carefully the factors in 18 U.S.C. § 3553(a), as well as the relevant Guidelines sections, the Court concludes:

(i) that it will not reconsider its determination of relevant conduct under U.S.S.G. § 1B1.3 for the purpose of calculating the total loss under U.S.S.G. § 2B1.1(b)(1); (ii) that it will not sentence Sandoval to a term of probation, because, in this case, probation would not be sufficient to reflect the factors in 18 U.S.C. § 3553(a) and to comply with the purposes of 18 U.S.C. § 3553(a)(2); (iii) the Court sentences Sandoval to the custody of the Federal Bureau of Prisons for a term of 15 months, followed by three years of supervised release, because a bottom of the Guidelines range in this case is sufficient, without being greater than necessary, to comply with the purposes of punishment set forth in the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1987-2001 (1984), codified as amended at 18 U.S.C. §§ 3551-3586; and (iv) based on Sandoval's lack of financial resources, the Court will not impose a fine on Sandoval, but, consistent with U.S.S.G. § 5E1.2(e), the Court will impose community service to be completed during Sandoval's term of supervised release.

## **FACTUAL BACKGROUND**

The Court takes its facts from the Presentence Investigation Report, filed February 21, 2023 (Doc. 97)("PSR"), the Addendum to the Presentence Report, filed March 15, 2023 (Doc. 105)("First PSR Addendum"), the U.S. Sentencing Memo., and Sandoval's Sentencing Memo. Sandoval is fifty-eight years old, see PSR at 3, and grew up in Santa Fe, New Mexico, see PSR ¶ 66, at 14. His mother is Dora Sandoval, who is approximately eighty-two years old and lives in Rio Rancho, New Mexico. See PSR ¶ 65, at 14. Sandoval's father is deceased. See PSR ¶ 65, at 14. Sandoval describes his upbringing as "strict," although he suffered "no childhood issues or abuse." PSR ¶ 66, at 14. Sandoval states that he graduated from Santa Fe High School in 1984 and later took some college-level classes, but "did not complete a degree program." PSR ¶ 66, at 14. Aside from a year-long relocation to Colorado Springs, Colorado around twenty-six years ago, Sandoval has resided in New Mexico for his entire life. See PSR ¶ 67, at 14. He

currently lives in Rio Rancho at a house in which he has resided since approximately 2010.  See PSR ¶ 67, at 14.  Sandoval currently lives alone.  See PSR ¶ 67, at 14.

Approximately twenty-five years ago, Sandoval had a "brief three-month marriage" to Roseanne Gonzales.  PSR ¶ 67, at 14.  Together, Sandoval and Gonzales have two daughters, aged approximately twenty-two and twenty.  See PSR ¶ 69, at 14.  Sandoval reports that his daughters "have always lived with Roseanne" and that "he is unsure where they live."  PSR ¶ 69, at 15.  Sandoval further states that Gonzales "has always kept his daughters from him."  PSR ¶ 69, at 15.  Sandoval states that, since the end of his marriage, "the last 25 years have been nothing but headaches, court battles, and there has never been a year when things have been quiet."  PSR ¶ 69, at 14-15.  While Sandoval states that he had "a history of using marijuana and alcohol about 25 to 30 years ago," and also "tried cocaine," he "stopped using all substances approximately 25 to 30 years ago following a domestic violence conviction involving his ex-wife."  PSR ¶ 73, at 15.  He also asserts that "the births of his daughters contributed to his sobriety."  PSR ¶ 73, at 15.

Sandoval's criminal history, as the PSR reflects, shows four adult criminal convictions.  See PSR ¶¶ 53-56, at 11-12.  One is the aforementioned domestic violence conviction -- a deferred sentence in 1999 for New Mexico aggravated assault against a household member and criminal damage to property convictions.  See PSR ¶ 54, at 11-12.  The PSR contains few facts about this conviction, but states that the allegations were that Sandoval "did unlawfully and intentionally apply force with a motor vehicle to a household member identified as R.G.," and "did intentionally damage R.G.'s property causing more than $1,000 worth of damage."  PSR ¶ 54, at 12.  During Sandoval's eighteen-month period of probation for this offense, Sandoval violated the terms of probation various times: once for testing positive for cocaine and alcohol, another time for "being charged with Domestic Violence/Battery Against a Household Member," a third time for failing

to receive permission prior to leaving the county, and a fourth and final time for another positive test for cocaine.  PSR ¶ 54, at 12.  The PSR also lists two driving-under-the-influence convictions -- a New Mexico conviction for aggravated DWI in 1998, see PSR ¶ 53, at 11, and a Colorado conviction for DUI in 2003, see PSR ¶ 54, at 12.  Sandoval's fourth and final criminal conviction is a Colorado conviction for "Criminal Mischief," also in 2003.  PSR ¶ 56, at 12.  The PSR provides no information regarding the factual circumstances of this offense.

Sandoval has significant medical issues, "including chronic obstructive pulmonary disease (COPD), heart disease, hypertension, and osteoporosis."  PSR ¶ 71, at 15.  He takes "approximately 20 different medications," and he "is in need of a bilateral lung transplant."  PSR ¶ 71, at 15.  He also uses "oxygen daily," PSR ¶ 71, at 15, which is necessary "to maintain his blood $O_2$ saturation," Sandoval's Sentencing Memo. at 13.  Sandoval "has been a patient at National Jewish Health in Denver, Colorado -- one of the leading respiratory hospitals in the country, and near to where his sister lives -- for over a decade."  Sandoval's Sentencing Memo. at 13.  Sandoval has had various diagnoses related to his respiratory health issues: "He was diagnosed with GOLD Stage IV COPD (i.e., end-stage emphysema) about five years ago; his other diagnoses include New York Heart Association class III, and his 'extremely severe chronic obstructive pulmonary disease [has] lead[] [sic] to hypoxemic and hypercapnic chronic respiratory failure.'"  Sandoval's Sentencing Memo. at 13 (source of quoted material not cited).  Sandoval has dealt with these issues for the past fifteen years, PSR ¶ 71, at 15, and medical records indicate that he is "underweight," First PSR Addendum at 4, weighing 112 pounds and standing five feet and five inches tall, see PSR ¶ 71, at 15; Sandoval's Sentencing Memo. at 13.

In 2007, based on his diagnosis of emphysema, Sandoval applied to receive Social Security Disability Insurance ("SSDI") benefits.  PSR ¶ 6, at 4.  The PSR notes that, "[t]o receive social

security disability benefits, the Defendant was required to prove that he could not work due to his medical condition and was not receiving earnings due to his disability." PSR ¶ 6, at 4. Once his application was approved, Sandoval began receiving SSDI benefits on a monthly basis. PSR ¶ 6, at 4.

In August, 2016, Sandoval "signed various SSA forms under penalty of perjury, in which the Defendant stated that he had not worked since January 2007 and had not received any income since January 2007," and he "further stated he could not work or conduct daily activities due to his medical diagnosis." PSR ¶ 7, at 4. In November, 2018, the Social Security Administration ("SSA") Office of the Inspector General ("OIG") Cooperative Disability Investigations ("CDI") Unit in Albuquerque, New Mexico, "began an investigation based on an allegation that James Sandoval, a participant of Title II -- Disability Insurance Benefit . . . program, intentionally concealed his ownership and earnings of a jewelry business, as well as work activity associated with the business, from the SSA." PSR ¶ 8, at 5. This allegation came from an "anonymous source," who "identified Sandoval as the owner-operator of the jewelry business named Traditions Past and Present." PSR ¶ 9, at 5. Indeed, in 2018, the website for Traditions Past and Present "presented to the public that Sandoval founded the business in 2009 and identified Sandoval as the designer and creator of the jewelry sold by the business." PSR ¶ 9, at 5. Further investigation uncovered a social media account bearing the business' name, which "revealed a video of a grand opening for a brick-and-mortar storefront that took place on August 31, 2018," and the video "shows Sandoval walking around the store and socializing without the assistance of a breathing apparatus." PSR ¶ 12, at 5. At the time of the investigation, records for the New Mexico Office of the Secretary of State indicated that Traditions Past and Present Incorporated "is an active, for-profit company," and that "James Sandoval is the Registered Agent, Director, Director of

Operations, and the Incorporator." PSR ¶ 11, at 5. The records also showed that "[t]he official address for the business was listed as 2912 Broadmoor Blvd SE, Rio Rancho, NM 87124, which is Sandoval's residential address." PSR ¶ 11, at 5.

The CDI unit reviewed Sandoval's SSA record, and found that he had, as discussed above, "reported to the SSA, in writing, and under the penalty of perjury, that he had not worked since becoming ill on January 5, 2007." PSR ¶ 10, at 5. In January, 2019, "Sandoval reported, in writing, to the SSA that he had not worked since becoming disabled in 2007, and that he had difficulty performing simple daily tasks such as any physical activity or ability to interact socially," and that "his illness had limited his daily activities because he is unable 'to do any physical activities,' 'watch[es] more TV,' and is unable to 'attend social events.'" PSR ¶ 10, at 5 (brackets in PSR, and source of quoted material not cited). A CDI unit conducted surveillance of Sandoval as he came to an SSA office for an appointment in December, 2018, and observed the following:

> CDI Unit investigators observed Sandoval operating a motor vehicle without difficulty. Sandoval drove himself to the SSA office in Rio Rancho, New Mexico, where he was observed exiting the driver's side of the vehicle. Upon exiting the vehicle, Sandoval placed a breathing apparatus on his face and proceeded to walk into the SSA building . . . . A SSA employee testified that during the meeting with the SSA, Sandoval reported that he was in constant need of oxygen, including bathing while using the oxygen supplementation.

PSR ¶ 13, at 5.

Throughout 2019, investigators arraigned various undercover interactions with Sandoval. First, in February, 2019, an SSA-OIG Special Agent "observed and spoke with Sandoval at the San Antonio, Texas, Stock and Rodeo show in an undercover capacity." PSR ¶ 14, at 6. During this interaction, Sandoval stood at a vendor booth below a sign that read "Traditions Past and Present Jewelry, My Heritage and Design by James Sandoval," and stated that he personally "makes all the jewelry he sells." PSR ¶ 14, at 6. Sandoval "was not wearing his supplemental

oxygen during their interaction." PSR ¶ 14, at 6. Next, also in February, 2019, CDI unit investigators went to Traditions Past and Present in Rio Rancho, where they spoke with Sandoval under the pretext of a separate investigation of which Sandoval was not a target. See PSR ¶¶ 15-16, at 6. During this interaction, investigators observed Sandoval arrive at the business driving a vehicle, exit the vehicle without the use of oxygen, and walk "into the business with no difficulty." PSR ¶ 15, at 6. When the investigators talked with Sandoval at this time, Sandoval stated that he owns Traditions Past and Present, designs and makes custom jewelry, which he "sold throughout the United States," and that he had "attended approximately 52 shows across the United States within the year prior." PSR ¶ 16, at 6. Last, in September, 2019, an SSA-OIG investigator went to Traditions Past and Present posing as a customer. See PSR ¶ 17, at 6. At the store, the investigator-qua-customer spoke with Sandoval, who identified himself as the business' owner, "as well as [the] creator and designer of all the jewelry that was for sale." PSR ¶ 17, at 6. During this interaction, "Sandoval did not use supplemental oxygen and/or any other assistive device," and nor did he "demonstrate any mobility issues or physical impairments, and he was moving freely and without any difficulty breathing." PSR ¶ 17, at 6.

On February 19, 2020, the CDI unit scheduled an interview with Sandoval at Rio Rancho's SSA office. See PSR ¶ 18, at 6. At this interview,

> Sandoval reported he had not worked since 2002 or 2003, and he used oxygen 24 hours a day, 7 days a week, even when driving his vehicle. Sandoval refused to answer any questions regarding his business. When questioned about the TPP website, which identified Sandoval as the jewelry designer, Sandoval stated it was "confidential information" and "trade secrets." Sandoval denied making a profit or working at the business. However, when identified as the operator of the business, Sandoval responded, "Not necessarily, there are others that work there." Sandoval did admit to traveling to trade shows on behalf of the business. This interview lasted approximately 35 minutes and it was audio recorded.

PSR ¶ 19 at 7 (source of quoted material not cited, but presumably the interview). At the

conclusion of this interview, undercover agents observed Sandoval remove his oxygen tube and put it in the vehicle's backseat, before driving "to his residence in an erratic manner, driving over the posted speed limit and switching lanes multiple times and passing other vehicles."  PSR ¶ 20 at 7.

Evidence adduced at trial -- both witness testimony and bank records -- indicates that Sandoval sought to conceal evidence of his income from the SSA because of his receipt of SSDI benefits.  See PSR ¶¶ 21-35, at 7-9.  For example, a former Traditions Past and Present employee "stated that Sandoval was intentionally concealing his income from the government because he was receiving SSA disability payments," PSR ¶ 21, at 7, and bank records introduced at trial show significant deposits into accounts "associated with TPP and/or Sandoval," PSR ¶ 24, at 8.  As the PSR states:

> The SSA-OIG analyst testified that there were transfers made into Sandoval's personal account (5742) from a TPP business account established by Sandoval on July 23, 2009, ending in 5042. A review of the TPP account (5042), for the period of October 2016 through March of 2019 showed deposits of $444,030.67 into the business account. A total $102,058.00 was subsequently transferred from the business account 5042 to Sandoval's personal account 5742. In addition, the amount of $36,875.00 was withdrawn in the form of cash at the time of the deposits. According to bank records, Sandoval was in control of the accounts and was the only known withdrawer from the accounts.

PSR ¶ 26, at 8.  All the while, "[f]rom the period of January 1, 2014, to April 1, 2019, Sandoval received SSA payments via direct deposit into an account established on February 27, 2007, account number ending in 5742, totaling approximately $90,744."  PSR ¶ 25, at 8.  As reflected in the jury's verdict, Sandoval "fraudulently received Social Security benefits by falsely claiming no income or employment," and he "completed and signed multiple Social Security forms claiming such, under penalty of perjury."  PSR ¶ 35, at 9.

## PROCEDURAL BACKGROUND

At the close of evidence, the jury convicted Sandoval of all thirty-five counts on which the

United States proceeded, including (i) thirty-three counts of Theft of Government Property under 18 U.S.C. § 641, corresponding to payments Sandoval received from June, 2017, through February, 2020; (ii) one count of Making False Statements under 18 U.S.C. § 1001(a)(2); and (iii) one count of False Statement in a Social Security Form under 42 U.S.C. § 408(a)(3).  See Verdict Form at 1-7, filed December 16, 2022 (Doc. 84).

The United States filed the U.S. Sentencing Memo. on March 15, 2023.  See U.S. Sentencing Memo. at 1.  The United States requests the Court "to sentence Defendant to a term of imprisonment within the Defendant's guideline range, followed by three years of supervised release, restitution, a fine within the guideline range, and a Special Penalty Assessment of $3,500." U.S. Sentencing Memo. at 1.  The U.S. Sentencing Memo. states that, while the SSA disability benefits' basic purpose is to "provide disabled individuals who cannot work with an income to meet their basic life expenses," Sandoval "defrauded the SSA program by lying to the SSA so that he could receive SSA disability benefits, including free health insurance, while working at his lucrative jewelry business."  U.S. Sentencing Memo. at 1.  The United States notes that it does not dispute that Sandoval "has health problems," but states that those "health problems have not prevented him from working at his jewelry business, including traveling to other states to promote and sell his jewelry, and socializing with his clients at his jewelry business events."  U.S. Sentencing Memo. at 1-2.

The United States begins its legal argument by citing the sentencing factors listed in 18 U.S.C. § 3553(a), which aid district courts in the determination of a sentence that is "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection":

> **(a)      Factors to be considered in imposing a sentence.** -- The court shall impose a sentence sufficient, but not greater than necessary, to comply with the

purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider --

**(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;

**(2)** the need for the sentence imposed --

**(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

**(B)** to afford adequate deterrence to criminal conduct;

**(C)** to protect the public from further crimes of the defendant; and

**(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

**(3)** the kinds of sentences available;

**(4)** the kinds of sentence and the sentencing range established for --

**(A)** the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines --

**(i)** issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28; and

**(ii)** that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

**(B)** in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

**(5)** any pertinent policy statement --

**(A)** issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

**(B)** that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.[]

**(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

**(7)** the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553.  See U.S. Sentencing Memo. at 1-2 (quoting, in part, 18 U.S.C. § 3553(a)(1)-(7)).  The U.S. Sentencing Memo. begins its analysis of these factors by discussing the "nature and circumstances of the offense," which is largely a resuscitation of the offense conduct facts that the PSR finds.  Compare U.S. Sentencing Memo. at 4-12, with PSR ¶¶ 5-35, at 4-9.  See Factual Background, supra, at 4-8.  Next, the United States discusses the "history and characteristics of the Defendant."  U.S. Sentencing Memo. at 12.  On this issue, the United States asserts that, "[a]s the nature and circumstances of the case show, the Defendant illegally and intentionally defrauded

the SSA disability program for over six years while his jewelry business was thriving."  U.S. Sentencing Memo. at 12.  The United States contends that Sandoval's behavior in this case, including his opening of a storefront and travelling "all over the country, promoting his jewelry business at trade shows," indicates that Sandoval "did not care that he was defrauding the SSA, which is charged with supporting the most vulnerable in our society."  U.S. Sentencing Memo. at 12.  The United States maintains that Sandoval's "criminal conduct was not only selfish, it was shameful."  U.S. Sentencing Memo. at 12.  The U.S. Sentencing Memo. continues that Sandoval used his business accounts' funds to support his personal lifestyle, and that Sandoval kept up his cash flow by "lying to the SSA about his work activity so that he could continue to illegally receive SSA disability benefits."  U.S. Sentencing Memo. at 12.  The United States also notes that, while Sandoval does not have criminal history points for the Guidelines' purposes, Sandoval "has a history of domestic violence and driving while intoxicated," and also "has a history of alcohol and drug abuse."  U.S. Sentencing Memo. at 12-13.

As for the "need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence and protect the public from further crimes of the Defendant," the United States argues that these factors support the imposition of its requested sentence for four reasons.  U.S. Sentencing Memo. at 13.  First, it asserts that a Guidelines sentence with three years' supervised release, restitution, a fine, and a special penalty reflects the offense's seriousness, because, given SSA benefits' purpose -- to provide public assistance to disabled individuals who cannot work -- "[i]ndividuals who can work and receive an income, such as the Defendant, should not be unpunished for intentionally defrauding and lying to the SSA and stealing from the SSA and taxpayers."  U.S. Sentencing Memo. at 13.  Second, the United States argues that its requested sentence promotes respect for

the law, because "it shows that these types of cases are taken seriously." U.S. Sentencing Memo. at 13. Third, the United States argues that its requested sentence provides just punishment, because "it is a sentence that the Guidelines have considered," and -- somewhat circularly -- "the 18 U.S.C. § 3553(a) factors support a sentence within the Defendant's guideline range." U.S. Sentencing Memo. at 13.

Fourth, the United States discusses deterrence, at both a general and specific level. It states that the United States Court of Appeals for the Tenth Circuit has identified white collar-crime as an area in which general deterrence is a sentencing principle that has particular salience: "The appellate courts have repeatedly affirmed the importance of general deterrence in determining a sentence, especially in the area of white-collar crime." U.S. Sentencing Memo. at 13. See id. at 13-14 (citing United States v. Morgan, 635 F. App'x 423, 450 (10th Cir. 2015)); United States v. Mueffelman, 470 F.3d 33, 40 (1st Cir. 2006); United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006); United States v. Hayes, 762 F.3d 1300, 1308 (11th Cir. 2014)). Sentencing Sandoval in the Guidelines range, the United States suggests, would provide this degree of general deterrence. See U.S. Sentencing Memo. at 13-14. As for specific deterrence, the United States argues that Sandoval "presents a risk of recidivism because of his base dishonesty, selfishness, and greed." U.S. Sentencing Memo. at 14. The United States also asserts that "[i]t does not matter if the Defendant is no longer receiving SSA disability benefits because fraud can occur wherever there is an opportunity," and, accordingly, "[a] guideline sentence would best assure that the Defendant will be adequately deterred from committing any future crimes." U.S. Sentencing Memo. at 14.

The U.S. Sentencing Memo. also considers "the kinds of sentence available, the sentencing range established for the applicable category of offense committed by the applicable category of

defendant, and the need to avoid unwarranted sentencing disparities between defendants who have committed similar crimes"; the United States argues that, generally, "'the purpose of the Guidelines is to promote uniformity in sentencing so as to prevent vastly divergent sentences for offenders with similar criminal histories and offenses.'" U.S. Sentencing Memo. at 14 (quoting United States v. Kristl, 437 F.3d 1050, 1054 (10th Cir. 2006)(per curiam)).  Here, the United States observes, the Guidelines provide a specific term of imprisonment for an individual with Sandoval's criminal history and who has committed the offenses at issue here, and thus "a sentence within the guideline imprisonment range is a reasonable approach to prevent unwarranted sentencing disparities between similarly situated defendants." U.S. Sentencing Memo. at 15.  The United States also argues that, "[c]onsidering the Defendant's guideline range and the factors set forth in 18 U.S.C. § 3553(a), a sentence within the Defendant's guideline range is 'sufficient, but not greater than necessary, to comply with the [sentencing goals].'" U.S. Sentencing Memo. at 15 (quoting 18 U.S.C. § 3553(a)).

The U.S. Sentencing Memo. concludes with a discussion of restitution and fines.  See U.S. Sentencing Memo. at 15-16.  It states that § 204 of the Mandatory Victims Restitution Act, codified at 18 U.S.C. § 3663A(a), mandates that the Court must include an order of restitution in this case, and that order "must include the full amount of the victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." U.S. Sentencing Memo. at 15 (citing 18 U.S.C. § 3664(f)(1)(A)).  As for fines, the United States asserts a fine is appropriate in this case, because the PSR states that Sandoval has the ability pay a fine, see U.S. Sentencing Memo. at 15 (citing PSR ¶ 81, at 17), he has not provided his financial information to the United States Probation Office as requested, see U.S. Sentencing Memo. at 15 (citing PSR ¶ 78, at 16), and he has assets and remains employed, see U.S. Sentencing Memo. at 15-16 (citing PSR ¶ 79-

80, at 16; id. ¶ 4, at 4).

Sandoval filed his sentencing memorandum on March 16, 2023.  See Sandoval's Sentencing Memo. at 1.  At the outset, Sandoval requests that the Court "reduce his offense level from what is stated in the PSR, vary downward further, and sentence him to probation." Sandoval's Sentencing Memo. at 1.  In support of this request, Sandoval forwards an argument in three parts: (i) he discusses the PSR's calculation of his offense level, arguing that his base offense level is 12, not 16 as the PSR states, compare Sandoval's Sentencing Memo. at 1, with PSR ¶ 83, at 17; (ii) he argues that the PSR's calculation of his restitution amount is legally flawed; and (iii) he argues that the Court should vary downward from the Guidelines range because of his precarious health condition, as well as the 18 U.S.C § 3553(a) factors.  The Court outlines each argument in turn.

First, Sandoval makes his argument regarding his Guidelines offense level.  See Sandoval's Sentencing Memo. at 1-11.  The PSR calculates Sandoval's offense level at 16, and arrives at that conclusion by adding the base offense level for an 18 U.S.C. § 641 violation -- 6 -- with 10 points of added specific offense characteristic points because of a determination that that the monetary loss exceeds $150,000.  See PSR ¶¶ 42-50, at 10; U.S.S.G. § 2B1.1(b)(1)(F)("If the loss exceeded $6,500, increase the offense level as follows: . . . (F) More than $150,000 . . . add **10**[.]" (emphasis in U.S.S.G. § 2B1.1(b)(1)(F)).  In Sandoval's Sentencing Memo., Sandoval accepts the base offense level of 6, see Sandoval's Sentencing Memo. at 11, but he attacks the addition of the specific offense characteristic points on three grounds.  First, he states that any Medicare benefits that he received cannot be counted towards the total loss for U.S.S.G. § 2B1.1's purposes, because -- given his disability -- he was entitled, as a matter of law, to receive Medicare benefits until September, 2022, and thus the United States cannot use the amount of those received benefits to

"height[] his offense level when that entire period falls within his 'continued Medicare entitlement.'"   Sandoval's Sentencing Memo. at 4-5 (source of quoted material not cited).   In short, Sandoval argues that his "continued receipt of Medicare though September 2022 was not a 'criminal offence,' but rather an '*entitlement*' created by federal law." Sandoval's Sentencing Memo. at 5 (emphasis in Sandoval's Sentencing Memo.)(source of quoted material not cited, but presumably from United States v. Griffith, 584 F.3d 1004, 1013 (10th Cir. 2009)).   He further contends, citing a case from the United States Court of Appeals for the Third Circuit, that, "[i]n cases involving government benefits, the value of the benefits that a defendant 'would have received if his forms had been accurate' must be subtracted from the total loss,'" Sandoval's Sentencing Memo. at 5 (quoting United States v. Tupone, 442 F.3d 145, 153 (3d Cir. 2006)), and argues that, here, "[t]he Government's witnesses -- and SSA correspondence with Mr. Sandoval -- confirmed that by every estimate, Mr. Sandoval's Medicare entitlement would have continued through September 2022 even if he had disclosed his work activity," Sandoval's Sentencing Memo. at 5.

The second way in which Sandoval disputes the PSR's total loss calculation is by arguing that any payments to his ex-wife Roseanne Gonzales, see Factual background, supra, at 3, cannot be counted towards his loss calculation for U.S.S.G. § 2B1.1's purposes, see Sandoval's Sentencing Memo. at 5-8.   This argument's thrust is that these amounts, which were paid to Sandoval's two children through their legal custodian, Gonzales, and which the PSR states total $57,378.00, see PSR ¶ 34, at 9, are not "relevant conduct" under the Guidelines and thus cannot be counted as part of the SSA's total loss.   Sandoval supports this proposition by arguing that the monies received by his children are too attenuated from his criminal conduct, and that the United States has not proven that the conduct in question is "criminal conduct by the defendant," which

Sandoval states is what the Guidelines require.  Sandoval's Sentencing Memo. at 6 (citing United States v. Griffith, 584 F.3d at 1013).  Sandoval states that "[t]here is . . . a clear break here between the causal power of Mr. Sandoval's conduct -- which no evidence has indicated he intended or even foresaw would provide a monetary windfall to Roseann Gonzalez -- and the SSA's ratification of all the beneficiaries' continued receipt of these benefits by its own conduct." Sandoval's Sentencing Memo. at 7.

The third and final reason why Sandoval argues that the PSR's total loss calculation is incorrect is that "[b]enefits received before June 2017 or after February 2020 can't be counted" toward the SSA's total loss amount, because this period is the only one on which Sandoval was tried, and the United States' "trial exhibits and the other evidence presented to the Court before now were aggressively constrained to this time period."  Sandoval's Sentencing Memo. at 8.  Even under the lower standard of proof for "relevant conduct" under the Guidelines, Sandoval argues, "the Government still has to make a showing far beyond what it was able to make at trial." Sandoval's Sentencing Memo. at 8.  Given the relevant subtractions from the PSR's loss level that Sandoval's arguments suggest, Sandoval proposes a loss amount of $50,377.40, which he states is "more than generous[] given the facts in the record."  Sandoval's Sentencing Memo. at 11.  This amount, under U.S.S.G. § 2B1.1(b)(1)(D), would result in 6 additional specific offense characteristic levels, resulting in Sandoval's suggested offense level of 12.  See Sandoval's Sentencing Memo. at 11; U.S.S.G. § 2B1.1(b)(1)(D)("If the loss exceeded $6,500, increase the offense level as follows: . . . (D) More than $40,000 . . . add **6**[.]" (emphasis in U.S.S.G. § 2B1.1(b)(1)(D))).

Next, Sandoval makes a brief restitution-related argument.  See Sandoval's Sentencing Memo. at 11.  In essence, he states that the United States has not "offered any argument that it

should be able to offer conduct outside the statute of limitations to increase the restitution amount," and nor has it "offered a dollar amount for the 'actual loss' it seeks to have repaid."  Sandoval's Sentencing Memo. at 11 (source of quoted material not cited).  Citing case law from the Tenth Circuit, Sandoval states that, "[o]n this record, it would be 'clearly erroneous' to enter a restitution order," Sandoval's Sentencing Memo. at 11 (quoting United States v. Williams, 292 F.3d 681, 688 (10th Cir. 2002)), because '[a] restitution order entered without proof of loss is clearly erroneous,'" United States v. Williams, 292 F.3d at 688 (quoting United States v. Smith, 156 F.3d 1046, 1057 (10th Cir. 1998)).

Last, Sandoval spends several pages of the Sandoval's Sentencing Memo. arguing for a downward variance from his Guidelines range because of his poor health.  See Sandoval's Sentencing Memo. at 12-18.  He begins by making the point that, if the Court "is persuaded that Mr. Sandoval's offense level here is 12, it could vary downward only a single offense level and have Mr. Sandoval within the range of probation-eligible sentences."  Sandoval's Sentencing Memo. at 12.  Moreover, Sandoval states that his medical needs present "more compelling reasons to justify a downward variance than in the typical case," and that "Sandoval's health is so extremely poor that it would justify a downward departure, not just a variance."  Sandoval's Sentencing Memo. at 12 (citing United States v. Griffin, 501 F. App'x 751, 755 (10th Cir. 2012); United States v. Rodella, No. CR 14-2783, 2015 WL 711941, at *45 (D.N.M. February 5, 2015)(Browning, J.)).  Sandoval notes that there are only five facilities "in this entire country" where he can be placed, because, given his health conditions, Sandoval contends that he would be "designated 'Care Level 4' in BOP."  Sandoval's Sentencing Memo. at 14 (quoting Care Level Classification for Medical and Mental Health Conditions or Disabilities, Federal Bureau of Prisons Clinical Guidance at 2-4 (dated May 2019), filed March 16, 2023 (Doc. 108-5)).  All such

facilities, he states, are very far from Albuquerque, see Sandoval's Sentencing Memo. at 14 (providing distances), which he argues is relevant because, per Bureau of Prisons policy, "individuals with severe COPD 'will not be considered for transport on the Bureau/U.S. Marshal's Service (USMS) airlift,'" and thus he would have to drive hundreds of miles from Albuquerque to an applicable facility, and then -- if he were placed at the closest Care Level 4 facility in Springfield, Missouri -- he would be another 1,244 miles from the medical facility in Arizona where he might receive a lung transplant. Sandoval's Sentencing Memo. at 14 (quoting Program Statement, Medical Designations and Referral Services for Federal Prisoners, United States Department of Justice, Federal Bureau of Prisons ¶ 5(d) at 3 (dated January 15, 2005), filed March 16, 2023 (Doc. 108-6)).

Sandoval then offers a response to the United States' contentions that he "'voluntarily postposed the lung transplant procedure,'" despite his doctors recommending this action. Sandoval's Sentencing Memo. at 14 (quoting United States' Response to Defendant's Objections to Presentence Investigation Report at 10, filed March 14, 2023 (Doc. 103)). Sandoval explains that a lung transplant is an incredibly complicated and medically risky procedure with a long recovery, and thus it is not "surprising that it might take some time for a person to resign himself to it," and that he "waffled about undergoing this procedure for months because he was afraid." Sandoval's Sentencing Memo. at 16. Moreover, he states that "BOP policy could prevent him from receiving the medical treatment he most needs *at all*," because any procedure of the extraordinary nature of a lung transplant would require "'the Medical Director's review and approval with notification to the Regional Director,'" and also that "'inmates with less than 12 months to serve are ineligible for' medical interventions deemed 'extraordinary.'" Sandoval's Sentencing Memo. at 17 (emphasis in Sandoval's Sentencing Memo.)(quoting Program Statement,

Patient Care, United States Department of Justice, Federal Bureau of Prisons at 2 (dated June 3, 2014), filed March 16, 2023 (Doc. 108-7)).

In conclusion, Sandoval makes four final points.  First, he states that the Court has before -- with reference to the 18 U.S.C. § 3553(a) factors -- varied downward in consideration of an individual's medical condition.  See Sandoval's Sentencing Memo. at 17 (citing United States v. Rodella, 2015 WL 711941, at *1).  Second, Sandoval states that his lung condition makes him "extraordinarily vulnerable to COVID-19, which continues to plague BOP facilities."  Sandoval's Sentencing Memo. at 17.  Third, and relatedly, Sandoval states that, because of his health condition, "[i]ncarcerating Mr. Sandoval in a BOP facility is not 'deterrence[]' . . . .  It's a death sentence."  Sandoval's Sentencing Memo. at 17.  He states that such a punishment would not be proportional "for a man who -- while undisputedly medically disabled -- lied to the SSA about designing and selling jewelry."  Sandoval's Sentencing Memo. at 17.  Last, Sandoval states that while the United States portrays Sandoval's business as lucrative, this depiction is not accurate: "This business bled money on expensive materials that it never made back.  The bank statements show a man who was barely ever breaking even and needed disability insurance to cover his medical bills, not a man snatching $1,500 a month from the federal government while sitting on piles of lucre."  Sandoval's Sentencing Memo. at 18.

The Court held a sentencing hearing on March 16, 2023, the same day that Sandoval's Sentencing Memo. was filed.  See Sentencing Minute Sheet, filed March 16, 2023 (Doc. 115)("Sentencing Minutes").  The United States called A-Jay Sanchez, a program specialist with the SSA cooperative disability investigation unit, and FBI Special Agent Raymond Mauk, as witnesses.  See Sentencing Minutes at 2.  The United States and the USPO confirmed that they had no opposition to including Sandoval's health information in the PSR.  See Sentencing Minutes

at 2.  The Court took the sentencing under advisement, stating that it needed more time to consider

Sandoval's objections to the PSR.  See Sentencing Minutes at 2.

In August, 2023, the Court issued a Memorandum Opinion and Order addressing

Sandoval's objections to the PSR.    See Objections MOO at 1; Defendant's Objections to

Presentence Investigation Report, filed March 7, 2023 (Doc. 99)("Objections").  In the Objections

MOO, the Court analyzes and rules on, among other things, three issues that are intimately related

to arguments that Sandoval's Sentencing Memo. makes, namely: (i) the total loss amount's correct

calculation for Guidelines purposes, see Objections MOO at 30-37; (ii) the correct number of

specific offense characteristic points under U.S.S.G. § 2B1.1(b)(1), see Objections MOO at 37-

38; and (iii) the correct amount for Sandoval's restitution calculation, see Objections MOO at 38-

45.  On these questions, the Court concludes in the Objections MOO that

> (i) the PSR's $182,735.10 total loss calculation is correct, because (a) Sandoval's
> non-charged receipt of benefits to which he was not entitled is relevant conduct
> under U.S.S.G. § 1B1.3(a)(2), and (b) Sandoval's non-charged receipt of benefits
> to which he was not entitled was part of an ongoing scheme and constitutes a
> criminal offense; (ii) because the PSR's $182,735.10 total loss calculation is
> correct, Sandoval's base offense level of 6 is subject to a 10-level increase under
> U.S.S.G. § 2B1.1(b)(1)(F), making his total offense level 16; and (iii) the PSR's
> restitution calculation should be $55,261.20, and not $182,735.10, because the
> United States does not meet its burden in establishing the SSA's entitlement to
> restitution for losses other than those resulting from Sandoval's charged receipt of
> benefits to which he was not entitled between June, 2017, through February, 2020.

Objections MOO at 1-2.

On February 13, 2024, the Court held a second sentencing hearing in this matter.  See

Clerk's Minutes for Sentencing Proceeding, filed February 13, 2024 (Doc. 123).  The Court noted

at the beginning of the hearing that it had filed the Objections MOO, and asked the parties if "there

are any other issues or objection with the presentence report or the addendums?"  Draft Transcript

of February 13, 2024, Hearing at 3:9-11 (held February 13, 2024)(Court)("Tr.").[1]  In response to this inquiry, Sandoval first asked the Court to reconsider its conclusion from the Objections MOO regarding the total loss amount that came from "payments made to Mr. Sandoval's ex-wife and her children who are in her custody."  Tr. at 3:18-20 (Harrison).  Sandoval argued that, at the Court's first sentencing hearing on March 16, 2023, "the evidence was that the statements that were made in order to procure those benefits were, in fact, made by Ms. Gonzales, Mr. Sandoval's ex-wife, and not him," and that Sandoval "was not aware that those had been applied for and made."  Tr. at 4:3-11 (Harrison).  Accordingly, Sandoval argues, the monies received by his children cannot count towards his total loss for U.S.S.G. § 2B1.1's purposes, because the conduct that led to the receipt of these funds was not part of the same scheme or course of conduct.  See Tr. at 3:25-5:6 (Harrison); U.S.S.G. § 1B1.3(a)(2).  The Court ruled that it would overrule this oral motion to reconsider, stating: "I think I've considered that as thoroughly as I can."  Tr. at 5:22-23 (Court).

Next, Sandoval presented to the Court an exhibit, which is a letter that Sandoval received from the Internal Revenue Service ("IRS") in March, 2022, which he states shows that "the IRS corrected its records to reflect the fact that Mr. Sandoval had no income and owed no taxes, nor any failure to file penalties, nor any interest payments."  Tr. at 7:4-9 (Kennedy).  See Letter from Department of the Treasury, Internal Revenue Service to James A. Sandoval, Re: Changes to your 2016 Form 1040A at 1 (notice dated March 7, 2022), filed February 13, 2024 (Doc. 124).  The Court had the exhibit attached to the Clerk's minutes, and Sandoval proceeded to argue for a downward variance in this case, "based on the [§] 3553 factors, . . . and in particular, because Mr. Sandoval's terminal health condition."  Tr. at 7:23-8:3 (Harrison).  In this part of the argument,

---

[1]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

Sandoval largely restates his arguments in his sentencing memorandum: he notes the questionable ability of BOP's facilities to care adequately for his health condition, he notes that Care Level 4 facilities are all very far away, and he notes that COVID remains a risk in BOP facilities and poses a great risk to him given his underlying health conditions. See Tr. at 8:4-10:18.

Sandoval then argued for a departure on the basis of the Guidelines' 2023 amendments regarding "zero point" offenders. Tr. at 14:6-13 (Harrison). Sandoval clarified that this request for a departure is not based solely on the U.S.S.G. § 4C1.1 adjustment, but rather for a separate ground for departure found in an application note to U.S.S.G. § 5C1.1. Tr. at 23:22-23:14 (Harrison). See U.S.S.G. § 5C1.1, cmt. app. n.10(B). Sandoval then quotes this application note, which reads:

> **Zero-Point Offenders.** --
>
> > (B)   **Departure for Cases Where the Applicable Guideline Range Overstates the Gravity of the Offense**. -- A departure, including a departure to a sentence other than a sentence of imprisonment, may be appropriate if the defendant received an adjustment under §4C1.1 (Adjustment for Certain Zero-Point Offenders) and the defendant's applicable guideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense. See 28 U.S.C. § 994(j).

U.S.S.G. § 5C1.1, cmt. app. n.10(B). See Tr. at Tr. at 23:22-23:14 (Harrison)(quoting U.S.S.G. § 5C1.1, cmt. app. n.10(B) in part). Sandoval argues that he is entitled to a departure under this provision, because "this isn't a crime of violence, or otherwise serious offence, as defined in 28 U.S.C. § 994(j)," and he is a "zero point offender." Tr. at 14:6-18 (Harrison). Sandoval argued that the application of this departure -- in addition to his lowered criminal history points pursuant to the amended U.S.S.G. § 4C1.1 -- is not "double dipping," because "Application Note 10 requires that he get the reduction under [§] 4C1.1 in order to be eligible for that departure." Tr. at 25:21-

26:1 (Harrison).

Sandoval made three additional points in his presentation to the Court.  First, he stated that, according to statistics from the Judiciary Sentencing Information tool, as of 2022, "about 20 percent of people who are sentenced for this type of crime, at this offense level and this criminal history category, don't receive a term of imprisonment."   Tr. at 15:7-15 (Harrison)(referencing Second Addendum to the Presentence Report at 1, filed November 17, 2023 (Doc. 119)).  Second, Sandoval notes that his arrest's circumstances in this matter evince "pure vindictiveness on the part of the agents": he was arrested at his Rio Rancho residence at 6:00 p.m. and was transported to the Cibola County Correctional Center, where he was booked and spent the evening, before being transported back to Albuquerque in the morning to appear before a United States Magistrate Judge.  Tr. at 17:15-18:5 (Kennedy).  Sandoval's counsel stated: "I've been practicing in this district for 50 years almost, and I have never seen that happen in a case of this nature . . . .  It is most unusual."  Tr. at 18:1-5 (Kennedy).  Third, Sandoval stated that he has "stayed on top" of his COVID vaccinations, Tr. at 11:2 (Sandoval), but that his potential lung transplant "has been on pause" since the inception of this case, because he "do[es]n't have the insurance that [he] had before," Tr. at 12:18-13:4 (Sandoval).

The United States stated that Sandoval's requested downward departure pursuant to U.S.S.G. § 5C1.1 is inappropriate, because Application Note 10 states that "a departure would be warranted if the applicable guideline range overstates the gravity of [the] offense," and that here, "from the Government's perspective he's already receiving an adjustment, and the guidelines do not overstate the gravity of the offense."  Tr. at 25:1-7 (Ruiz-Velez).  Regarding the IRS exhibit, the United States argued that "from the Government's perspective this is not relevant for the purposes of sentencing," because this issue was raised at trial and the "jury rejected that."  Tr. at

29:1-8 (Ruiz-Velez).  The United States "respectfully requests the Court to sentence the defendant to a term of imprisonment within the defendant's guideline range," as well as restitution and "a fine within the defendant's guideline range, and a special penalty assessment of $3,500."  Tr. at 29:10-16 (Ruiz-Velez).  The United States notes that it "never disputed that the defendant has a serious condition," but states that "his health condition . . . has not prevented the defendant from defrauding the Social Security Administration," and notes that Sandoval "stole over $180,000."  Tr. at 30:22-31:6 (Ruiz-Velez).

The Court adopted the PSR's factual findings -- noting that "[w]e've worked through the medical issues to the satisfaction of the defendant," Tr. at 33:14-16 (Court) -- and stated that it had "carefully considered the guidelines," Tr. at 34:6-15 (Court).  The Court then considered the various factors that put downward pressure on the sentence, specifically identifying "14 factors that put downward pressure on the sentence to take it outside of the guideline range."  Tr. at 34:16-18 (Court).  The Court identified: (i) the seriousness of the offense, namely, that the offense is not a crime of violence; (ii) relatedly, the Court does not want the sentence to overstate the gravity of the offense; (iii) Sandoval's health conditions, about which there is no dispute; (iv) although the Court does not depart downward on the basis of Sandoval's "[p]hysical condition" pursuant to U.S.S.G. § 5H1.4, this provision reflects a policy that an individual's physical condition can be taken into account in sentencing, and the Court concludes that, although a departure is not appropriate under this case's facts and circumstances, this factor nevertheless puts downward pressure on the sentence; (v) the factors feed into the need to provide just punishment; (vi) the manner in which Sandoval's poor health may reduce his likelihood to reoffend, thus bearing on the adequate deterrence calculus; (vii) Sandoval's need for a lung transplant and the fact that "it's very likely that any time in custody is going to delay that," Tr. at 36:7-11 (Court); (viii) the

possibility of positive outcomes on supervised release; (ix) opportunities for education, training, and care while on supervised release to help him with the problems that have brought him before the criminal justice system; (x) the fact that Sandoval has no other recent criminal history; (xi) the fact that "there are people that don't receive sentences of imprisonment" for similar offenses, Tr. at 36:2-6 (Court); (xii) the fact that Sandoval received a departure under amended U.S.S.G. § 4C1.1 for "zero-point offenders"; (xiii) the fact that U.S.S.G. § 5C1.1, cmt. app. n.10(B) provides the possibility of a further departure that could be applicable to Sandoval's case; and (xiv) the fact that Sandoval's health conditions might put him at greater risk for contracting COVID while incarcerated, see Tr. at 34:16-36-11 (Court).  The Court also noted that its task as a district court is not to just come up with what it thinks is a reasonable sentence; rather, its task is to craft a sentence that is sufficient, but not greater than necessary to reflect the 18 U.S.C. § 3553(a) factors -- i.e., the sentence should embody the considerations reflected in the parsimony clause. See United States v. Martinez-Barragan, 545 F.3d 894, 904 (10th Cir. 2008).

The Court also considered the factors that apply upward pressure on Sandoval's sentence, identifying "about 27 factors that continue to put upward pressure on the sentence to keep it in the guideline range."  Tr at 36:12-14 (Court).  Those factors are: (i) the seriousness of the offense, and in particular the length of the fraud; (ii) relatedly, the manifold continuing instances of deception required to keep the fraud going over many years, also reflecting the offense's seriousness; (iii) the fact that "our society and Congress has decided that people should be punished for taking money fraudulently," thus also reflecting the seriousness of the offense, Tr. at 36:19-21 (Court); (iv) the seriousness of the offense in that the fraud perpetuated in this case involves taking money from a public assistance program designed to provide financial assistance to individuals who are unable to work; (v) the fact that "the overwhelming number of judges and court that have reviewed these

types of cases have sent people to prison for this type of crime," Tr. at 36:21-23 (Court); (vi) the need to generally promote respect for the law, a factor that often weighs in favor of imposing a guideline sentence; (vii) the need to foster respect for the law by indicating that financial offenses harm the public in a serious manner, as reflected by the Guidelines range; (viii) the need to provide a just punishment, which weighs in favor of imposing a sentence within the range that the Commission -- and by extension of its delegated authority, Congress -- has endorsed; (ix) the need to afford adequate deterrence to criminal conduct; (x) in particular, the general deterrence at issue in this case, and the need to demonstrate that "these crimes have to be punished . . . the public has to be protected, and the public purse has to be protected," Tr. at 37:4-11 (Court); (xi) relatedly, the need to protect the public from individuals who seek to defraud public assistance programs; (xii) specific deterrence to discourage Sandoval from undertaking further fraudulent activity; (xiii) the need to avoid unwarranted sentencing outcomes, and the fact that most people who are convicted of this offense receive a sentence of incarceration; (xiv) Sandoval's need for an organ transplant, although "it's a factor that puts downward pressure, at the same time I think we know that it's very speculative right now as to [whether] it will ever occur and when it will occur," and therefore might not put as much downward pressure on a Guidelines sentence as other health factors, Tr. at 37:20-23 (Court); (xv) similarly, while Sandoval might be at a greater risk for contracting and having complications from COVID-19, that downward pressure "is mitigated by the fact that you can get COVID in New Mexico in various situations, not just because you're in prison," Tr. 38:1-11 (Court); (xvi) Sandoval's health condition is not new; (xvii) Sandoval's health condition did not prevent him from committing the fraud at issue in this case; (xviii) Sandoval's health condition did not prevent him from running his business; (xix) Sandoval's health condition did not prevent him from working hard at his business, which "undercuts to some degree the medical condition

which does put downward pressure," Tr. at 38:22-23 (Court); (xx) the Bureau of Prisons have medical facilities that will meet Sandoval's needs; (xxi) a correct application of the Guidelines, using the applicable category of offense committed by the applicable category of defendant as set forth in the Guidelines, indicates a sentence of imprisonment; (xxii) the sizable increase in Sandoval's base offense level imposed pursuant to U.S.S.G. § 2B1.1(b)(1)(F), because of the monetary amount of his fraud against the United States; (xxiii) general policy within the Guidelines reflects that financial crimes involving high loss amounts are to be punished accordingly with increased offense levels; (xxiv) the need to impose a reasonable sentence; (xxv) the need to impose a sentence which reflects the 18 U.S.C. § 3553(a) factors; (xxvi) the need to impose a reasonable sentence, which at the trial court level means a sentence that is sufficient to comply with the statutory purposes of punishment set forth in 18 U.S.C. § 3553(a)(2); and (xxvii) Sandoval's relative lack of apparent remorse, as reflected in the fact that he has not received a decrease in his offense level pursuant to U.S.S.G. § 3E1.1, see Tr. at 36:12-39:2 (Court).

Overall, the Court stated: "I think the factors that put upward pressure to keep it in the guideline range overwhelm those factors that put downward pressure, both quantitatively and qualitatively." Tr. at 39:3-6 (Court). The Court "believes a sentence at the low end of the guideline range of 15 months is adequate, but also necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence at both a specific and general level, [and] protect the public." Tr. at 39:25-40:6 (Court). The Court thus imposed a sentence of 15 months of imprisonment, followed by 3 years of supervised release. See Tr. at 39:25-48:18 (Court, Kennedy, Ruiz-Velez); Sentencing Minute Sheet at 1, filed February 13, 2024 (Doc. 123).

## LAW REGARDING THE GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1976, thus making Guidelines sentencing ranges advisory.  See United States v. Booker, 543 U.S. at 261.  In excising the two sections, the Supreme Court left the remainder of the Sentencing Reform Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing.  Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."  United States v. Booker, 543 U.S. at 261.  Accordingly, even though the Guidelines are not mandatory, courts must consult them for advice in arriving at an appropriate sentence.  See Peugh v. United States, 569 U.S. 530, 541-42 (2013).  The Guidelines should provide a starting point for the court's determination of a proper sentence.  See Gall v. United States, 552 U.S. 38, 50 n.6 (2007)("[D]istrict courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process."); Peugh v. United States, 569 U.S. at 541 ("The post-Booker federal sentencing scheme aims to achieve uniformity by ensuring that sentencing decisions are anchored by the Guidelines and that they remain a meaningful benchmark through the process of appellate review.").

Congress has directed sentencing courts to "impose a sentence sufficient, but not greater than necessary, to comply with" the four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> **(A)**     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> **(B)**     to afford adequate deterrence to criminal conduct;
>
> **(C)**     to protect the public from further crimes of the defendant; and
>
> **(D)**     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective

manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal
> statute . . . shall be sentenced in accordance with the provisions of this chapter so
> as to achieve the purposes set forth in subparagraphs (A) through (D) of section
> 3553(a)(2) to the extent that they are applicable in light of all the circumstances of
> the case.

18 U.S.C. § 3551.  To achieve these purposes, § 3553(a) directs sentencing courts to further

consider: (i) "the nature and circumstances of the offense," as well as the defendant's "history and

characteristics"; (ii) the available sentences; (iii) the Guidelines; (iv) any pertinent Sentencing

Commission policy statements in effect on the date of sentencing; (v) the policy favoring

uniformity in sentences for defendants who commit similar crimes; and (vi) the need to provide

restitution to victims.  18 U.S.C. § 3553(a)(1), (3)-(7).

The United States Court of Appeals for the Tenth Circuit holds that, while the Guidelines

are one of several factors which § 3553(a) enumerates, they are entitled to careful consideration.

See United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more

than "just one factor among many").  They are significant, because "the Guidelines are an

expression of popular political will about sentencing that is entitled to due consideration . . . ."

United States v. Cage, 451 F.3d at 593.  A court's careful consideration of the Guidelines is proper

in light of the fact that "[t]he Guidelines as written reflect the fact that the Sentencing Commission

examined tens of thousands of sentences and worked with the help of many others in the law

enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."

Rita v. United States, 551 U.S. 338, 349 (2007).

"[A] sentence within the applicable Guidelines range is presumptively reasonable."  United

States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006), overruled on other grounds by Rita v.

United States, 551 U.S. at 349, as recognized in United States v. Zamora-Solorzano, 528 F.3d

1247, 1251 n.3 (10th Cir. 2008).  This presumption, however, is an appellate presumption, and not

one that the trial court can or should apply.  See Gall v. United States, 552 U.S. at 46-47;

Kimbrough v. United States, 552 U.S. 85, 90-91 (2007); Rita v. United States, 551 U.S. at 351.

Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption

in favor of the advisory[2] Guidelines sentence.  See Rita v. United States, 551 U.S. at 351; Gall v.

---

[2]Attorneys and courts often say that the Guidelines are advisory, but it is more accurate to
say that the resulting Guidelines ranges are advisory.  See Gall v. United States, 552 U.S. 38, 46
(2007)("As a result of our decision [in United States v. Booker], the Guidelines are now
advisory . . . ."); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)("[T]he Guidelines
are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he
sentence ultimately imposed by the district court was based on a correctly calculated Guidelines
range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines
are advisory.").  The Court must consider the Guidelines, see Gall v. United States, 552 U.S. at 46 ("It
is . . . clear that a district judge must give serious consideration to the extent of any departure from
the Guidelines . . . ."), and must accurately calculate the Guidelines range, see Gall v. United
States, 552 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly
calculating the applicable Guidelines range.").  The Court is not mandated to apply, however, a
sentence within the calculated Guidelines range.  See United States v. Sierra-Castillo, 405 F.3d
932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences
outside of the Guidelines-authorized range . . . .").  Accord United States v. Chavez-Rodarte, No.
CR 08-2499, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

　　　The Court must adhere to the following three-step sequence when
sentencing a criminal defendant: first, determining the appropriate sentencing range
on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-
contemplated departures based on parts 5H and 5K; and, only then, varying from
the Guidelines framework on the basis of the § 3553(a) factors taken as a whole.
The Court must follow this sequence, because: (i) the Guidelines expressly provide
for it, and courts must still consult the Guidelines, even if they will subsequently
vary from them in the third step of the sequence; and (ii) adherence to this sequence
is the only way to give effect to 18 U.S.C. § 3553(e).

. . . .

　　　The Supreme Court held in United States v. Booker that "district courts,
while not bound to apply the Guidelines, must consult those Guidelines and take
them into account when sentencing," 543 U.S. at 264, but further expounded in
Kimbrough v. United States, 552 U.S. 85 (2007), that "courts may vary [from the
Guidelines ranges] based solely on policy considerations, including disagreements
with the Guidelines," 552 U.S. at 101 (alteration in original)(internal quotation

United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

> While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence.   Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures.   The sentencing court may, however, also use these same departure factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479, 2008 WL 2229550, at *6 (D.N.M. February

13, 2008)(Browning, J.).  The Supreme Court has recognized, however, that sentencing judges are

"in a superior position to find facts and judge their import under § 3553(a) in each particular case."

Kimbrough v. United States, 552 U.S. at 89.  A reasonable sentence is one that also "avoid[s]

unwarranted sentence disparities among defendants with similar records who have been found

guilty of similar conduct."  18 U.S.C. § 3553(a).  See United States v. Booker, 543 U.S. at 261-

62.

---

> marks omitted).  In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield.  In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances."  Irizarry v. United States, 553 U.S. 708, 710-16 (2008).   A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably.  See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

United States v. Nolf, 30 F. Supp. 3d 1200, 1222-24 (D.N.M. June 20, 2014)(Browning, J.)(emphasis in original).

## LAW REGARDING DOWNWARD DEPARTURES

The Guidelines "place essentially no limit on the number of potential factors that may warrant a departure." Koon v. United States, 518 U.S. 81, 106 (1996). See United States v. Coleman, 188 F.3d 354, 358 (6th Cir. 1999)(en banc)(stating that there are a "potentially infinite number of factors which may warrant a departure"); 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."). A departure is warranted if the case is "unusual enough for it to fall outside the heartland of cases in the Guideline." Koon v. United States, 518 U.S. at 92. Accord United States v. Lewellen, No. CR 11-1524, 2012 WL 2175769, at *5 (D.N.M. June 5, 2012)(Browning, J.).

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue. We do not understand it to have been the congressional purpose to withdraw all sentencing discretion from the United States district judge.

Koon v. United States, 518 U.S. at 113.

For example, in United States v. Jim, 877 F. Supp. 2d 1018 (D.N.M. 2012)(Browning, J.), the Court did not grant a defendant's request for a downward departure under U.S.S.G. § 4A1.3(b), where the defendant argued that his criminal history category over-represented the seriousness of his criminal history and the likelihood that he would commit other crimes. See 877 F. Supp. 2d at 1044-45. The Court noted that Jim's criminal history included: (i) two DWI convictions; (ii) a conviction for Roadway Laned Traffic; and (iii) Abandonment or Abuse of a Child. See 877 F. Supp. 2d at 1044-45. The Court concluded that a criminal history category of II did not over-represent Jim's criminal history, explaining that Jim's previous convictions involved alcohol and

driving, demonstrating a pattern of aberrant use of alcohol also seen in the offense for which he was sentenced -- sexual assault -- as Jim asserted that both he and the victim were intoxicated at the time he assaulted the victim.  See 877 F. Supp. 2d at 1022-23, 1044-45.  The Court noted that it "does not take much for a defendant to qualify for a criminal history category of II" and that the Court could not distinguish Jim's criminal history from that of other defendants that the Court regularly sees who also have a criminal history category of II, and thus denied Jim's request for a downward departure under U.S.S.G. § 4A1.3. 877 F. Supp. 2d at 1044-45.

In United States v. Jager, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. February 17, 2011)(Browning, J.), the Court denied a defendant's request for a downward departure, under U.S.S.G. § 5H1.11, based upon the defendant's eleven years of military service.  See 2011 WL 831279, at *3.  Even though Jager had received exemplary reviews in his performance reports, earning either the highest or second highest ratings possible, during his military career, the Court concluded that his service was not present in an unusual degree or distinguishable from other cases which the Guidelines cover. See 2011 WL 831279, at **10-11. The Court noted that, in many child pornography cases, such as Jager's, the defendant leads an exemplary life publicly, while engaging in a sordid secret life privately.  See 2011 WL 831279, at **10-11.  Jager's case was thus not distinguishable from other defendants sentenced under the Guidelines.  See 2011 WL 831279, at **10-11.  Additionally, Jager was not in intense combat during his military career, most of his time was spent in the support role of a mechanic.  See 2011 WL 831279, at **10-11.  The Court concluded, thus, that Jager's military service did not distinguish his case from those of many other defendants who commit child pornography, and the Court denied Jager's request for a downward departure.  See 2011 WL 831279, at *10-11.

## LAW REGARDING VARIANCES FROM THE SENTENCING GUIDELINES

After United States v. Booker, 543 U.S. 220 (2005), the sentencing guideline ranges are

now advisory and are one of several factors set out in 18 U.S.C. § 3553(a).  Although appellate

courts are allowed to assume that within-guidelines sentences are reasonable, subject to rebuttal,

see Gall v. United States, 552 U.S. 38, 50-51 (2007), the Supreme Court has made it clear that no

presumption of reasonableness attaches at the district court level to the sentence the Guidelines

suggest, see Gall v. United States, 552 U.S. at 50 (explaining that a sentencing judge "may not

presume that the Guidelines range is reasonable"); Rita v. United States, 551 U.S. 338, 351

(2007)("In determining the merits of [the parties'] arguments, the sentencing court does not enjoy

the benefit of a legal presumption that the Guidelines sentence should apply.").

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater

than necessary" to comply with four statutorily defined purposes enumerated in

18 U.S.C. § 3553(a)(2):

> (A)     to reflect the seriousness of the offense, to promote respect for the law, and
>         to provide just punishment for the offense;
>
> (B)     to afford adequate deterrence to criminal conduct;
>
> (C)     to protect the public from further crimes of the defendant; and
>
> (D)     to provide the defendant with needed educational or vocational training,
>         medical care, or other correctional treatment in the most effective
>         manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).  Section 3553(a) also directs sentencing courts to consider: (i) the

nature of the offense and the defendant's character; (ii) the available sentences; (iii) the Sentencing

Guidelines and policy statements that the Sentencing Commission has promulgated; (iv) a policy

favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to

provide restitution to victims.  See 18 U.S.C. § 3553(a)(1), (3)-(7).  The Tenth Circuit reviews a

district court's variance for "substantive reasonableness."  United States v. Kaspereit, 994 F.3d

1202, 1214 (10th Cir. 2021)(citing United States v. Sayad, 589 F.3d 1110, 1116 (10th Cir. 2009)).

## LAW REGARDING MOTIONS TO RECONSIDER

"Motions to reconsider are proper in criminal cases even though the Federal Rules of Criminal Procedure do not specifically provide for them."  United States v. Christy, 739 F.3d 534, 539 (10th Cir. 2014).  See United States v. Rollins, 607 F.3d 500, 502 (7th Cir. 2010)(Easterbrook, C.J.)("None of the Rules of Criminal Procedure authorizes a generic motion to reconsider; the criminal rules lack a counterpart to the motions authorized by Fed. R. Civ. P. 50(b), 52(b), or 59, though they do authorize some post-trial motions . . . that have features in common with motions under the civil rules.").  The Tenth Circuit has held that criminal motions to reconsider are proper, because a "district court should have the opportunity to correct alleged errors in its dispositions." United States v. Christy, 739 F.3d at 539.  The authority to reconsider, according to the Tenth Circuit, "comes from the common law."  United States v. Warren, 22 F.4th 917, 922 (10th Cir. 2022)(citing United States v. Rollins, 607 F.3d at 502).

This authority, however, is not without limits.  A district court may grant a motion to reconsider "when the court has misapprehended the facts, a party's position, or the law."  United States v. Christy, 739 F.3d at 539 (citing Servants of Paraclete v. Does, 204 F.3d 1005, 1012 (10th Cir. 2000)).  Specific grounds for reconsideration include: "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice."  Servants of Paraclete v. Does, 204 F.3d at 1012.  Motions to reconsider, however, "should not be used to revisit issues already addressed or advance arguments that could have been raised earlier."  United States v. Christy, 739 F.3d at 539.

The Tenth Circuit has applied the law regarding motions to reconsider in civil cases to the criminal context.  See United States v. Christy, 739 F.3d at 539-40; United States v. Huff, 782 F.3d 1221, 1223-24 (10th Cir. 2015).  "In the criminal context, courts ordinarily apply the same

standards to motions to reconsider as those used in civil cases." United States v. Christy, 810 F. Supp. 2d 1219, 1249 (D.N.M. 2011)(Browning, J.), aff'd by, United States v. Christy, 739 F.3d 534 (10th Cir. 2014). See United States v. Rollins, 607 F.3d at 502 (stating that the Supreme Court of the United States has "concluded that motions to reconsider in criminal prosecutions are proper and will be treated just like motions in civil suits"); United States v. Matlack, No. CR 09-0531, 2010 WL 2682110, at *1 (D. Colo. July 1, 2010)(Daniel, C.J.)(stating that other district courts in the Tenth Circuit have relied on the standards for evaluating a motion to reconsider in the civil context when addressing motions to reconsider in the criminal context), declined to follow on other grounds by United States v. Games-Perez, 667 F.3d 1136 (10th Cir. 2012); United States v. West, No. 01-40122, 2002 WL 1334870, at *1 (D. Kan. May 9, 2002)(Crow, J.)("Rarely do parties in criminal proceedings file motions to reconsider rulings on pretrial motions. This court believes that the standards for evaluating a motion to reconsider in the civil context are relevant for evaluating a motion to reconsider in a criminal case."); United States v. Ibarra, 502 U.S. 1 (1991); United States v. Dieter, 429 U.S. 6 (1976); United States v. Healy, 376 U.S. 75 (1964).

Accordingly, the Tenth Circuit has applied the civil standard, as it announced in Servants of Paraclete v. Does, 204 F.3d at 1012, in reconsidering a motion to suppress in the criminal context. In United States v. Huff, the Tenth Circuit explains:

> We have held that a motion to reconsider may be granted when the court has misapprehended the facts, a party's position, or the law. *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). Specific situations where circumstances may warrant reconsideration include "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice." *Id.* "A motion to reconsider is not a second chance for the losing party to make its strongest case or to dress up arguments that previously failed." *Voelkel v. Gen. Motors Corp.*, 846 F. Supp. 1482, 1483 (D. Kan. 1994). We have specifically held that "[a] motion to reconsider should not be used to revisit issues already addressed or advance

arguments that could have been raised earlier." *United States v. Christy*, 739 F.3d 534, 539 (10th Cir. 2014).

United States v. Huff, 782 F.3d at 1224.  The Court thus will use the same test that it has developed for motions to reconsider in the civil context for motions to reconsider in criminal cases.  See Anderson Living Trust v. WPX Energy Prod., LLC, 312 F.R.D. 620, 642-49 (D.N.M. 2015)(Browning, J.).  The Court outlines the law regarding motions to reconsider in the civil context, below.

Except where the Federal Rules of Civil Procedure specify, motions to reconsider in civil cases fall into three categories:

> First, there are motions to reconsider "filed within [twenty-eight] days of the entry of judgment," which are "treated as a motion to alter or amend the judgment under rule 59(e)" of the Federal Rules of Civil Procedure.  Pedroza v. Lomas Auto Mall, Inc., 258 F.R.D. 453, 462 (D.N.M. 2009)(Browning, J.).  See N.M. Health Connections v. U.S. Dep't of Health and Human Servs., 340 F. Supp. 3d 1112, 1164-75 (D.N.M. 2018)(Browning, J.)(denying motion to reconsider under rule 59(e)).  Second, there are motions to reconsider "filed more than [twenty-eight] days after judgment," which are "considered a motion for relief from judgment under rule 60(b)" of the Federal Rules of Civil Procedure.  Pedroza v. Lomas Auto Mall, Inc., 258 F.R.D. at 462.  See Kruskal v. Martinez, No. CIV 16-1075 JB/SCY, 2018 WL 3972910, at *9 (D.N.M. Aug. 18, 2018)(Browning, J.)(denying motion to reconsider under rule 60(b)).  Finally, there are motions to reconsider "any order that is not final," which are treated as "a general motion directed at the Court's inherent power to reopen any interlocutory matter in its discretion."  Pedroza v. Lomas Auto Mall, Inc., 258 F.R.D. at 462.  See Price v. Philpot, 420 F.3d 1158, 1167 & n.9 (10th Cir. 2005); Computerized Thermal Imaging, Inc. v. Bloomberg, L.P., 312 F.3d 1292, 1296 n.3 (10th Cir. 2002).  See also United States v. Loera,

182 F. Supp. 3d 1173, 1218-30 (D.N.M. 2016)(Browning, J.)(denying motion to reconsider rulings on a motion to suppress).

Rivero v. Bd. of Regents of Univ. of N.M., No. CIV 16-0318, 2019 WL 1085179, at *55 (D.N.M. March 7, 2019)(Browning, J.).

## 1.    Motions for Reconsideration Under Rules 59(e) and 60(b) of the Federal Rules of Civil Procedure.

Courts may treat motions for reconsideration as a rule 59(e) motion when the movant files within twenty-eight days of a court's entry of judgment.  See Price v. Philpot, 420 F.3d at 1167 n.9.  If the movant files outside that time period, courts should treat the motion as seeking relief from judgment under rule 60(b).  See Price v. Philpot, 420 F.3d at 1167 n.9.  "[A] motion for reconsideration of the district court's judgment, filed within [rule 59's filing deadline], postpones the notice of appeal's effect until the motion is resolved."  Jones v. United States, 355 F. App'x 117, 121 (10th Cir. 2009)(unpublished).[3]  Rule 59(e)'s time limit is now twenty-eight days from the entry of a judgment.  See Fed. R. Civ. P. 59(e).

Whether a motion for reconsideration should be considered a motion under rule 59 or rule 60 is not only a question of timing, but also "depends on the reasons expressed by the movant." Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc., 680 F.3d 1194,

---

[3]Jones v. United States is an unpublished opinion, but the Court can rely on a United States Court of Appeals for the Tenth Circuit unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. [. . .] However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citing In re Citation of Unpublished Opinions/Ords. & Judgments, 151 F.R.D. 470 (10th Cir. 1993)).  The Court concludes that Jones

1200 (10th Cir. 2011).   Where the motion "involves 'reconsideration of matters properly

encompassed in a decision on the merits,'" a court considers the motion under rule 59(e).  Phelps

v. Hamilton, 122 F.3d 1309, 1324 (10th Cir. 1997)(quoting Martinez v. Sullivan, 874 F.2d 751,

753 (10th Cir. 1989)).   In other words, if the reconsideration motion seeks to alter the district

court's substantive ruling, then it should be considered a rule 59 motion and be subject to rule 59's

constraints.  See Phelps v. Hamilton, 122 F.3d at 1324.  In contrast, under rule 60,

> [o]n motion and just terms, the court may relieve a party or its legal representatives
> from a final judgment, order, or proceeding for the following reasons:
>
> > (1)     mistake, inadvertence, surprise, or excusable neglect;
> >
> > (2)     newly discovered evidence that, with reasonable diligence, could
> > not have been discovered in time to move for a new trial under Rule 59(b);
> >
> > (3)     fraud (whether previously called intrinsic or extrinsic),
> > misrepresentation, or misconduct by an opposing party;
> >
> > (4)     the judgment is void;
> >
> > (5)     the judgment has been satisfied, released or discharged; it is based
> > on an earlier judgment that has been reversed or vacated; or applying it
> > prospectively is no longer equitable; or
> >
> > (6)     any other reason that justifies relief.

Fed. R. Civ. P. 60(b).  Neither a rule 59 nor a rule 60 motion for reconsideration

> are []appropriate vehicles to reargue an issue previously addressed by the court
> when the motion merely advances new arguments, or supporting facts which were
> available at the time of the original motion. . . .  Grounds warranting a motion to
> reconsider include (1) an intervening change in the controlling law, (2) new

---

v. United States has persuasive value with respect to material issues in this case, and will assist the
Court in its preparation of this Memorandum Opinion and Order.

evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice.

Servants of the Paraclete v. Does, 204 F.3d at 1012.  "[A] motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law."  Servants of the Paraclete v. Does, 204 F.3d at 1012.  A district court has considerable discretion in ruling on a motion to reconsider.  See Phelps v. Hamilton, 122 F.3d at 1324.

Rule 60 authorizes a district court to, "[o]n motion and just terms, . . . relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons," including "any other reason that justifies relief."  Fed. R. Civ. P. 60(b).  A court cannot enlarge the time for filing a rule 59(e) motion.  See Brock v. Citizens Bank of Clovis, 841 F.2d 344, 348 (10th Cir. 1988)(holding that district courts lack jurisdiction over untimely rule 59(e) motions); Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp., No. CIV 11-0103, 2012 WL 869000, at *2 (D.N.M. March 8, 2012)(Browning, J.)("The Court may not extend the time period for timely filing motions under Rule 59(e).").  "A motion under rule 59 that is filed more than 28 days after entry of judgment may be treated as a Rule 60(b) motion for relief from judgment."  12 James Wm. Moore et al., Moore's Federal Practice § 59.11[4][b], at 59-32 (3d ed. 2012).  Nevertheless, a court will not generally treat an untimely rule 59(e) motion as a rule 60(b) motion when the party is seeking "'reconsideration of matters properly encompassed in a decision on the merits' contemplated by Rule 59(e)."  Jennings v. Rivers, 394 F.3d 850, 854 (10th Cir. 2005)(quoting Osterneck v. Ernst & Whinney, 489 U.S. 169, 174 (1989)).

Under some circumstances, parties can rely on rule 60(b)(1) for a mistake by their attorney or when their attorney acted without their authority.  See Yapp v. Excel Corp., 186 F.3d 1222, 1231 (10th Cir. 1999)("Rule 60(b)(1) motions premised upon mistake are intended to provide relief to a party . . . when the party has made an excusable litigation mistake or an attorney in the

litigation has acted without authority . . . .").  Mistake in this context entails either acting without the client's consent or making a litigation mistake, such as failing to file or to comply with deadlines.  See Yapp v. Excel Corp., 186 F.3d at 1231.  If the alleged incident entails a mistake, then it must be excusable, meaning that the party was not at fault.  See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 394 (1993); Cashner v. Freedom Stores, Inc., 98 F.3d 572, 577 (10th Cir. 1996)("If the mistake alleged is a party's litigation mistake, we have declined to grant relief under Rule 60(b)(1) when the mistake was the result of a deliberate and counseled decision by the party."); Pelican Prod. Corp. v. Marino, 893 F.2d 1143, 1146 (10th Cir. 1990)(holding that attorney carelessness is not a basis for relief under rule 60(b)(1)).

Courts will not grant relief when the mistake of which the movant complains is the result of an attorney's deliberate litigation tactics.  See Cashner v. Freedom Stores, Inc., 98 F.3d at 577.  This rule exists because a party

> voluntarily chose [the] attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have "notice of all facts, notice of which can be charged upon the attorney."

Link v. Wabash R.R., 370 U.S. 626, 633-34 (1962)(quoting Smith v. Ayer, 101 U.S. 320, 326 (1879)).  The Tenth Circuit has held that there is nothing "novel" about "the harshness of penalizing [a client] for his attorney's conduct" and has noted that "[t]hose who act through agents are customarily bound," even though, when "an attorney is poorly prepared to cross-examine an expert witness, the client suffers the consequences."  Gripe v. City of Enid, 312 F.3d 1184, 1189 (10th Cir. 2002).

Rule 60(b)(6) is a "'grand reservoir of equitable power to do justice in a particular case.'"  Van Skiver v. United States, 952 F.2d 1241, 1244 (10th Cir. 1991)(quoting Pierce v. Cook & Co.,

518 F.2d 720, 722 (10th Cir. 1975)).  "If the reasons offered for relief from judgment could be considered under one of the more specific clauses of Rule 60(b)(1)-(5), those reasons will not justify relief under Rule 60(b)(6)."  Moore et al., supra § 60.48[2], at 60-182.  Accord Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 863 n.11 (1988)("This logic, of course, extends beyond clause (1) and suggests that clause (6) and clauses (1) through (5) are mutually exclusive.").  "The Rule does not particularize the factors that justify relief, but we have previously noted that it provides courts with authority 'adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice,' . . . while also cautioning that it should only be applied in 'extraordinary circumstances.'"  Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. at 863-64 (first quoting Klapprott v. United States, 335 U.S. 601, 614-15 (1949); and then quoting Ackermann v. United States, 340 U.S. 193, 199 (1950)).

To warrant relief, the situation must, generally, be one beyond the control of the party moving under rule 60(b)(6).  See Ackermann v. United States, 340 U.S. at 202 ("The comparison [of prior precedent] strikingly points up the difference between no choice and choice; imprisonment and freedom of action; no trial and trial; no counsel and counsel; no chance for negligence and inexcusable negligence.  Subsection 6 of Rule 60(b) has no application to the situation of petitioner.").  Legal error that provides a basis for relief under rule 60(b)(6) must be extraordinary, as the Tenth Circuit discussed in Van Skiver v. United States:

> The kind of legal error that provides the extraordinary circumstances justifying relief under Rule 60(b)(6) is illustrated by Pierce [v. Cook & Co., 518 F.2d at 722]. In that case, this court granted relief under 60(b)(6) when there had been a post-judgment change in the law "arising out of the same accident as that in which the plaintiffs . . . were injured."  Pierce, 518 F.2d at 723.  However, when the post-judgment change in the law did not arise in a related case, we have held that "[a] change in the law or in the judicial view of an established rule of law" does not

> justify relief under Rule 60(b)(6).  <u>Collins v. City of Wichita</u>, 254 F.2d 837, 839
> (10th Cir. 1958).

<u>Van Skiver v. United States</u>, 952 F.2d at 1244-45 (first alteration added and second alteration in

<u>Van Skiver v. United States</u>).

### 2. <u>Motions to Reconsider Interlocutory Orders.</u>

Considerable confusion exists among the bar regarding the proper standard for a district

court to apply when ruling on a motion to reconsider one of its prior "interlocutory" or "interim"

orders, <u>i.e.</u>, an order that a district court issues while the case is ongoing, as distinguished from a

final judgment.  This confusion originates from the fact that neither the Federal Rules of Civil

Procedure nor the Federal Rules of Criminal Procedure mention motions to reconsider such

interlocutory orders, let alone set forth a specific procedure for filing them or a standard for

analyzing them.  A loose conflation in terminology in <u>Servants of the Paraclete v. Does</u>, which

refers to rule 59(e) motions in civil cases -- "motion[s] to alter or amend a <u>judgment</u>," Fed R. Civ.

P. 59(e)(emphasis added)(title case omitted) -- as "motions to reconsider,"[4] compounds this

---

[4]The Honorable Paul J. Kelly, Jr., United States Circuit Judge for United States Court of
Appeals for the Tenth Circuit, who authored <u>Servants of the Paraclete v. Does</u>, refers to rule 59(e)
motions as "motions to reconsider" several times throughout the opinion.  204 F.3d at 1005.  He
uses the term "motion to reconsider" as an umbrella term that can encompass three distinct
motions: (i) motions to reconsider an interlocutory order, which no set standard governs, save that
the district court must decide them "before the entry of . . . judgment," Fed. R. Civ. P. 54(b);
(ii) motions to reconsider a judgment made within twenty-eight days of the entry of judgment,
which the <u>Servants of the Paraclete v. Does</u> standard governs; and (iii) motions to reconsider a
judgment made more than twenty-eight days after the entry of judgment, which rule 60(b) governs.
There is arguably a fourth standard for motions to reconsider filed more than a year after the entry
of judgment, as three of the rule 60(b) grounds for relief expire at that point.
    Much confusion could be avoided by using the term "motion to reconsider" exclusively to
refer to the first category, "motion to amend or alter the judgment" exclusively to refer to the
second category, and "motion for relief from judgment" exclusively to refer to the third category
(and arguable fourth category).  These are the terms that the Federal Rules of Civil Procedure --
and other Courts of Appeals -- use to describe (ii) and (iii).  The Court agrees with Judge Kelly,
and all he likely meant by using motion to reconsider as an umbrella term is that, if a party submits
a motion captioned as a "motion to reconsider" after an entry of final judgment, the court should

baseline confusion.  <u>Servants of the Paraclete v. Does</u>, 204 F.3d at 1012.  Moreover, there is confusion surrounding how a motion to reconsider an interlocutory order relates to a district court's inherent power to revise its rulings prior to final judgement.  See <u>Warren v. Am. Bankers Ins. of FL</u>, 507 F.3d 1239, 1243 (10th Cir. 2007)(Baldock, J.)("Of course, a district court always has the inherent power to reconsider its interlocutory rulings, and we encourage a court to do so where error is apparent." (citing <u>K.C.1986 Ltd. P'ship v. Reade Mfg.</u>, 472 F.3d 1009, 1017 (8th Cir. 2007)).

Final judgments are different from interlocutory orders.  <u>See</u> Fed. R. Civ. P. 54(a) ("'Judgment' as used in these rules includes a decree and any order <u>from which an appeal lies</u>.")(emphasis added).  In addition to ripening the case for appeal, <u>see</u> 28 U.S.C. § 1291 ("The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts . . . ."), the entry of final judgment narrows the district court's formerly plenary jurisdiction over the case in three ways.  First, for the first twenty-eight days after the entry of a civil judgment, when the court can entertain motions under rules 50(b), 52(b), 59, and 60, the district court's jurisdiction trumps that of the Court of Appeals.  <u>See</u> Fed. R. App. P. 4(a)(4)(B).  Even if a party files a notice of appeal, the Court of Appeals will wait until after the district court has ruled on the post-judgment motion to touch the case.  <u>See</u> Fed. R. App. P. 4(a)(4)(B).  Second, after twenty-eight days, when the court may consider motions under rule 60, if a party has filed a notice of appeal, the Court of Appeals' jurisdiction trumps the district court's, and the district court needs

---

evaluate it under rule 59(e) or 60(b), as appropriate, rather than rejecting it as untimely or inappropriate.

the Court of Appeals' permission even to grant a rule 60 motion.  Third, after twenty-eight days, if no party has filed a notice of appeal, district courts may consider motions under rule 60.

Final judgments implicate two important concerns militating against giving district courts free reign to reconsider their judgments.  First, when a case is not appealed, there is an interest in finality.  The parties and the lawyers expect to go home, quit obsessing about the dispute, and put the case behind them, and the final judgment -- especially once the twenty-eight-day window of robust district court review and the thirty-day window of appeal have both closed -- is the disposition upon which they are entitled to rely.  Second, when a case is appealed, there is the need for a clean jurisdictional handoff from the district court to the Court of Appeals.  "[A] federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously," as doing so produces a "danger [that] a district court and a court of appeals w[ill] be simultaneously analyzing the same judgment."  Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58-59 (1982)(per curiam), superseded on other grounds by statute Fed R. App. P. 4(a)(4).

The Court of Appeals needs a fixed record on which to base its decisions -- especially given the collaborative nature of appellate decision-making -- and working with a fixed record requires getting some elbow room from the district court's continued interference with the case.  The "touchstone document" for this jurisdictional handoff is the notice of appeal and not the final judgment, see Griggs v. Provident Consumer Discount Co., 459 U.S. at 58 ("The filing of a notice of appeal is an event of jurisdictional significance -- it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."); Garcia v. Burlington N. R.R., 818 F.2d 713, 721 (10th Cir. 1987)("Filing a timely notice of appeal pursuant to Fed. R. App. P. 3 transfers the matter from the district court to the court of

appeals . . . .   The district court is thus divested of jurisdiction.  Any subsequent action by it is null

and void."  (citing Griggs v. Provident Consumer Discount Co., 459 U.S. at 58); Kirtland v. J. Ray

McDermott & Co., 568 F.2d 1166, 1170 (5th Cir. 1978)("[I]t is the filing of the appeal, not the

entering of a final judgment, that divests the district court of jurisdiction.")), but, because the final

judgment starts the parties' thirty-day clock for filing a timely notice of appeal, the Federal Rules

of Civil Procedure and the Tenth Circuit have chosen to curtail the district court's jurisdiction over

the case in the roughly month-long period of potentially overlapping trial- and appellate-court

jurisdiction that immediately follows the entry of final judgment, see Servants of the Paraclete v.

Does, 204 F.3d at 1009 (noting that post-final judgment motions at the district court level are "not

intended to be a substitute for direct appeal").  Rather than suddenly divesting the district court of

all jurisdiction over the case -- potentially resulting in the district court being unable to rectify

easily fixable problems with the final judgment before the case goes to the Tenth Circuit, or even

requiring appeal of a case that might otherwise not need to be appealed -- the Federal Rules of

Civil Procedure set forth a jurisdiction phased de-escalation process, wherein the district court

goes from pre-final judgment plenary jurisdiction, to limited review for the first twenty-eight days

post-final judgment, and, finally, to solely rule 60 review after twenty-eight days.  In defining the

"limited review" that rule 59(e) allows a district court to conduct in the twenty-eight-day flux

period, the Tenth Circuit, in Servants of the Paraclete v. Does, incorporates traditional law-of-the-

case grounds -- the same grounds that inform whether a court should depart from an appellate

court's prior decision in the same case -- into rule 59(e).  See United States v. Alvarez, 142 F.3d

1243, 1247 (10th Cir. 1998)(departing from the law-of-the-case doctrine in "three exceptionally

narrow circumstances: (1) when the evidence in a subsequent trial is substantially different;

(2) when controlling authority has subsequently made a contrary decision of the law applicable to

such issues; or (3) when the decision was clearly erroneous and would work a manifest injustice");

Servants of the Paraclete v. Does, 204 F.3d at 1012 (incorporating those grounds into rule 59(e)).

Neither of these concerns -- finality nor jurisdictional overlap -- is implicated when a district court reconsiders one of its own interlocutory orders.  The Federal Rules do not specifically mention motions to reconsider interlocutory orders, but rule 54(b) of the Federal Rules of Civil Procedure makes the following open-ended proclamation about their mutability:

> When an action presents more than one claim for relief -- whether as a claim, counterclaim, crossclaim, or third-party claim -- or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.  Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b) (emphases added).  Rule 54(b) thus provides that a district court can freely reconsider its prior rulings, and places no limit or governing standard on the district court's ability to do so, other than that it must do so "before the entry of a judgment."  Fed. R. Civ. P. 54(b).

The Tenth Circuit has not cabined district courts' discretion beyond what rule 54(b) provides: "[D]istrict courts generally remain free to reconsider their earlier interlocutory orders." Been v. O.K. Indus., Inc., 495 F.3d 1217, 1225 (10th Cir. 2007).  In the Tenth Circuit, "law of the case doctrine has no bearing on the revisiting of interlocutory orders, even when a case has been reassigned from one judge to another." Rimbert v. Eli Lilly & Co., 647 F.3d 1247, 1252 (10th Cir. 2011)(emphasis added)(citing Been v. O.K. Indus., Inc., 495 F.3d at 1225).  In this context, "the doctrine is merely a 'presumption, one whose strength varies with the circumstances.'"  Been v. O.K. Indus., Inc., 495 F.3d at 1225 (quoting Avitia v. Metro. Club of Chi., Inc., 49 F.3d 1219,

1227 (7th Cir. 1995)).[5]  In short, a district court can use whatever standard it wants to review a

motion to reconsider an interlocutory order.  It can review the earlier ruling de novo and essentially

_____

[5]As the Supreme Court has noted, "law of the case is an amorphous concept."  Arizona v. California, 460 U.S. 605, 618 (1983)(White, J.), decision supplemented, 466 U.S. 144 (1984).  The likely root cause of this amorphousness is the fact that, as Wright and Miller note, the "[l]aw-of-the-case doctrine seems to have exploded during the last few decades."  18B Charles Allen Wright & Arthur R. Miller, Federal Practice & Procedure § 4478 (3d ed. 2023 update).  Owing to this explosion, the term is used offhandedly in a variety of different ways.  As one commentator has noted, the phrase is "liberally bandied about in federal court."  John R. Knight, The Law of the Case Doctrine: What Does It Really Mean?, Fed. Law., Oct. 1996, at 8.  In the Court's view, the term's uses fall into two broad categories.  For ease of reference, the Court will refer to these two categories as the traditional and the contemporary.

The traditional law-of-the-case doctrine is suggested by the proposition -- which the main text above cites -- that the law of the case doctrine "has no bearing on [a trial judge's] revisiting of interlocutory orders, even when a case has been reassigned from one judge to another."  Rimbert v. Eli Lilly & Co., 647 F.3d at 1252.  See Keepseagle v. Perdue, 856 F.3d 1039, 1048 (D.C. Cir. 2017)(stating that "the law-of-the-case doctrine 'does not apply to interlocutory orders'" (quoting First Union Nat. Bank v. Pictet Overseas Tr. Corp., 477 F.3d 616, 620 (8th Cir. 2007))).  This understanding accords with the historical articulation of the law-of-the-case-doctrine, which posits that the doctrine deals with the relationship between an appellate ruling of law and that ruling's subsequent preclusive nature of on subsequent parts of that case -- whether at the district court level or in a subsequent appeal:

> The law of the case, an . . . American doctrine, requires that rulings of law made by an appellate court in remanding a case for further proceedings be considered binding in all subsequent stages of the litigation, including a second appeal to the same appellate court.[]  The doctrine has two distinct aspects -- the effect of the statements of law on the lower court, and the effect of those rulings on the appellate court itself in a later appeal.

Note, Successive Appeals and the Law of the Case, 62 Harv. L. Rev. 286, 286 (1948).  See Note, The Law of the Case, 42 Harv. L. Rev. 938, 938 (1929)(describing the law-of-the-case as "the decision of an appellate court resulting in a remand for a new trial is binding on the parties in all subsequent stages of the litigation, and is conclusive in the event of a second appeal to the same court");  Casenote, Judgments-Stare Decisis-Res Judicata-Law of the Case, 29 Yale L.J. 568, 568 (1920)("[B]y the great weight of authority, all questions when decided by a court of final resort on the first appeal become the law of the case and are not subject to review on the second appeal").  Indeed, the case law from the early twentieth century focuses the doctrinal understanding of law-of-the-case on appellate court rulings' preclusive effect:

> Matters decided on appeal become the law of the case to be followed in all subsequent proceedings in the trial court and in the appellate court where the evidence is substantially the same, and the introduction of new evidence in the

_____

second trial which is merely cumulative does not change the rule.

State of Kansas ex rel. Beck v. Occidental Life Ins. Co., 95 F.2d 935, 936 (10th Cir. 1938)(Bratton, J.). See Jones v. Box Elder Cnty., Utah, 67 F.2d 900, 900 (10th Cir. 1933)(Bratton, J.); Town of Fletcher v. Hickman, 208 F. 118, 121 (8th Cir. 1913). The footnote that accompanies unpublished orders and judgments entered by the Tenth Circuit reflects this traditional meaning of law-of-the-case: "This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel." E.g., United States v. Talbot, No. 23-8025, 2024 WL 2013910, at *1 (10th Cir. May 7, 2024).

As Professor Ted Occhialino notes, this traditional law-of-the-case understanding, which focuses on the preclusive effect of appellate court rulings, differs from the "related questions [that] arise about the power of a trial judge to revisit and change his/her earlier, non-final rulings or of the power of a successor trial judge to revisit and change earlier non-final rulings of a predecessor trial judge." Ted Occhialino, Civil Procedure II, vol. 1 at 16, Univ. of N.M. (2022). This "related" issue is the second sense in which the phrase "law-of-the-case" is used -- what the Court calls the "contemporary" sense. This category of the doctrine arises from the same basic principle as the traditional sense, namely, that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Arizona v. California, 460 U.S. at 618. The contemporary version of the law-of-the-case doctrine, however, focuses this principle on a trial court's own rulings, with no intermediation of an appellate ruling. Used in this contemporary sense, the law-of-the-case doctrine is a reflection of the oft-noted principle that trial courts should accord some degree of presumption against the "perpetual reexamination" of its own prior non-final rulings. Wright & Miller, supra, at § 4478. It is for this reason that the Tenth Circuit notes that, in the context of a trial court reviewing its own non-final rulings, the "presumption" that "prior judicial decisions on rules of law govern the same issues in subsequent phases of the same case," is accorded less weight than it is in the traditional law-of-the-case context. Been v. O.K. Indus., Inc., 495 F.3d 1224.

In sum, while it is true that the traditional law-of-the-case doctrine "has no bearing on the revisiting of interlocutory orders, even when a case has been reassigned from one judge to another," Rimbert v. Eli Lilly & Co., 647 F.3d at 1252, the contemporary usage of the term, which is more capacious and less restrictive, retains currency in the context of a trial court's review of its own non-final rulings. As the United States Court of Appeals for the Ninth Circuit has noted, when used in its contemporary sense:

> The . . . argument that the law of the case doctrine does not apply to interlocutory orders which are not immediately appealable is meritless. The law of the case doctrine is a discretionary one created to maintain consistency and avoid reconsideration, during the course of a single continuing lawsuit, of those decisions that are intended to put a matter to rest. Law of the case is not synonymous with preclusion by final judgment.

Pit River Home & Agr. Co-op. Ass'n v. United States, 30 F.3d 1088, 1097 (9th Cir. 1994). The Tenth Circuit also acknowledges this contemporary principle in Been v. O.K. Indus., Inc., 495 F.3d at 1224, despite holding elsewhere that the doctrine "has no bearing on the revisiting of interlocutory orders, even when a case has been reassigned from one judge to another," Rimbert

reanalyze the earlier motion from scratch, it can review the ruling de novo but limit its review, it can require parties to establish one of the law-of-the-case grounds, or it can refuse to entertain motions to reconsider altogether.

The best approach, in the Court's eyes, is to analyze motions to reconsider differently depending on three factors. Cf. Been v. O.K. Indus., Inc., 495 F.3d at 1225 ("[T]he doctrine is merely a 'presumption, one whose strength varies with the circumstances.'")(quoting Avitia v. Metro. Club of Chicago, Inc., 49 F.3d at 1227). First, the Court should restrict its review of a motion to reconsider a prior ruling in proportion to how thoroughly the earlier ruling addressed the specific findings or conclusions that the motion to reconsider challenges. How "thoroughly" the Court addresses a point depends both on the amount of time and energy that the Court spent on these finding and conclusions, and on the amount of time and energy the parties spent on them -- in briefing and orally arguing the issue, but especially if they developed evidence on the issue. A movant for reconsideration thus faces a steeper uphill challenge when the prior ruling was on a criminal suppression motion, class certification motion, or preliminary injunction,[6] than

---

v. Eli Lilly & Co., 647 F.3d at 1252. This confusion, as the Court has explained here, results from slippery terminology.

   [6]The Court typically makes findings of fact and conclusions of law in ruling on these motions. At first glance, it appears that the Federal Rules of Civil Procedure set forth additional standards -- beyond that which applies to other interlocutory orders -- for amending findings of fact and conclusions of law: "**Amended or Additional Findings.** On a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings -- or make additional findings -- and may amend the judgment accordingly. The motion may accompany a motion for a new trial under Rule 59." Fed. R. Civ. P. 52(b) (bold in original). This rule appears to limit motions to reconsider orders with findings of fact and conclusions of law to twenty-eight days. The rule's use of the term "entry of judgment," its reference to rule 59, and its adoption of the same time period that applies to motions to alter or amend a judgment, all lead the Court to conclude, however, that rule 52(b) -- and its 28-day time limit -- does not apply to interlocutory orders. The time limit applies only to findings of fact and conclusions of law supporting a case-ending judgment -- such as those entered after a bench trial -- and to those giving rise to an interlocutory appeal that, if filed, divest the district court of its jurisdiction -- such as those entered in support of a preliminary injunction.

when the prior ruling is, e.g., a short discovery ruling.  The Court also should look, not to the prior ruling's overall thoroughness, but to the thoroughness with which the Court addressed the exact point or points that the motion to reconsider challenges.  A movant for reconsideration thus faces an easier task when he or she files a targeted, narrow-in-scope motion asking the Court to reconsider a small, discrete portion of its prior ruling than when he or she files a broad motion to reconsider that rehashes the same arguments from the first motion, and essentially asks the Court to grant the movant a mulligan on its earlier failure to present persuasive argument and evidence.

Second, the Court should consider the case's overall progress and posture, the motion for reconsideration's timeliness relative to the ruling it challenges, and any direct evidence the parties may produce, and use those factors to assess the degree of reasonable reliance the opposing party has on the Court's prior ruling.  See 18B Charles Alan Wright, et al., Federal Practice & Procedure § 4478.1, at 695-96 (2d ed. 2002)("Stability becomes increasingly important as the proceeding nears final disposition . . . .  Reopening should be permitted, however, only on terms that protect against reliance on the earlier ruling.").  For example, if a defendant (i) spends tens of thousands of dollars removing legacy computer hardware from long-term storage; then (ii) obtains a protective order in which the Court decides that the defendant need not produce the hardware in discovery; then (iii) returns the hardware to long-term storage, sustaining thousands more in expenses; and (iv) several months pass, then the plaintiffs should face a higher burden in moving the Court to reconsider its prior ruling than they faced in fighting the motion for protective order the first time.

Third, the Court should consider the Servants of the Paraclete v. Does grounds.  The Court should be more inclined to grant motions for reconsideration if the movant presents (i) new controlling authority -- especially if the new authority overrules prior law or sets forth an entirely

new analytical framework; (ii) new evidence -- especially if the movant has a good reason why the evidence was not presented the first time around; or (iii) a clear indication -- one that manifests itself without the need for in-depth analysis or review of the facts -- that the Court erred.

These three factors should influence the degree to which the Court restricts its review of a prior ruling, but they do not necessarily mean that the Court always should apply a deferential standard of review.  The Court should pause before applying a standard of review to its own interlocutory orders that is more deferential than the standard that the Court of Appeals will apply to it, unless the Court concludes that the alleged error in the prior ruling is harmless, or that the party moving for reconsideration waived its right to appeal the alleged error by not raising the appropriate argument.  Even in circumstances where the Court concludes that it is insulated from reversal on appeal, there are principled reasons for applying a de novo standard.  After all, if the Court was wrong in its earlier decision, then, generally speaking, it is unjust to maintain that result -- although the Court should weigh this injustice against any injustice that would result from upending the parties' reliance on the earlier ruling, which is the balancing test that the three factors above represent.

What the Court means by "restricting its review" is less about applying a deferential standard of review -- although that may be appropriate in some circumstances -- and more about reducing (i) the depth of the Court's analysis the second time around -- thus conserving judicial resources; and (ii) the impositions that relitigation of the prior ruling will impose on the party opposing the motion for reconsideration.  The Court should consider the time and expense that the party opposing reconsideration spent in winning the earlier ruling and should try to prevent that party from having to bear the same impositions again.  Even if the Court ultimately analyzes a motion to reconsider under the same standard that it analyzed the motion that produced the earlier

ruling, it should analyze the motion in a different way -- one focused on reducing the litigation burdens of the party opposing reconsideration. For example, when a party moves the Court for a preliminary injunction, standard practice is that the Court holds an evidentiary hearing as a matter of course, regardless whether it looks as if the party has a good chance of prevailing. If the party loses, and the Court denies the injunction, however, and the party moves for reconsideration, the party should not be entitled to the presumption of an evidentiary hearing merely because he or she received that presumption the first time the Court considered the motion.

In light of these statements, it is perhaps better to characterize the increased burden that a movant for reconsideration faces as one of production and not of persuasion. The Court analyzes motions to reconsider by starting where it stopped in the prior ruling and not by starting anew. Parties opposing reconsideration can do the same, and they may stand on whatever evidence and argument they used to win the earlier ruling. Movants for reconsideration, on the other hand, carry the full burden of production: they must persuade the Court, using only the evidence and argument they put before it, that it should change its prior ruling; they must do all of the legwork, and not rely on the Court to do any supplemental fact-finding or legal research; and they must refute convincingly both the counterarguments and evidence that the opposing party used to win the prior ruling and any new arguments and evidence that the opposing party produces while opposing the motion to reconsider. Unlike the motion that produced the prior ruling, a motion to reconsider is not -- and is not supposed to be -- a fair fight procedurally. The deck is stacked against a movant for reconsideration, and if such a movant hopes to prevail, he or she must have not only a winning legal position, but the work ethic and tenacity to single-handedly lead the Court to his or her way of thinking. See Rivero v. Bd. of Regents of Univ. of N.M., 2019 WL 1085179, at *55-62; New

Mexico v. Valley Meat Co., No. CIV 14-1100, 2015 WL 9703255, at *16-22 (D.N.M. December 14, 2015)(Browning, J.).

## ANALYSIS

The Court denies Sandoval's oral motion to reconsider, denies Sandoval's request that the Court sentence Sandoval to a sentence of probation, and sentences Sandoval to the Federal Bureau of Prisons' custody for a term of 15 months, followed by three years of supervised release. To explain these conclusions, the Court divides its analysis into two parts. First, the Court explains its conclusion that it will not change its determinations of relevant conduct under U.S.S.G. § 1B1.3 for the purpose of calculating the total loss under U.S.S.G. § 2B1.1(b). Second, the Court assesses and describes the various factors that lead the Court to sentence Sandoval at the bottom of his Guidelines range. In the second section of its analysis, the Court also explains why the Court will not impose a fine in this case.

## I.    THE COURT DENIES SANDOVAL'S ORAL MOTION TO CHANGE THE COURT'S CONCLUSIONS REGARDING HIS TOTAL LOSS FOR U.S.S.G. § 2B1.1'S PURPOSES.

First, the Court considers Sandoval's invitation to reconsider its conclusion from the Objections MOO regarding the total loss amount that came from "payments made to Mr. Sandoval's ex-wife and her children who are in her custody." Tr. at 3:18-20 (Harrison). As noted above, at the sentencing hearing on February 13, 2024, Sandoval argues that, at the Court's first sentencing hearing on March 16, 2023, "the evidence was that the statements that were made in order to procure those benefits were, in fact, made by Ms. Gonzales, Mr. Sandoval's ex-wife, and not him," and that Sandoval "was not aware that those had been applied for and made." Tr. at 4:3-11 (Harrison). Accordingly, Sandoval argues, the monies received by his children cannot count towards his total loss for U.S.S.G. § 2B1.1's purposes, because the conduct that led to the receipt of these funds was not part of the same scheme or course of conduct. See Tr. at 3:25-5:6

(Harrison); U.S.S.G. § 1B1.3(a)(2).   Sandoval's Sentencing Memo. at 5-8 also forwards this argument.   See Procedural Background, supra, at 16.

The Court already has considered thoroughly this argument in the Objections MOO.   See Objections MOO at 30-37.   There, the Court considered Sandoval's argument that, because the United States had not substantiated the PSR's loss amount of $182,735.10, in part because,

> the Government has never offered -- nor does the PSR contain -- any proof whatsoever that Roseann Gonzales received benefits for her children in violation of a criminal statute.  The federal regulations lay out several circumstances in which a child will be entitled to benefits even if her parent's disability benefits terminate. *See, e.g.*, 20 C.F.R. § 404.350, 404.351, 404.352.  None of those circumstances has been addressed here, nor has the Government ever addressed whether "credits against loss" or other reductions could be available based on the conduct of Ms. Gonzales or her children.  *Cf.* USSG § 2B1.1 cmt. n.3(E).

Defendant's Objections to Presentence Investigation Report at 3, filed March 7, 2023 (Doc. 99)("Objections").   In the Objections MOO, the Court disagrees with this argument, first stating:

> Sandoval's monthly receipt of government benefits, whether through Social Security or Medicare payments, and whether for his own benefit or that of his family members, had a common victim in the SSA, a common purpose in securing benefits to which Sandoval was not entitled, and similar modus operandi in Sandoval's making false statements to the SSA.

Objections MOO at 35.   Accordingly, the Court concludes that this money is relevant conduct for Guidelines purposes, see Objections MOO at 33-35; United States v. Griffith, 584 F.3d 1004, 1011-12 (citing U.S.S.G. §§ 1B1.3, 1B1.2(b)), and also that Sandoval's family member's receipt of these benefits is part of Sandoval's ongoing scheme and constitutes a criminal offense under federal law, see Objections MOO at 36-37; United States v. Kieffer, 681 F.3d 1143, 1168 (10th Cir. 2012)(Baldock, J.).   The Court specifically states that the "scheme" in question here is "his years-long effort to receive, on a monthly basis, benefits from the SSA to which he was not entitled."   Objections MOO at 36.   The Court makes this conclusion by a preponderance of the

evidence.  See Objections MOO at 36; United States v. Kieffer, 681 F.3d at 1168.  Accordingly, after an evidentiary hearing and responsive briefing on this issue, see United States' Response to Defendant's Objections to Presentece [sic] Investigation Report, filed March 14, 2023 (Doc. 103), the Court -- in the Objections MOO -- "concludes that the United States meets its burden in establishing that Sandoval's actions caused the SSA to incur a total loss of $182,735.10 and overrules Sandoval's Objection."  Objections MOO at 37.

As noted above, see Law Regarding Motions to Reconsider, supra, at 48-54, the Court has "inherent power" to revise its non-final interlocutory rulings before final judgement.  Warren v. Am. Bankers Ins. of FL, 507 F.3d at 1243.  This power implicates the contemporary law-of-the-case doctrine, under which "the doctrine is merely a 'presumption, one whose strength varies with the circumstances.'"  Been v. O.K. Indus., Inc., 495 F.3d at 1225 (quoting Avitia v. Metro. Club of Chi., Inc., 49 F.3d 1219, 1227 (7th Cir. 1995)).  See Law Regarding Motions to Reconsider, supra, at 49 n.5.  As noted above, in considering whether the Court will deploy this inherent power and revisit a prior ruling according to varying circumstances, the Court considers three nonsequential factors: (i) the Court restricts its review of a motion to reconsider a prior non-final ruling in proportion to how thoroughly the earlier ruling addressed the specific findings or conclusions that the motion to reconsider challenges; (ii) the case's overall progress and posture, the motion for reconsideration's timeliness relative to the ruling it challenges, and any direct evidence the parties may produce, and use those factors to assess the degree of reasonable reliance the opposing party has on the Court's prior ruling; and (iii) the Servants of the Paraclete v. Does grounds, which include: (a) new controlling authority -- especially if the new authority overrules prior law or sets forth an entirely new analytical framework; (b) new evidence -- especially if the movant has a good reason why the evidence was not presented the first time around; and (c) a clear

indication -- one that manifests itself without the need for in-depth analysis or review of the facts -- that the Court erred.  See Law Regarding Motions to Reconsider, supra, at 50-52.  After considering carefully these factors, the Court concludes that it will not alter its previous conclusions regarding whether payments to Sandoval's ex-wife on behalf of his children may be counted towards his total loss for U.S.S.G. § 1B1.3's purposes.

On the first factor, the Court concludes that its earlier treatment of this specific issue, in the Objections MOO, is thorough and well-reasoned.  As the Court noted at the sentencing hearing when overruling Sandoval's request to reconsider, "I think I've considered that as thoroughly as I can." Tr. at 5:22-23 (Court).  On the second factor, Sandoval made his motion to reconsider at the sentencing hearing, moments before the sentence was to be imposed.  As Miller and Wright note, "[s]tability becomes increasingly important as the proceeding nears final disposition."  Wright and Miller, supra, § 4478.1, at 695-96.  The Objections MOO was filed on August 29, 2023, over five-and-a-half months before the sentencing hearing.  See Objections MOO at 1.  Last, on the third factor, in support of his motion to reconsider, Sandoval makes the same points as he did in the first sentencing hearing, namely, that "the evidence was that the statements that were made in order to procure those benefits were, in fact, made by Ms. Gonzales, Mr. Sandoval's ex-wife, and not him," and that Sandoval "was not aware that those had been applied for and made." Tr. at 4:3-11 (Harrison).  Compare id. with Draft Transcript of March 16, 2023, Hearing at 65:9-68:24 (held March 16, 2023)(Harrison).  He cites no new case law that bears on this issue, and nor does he provide any new evidence that he did not have at the time that the Court ruled on the Objections MOO.  In sum, the Court declines to alter the conclusions that the Court reached in the Objections MOO regarding the total loss amount that came from "payments made to Mr. Sandoval's ex-wife

and her children who are in her custody."  Tr. at 3:18-20 (Harrison).[7]

## II.   **A SENTENCE AT THE LOW END OF THE GUIDELINES RANGE IS APPROPRIATE IN SANDOVAL'S CASE.**

As the Court explained at the sentencing hearing, after the application of the new U.S.S.G. § 4C1.1 adjustment for "Zero-Point" offenders, Sandoval's total offense level is 14, and with a criminal history category of I, his Guidelines imprisonment range is 15 to 21 months.  See Tr. at 6:2-10 (Court); U.S.S.G. Ch.5, Pt.A, Sentencing Table.   As noted above, see Procedural Background, supra, at 24-25, there are fourteen factors that put downward pressure on the sentence to take it outside of the guideline range.  See Tr. at 34:16-18 (Court).  First, the Court considers the need for the sentence imposed to reflect the seriousness of the offense, see 18 U.S.C. § 3553(a)(2)(A), and recognizes that Sandoval's offense is non-violent.  Second, the Court is cautious and mindful that Sandoval's sentence should not overstate the gravity of the offense.

Third, the Court acknowledges Sandoval's poor health, which plays into the Court's consideration of the "history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).

---

[7]This analysis has focused on the issue that Sandoval specifically raised during his February 13, 2024, sentencing hearing, where Sandoval asked the Court to "reconsider" its previous ruling that payments made to Ms. Gonzales are to be counted towards the "loss" pursuant to U.S.S.G. § 2B1.1(b).  Tr. at 4:12-16 (Harrison).  The Court notes, however, that Sandoval also makes this argument in the Sandoval's Sentencing Memo.  See Sandoval's Sentencing Memo. at 5-8.  Moreover, Sandoval's Sentencing Memo. also argues that two other categories of monies -- Sandoval's Medicare benefits, and benefits received before June, 2017, or after February, 2020 -- are also not proper additions to his "loss" amount pursuant to U.S.S.G. § 2B1.1(b).  See Sandoval's Sentencing Memo. at 2-5 ("Medicare benefits cannot be counted toward the total loss here."); id. at 8-11 ("Benefits received before June 2017 or after February 2020 can't be counted.").  The Court also considered these arguments in the Objections MOO, see Objections MOO at 30-38, and thus, to the extent that the Court construes Sandoval's Sentencing Memo. as an invitation to reconsider its conclusions regarding Medicare benefits and benefits received outside of the charging period, the Court does not revisit those conclusions.  The Court considered thoroughly these issues in the Objections MOO, and Sandoval presents no new case law that bears on this issue, and nor does he provide any new evidence that he did not have at the time that the Court ruled on the Objections MOO.

Fourth, and relatedly, although the Court does not depart downward on the basis of Sandoval's "[p]hysical condition" pursuant to U.S.S.G. § 5H1.4, this provision reflects a policy that an individual's physical condition can be taken into account in sentencing, and the Court concludes that, although a departure is not appropriate under this case's facts and circumstances, this factor nevertheless puts downward pressure on the sentence.  See U.S.S.G. § 5H1.4 ("Physical condition or appearance, including physique, may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines.").  Fifth, the Court concludes that these health-related factors also feed into the 18 U.S.C. § 3553(a) factor of the "need for the sentence imposed . . . to provide just punishment for the offense," and sixth, the Court also takes into account the idea that Sandoval's poor health may reduce his likelihood to reoffend, see 18 U.S.C. § 3553(a)(2)(B).  Seventh, and also part-and-parcel of Sandoval's health concerns, is Sandoval's need for a lung transplant, see PSR ¶ 71, at 15, which the Court recognizes is less likely to occur if Sandoval is incarcerated, see Tr. at 36:7-11 (Court).

Eighth, the Court concludes that Sandoval might have positive outcomes on supervised release.  Ninth, and relatedly, the Court considers the opportunities for Sandoval on supervised release -- including opportunities for education, training, and care to help him address the problems that have brought him before the criminal justice system -- and concludes that this fact applies downward pressure on Sandoval's Guidelines sentence.  See 18 U.S.C. § 3553(a)(2)(D).   Tenth, the Court concludes that Sandoval's lack of other recent criminal history is a factor which applies downward pressure on the sentence.  See 18 U.S.C. § 3553(a)(1).  Eleventh, the Court considers the fact, which the United States Probation Office provides in its Second Addendum to the

Presentence Report at 1, filed November 17, 2023 (Doc. 119)("Second Addendum"), that, "[d]uring the last five fiscal years (FY2018-2022), there were 442 defendants whose primary guideline was § 2B1.1, with a Final Offense Level of 14 and a Criminal History Category of I," and twenty percent of those individuals did not receive a sentence of imprisonment, Second Addendum at 1.[8]

Twelfth, although the Court ultimately rejects Sandoval's request for a departure pursuant to U.S.S.G. § 5C1.1, cmt. app. n.10(B) -- because the Court concludes that Sandoval's Guidelines sentencing range does not overstate the gravity of his offense -- the Court considers the policy that underlies this basis for departure, and concludes that this policy is a factor that applies downward pressure on Sandoval's Guidelines sentencing range.   Thirteenth, and relatedly, the Count concludes that Sandoval's status as a "Zero Point" offender under U.S.S.G. § 4C1.1, and the policy underlying that recent amendment to the Guidelines, puts downward pressure on the sentence. Fourteenth, and last, the Court considers that Sandoval's risk of serious complications from the coronavirus, which he may be more susceptible to contracting while incarcerated than on supervised release.  See Sandoval's Sentencing Memo. at 17.  This fact, although speculative, applies some downward pressure on the Guideline sentence range.

On the other hand, as the Court also noted at the sentencing hearing, there are twenty-seven factors that apply upward pressure on Sandoval's sentence to keep it in the Guidelines range of 15 to 21 months.  See Tr. at 36:12-14 (Court).  The Court acknowledges that some factors are present to some extent on both sides of the ledger, and there is some overlap.  The first four upward-pressure factors relate to "the nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1),

---

[8]This calculation does not include individuals "who received a §5K1.1 substantial assistance departure."  Second Addendum at 1.

and the "need for the sentence imposed . . . to reflect the seriousness of the offense," 18 U.S.C. § 3553(a)(2)(A). First, the Court concludes that the length of the fraud at issue in this case, which was undertaken over years, applies upward pressure on the sentence. Second, the Court considers the repetitious nature of the fraud, which required continuing instances of deception over many years. Third, as the Court stated on the record at the sentencing hearing, that "our society and Congress has decided that people should be punished for taking money fraudulently," also reflects the seriousness of the offense. Tr. at 36:19-21 (Court). Fourth, the Court also considers that the crime in this case involves stealing money from a public assistance program intended for some of our society's most vulnerable individuals, a fact that the Court concludes puts upward pressure on the sentence, because of the particular "circumstance[] of the offense." 18 U.S.C. § 3553(a)(1).

Fifth, the Court considers that, over the last five years, an overwhelming percentage -- eighty percent -- of the "442 defendants whose primary guideline was § 2B1.1, with a Final Offense Level of 14 and a Criminal History Category of I," received a sentence of incarceration, "in whole or in part." Second Addendum at 1.[9] See Tr. at 36:21-23 (Court). Sixth, the Court considers the need for the sentence imposed "to promote respect for the law," 18 U.S.C. § 3553(a)(2)(A), a factor which, in the Court's view, tilts the scales in favor of a Guidelines sentence in this case. Seventh, and also related to the need for the sentence imposed "to promote respect for the law," 18 U.S.C. § 3553(a)(2)(A), the Court factors the need to acknowledge -- through the imposition of a Guidelines sentence -- that our justice system takes financial crimes seriously, and that the harm to the public is not insignificant or trivial. Eighth, with respect to the general policy of the Commission, the Court considers that a sentence within the Guidelines range

---

[9]Again, this calculation does not include those defendants "who received a § 5K1.1 substantial assistance departure." Second Addendum at 1.

reflects the punishment that the Commission -- and by extension of its delegated authority, Congress -- has endorsed for this offense.

Ninth, the Court considers the "need for the sentence imposed . . . to afford adequate deterrence to criminal conduct," and concludes that this factor puts upward pressure on the sentence to keep it within the Guidelines range.  18 U.S.C. § 3553(a)(2)(B).  Tenth, and more specifically, the Court weights the need to afford adequate general deterrence, and the need to demonstrate that "these crimes have to be punished . . . [,] the public has to be protected, and the public purse has to be protected," Tr. at 37:4-11 (Court).  Eleventh, and relatedly, the Court weights the general deterrence-related need to protect the public from individuals who seek to defraud public assistance programs.  Twelfth, as for specific deterrence, the Court factors the need to discourage and prevent Sandoval from undertaking further fraudulent activity.  Thirteenth, the court weights the need to avoid unwarranted sentencing disparities, which the Guidelines -- calculated objectively according to impersonal standards -- promote.

The Court also considers a variety of health-related factors that apply upward pressure to keep Sandoval's sentence within the Guidelines range.  Fourteenth, the Court acknowledges that, while Sandoval's need for a lung transplant applies downward pressure to his sentence, "at the same time I think we know that it's very speculative right now as to [whether] it will ever occur and when it will occur," and this uncertainty weighs in favor of a Guidelines sentence.  Tr. at 37:20-23 (Court).  Fifteenth, while the Court gives some weight the fact that while Sandoval might be at a greater risk for contracting the coronavirus while incarcerated, that downward pressure "is mitigated by the fact that you can get COVID in New Mexico in various situations, not just because you're in prison." Tr. 38:1-11 (Court).   Sixteenth, Sandoval's health condition is not new; he has dealt with these issues -- by his own account -- "for about 15 years."  PSR ¶ 71, at 15.  Seventeenth,

the Court considers that Sandoval's health condition did not prevent him from carrying on the lengthy fraud at issue in this case, and, relatedly, eighteenth and nineteenth, Sandoval's health condition did not prevent him from running his business, nor did his health prevent him from working hard at his business, which "undercuts to some degree the medical condition which does put downward pressure," Tr. at 38:22-23 (Court).  Twentieth, the Court considers that -- even by Sandoval's own account, see Sandoval's Sentencing Memo. at 14 -- the Bureau of Prisons has facilities that can accommodate Sandoval's needs, and weighs this factor in favor of keeping Sandoval's sentence within the Guidelines range.

Twenty-first, and on a general level, 18 U.S.C. § 3553(a)(4)(A) instructs the Court to consider "the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines," and the Court notes that the Guidelines range indicates a sentence of imprisonment.  Twenty-second, the Court notes that, given the total monetary loss at issue in this case, Sandoval's base offense level is subject a 10-point increase pursuant to U.S.S.G. § 2B1.1(b)(1)(F), and the Court weighs this fact as a factor which indicates the seriousness of this offense and applies upward pressure on the sentence to keep it within the Guidelines range. Twenty-third, and relatedly, the Court considers that U.S.S.G. § 2B1.1(b)(1)'s specific offense characteristic increases associated with monetary loss indicate a general policy within the Guidelines reflects that financial crimes involving high loss amounts are to be punished accordingly with increased offense levels.  Twenty-fourth, the Court considers the need to impose a reasonable sentence, and twenty-fifth, the Court considers the need to impose a sentence which reflects the 18 U.S.C. § 3553(a) factors, both of which lean the Court in the direction of imposing a sentence within the Guidelines range. Twenty-sixth, the Court concludes that, based on this case's facts and circumstances, a Guidelines sentence likely reflects a sentence that is sufficient,

but not greater than necessary, to comply with the sentencing purposes set forth in 18 U.S.C. § 3553(a)(2). Finally, the twenty-seventh factor that the Court concludes applies upward pressure on the sentence to keep it within the Guidelines range is that, as indicated by the fact that Sandoval has not received a decrease in his offense level pursuant to U.S.S.G. § 3E1.1, Sandoval "has not clearly demonstrated acceptance of responsibility for the offense." PSR ¶ 49, at 10. While the Court would never punish a criminal defendant for holding the United States to its Constitutional obligation to prove its case beyond a reasonable doubt at a jury trial, the Court also is not required to close its eyes to the evidence and to the fraud that Sandoval committed.

As noted on the record at Sandoval's sentencing hearing, the Court determines that "the factors that put upward pressure to keep it in the guideline range overwhelm those factors that put downward pressure, both quantitatively and qualitatively." Tr. at 39:3-6 (Court). The Court has considered carefully the 18 U.S.C. § 3553(a) factors, the Guidelines, the PSR, Sandoval's request for a departure based on U.S.S.G. § 5C1.1, cmt. App. N.10(B), and Sandoval's requests for a variance under which the Court would impose a sentence of probation. In considering the 18 U.S.C. § 3553(a) factors, as outlined above, the Court concludes that a sentence of 15 months, followed by three years of supervised release, is sufficient, without being greater than necessary, to comply with the purposes of punishment set forth in the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1987-2001 (1984), codified as amended at 18 U.S.C. §§ 3551-3586. Moreover, the Court will not depart from the Guidelines range on the basis of U.S.S.G. § 5C1.1, cmt. app. n.10(B), because, as noted above, the Court concludes that Sandoval's Guidelines sentencing range does not overstate the gravity of his offense. In addition, as described above, the Court ultimately disagrees with Sandoval's request for a variance on the basis of his health, because, even taking his condition fully into account, on balance the 18 U.S.C. § 3553(a) factors, and other goals of

sentencing, weigh in favor of a sentence at the low end of the Guidelines range.  In sum, as the Court's statements at the sentencing hearing reflect -- in addition to its analysis in the Memorandum Opinion and Order -- the Court has considered the Guidelines, but in arriving at a sentence, the Court has taken into account not only the Guidelines but other sentencing goals, including the 18 U.S.C. § 3553(a) factors.  See United States v. Martinez-Barragan, 545 F.3d 894, 903 (10th Cir. 2008); United States v. Nunez-Carranza, 83 F.4th 1213, 1222 (10th Cir. 2023).  The Court therefore imposes a sentence of 15 months, followed by three years of supervised release, according to the special conditions on the record at the hearing, see Tr. at 41:2-47:24 (Court), and outlined in the Sentencing Minute Sheet at 1-2, filed February 13, 2024 (Doc. 123).

Last, the Court considers the United States' request for a fine to be imposed on Sandoval. See U.S. Sentencing Memo. at 15.  The Guidelines state that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine."  U.S.S.G. § 5E1.2(a).  The PSR, as Sandoval notes in the Sandoval's Sentencing Memo., shows that Sandoval has "a net worth of *negative* $143,120.00."  Sandoval's Sentencing Memo. at 18 n.8 (emphasis in Sandoval's Sentencing Memo.)(citing PSR ¶ 80 at 16-17).  That information is based, however, only on "[a]n Equifax Credit Report," PSR ¶ 80 at 16, because, at the time the United States Probation Office prepared the PSR, "[t]he defendant ha[d] not yet provided information regarding his monthly income, expenses, or assets," PSR ¶ 78 at 16. The PSR also states, however, that, "[a]t the time of the pretrial services interview in July 2022, the defendant . . . reported a positive monthly cash flow."  PSR ¶ 78 at 16.  Ultimately, the PSR concludes that "a fine is not recommended, as the defendant will be required to pay restitution in the amount of $182,735.10."  PSR ¶ 81 at 17.

Taking these facts into account, along with a careful consideration of the arguments that

the United States and Sandoval presented, the Court concludes, consistent with U.S.S.G. § 5E1.2(e), that it will not impose a fine on Sandoval.  The Court reaches this conclusion because the Court concludes that, given Sandoval's sizable restitution obligation, Sandoval is unable to pay a fine and is not likely to become able to pay a fine.  See U.S.S.G. § 5E1.2.  As stated on the record at the sentencing hearing, the Court orders Sandoval to complete twenty hours of community service during his period of supervised release following incarceration, and this special condition is imposed in lieu of a fine.  See Tr. at 41:6-16 (Court); U.S.S.G. § 5E1.2(e) ("Although any additional sanction not proscribed by the guidelines is permissible, community service is the generally preferable alternative in such instances."); Sentencing Minute Sheet at 1, filed February 13, 2024 (Doc. 123).

In sum, as this Memorandum Opinion and Order describes, the Court concludes: (i) that it will not reconsider its determination of relevant conduct under U.S.S.G. § 1B1.3 for the purpose of calculating the total loss under U.S.S.G. § 2B1.1(b); (ii) that it will not sentence Sandoval to a term of probation, because, in this case, probation would not be sufficient to reflect the factors in 18 U.S.C. § 3553(a) and to comply with the purposes of 18 U.S.C. § 3553(a)(2); (iii) the Court sentences Sandoval to the custody of the Federal Bureau of Prisons for a term of 15 months, followed by three years of supervised release, because a sentence at the bottom of the Guidelines range in this case is sufficient, without being greater than necessary, to comply with the purposes of punishment set forth in the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1987-2001 (1984), codified as amended at 18 U.S.C. §§ 3551-3586; and (iv) based on Sandoval's lack of financial resources, the Court will not impose a fine on Sandoval, but, consistent with U.S.S.G. § 5E1.2(e), the Court will impose -- as a special condition to Sandoval's supervised release -- twenty hours of community service to be completed during Sandoval's term of supervised release.

      **IT IS ORDERED** that: (i) the Defendant James Anthony Sandoval's oral motion for the

Court to reconsider its previous conclusions on relevant conduct for U.S.S.G. § 2B1.1's purposes

is denied; (ii) Sandoval's request for a term of probation in lieu of incarceration, in the Defendant's

Sentencing Memorandum, filed March 16, 2023 (Doc. 108), is denied; (iii) the Plaintiff United

States of America's request for the Court to impose a sentence within the range provided by the

United States Sentencing Guideline Manual, as argued in the United States' Sentencing

Memorandum, filed March 15, 2023 (Doc. 107), is granted; (iv) Sandoval is sentenced to a term

of imprisonment of  15 months, followed by three years of supervised release; and (v) no fine will

be imposed on Sandoval, but the Court will impose -- as a special condition to Sandoval's

supervised release -- twenty hours of community service to be completed during Sandoval's term

of supervised release.

 

 

_____
UNITED STATES DISTRICT JUDGE


*Counsel:*

Alexander M.M. Uballez
  United States Attorney
Kristopher N. Houghton
Raquel Ruiz-Velez
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Paul J. Kennedy
Elizabeth Harrison
Kennedy Hernandez & Harrison, P.C.
Albuquerque, New Mexico

*Attorneys for the Defendant*